UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

```
-----------------------------------------------------------x
                                              :
In re                                         :    Chapter 11 Case No.
                                              :
THE COLONIAL BANCGROUP, INC.,                 :    09-32303 (DHW)
                                              :
              Debtor.                         :
                                              :
-----------------------------------------------------------x
```

# DECLARATION OF SARAH H. MOORE
## IN SUPPORT OF CHAPTER 11 PETITION AND CERTAIN MOTIONS

SARAH H. MOORE, being duly sworn, deposes and states:

1. I am the Chief Financial Officer of The Colonial BancGroup, Inc., a Delaware corporation (the "Debtor").

2. On August 25, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Alabama, Northern Division (the "Chapter 11 Case").

3. I am generally familiar with the Debtor's day-to-day operations, business affairs, and books and records. I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of the Chapter 11 Case and in support of (i) the Debtor's Petition and (ii) the relief as set forth in motions and applications that the Debtor has filed or intends to file with the Court.

4. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with members of each of the Debtor's senior management, my review of relevant documents and information concerning the Debtor's operations and financial affairs, information provided to me from sources I believe to be reliable, and my opinion based upon my

1257662_15

experience and knowledge of the Debtor's operations and financial affairs. If called upon, I could and would testify competently to the facts set forth in this Declaration.

## I. BACKGROUND AND EVENTS LEADING TO THE COMMENCEMENT OF COLONIAL BANKRUPTCY CASE

### A. Organizational Background.

5. The Debtor is a Delaware corporation that was organized in 1974 as a bank holding company under the Bank Holding Company Act of 1956, as amended. The Debtor was originally organized as "Southland Bancorporation," and its name was changed to The Colonial BancGroup, Inc. in 1981. Pursuant to the Gramm-Leach-Bliley Financial Services Modernization Act, the Debtor elected to become a financial holding company.

6. As a bank holding company, the Debtor, through Colonial Bank and other subsidiaries, provided diversified financial services, including retail and commercial banking, wealth management services, and mortgage origination and insurance products to consumers and businesses. The principal activity of the Debtor is to supervise and coordinate the business of its subsidiaries and to provide them with capital and services. A list of all of the Debtor's subsidiaries and joint ventures is attached to this Declaration as Exhibit A.

7. Pursuant to the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994, the Debtor consolidated its various banking subsidiaries into its wholly-owned and principal operating subsidiary, Colonial Bank. Colonial Bank was converted from a national banking association into an Alabama state-chartered, non-member bank on June 10, 2008, and its legal name was changed from "Colonial Bank, N.A." to "Colonial Bank."

8. Prior to the Petition Date, the Debtor and certain of its subsidiaries, including Colonial Bank, filed consolidated federal income tax returns. The Debtor's consolidated tax losses for 2009 are expected to be in excess of $500 million. The Debtor and its subsidiaries suffered consolidated pre-tax losses for fiscal year ending December 31, 2008, of approximately $1.128 billion and consolidated pre-tax losses for the first six months of 2009 of approximately $638 million.

9. On August 14, 2009, Colonial Bank was closed by the Alabama State Banking Department, and the Federal Deposit Insurance Corporation ("FDIC") was appointed as receiver of Colonial Bank. Subsequent to the closure, Branch Banking and Trust Company assumed substantially all of the deposits of Colonial Bank and purchased approximately $22 billion of Colonial Bank's assets in a transaction facilitated by the FDIC.

10. The Debtor's stock was listed on the New York Stock Exchange (the "NYSE"). On August 17, 2009, the NYSE suspended trading in the Debtor's common stock and its other securities. The NYSE determined that the Debtor's securities are no longer suitable for listing on the NYSE due to the closure of Colonial Bank, the Debtor's principal operating subsidiary. The Debtor has filed with the Securities and Exchange Commission ("SEC") a Form 25-NSE to remove its securities from listing and registration from the NYSE.

11. For several days prior to the Petition Date, the FDIC has placed a "hold" on the Debtor's operating account which has prohibited the Debtor from withdrawing or otherwise utilizing any funds in its operating accounts. As a result, checks previously issued by the Debtor have been returned by the drawee bank and the Debtor has been unable to pay lawful expenses in the ordinary course of its business.

12. To assist the Debtor in administering the Chapter 11 Case, the Debtor's board of directors authorized the Debtor's retention of a chief restructuring officer and the hiring of Kevin O'Halloran of Atlanta, Georgia, to fill that position.

13. As a result of the seizure of Colonial Bank by the FDIC, the FDIC's disallowance of use by the Debtor of unpledged cash in its operating accounts, the continued prosecution of civil litigation against the Debtor, the ongoing investigations of the Debtor by federal regulatory authorities, and the recent assessment of substantial, contested tax liabilities against the Debtor by the State of Alabama, all as described in greater detail below, the Debtor determined that it was necessary and appropriate to petition for relief under Chapter 11 of the Bankruptcy Code to preserve its assets for the benefit of all of its creditors.

### B. Summary of Major Assets.

14. The Debtor derived substantially all of its income from dividends received from Colonial Bank. The Debtor's principal asset is the capital stock that it owns in Colonial Bank, and, as a result of the closure of Colonial Bank, the Debtor's remaining tangible assets are substantially less in value than the aggregate of its liabilities.

15. The Debtor's assets include, as of August 14, 2009, cash and pledged funds in the aggregate amount of approximately $36,700,000, consisting of approximately $24,000,000 of funds pledged to secure certain affiliate loans and transactions and approximately $12,700,000 of cash in the Debtor's operating account. As noted above, the FDIC has prohibited the Debtor from using any of the cash in the Debtor's unpledged operating accounts.

16. The Debtor's intangible assets include its investments in its wholly-owned subsidiaries, Colonial Brokerage, Inc., a Delaware corporation, which provides full service and discount brokerage services and investment advice and is a member of, and is regulated by, the Financial Industry Regulatory Authority, and CBG Real Estate LLC, an Alabama limited liability company; and its equity investments in 18 joint ventures and two capital trusts. As of the date of this Declaration and after giving effect to the closure of Colonial Bank, the realizable value of the Debtor's investments in its subsidiaries, joint ventures and capital trusts is not presently capable of an accurate calculation.

17. As the owner of all of the capital stock of Colonial Bank, the Debtor is entitled to net recoveries, if any, following the sale of Colonial Bank's assets by the FDIC. However, at this time, the Debtor does not anticipate that any recovery will be realized.

18. The Debtor may be entitled to refunds of federal and state taxes with respect to prior years' income. The availability and amounts of any such refunds have not been determined at this time.

19. The Debtor's assets may also include claims against various third parties. However, the validity and recoverability of any such claims have not been thoroughly analyzed at this time.

### C. Debtor's Capital Structure - Common Stock.

20. As of August 14, 2009, there were approximately 202,741,587 shares of the Debtor's common stock outstanding. As noted above, all securities of the Debtor have been de-listed from, and are no longer traded on, the NYSE.

### D. Debtor's Capital Structure - Public Debt and Preferred Stock.

21. The Debtor's capital structure is dominated by a preferred equity issuance made in 2003 (7.875% Preferred Securities) and two debt issuances made in 2003 (Floating Rate Junior Subordinated Deferrable Interest Debentures Due 2033) and 2008 (8.875% Subordinated Notes Due 2038), respectively.

22. As of August 14, 2009, the Debtor had approximately $250,000,000 in principal amount of 8.875% Subordinated Notes (the "Subordinated Notes") outstanding pursuant to an Indenture, dated as of March 1, 2008 (the "Indenture"), between the Debtor and The Bank of New York Trust Company, N.A., a national banking association, as trustee. The August 14, 2009 appointment of the FDIC as receiver of Colonial Bank constitutes a triggering event, also termed an "Event of Default," under the Indenture. Under the Indenture, an Event of Default occurs if, among other things, a receiver is appointed for the Debtor or any substantial part of its property, including Colonial Bank. Upon such Event of Default, the principal amount of the Notes arguably becomes immediately due and payable.

23. As of August 14, 2009, the Debtor had approximately $5,155,000 in principal amount of Floating Rate Junior Subordinated Deferrable Interest Debentures Due 2033 (the "Debentures") outstanding pursuant to an Indenture, dated as of March 26, 2003 (the "Indenture"), between the Debtor, as successor in interest to P.C.B. Bancorp, Inc., and U.S. Bank National Association, a national banking association, as trustee. The August 14, 2009 appointment of the FDIC as receiver of Colonial Bank constitutes a triggering event, also termed an "Event of Default," under the Indenture. Under the Indenture, an Event of Default occurs if, among other things, a receiver is appointed for the Debtor or any substantial part of its property, including Colonial Bank. Upon such Event of Default, the principal amount of the Debentures, together with any interest accrued but unpaid, becomes due upon an Event of Default only

after the Debenture Trustee or holders of not less than 25% in aggregate principal amount of the Debentures then outstanding, by notice in writing to the Debtor (and to the Debenture Trustee if given by the holders of the Debentures), declare such principal and accrued interest immediately due and payable.

24. As of August 14, 2009, the Debtor had approximately $103,000,000 in principal amount of 7.875% Preferred Securities (the "Preferred Securities") outstanding pursuant to an Indenture, dated as of March 21, 2002, between the Debtor and The Bank of New York, a New York banking corporation, as trustee, as supplemented by a Second Supplemental Indenture, dated as of September 16, 2003, between the Debtor and such trustee (together, the "Preferred Securities Indenture"). The August 14, 2009 appointment of the FDIC as receiver of Colonial Bank constitutes a triggering event, also termed an "Event of Default," under the Preferred Securities Indenture. Under the Preferred Securities Indenture, an Event of Default occurs if, among other things, a receiver is appointed for the Debtor or any substantial part of its property, including Colonial Bank. Upon such Event of Default, the principal amount of the Preferred Securities, together with any interest accrued but unpaid, arguably becomes due upon an Event of Default only after the trustee or holders of not less than 25% in aggregate principal amount of the Preferred Securities then outstanding, by notice in writing to the Debtor (and to the trustee if given by the holders of the Preferred Securities), declare such principal and accrued interest immediately due and payable.

25. Colonial Bank received notice on August 10, 2009, from the FDIC directing CBG Florida REIT Corp., an indirect subsidiary of Colonial Bank (the "REIT"), to exchange all outstanding shares of its Fixed-to-Floating Rate Perpetual Non-cumulative Preferred Stock, Class A, Series A (the "REIT Preferred Stock") for an equal amount of Fixed-to-Floating Rate Perpetual Non-Cumulative Preferred Stock, Series A of the Debtor (the "BancGroup Preferred Stock") due to the occurrence of an "Exchange Event" under the Exchange Agreement, entered into as of May 21, 2007, among the REIT, Colonial Bank and the Debtor. Among other events, an Exchange Event would occur if the FDIC anticipates Colonial Bank becoming "undercapitalized" in the near term or takes a supervisory action that limits the payment of dividends by Colonial Bank and, in connection therewith, directs an exchange. As of August 11, 2009,

there was $300,000,000 in liquidation amount of REIT Preferred Stock outstanding. The exchange was effective at 8:00 a.m. New York time on August 11, 2009. The holders of the BancGroup Preferred Stock will have no pre-emptive rights with respect to any shares of the Debtor's capital stock or any of its other securities convertible into or carrying rights or options to purchase any such capital stock. The BancGroup Preferred Stock is perpetual and is not convertible into shares of the Debtor's common stock or any other class or series of its capital stock and is not subject to any sinking fund or other obligation for its purchase or retirement.

### E. Debtor's Capital Structure - Other Liabilities.

26. On August 14, 2009, the State of Alabama Department of Revenue entered notices of final assessments of financial institution excise taxes against the Debtor and its subsidiaries and final assessments of business income tax against certain of the Debtor's subsidiaries for certain past years for substantial amounts. The Debtor and its subsidiaries dispute their liability for the assessed taxes and the amounts assessed and are in ongoing discussions with the Alabama Department of Revenue concerning these assessments. Under applicable Alabama law, the respective taxpayers have the right to appeal the final assessments by written notice of appeal within 30 days of the final assessment date.

27. Other debts owed by the Debtor are primarily owed to miscellaneous vendors and professionals, such as attorneys, accountants and consultants, and were incurred in connection with the Debtor's performance of the obligations of a public company, including, but not limited to, preparing filings with the SEC and bank regulatory agencies, assisting in connection with the closure of Colonial Bank and handling various litigation matters.

28. The source of funds for the Debtor to pay holding company expenses, including principal and interest on outstanding indebtedness such as the Subordinated Notes, the Debentures and the Preferred Securities, has been the distribution to the Debtor of funds by Colonial Bank and the Debtor's other subsidiaries. With the closure of Colonial Bank, the primary source of such funds no longer exists.

1257662_15
Case 09-32303    Doc 14    Filed 08/26/09    Entered 08/26/09 14:38:31    Desc Main
Document      Page 7 of 17

### F. Debtor's Benefit Plans.

29. The Debtor has a 401(k) savings plan (the "Savings Plan") that provides certain retirement, death, disability and employment benefits to eligible employees and qualifies as a deferred arrangement under Section 401(k) of the Internal Revenue Code. Participants in the Savings Plan make elective contributions through payroll deduction. Beginning in 2007, the Debtor made matching contributions equal to 100% of the first 6% of employee contributions. During years previous to 2007, the Debtor made matching contributions equal to 50% of the first 6% of employee contributions. During 2006, the Debtor also made a profit-sharing contribution equal to 2.5% of employees' eligible compensation. During 2007 and 2008, there were no additional contributions paid. An employee's interest in the Debtor's contributions becomes 100% vested after five years of service. Participants in the Savings Plan have options as to the investment of their plan funds, one of which includes purchase of the Debtor's common stock. On April 16, 2008, the Debtor's Board of Directors approved the registration of 10,000,000 additional shares of the Debtor's common stock that may be issued under the Savings Plan. On May 5, 2008, the Debtor filed the related registration statement with the SEC registering the new shares.

30. The Debtor has a long-term incentive compensation plan which permits the granting of various types of incentive stock-based awards, including stock options, restricted stock, stock appreciation rights and performance units, all of which were issued only to key employees, officers and directors of the Debtor. A total of 10,000,000 shares of the Debtor's common stock are authorized to be issued under the plan. As of December 31, 2008, 4,000,000 shares remained eligible to be granted under the plan. The terms of the plan stipulate that the exercise price of incentive stock options may not be less than the fair market value of the Debtor's common stock on the date they are granted, and the exercise price of nonqualified stock options may not be less than 85% of the fair market value of the Debtor's common stock on the date of grant. All options expire on the earlier of 10 years from the date of grant, or three months after an employee's termination. Options generally are exercisable on a pro-rata basis over a period of five years. Restricted stock awards typically vest over a five-year period unless they are subject to specific

1257662_15
Case 09-32303    Doc 14    Filed 08/26/09    Entered 08/26/09 14:38:31    Desc Main
Document      Page 8 of 17

performance criteria. During 2008, performance units were issued which have substantially the same terms as the restricted stock awards. There have been no stock appreciation rights granted under the plan.

31. Prior to establishment of the long-term incentive plan that is currently in place, the Debtor had other incentive plans which permitted the granting of various types of stock-based awards. The awards granted under those plans may still be exercised; however, no new awards may be granted. As of December 31, 2008, there were 675,964 stock options still outstanding from those plans.

32. Pursuant to various business combinations, the Debtor has assumed incentive and nonqualified stock options according to the respective exchange ratios described in the respective business combination documentation.

33. In April 2007, the Debtor, upon approval of the stockholders, instituted a compensation plan whereby directors of the Debtor and Colonial Bank were required to receive at least a certain portion of director fees in the form of common stock and could elect to receive additional portions of director fees in common stock. Directors serving on regional or local boards of Colonial Bank could also participate in the plan; however, they were not required to receive a portion of their fees in the form of common stock. Shares earned under the plan for regular fees were issued quarterly, while shares earned for supplemental fees were issued annually. All shares became vested at the end of the respective plan year. The plan also allows for the granting of restricted stock awards which become vested at the end of the director's term. The plan is authorized to issue up to 500,000 shares of common stock, and as of December 31, 2008, had issued 139,801 shares of common stock for director fees and granted 33,015 shares of restricted stock. Prior to the plan that is currently in place, the Debtor had another compensation plan for directors whereby the receipt of fees in the form of common stock was optional, and under which a total of 18,348 shares of common stock were issued for director fees during 2007. During 2008, 81,353 shares of common stock were issued under the plans, representing approximately $853,000 in directors' fees.

34. The Debtor maintains an Employee Stock Purchase Plan which provides employees of the Debtor, who work in excess of 29 hours per week, a means to become shareholders of the Debtor. A

participant could authorize a regular payroll deduction of not less than $10 and not more than 10% of salary. The participant could also contribute whole dollar amounts of not less than $100 or not more than $1,000 each month toward the purchase of the stock at market price. There are 600,000 shares authorized for issuance under this plan. As of December 31, 2008, approximately 132,000 shares remain eligible to be issued.

35. The Debtor and its subsidiaries sponsor a pension plan that covers most employees who have met certain age and length-of-service requirements. The pension plan provides benefits based on final average earnings, covered compensation and years of benefit service. On December 31, 2005, the Debtor closed the pension plan to new employees and set the compensation amount and years of service for the future benefits calculation for participants. Actuarial computations for financial reporting purposes are based on the projected unit credit method. The plan measurement date is December 31. As of December 31, 2008, plan assets included 164,520 shares of the Debtor's common stock.

36. Effective January 1, 2006, the Debtor adopted The Colonial BancGroup, Inc. Non-Qualified Deferred Compensation Plan (the "NQDC Plan") to provide deferred compensation and supplemental retirement income to key senior management or highly compensated employees selected from time to time by the Debtor as eligible to participate in the NQDC Plan. Most of the participants in the NQDC Plan are former employees of Colonial Bank. As of the date of this Declaration, the assets of the NQDC Plan consist of approximately $1,900,000 invested with Charles Schwab & Co., Inc.

    **G.**     **Pending Investigations.**

37. On August 6, 2009, the Debtor was informed by the U.S. Department of Justice that it was the target of a federal criminal investigation relating to the Debtor's mortgage warehouse lending division in Orlando, Florida and related alleged accounting irregularities relating to more than one year's audited financial statements and regulatory financial reporting.

38. Earlier in 2009, the Debtor provided documents to the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP") in response to a subpoena issued by SIGTARP.

39. The SEC has issued subpoenas to the Debtor seeking documents related to, among other things, the Debtor's disclosures related to its participation in the U.S. Treasury Department's Troubled Asset Relief Program and the Debtor's disclosures respecting accounting for loan loss reserves. On June 30, 2009, the SEC issued a formal order of investigation to the Debtor.

### H.     Cease and Desist Orders.

40. On June 3, 2009, Colonial Bank entered into a Stipulation and Consent agreeing to the issuance of an Order to Cease and Desist (the "June 3 Order") with the FDIC and the Alabama State Banking Department (the "Department"). Among other things, the June 3 Order required Colonial Bank to:

- Present a written capital plan to the FDIC and the Department within 60 days of the Order by which Colonial Bank would achieve a Tier I Leverage Capital Ratio of not less than 8 percent and a Total Risk-Based Capital Ratio of not less than 12% by September 30, 2009;

- Formulate and implement a plan to reduce Colonial Bank's risk exposure in classified assets and to reduce assets classified "substandard" in relation to Tier I Capital plus the allowance for loan losses to not more than 100% by December 31, 2009, to not more than 75% by June 30, 2010, to not more than 50 percent by December 31, 2010 and to continue to reduce the volume of such assets after that date;

- Not pay cash dividends without the prior written consent of the FDIC and the Department;

- Neither renew, roll-over nor increase the amount of brokered deposits above the amount outstanding at the date of the June 3 Order without obtaining a waiver from the FDIC; and

- Adopt and implement a written plan for reducing Colonial Bank's reliance on brokered deposits.

41. Effective July 22, 2009, the Debtor consented to the issuance of a Cease and Desist Order (the "July 22 Order") by the Federal Reserve and the Department. The July 22 Order generally provided

1257662_15

Case 09-32303    Doc 14    Filed 08/26/09    Entered 08/26/09 14:38:31    Desc Main
Document    Page 11 of 17

for the development and implementation of actions to ensure that the Debtor's wholly-owned subsidiary, Colonial Bank, complied with its Order to Cease and Desist entered into with the FDIC and the Department effective June 15, 2009, and any other supervisory action taken by Colonial Bank's federal or state regulators. Among other things, the July 22 Order required the Debtor to:

- Present a written capital plan to the Federal Reserve and the Department within 30 days of the July 22 Order by which the Debtor and Colonial Bank would achieve sufficient capital to meet current and future capital requirements, including compliance with the Capital Adequacy Guidelines for Bank Holding Companies and the applicable capital adequacy guidelines for Colonial Bank issued by the FDIC;

- Within 60 days of the July 22 Order, submit to the Federal Reserve and the Department an acceptable written plan for liquidity management at the consolidated organization;

- Within 30 days of the July 22 Order, eliminate (through charge-offs or collection) all assets or portions of assets identified as "loss" that have not been previously collected in full or charged-off; thereafter, the Debtor shall, within 30 days from the receipt of any federal report of inspection, charge off all assets classified or identified as "loss" unless otherwise approved in writing by the Federal Reserve and the Department;

- Within 60 days of the July 22 Order, review and revise as appropriate its consolidated allowance for loan and lease losses methodology to assure that it is consistent with relevant supervisory guidance and shall submit to the Federal Reserve and the Department an acceptable written program to be implemented for determining, documenting, and recording an adequate consolidated allowance for loan and lease losses;

- Not declare or pay dividends without the prior written approval of the Federal Reserve and the Department;

- Not make any distributions of interest, principal, or other sums on subordinated debentures or trust preferred securities without the prior written approval of the Federal Reserve and the Department.

I. **Pending Litigation.**

42. On February 13, 2009, a civil action was filed by Kelly S. Hudson in the Circuit Court of Montgomery County, Alabama, seeking to bring claims derivatively on behalf of the Debtor and its shareholders against the Debtor's executive officers and directors. The complaint is styled <u>Kelly S. Hudson, Derivatively on behalf of The Colonial BancGroup, Inc. v. Robert E. Lowder, Sarah H. Moore, Lewis E. Beville, Augustus K. Clements, III, Robert S. Craft, Patrick F. Dye, Hubert L. Harris, Jr., Clinton O. Holdbrooks, Milton E. McGregor, John C. H. Miller, Jr., Joseph D. Mussafer, William E. Powell, III, James W. Rane, Simuel Sippial, Jr., and Edward V. Welch, Defendants, and The Colonial BancGroup, Inc., Nominal Defendant</u>. The plaintiff alleges, among other things, that each individual defendant "knew, consciously disregarded or was reckless in not knowing the adverse, non-public information about the Debtor's need and application for TARP funds." The plaintiff further claims that the individual defendants caused the Debtor to issue public filings and statements concerning the Debtor's need and application for TARP funds, and defendants' failure to disclose all material information concerning the Debtor's need and application for TARP funding resulted in investors filing suit against the Company in civil class actions alleging various violations of federal securities laws, all of which caused the Debtor to incur substantial costs in defending the lawsuits and in satisfying any adverse judgments or settlements.

43. Subsequent to the filing of the Hudson shareholder derivative complaint, two other shareholder derivative complaints were filed in the same court, making essentially the same allegations. Those civil actions are styled (i) <u>James T. Stewart and Terri Lu Whitten, Derivatively on behalf of The Colonial BancGroup, Inc. v. Robert E. Lowder, Sarah H. Moore, Lewis E. Beville, Augustus K. Clements, III, Robert S. Craft, Patrick F. Dye, Hubert L. Harris, Jr., Clinton O. Holdbrooks, Milton E. McGregor, John C. H. Miller, Jr., Joseph D. Mussafer, William E. Powell, III, James W. Rane, Simuel Sippial, Jr., and</u>

Edward V. Welch, Defendants, and The Colonial BancGroup, Inc., Nominal Defendant, and (ii) Peter Drysdale, Derivatively on behalf of The Colonial BancGroup, Inc. v. Robert E. Lowder, Sarah H. Moore, T. Brent Hicks, Lewis E. Beville, Augustus K. Clements, III, Robert S. Craft, Patrick F. Dye, Hubert L. Harris, Jr., Clinton O. Holdbrooks, John Ed Mathison, Milton E. McGregor, John C. H. Miller, Jr., Joe D. Mussafer, William E. Powell, III, James W. Rane, Simuel Sippial, Jr., and Edward V. Welch, Defendants, and The Colonial BancGroup, Inc., Nominal Defendant. All three shareholder derivative actions have been consolidated in the Circuit Court of Montgomery County, Alabama.

44. On February 9, 2009, a class action complaint was filed in the United States District Court for the Middle District of Alabama against the Debtor and certain of its directors and senior officers. The complaint asserts violations of federal securities laws by reason of the defendants' alleged knowing or reckless making of material misrepresentations concerning the Debtor's participation in the federal government's Troubled Asset Relief Program. The complaint is styled Earl and Patricia Dees, individually and on behalf of all others similarly situated v. Colonial BancGroup, Inc., Robert E. Lowder, Sarah H. Moore and T. Brent Hicks. Plaintiffs further allege that the class purchased publicly traded securities of the Debtor during the period December 2, 2008 through January 27, 2009, inclusive, and were damaged thereby.

45. Subsequent to filing of the Dees class action complaint, as described above, class action complaints styled (a) James J. McLaughlin, individually and on behalf of all others similarly situated v. Colonial BancGroup, Inc., et al.; Robert C. Newman, individually and on behalf of all others similarly situated v. Colonial BancGroup, Inc., et al.; Craig Bozeman, individually and on behalf of all others similarly situated v. The Colonial BancGroup, Inc., et al.; Donald R. Myrick, individually and on behalf of all others similarly situated v. The Colonial BancGroup, Inc., et al.; Eric Crowley and Danny Ray Price, individually and on behalf of all other similarly situated v. The Colonial BancGroup, Inc. et al.; and (b) Robin Reynolds, individually and on behalf of all others similarly situated v. Colonial BancGroup, Inc., et al. were also filed in the United States District Court for the Middle District of Alabama. In addition to

claims regarding the TARP participation and associated alleged misconduct, these (now consolidated) class actions also assert causes of action for alleged issuance of materially false and misleading statements regarding the Debtor's business and operating results; the Debtor's alleged failure to properly account for its troubled loan portfolio and goodwill; the Debtor's alleged failure to reserve adequately for mortgage related exposure and failure to write down impaired goodwill, causing its balance sheet and financial results to be artificially inflated; and the Debtor's alleged failure to disclose that its exposure to troubled assets extended beyond its residential construction portfolio.

46. On or about June 22, 2009, a consolidated class action complaint styled In Re: Colonial BancGroup, Inc. Securities Litigation, was filed against the Debtor and certain individual defendants in the United States District Court for the Middle District of Alabama. In it, the plaintiffs allege that the Debtor represented to investors that it practiced conservative credit risk management that differentiated from its peers, when, in reality, it pursued a high risk, high growth lending strategy with respect to its commercial construction loan portfolios, which ultimately led to increased loan defaults and brought the company to the brink of bankruptcy; originated so-called "subprime" residential mortgage loans to borrowers with low credit ratings despite the Debtor's alleged public statements to the contrary; and misrepresented that it had been preliminarily approved for $550 million in bailout funds distributed through the United States Treasury Department's Troubled Asset Relief Program. Plaintiffs seek certification of the class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all those persons or entities who purchased or acquired the securities of the Debtor between April 18, 2007 and January 27, 2009, inclusive, and who were allegedly damaged thereby.

47. On or about August 14, 2009, SunTx Capital II Management Corp. d/b/a SunTx Capital Partners filed a complaint against the Debtor and Colonial Bank in the United States District Court for the Northern District of Texas, Dallas Division. Styled SunTx Capital II Management Corp. d/b/a SunTx Capital Partners v. The Colonial BancGroup, Inc. and Colonial Bank, N.A., the suit alleges that the Debtor has failed to pay to the plaintiff a $4,000,000 breakup fee and certain transaction expenses incurred by the

plaintiff in connection with a letter agreement dated January 27, 2009, with respect to the plaintiff's proposed purchase of contingent convertible preferred stock in the Debtor.

48. On information and belief, a complaint was filed against the Debtor on or about August 20, 2009, in the United States District Court for the Middle District of Alabama, alleging violations of the Employee Retirement Income Security Act of 1974 with respect to the Debtor's 401(k) plan for employees. The Debtor has not been served with the complaint and, therefore, does not know the full nature of the claims asserted and relief requested.

49. On information and belief, the Debtor and Colonial Bank are named as defendants in a class action complaint recently filed in United States District Court for the District of Nevada in a case styled <u>Don Anderson, individually and all others similarly situated v. The Colonial BancGroup, Inc. and Colonial Bank</u>. The complaint appears to allege violations by the defendants of the Electronic Fund Transfer Act and seeks unspecified monetary relief. The Debtor has not yet been served with the complaint and has not had an opportunity to review with counsel the allegations therein.

50. The Debtor and certain of its subsidiaries have been named as defendants in other currently pending litigation or arbitrations that have arisen in the ordinary course of the conduct of their businesses, ranging from slip and fall claims to condemnation proceedings, in various stages of proceedings.

51. The Debtor is defending each of the cases filed against it. The Debtor's exposure, if any, to an award of damages in such cases is not susceptible to accurate determination at this time. The Debtor believes that all the litigation against it is stayed by the filing of the Chapter 11 Case unless and until otherwise ordered by the Court.

Executed on August 26, 2009, in Montgomery, Alabama.

/s/_____
SARAH H. MOORE
Chief Financial Officer

# EXHIBIT A

## LIST OF SUBSIDIARIES OF THE DEBTOR

Colonial Bank, an Alabama state-chartered non-member bank

Colonial Brokerage, Inc., a Delaware Corporation

Colonial Capital Trust IV, a Delaware Business Trust

P.C.B. Statutory Trust II, a Connecticut Business Trust

CBG Real Estate, LLC, an Alabama Limited Liability Company (100% owned subsidiary)

Colonial Crabapple, LLC, a Georgia Limited Liability Company (60% owned subsidiary)

Crabapple White Columns Development, LLC, a Georgia Limited Liability Company (40% owned subsidiary)

CB Habersham, LLC, a Georgia Limited Liability Company (45% owned subsidiary)

CB Habersham II, LLC, a Georgia Limited Liability Company (45% owned subsidiary)

CB Dogwood, LLC, a Georgia Limited Liability Company (45% owned subsidiary)

Colonial Deerfield, LLC, a Georgia Limited Liability Company (60% owned subsidiary)

CD Lake Deerfield, LLC, a Georgia Limited Liability Company (75% owned subsidiary)

Colonial Mead, LLC, a Georgia Limited Liability Company (60% owned subsidiary)

Lake Avenue Associates, LLC, a Georgia Limited Liability Company (60% owned subsidiary)

CD Peachtree Corners, LLC, a Georgia Limited Liability Company (50% owned subsidiary)

Peachtree Hills Place, LLC, a Georgia Limited Liability Company (18.75% owned subsidiary)

MCOL Development Three, L.P., a Georgia Limited Partnership (80% owned subsidiary)

MCOL Development Four, L.P., a Georgia Limited Partnership (80% owned subsidiary)

BP Hwy 10 San Antonio, Ltd, a Texas Limited Partnership (50% owned subsidiary)

BP 395 Nashville, Ltd, a Texas Limited Partnership (45% owned subsidiary)

Denton 1385 Partners, L.P., a Texas Limited Partnership (50% owned subsidiary)