# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| *In re:* | Chapter 11 |
| THE COLONIAL BANCGROUP, INC., | Case No. 09-32303(DHW) |
| Debtor. | |

## MOTION OF THE FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR COLONIAL BANK, MONTGOMERY, ALABAMA, FOR AN ORDER (A) TO REQUIRE CURE OF DEFICIENCIES UNDER 11 U.S.C. § 365(o) OR (B) CONVERTING DEBTOR'S BANKRUPTCY CASE TO A LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

Pursuant to section 365(o) of title 11 of the Untied States Code (the "Bankruptcy Code"), the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as receiver ("FDIC-Receiver") for Colonial Bank, Montgomery, Alabama ("Colonial Bank"), respectfully submits this motion (the "Motion") for an order (a) requiring the debtor and debtor in possession Colonial BancGroup, Inc. (the "Debtor" or "Colonial BancGroup") to immediately cure all outstanding deficiencies under its commitment to maintain the capital of Colonial Bank or (b) in the alternative, converting the Debtor's chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In support of the Motion, the FDIC-Receiver respectfully states:

## PRELIMINARY STATEMENT

The Debtor, Colonial BancGroup, was a regulated bank holding company that owned Colonial Bank, a depository institution that was insured by the FDIC. The Colonial Bank receivership – the largest United States bank failure in 2009 – will cost the FDIC's Deposit Insurance Fund an estimated $2.8 billion. Only days before the receivership, Colonial Bank's holding company, the Debtor in this case, disclosed that it was a target of a federal criminal

investigation into accounting irregularities and other alleged misconduct. These facts provide the appropriate lens in which to view this bankruptcy case, an attempt by a failed holding company to avoid its obligations to the underlying Colonial Bank creditors, as represented by the FDIC-Receiver.

In January 2009, the Debtor entered into an express written agreement with the Federal Reserve Bank of Atlanta and the Alabama State Banking Department under which the holding company agreed "to utilize its financial . . . resources" to ensure that Colonial Bank complied with its own memorandum of understanding with bank regulators. Under these capital maintenance commitments, Colonial Bank agreed to raise its Tier 1 Leverage Capital Ratio to specified levels and its holding company – the Debtor here – agreed to use its financial resources to ensure that happened.

As of Colonial Bank's most recent quarterly call report, its Tier 1 Leverage Capital was over $1 billion less than agreed. There is no dispute that the Debtor has never cured this deficit. Under Bankruptcy Code section 365(o), a debtor in a chapter 11 case "shall be deemed to have assumed . . . and *shall immediately cure* any deficit under, any commitment by the debtor to a Federal depository institutions regulatory agency . . . to maintain the capital of an insured depository institution . . . ." 11 U.S.C. § 365(o) (emphasis added). This provision imposes a condition to obtaining relief under chapter 11 of the Bankruptcy Code. If a debtor fails or refuses to immediately cure deficiencies under such a capital maintenance commitment, then it is not entitled to proceed under chapter 11 and its bankruptcy case is to be converted to a liquidation under chapter 7 of the Bankruptcy Code.

Although it is a condition to the Debtor's entitlement to protection under chapter 11, to date the Debtor has made no effort to cure the outstanding deficit under its capital maintenance

commitment. By this Motion, the FDIC-Receiver seeks an order pursuant to Bankruptcy Code section 365(o) directing the Debtor to immediately cure the outstanding deficits under its capital maintenance commitment, namely, immediately paying $1,003,972,000.00 (the "Cure Amount") to the FDIC-Receiver. If the Debtor fails or is unable to make that payment "immediately," as required by the Bankruptcy Code, then this bankruptcy case must be converted to a liquidation under chapter 7 of the Bankruptcy Code.

## JURISDICTION AND VENUE

1. Under 12 U.S.C. § 1821(j), "no court may take any action . . . to restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver." Section 1821(j) "effect[s] a sweeping ouster of courts' power to grant equitable remedies" that would frustrate the FDIC's exercise of its statutory powers as receiver or conservator. *Freeman v. F.D.I.C.*, 56 F.3d 1394, 1399 (D.C. Cir. 1995); *see RPM Investments, Inc. v. R.T.C.*, 75 F.3d 618, 622 (11th Cir. 1996) (*per curiam*). The FDIC-Receiver reserves all of its jurisdictional arguments, under section 1821(j) or otherwise. *See also* 12 U.S.C. § 1821(d)(13)(D) (in connection with statutory provisions setting forth receivership claims process, providing that "no court shall have jurisdiction" over specified claims or actions).

2. Subject to the foregoing, subject matter jurisdiction for the Motion arises under 28 U.S.C. § 1334. The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for the Motion is proper in this district under 28 U.S.C. § 1409. *But see* 12 U.S.C. § 1821(d)(6)(A) (specifying limited federal district court jurisdiction over cases concerning receivership claims process).

## BACKGROUND

A. <u>The Debtor and the Colonial Bank Receivership.</u>

2. By order of the Alabama State Banking Department dated August 14, 2009, Colonial Bank was closed and the FDIC-Receiver was appointed as its receiver. By operation of law, the FDIC-Receiver succeeded to "all rights, titles, powers, and privileges of [Colonial Bank] and of any stockholder, member, accountholder, depositor, officer or director of [Colonial Bank] with respect to the institution and the assets of the institution." 12 U.S.C. § 1821(d)(2)(A). After its appointment, the FDIC-Receiver entered into a Purchase and Assumption Agreement with Branch Banking & Trust Company ("<u>BB&T</u>"), under which BB&T purchased certain assets and assumed certain liabilities of Colonial Bank from the FDIC-Receiver (the "<u>P&A Agreement</u>").

3. The Debtor was a bank holding company that owned Colonial Bank until its receivership. On August 25, 2009, the Debtor filed a voluntary petition in this Court under chapter 11 of the Bankruptcy Code. The Debtor continues as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code but currently has no business operations or reasonable prospects of generating future revenue or reorganizing. No trustee or examiner has been appointed. On September 28, 2009, the Court entered an order appointing a committee of unsecured creditors. [D.I. 130]

B. <u>The Debtor's Capital Maintenance Commitment.</u>

4. On January 21, 2009, the board of directors of Colonial BancGroup entered into a Memorandum of Understanding with the Federal Reserve Bank of Atlanta and the Alabama State Banking Department under which the holding company's board agreed, on behalf of Colonial BancGroup, to a number of measures related to the financial soundness of its subsidiary

Colonial Bank. *See* Rich Decl., Exh. C.[1] First among these was the holding company's commitment (the "Capital Maintenance Commitment") to "utilize its financial and managerial resources to assist its subsidiary bank in addressing weaknesses identified by its primary banking supervisors and achieving/maintaining compliance with [Colonial Bank's] December 15, 2008 Memorandum of Understanding with" the FDIC and the Alabama State Banking Department. *See id.* ¶ 1. The board of directors of Colonial Bank, in turn, had agreed in the bank's own Memorandum of Understanding with bank regulators that by no later than February 28, 2009, Colonial Bank would bring its Tier I Leverage Capital Ratio to a level of not less than 8 percent and its Total Risk-Based Capital Ratio to a level of not less than 12 percent. *See* Rich Decl., Exh. B, ¶ 14.

5. Both Colonial Bank and Colonial BancGroup failed to meet their obligations under their respective regulatory agreements. As a result, on June 15, 2009, Colonial Bank consented to the entry of a cease and desist order by the FDIC and the Alabama Superintendent of Banks under which Colonial Bank again agreed to raise its Tier 1 Leverage Capital Ratio to not less than 8 percent and its Total Risk-Based Capital Ratio to not less than 12 percent. *See* Rich Decl., Exh. D, at 6-7. On the same date, Colonial BancGroup consented to a similar cease and desist order by the Board of Governors of the Federal Reserve System and the Alabama State Banking Department in which Colonial BancGroup agreed, among other things, to "take appropriate steps to ensure that the [Colonial Bank] complies with the Cease and Desist Order, and any other supervisory action taken by [Colonial Bank's] federal or state regulators." Rich Decl., Exh. E, ¶ 1.

---

[1] Citations to "Rich Decl." refer to the Declaration of Timothy D. Rich dated October 5, 2009. [D.I. 156]

6. As of June 30, 2009, the date of Colonial Bank's last quarterly Call Report, its Tier I Leverage Capital Ratio was 4.18%, far below the 8% required under its Memorandum of Understanding. This was a substantial decline from its inadequate capital at the end of the previous quarter, March 31, 2009, when its Tier I Leverage Capital Ratio was 5.54%. *See* Rich Decl., Exh. F at 2.

7. Translated into dollars, the shortfall from the capital level that Colonial Bank had agreed in its Memorandum of Understanding to achieve by no later than February 28, 2009 was $669,676,120 as of March 31, 2009 and $1,003,972,000 as of June 30, 2009.[2] Undoubtedly, the amount of the capital shortfall would have been substantially higher as of the next quarter-end, September 30, 2009, had Colonial Bank filed a Call Report for that date.

8. Colonial BancGroup made its own commitment to use its financial resources to ensure that Colonial Bank met these capital obligations. Accordingly, the Debtor has an uncured deficit under its capital maintenance commitment of no less than the Cure Amount, $1,003,972,000, and in all likelihood substantially more. Pursuant to Bankruptcy Code section 365(o), the Debtor was deemed to have assumed its capital maintenance commitment as a condition to entering chapter 11 and is required to immediately cure this deficit. Further, the FDIC-Receiver's claim for these amounts is entitled to administrative priority under Bankruptcy Code section 507(a)(9).

---

[2] The shortfall is readily calculable from statistics provided in Colonial Bank's Uniform Bank Performance Report, which is a publicly available financial report of statistics and data included in Colonial Bank's quarterly Call Reports. *See* Rich Decl., Exh. F. The amount of capital required to meet the agreed 8% Tier I leverage capital ratio is determined by multiplying the bank's total assets by .08. The shortfall from this agreed capital level is then determined by subtracting Colonial Bank's reported Tier I leverage capital from the product of this equation. For June 30, 2009, the calculation is as follows: ($26,210,000,000 * 0.08) = $2,096,800,000 - $1,092,828,000 = $1,003,972,000.

C.  The Bankruptcy Case.

9. On August 25, 2009 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for bankruptcy under chapter 11 of the Bankruptcy Code.

10. The Debtor continues to operate its business as a debtor and debtor in possession.

11. The Office of the United States Trustee has appointed a committee of unsecured creditors (the "Committee") in these cases. No trustee or examiner has been appointed.

**RELIEF REQUESTED**

12. The FDIC-Receiver therefore seeks an order pursuant to Bankruptcy Code section 365(o) (a) that requires the Debtor to immediately cure all outstanding deficiencies under the Capital Maintenance Commitment by immediately paying the Cure Amount to the FDIC-Receiver, (b) in the event that the Debtor is unable or unwilling to pay this amount "immediately," as required by the Bankruptcy Court, that allows the Cure Amount as priority claims pursuant to Bankruptcy Code section 507(a)(9) and converts the Debtor's chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. The FDIC-Receiver respectfully submits that, due to the overlapping factual issues, that this Motion be heard in conjunction with the lift stay motion filed by the FDIC-Receiver, which is currently scheduled for December 9, 2009.

**BASIS FOR THE REQUESTED RELIEF**

**I. The Debtor Was Deemed to Have Assumed and Is Required to "Immediately" Cure All Deficits Under the Capital Maintenance Commitment Upon Filing.**

13. The Capital Maintenance Commitment undertaken by the Debtor constitutes an enforceable capital maintenance commitment within the meaning of Bankruptcy Code section 365(o). *See* 11 U.S.C. § 365(o). Section 365(o) provides in pertinent part:

> [i]n a case under chapter 11 of this title, the trustee *shall be deemed to have assumed* (consistent with the debtor's other obligations under

> section 507), and *shall immediately cure any* deficit under, *any commitment* by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution, and any claim for a subsequent breach of the obligations thereunder shall be entitled to priority under section 507.

11 U.S.C. § 365(o) (emphasis added).

14. Congress was unambiguous and unequivocal in its use of the word "any" in describing the types of capital maintenance commitments Bankruptcy Code section 365(o). The word "any" as used in section 365(o) has universal scope and connotes "every" commitment. *Bollman Hat. Co. v. Root*, 112 F.3d 113, 116 (3d Cir.), cert. denied, 118 S.Ct. 373 (1997) (citing Black's Law Dictionary 94 (6th ed. 1990)); *R.T.C. v. FirstCorp, Inc. (In re FirstCorp., Inc.)*, 973 F.2d 243, 247 (4th Cir. 1992). The common definition of "commitment" is an "[a]greement or pledge to do something." *FirstCorp*, 973 F.2d at 249 n.5 (quoting Black's Law Dictionary 248 (5th ed. 1979)).

15. Congress intentionally cast a wide net to ensure that bank or thrift holding companies such as the Debtor could not use chapter 11 bankruptcy proceedings "to evade commitments to maintain capital reserve requirements of a Federally insured depository institution." H.R. Rep. No. 681(I) (1990), *reprinted in* 1990 U.S.C.C.A.N. 6472, 6585 (stating the purpose of section 365(o)); *see Wolkowitz v. F.D.I.C. (In re Imperial Credit Indus., Inc.)*, 527 F.3d 959, 973 (9th Cir. 2008) (same); *O.T.S. v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.)*, 236 F.3d 1246, 1251 (10th Cir. 2001) (same); *First Corp.*, 973 F.2d at 246 (same).

16. As the courts have recognized repeatedly, "[t]he meaning and function of § 365(o) is plain from its language: in every Chapter 11 case, the trustee-or, as here, the debtor-in-possession, 'shall be deemed to have assumed' any capital maintenance commitment made by the debtor, and if a deficit under such a commitment arises, he '*shall immediately cure [it]*'."

EAST\42571460.3   8
Case 09-32303   Doc 257   Filed 11/05/09   Entered 11/05/09 16:43:45   Desc Main
Document    Page 8 of 18

*FirstCorp.*, 973 F.2d at 247 (emphasis added). In section 365(o), Congress "place[d] the financial interests of the federal deposit insurance system ahead of that of the holding company and its creditors. *See id.* at 248.

17.     The commitment made by the Debtor to its regulators in this instance constitutes a capital maintenance commitment that is subject to the strict requirements of section 365(o). *See Overland Park*, 236 F.3d at 1252-53. In *Overland Park*, the debtor holding company challenged the application of section 365(o), arguing that the informal net worth stipulation that it had entered into with the OTS there was not an "enforceable contract" and could not constitute a capital maintenance commitment. The Tenth Circuit disagreed, concluding that the argument reflected a "strained reading" of section 365(o).

18.     Based on the language of the statute itself, the court held, "it is apparent that nowhere in 11 U.S.C. § 365(o) does Congress mention the commitment must be contractual, executory, formal, or post 1984. . . . It is well recognized by this circuit that in drafting legislation, we assume Congress says what it means." *Id.* at 1252 (citation omitted). Since section 365(o) applies to "any" commitment to maintain the capital of an insured depository institution, the Tenth Circuit concluded, the section plainly reached the informal stipulation at issue. *Id.*

19.     Equally of note, the *Overland Park* court observed that if the debtor holding company had not made the commitment to bank regulators that was at issue, it would not have been permitted by regulators to acquire the thrift subsidiary to which the commitment applied, and the holding company therefore would not have "had the privilege of operating Overland Savings & Loan from 1979 to 1992." *Id.* at 1253. In this case, of course, Colonial BancGroup already owned Colonial Bank, but its agreement to the Capital Maintenance Commitment

resulted in a direct benefit – its ability to continue in business as a bank holding company rather than having its bank subsidiary closed by its regulators.

20. Upon the filing of the Debtor's chapter 11 petition, the Debtor was deemed to have assumed all of its outstanding obligations under the Capital Maintenance Commitment. 11 U.S.C. § 365(o) (debtor "shall be deemed to have assumed" any capital maintenance commitment) (emphasis added). The "assumption and obligation to cure occur by operation of law, without review by or approval of the bankruptcy court." *FirstCorp.*, 973 F.2d at 247; *see also In re Mirant Corp.*, 378 F.3d 511, 521 (5th Cir. 2004) (noting that section 365(o) requires a debtor "to assume 'any commitment by the debtor to a Federal depository institutions regulatory agency . . . to maintain the capital of an insured depository institution'.").

21. The "assumption and cure" mechanism of section 365(o) "has been interpreted to require a trustee to immediately pay any deficit to a federal depository institution as a condition of remaining in Chapter 11." *Imperial Credit*, 527 F.3d at 973; *see also Overland Park*, 236 F.3d at 1253 (same); *FirstCorp.*, 973 F.2d at 247 ("the obligation to cure attaches 'immediately' i.e., 'without lapse of time; without delay; instantly; at once'").

22. The Debtor has failed to meet its obligations under the Capital Maintenance Commitment, resulting, ultimately, in the regulatory closure of Colonial Bank. Indeed, because of the Debtor's failure to honor its Capital Maintenance Commitment, it was required to enter into a subsequent cease and desist order with its regulators reiterating the commitment. *See* Rich Decl., Exh. E, ¶ 1.

23. As of its last quarterly reporting date on June 30, 2009, Colonial Bank's capital was roughly $1 billion below the amount necessary to be in compliance with this agreement and had a Tier 1 Leverage Capital Ratio of less than half that required under the Capital Maintenance

Commitment. *See supra* at 5 n.2. While the precise shortfall under the Capital Maintenance Commitment immediately prior to the Petition Date is currently unavailable, the deficit undoubtedly increased between June 30, 2009 and the Petition Date, consistent with the trend from the previous quarters.[3] *See* Rich Decl., Exh. F.

24.     To the extent the Debtor has failed to meet its obligation to provide capital support to Colonial Bank pursuant to the terms of the Capital Maintenance Commitment, the Debtor continues to be in violation of its obligation. *First Corp.*, 973 F.2d at 247; *see also Mirant Corp.*, 378 F.3d at 521 (noting in dicta that section 365(o) requires a debtor "to assume 'any commitment by the debtor to a Federal depository institutions regulatory agency . . . to maintain the capital of an insured depository institution'").

25.     Congress enacted Bankruptcy Code section 365(o) to prevent precisely this type of windfall to a debtor holding company that has committed to, but failed to support its banking subsidiaries' capital needs, at the expense of the federal deposit insurance system. H.R. Rep. No. 681(I) (1990), *reprinted in* 1990 U.S.C.C.A.N. 6472, 6585 (stating the purpose of section 365(o)); *see Imperial Credit*, 527 F.3d at 973 (quoting same); *Overland*, 236 F.3d at 1251 (same); *First Corp.*, 973 F.2d at 246 (same).

26.     Section 365(o) requires the Debtor to cure its Capital Maintenance Commitment "immediately" by paying the amount of the outstanding deficit to the FDIC-Receiver. This Court therefore should enter an order directing the Debtor to immediately cure any outstanding

---

[3] While the FDIC-Receiver believes the exact amount of the deficit on the Petition Date is irrelevant, given the substantial difference between any reasonable estimate and the funds available to the Debtor for immediate cure, upon request the FDIC-Receiver respectfully reserves the right to establish the precise amount of such deficit upon request by the Court.

deficit under the Capital Maintenance Commitment, namely, immediately paying the Cure Amount to the FDIC-Receiver.

## II. If the Debtor Cannot Cure, the Debtor's Bankruptcy Case Must Be Converted to a Chapter 7 Liquidation.

27. If the Debtor will not or cannot "immediately" cure such a deficit, then its bankruptcy case must be converted into a chapter 7 liquidation. *See Imperial Credit*, 527 F.3d at 975 ("A debtor with an uncured maintenance obligation to a federal depository institution cannot reorganize under Chapter 11 unless it first cures its deficit and it can avoid the immediate cure obligation only by liquidating under Chapter 7."); *Overland Park*, 236 F.3d at 1253 ("[W]e hold [that] before a debtor may proceed with Chapter 11, and acquire Chapter 11 protection, the debtor's commitment to assume and cure its capital deficit must be satisfied."); *FirstCorp.*, 973 F.2d at 247 (same).

28. As the courts have recognized, a bank holding company such as the Debtor "cannot use a chapter 11 reorganization to jettison [its thrift] subsidiary in an effort to enhance its own financial position and that of its creditors." *FirstCorp.*, 973 F.2d at 248. In effect, section "365(o) places the financial interest of the federal deposit insurance system ahead of that of the holding company." *Id.*

29. The plain language of the statue and the policy of section 365(o) expressed in its legislative history make clear that Congress explicitly barred holding companies which cannot immediately live up to their commitments to regulatory agencies such as the FDIC from continuing as a debtor in possession under chapter 11 of the Bankruptcy Code, either to pursue reorganization or liquidation.

30. In the context of a chapter 7 liquidation, the Cure Amount constitutes a priority claim under Bankruptcy Code section 507(a)(9), which provides:

> Ninth, allowed unsecured claims based upon any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution.

11 U.S.C. § 507(a)(9).

31. Since the Petition Date, the Debtor and the Committee, and their respective professionals have sought to spend approximately $1.425 million, of which approximately $1.2 million is designated for payment to attorneys, advisors and a "Chief Restructuring Officer" to liquidate a non-operating entity. Upon information and belief, the Debtor and Committee (and their professionals) will likely seek additional use of certain after-acquired cash for professional fees. The FDIC-Receiver respectfully submits that these amounts are excessive in light of the fact that this is a liquidation of a non-operating entity without substantial assets. This case could be handled more efficiently, and much more cheaply, as a Chapter 7 liquidation.

32. Accordingly, if the Debtor is unwilling or unable to make arrangements to immediately pay the FDIC-Receiver the Cure Amount, then pursuant to Bankruptcy Code section 365(o), the FDIC-Receiver respectfully requests entry of an order allowing the Cure Amount and converting the Debtor's bankruptcy case to a case under chapter 7 of the Bankruptcy Code.

### NO PRIOR REQUEST

33. No previous motion for the relief requested herein has been made to this or any other Court.

**WHEREFORE**, the FDIC-Receiver respectfully requests that this Court enter an order, substantially in the form attached hereto as Exhibit A: (i) directing the Debtor to immediately pay the Cure Amount to the FDIC-Receiver, or in the alternative, immediately converting

Debtor's bankruptcy case to a liquidation under chapter 7 of the Bankruptcy Code; and (ii) granting such other relief as is just and proper.

Dated: Montgomery, Alabama
November 5, 2009

Respectfully submitted,

/s/ Michael A. Fritz, Sr.
Michael A. Fritz, Sr.
Fritz & Hughes LLC
7020 Fain Park Drive Suite 1
Montgomery, AL 36117
T: (334) 215-4422

- and –

Thomas R. Califano
John. J. Clarke, Jr.
Jeremy R. Johnson
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
T: (212) 335-4500
F: (212) 335-4501

*Attorneys for the
Federal Deposit Insurance Corporation
as Receiver for Colonial Bank*

**Exhibit A**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| *In re:* | Chapter 11 |
| THE COLONIAL BANCGROUP, INC., | Case No. 09-32303(DHW) |
| Debtor. | |

**ORDER GRANTING MOTION OF FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER, TO REQUIRE DEBTOR'S <u>CURE OF DEFICIENCIES UNDER 11 U.S.C. § 365(o)</u>**

This matter coming before the Court on motion (the "<u>Motion</u>") of the Federal Deposit Insurance Corporation, as Receiver for Colonial Bank, Montgomery, Alabama (the "<u>FDIC-Receiver</u>"), to (a) require cure of deficiencies under section 365(o) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") by the above-captioned debtor and debtor in possession (the "<u>Debtor</u>"), or (b) converting the Debtor's bankruptcy case to a liquidation under chapter 7 of the Bankruptcy Code;[4] and the Court having reviewed the Motion and having heard the statements of counsel regarding the relief requested in the Motion at a hearing on the Motion (the "<u>Hearing</u>"); the Court finding that (a) the Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (c) venue of these chapter 11 cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and (d) notice of the Motion and the Hearing was properly served; the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein;

---

[4] All capitalized terms used but not otherwise defined herein shall have the meanings given them in the Motion.

**NOW THEREFORE, IT IS ORDERED:**

1. The Motion of the FDIC-Receiver is GRANTED.

2. The Court finds that the Capital Maintenance Commitment constituted a capital maintenance commitment within the meaning of Bankruptcy Code section 365(o). Accordingly, the Debtor was deemed to have assumed that commitment as a condition to obtaining relief under chapter 11 of the Bankruptcy Code and is obligated to immediately cure any deficits that exist thereunder.

3. Under the Capital Maintenance Commitment, among other things, the Debtor agreed to use its financial and managerial resources to bring and maintain Tier 1 Leverage Capital Ratio to a level of not less than 8% and its Total Risk-Based Capital Ratio to a level of not less than 12% at Colonial Bank.

4. Pursuant to its Capital Maintenance Commitment and in accordance with Bankruptcy Code section 365(o) of the Bankruptcy Code, the Debtor shall immediately take all actions necessary to immediately pay $1,003,972,000.00 (the "<u>Cure Amount</u>") to the FDIC-Receiver in immediately available funds. The Cure Amount is an allowed priority claim pursuant to Bankruptcy Code section 507(a)(9) Such actions shall not violate the automatic stay provided under Bankruptcy Code section 362.

5. In accordance with the foregoing, the Debtor, FDIC-Receiver and all persons and entities who receive actual notice of this Order, are hereby ordered to take any and all necessary, proper and/or advisable actions necessary to effectuate the payment of the Cure Amount.

6. In the event that the Debtor fails or is unable to pay the Cure Amount within ten (10) business days from entry of this order, the Court shall enter an order converting the Debtor's

chapter 11 case to a liquidation under chapter 7 of the Bankruptcy Code and granting related relief within twenty (20) days of entry of this Order pursuant to Bankruptcy Code section 365(o).

7. This Court will retain jurisdiction to address all disputes related to the interpretation or enforcement of this Order.

**SO ORDERED** this ___ day of _____, 2009.

_____
United States Bankruptcy Judge