UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

---------------------------------------------------------x
:
In re                                        :          Chapter 11
:
THE COLONIAL BANCGROUP, INC.,                :          Case No.  09-32303 (DHW)
:
Debtor.                                :
:
---------------------------------------------------------x
:
:
FEDERAL DEPOSIT INSURANCE                    :
CORPORATION, as Receiver for                 :
COLONIAL BANK,                               :
:
Movant,                                :
:
v.                                           :          CONTESTED MATTER
:
THE COLONIAL BANCGROUP, INC,                 :
:
Respondent.                            :
:
---------------------------------------------------------x

BRIEF IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT OF THE COLONIAL BANCGROUP, INC.

A.      Introduction

On October 5, 2009, the Federal Deposit Insurance Corporation, in its capacity as receiver for Colonial Bank (in such capacity, the "FDIC-Receiver"), filed an *Emergency Motion of the Federal Deposit Insurance Corporation, as Receiver for Colonial Bank, for an Order Modifying the Automatic Stay* [Doc. No. 156] (the "Stay Relief Motion"). The FDIC-Receiver seeks to modify the automatic stay to allow setoff of alleged Colonial Bank claims against balances in the Debtor's bank accounts at Branch Banking and Trust Company ("BB&T").

Pursuant to Rules 7056 and 9014(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 56 of the Federal Rules of Civil Procedure (the "Federal Rules"), The Colonial BancGroup, Inc. (the "Debtor") moves for entry of summary judgment against the FDIC-Receiver on the grounds that, based upon the undisputed material facts and for the reasons hereinafter set forth, the FDIC-Receiver is unable, as a matter of law, to establish a *prima facie* case in support of the Stay Relief Motion and the Debtor is entitled to judgment in its favor as a matter of law.

In support of this Motion, the Debtor relies upon the documents submitted in the Debtor's Appendix of Documents in Support of Motion for Summary Judgment, which documents include the following: (a) the document which the FDIC-Receiver identifies as the Purchase and Assumption Agreement, Whole Bank, All Deposits, among the FDIC-Receiver, the Federal Deposit Insurance Corporation ("FDIC-Corporate") and BB&T, dated as of August 14, 2009 (the "P&A Agreement"); (b) the Amended and Restated Security Agreement dated January 1, 2009, executed by the Debtor in favor of Colonial Bank (the "Security Agreement"); (c) the Stay Relief Motion; (d) the FDIC-Receiver Proof of Claim filed on or about November 30, 2009; (e) the Agreed Final Order Granting Debtor's Emergency Motion for Use of Cash Collateral [Doc. No. 199] (the "Final Cash Collateral Order"); (f) the Objections and Responses of the FDIC-Receiver to Debtor's First Request for Admissions served by the FDIC-Receiver on January 6, 2010 ("FDIC-Receiver Admissions"); (g) the Objections and Responses of the FDIC-Receiver to Debtor's First Set of Interrogatories served by the FDIC-Receiver on January 6, 2010 ("FDIC-Receiver Interrogatory Responses"); and (h) the BB&T Proof of Claim filed on or about November 30, 2009.

### B. Background and Undisputed Facts

The Debtor is a corporation formed under the laws of the State of Delaware. Prior to August 14, 2009, the Debtor was a bank holding company that owned Colonial Bank. The Debtor also owned certain non-banking, non-debtor subsidiaries.

On August 14, 2009, Colonial Bank was closed by the Alabama State Banking Department, and the FDIC-Receiver was appointed as receiver of Colonial Bank. On or about August 14, 2009, the FDIC-

Receiver sold substantially all of the assets of Colonial Bank to BB&T pursuant to the P&A Agreement. Among the assets transferred to BB&T were all of Colonial Bank's commercial loans and collateral securing such loans, including all rights and interests of Colonial Bank under the Security Agreement (P&A Agreement, Appendix Exhibit A, at 15 of 128, ¶ 3.1, and 50 of 128 [Schedule 3.2]; FDIC-Receiver Admissions, Appendix Exhibit F, at 6-7, nos. 7-12). In addition, pursuant to the P&A Agreement, the FDIC-Receiver transferred to BB&T, and BB&T assumed responsibility for, certain demand deposit accounts of Colonial Bank, referred to as the "Assumed Deposits" in the P&A Agreement (P&A Agreement, Appendix Exhibit A, at 12, ¶ 2.1). The Assumed Deposits included the Debtor's deposit accounts that had been maintained at Colonial Bank.

On August 25, 2009 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On the Petition Date, the Debtor's assets included depository balances in bank accounts at BB&T, which BB&T had acquired and assumed pursuant to the P&A Agreement. These demand depository accounts of the Debtor (the "Debtor Accounts") held aggregate balances of approximately $38,408,337.74, broken down by accounts as follows: Account No. XXXXXX1127 (the "Operating Account"), the amount of $14,381,038.24; Account No. XXXXXX5437, the amount of $4,000,000; Account No XXXXXX5460, the amount of $5,091,170.82; Account No. XXXXXX5452, the amount of $5,045,815.06; Account No. XXXXXX5445, the amount of $2,282,904.24; and Account No. XXXXXX3218, the amount of $7,607,409.38 (collectively, the "Debtor Deposits"). The Debtor Deposits were part of the Assumed Deposits transferred under the P&A Agreement to BB&T.

Notwithstanding the transfer of the Debtor accounts to BB&T, the FDIC-Receiver placed a "freeze" on the Debtor Accounts, with the result that the Debtor was unable to make withdrawals therefrom (which has continued to the present date) and numerous checks of the Debtor did not clear and were returned to the applicable payees. Shortly before the Petition Date, but during the period that the FDIC-Receiver had "frozen" the Debtor Accounts at BB&T, the Debtor received a substantial wire transfer from SunTrust Bank in Atlanta, Georgia, in the approximate amount of $1,425,000. The Court authorized the Debtor to use the amount of that wire transfer ultimately with the consent of the FDIC-Receiver, as purported cash collateral of

the FDIC-Receiver.[1]

BB&T filed the BB&T Proof of Claim in which it asserts a secured claim of $24,027,299.50. It is apparent from the BB&T Proof of Claim that the secured claim is based on the portions of the Debtor Deposits in the following Debtor Accounts: XXXXXX5437, XXXXXX5460, XXXXXX5452, XXXXXX5445, and XXXXXX3218. BB&T alleges in the BB&T Proof of Claim that $24,027,299.50 in Debtor Deposits secures outstanding loans made by Colonial Bank and sold by the FDIC-Receiver to BB&T (BB&T Proof of Claim, Appendix Exhibit H, at 3). BB&T does not assert in its proof of claim or otherwise any lien or interest in or offset right with respect to the $14,381,038.24 balance in the Debtor Account that is the Operating Account.[2] In summary, as of the Petition Date and at all times thereafter, the Debtor Accounts were demand deposit accounts held at BB&T and not Colonial Bank.

Despite the sale of assets to BB&T and the undisputed fact that the Debtor Accounts were at BB&T on and at all times after the Petition Date, the FDIC-Receiver asserts in its Stay Relief Motion a security interest in and a right of offset with respect to the Debtor Deposits that is duplicative of the claim and lien asserted by BB&T. In other words, the FDIC-Receiver seeks relief as if the sale to BB&T had never occurred and Colonial Bank remained the owner of the Debtor Deposits and the Security Agreement.

---

[1] It is highly doubtful that, under any theory advanced by the FDIC-Receiver to date, that the wire transfer from SunTrust Bank could constitute funds subject to offset by the FDIC-Receiver and the Debtor will vigorously contest the FDIC-Receiver's entitlement to a replacement lien as adequate protection for the use of that purported cash collateral. See In re WACO Oil Co., Inc., 137 B.R. 544 (Bankr. M.D. Fl. 1992) (creditor bank not authorized to offset amounts in deposit account attributable to deposits made by debtor following creditor's administrative freeze on debtor's account as creditor bank never intended to become liable to debtor for such deposits, which therefore were not accepted in good faith and in regular course of business).

[2] The Operating Account is, and remains, one of the Debtor's deposit accounts at BB&T. The validity, extent and priority of BB&T's alleged lien or interest in the Debtor Deposits is an issue in dispute, but such issues are not material to this Motion.

### C. Argument and Citation of Authority

**1. Summary of Argument**

To prevail on the Stay Relief Motion, the FDIC-Receiver must carry its burden of proof that (i) it holds a perfected security interest in the Debtor Accounts to secure an obligation owed to Colonial Bank or (ii) it has a right to offset against the Debtor Accounts an obligation of the Debtor to Colonial Bank.

The FDIC-Receiver cannot prevail on the basis asserted in the Stay Relief Motion that it holds a security interest in the Debtor Accounts pursuant to the Security Agreement. On the uncontroverted facts, the Security Agreement is now held by BB&T pursuant to the P&A Agreement, as are all of the obligations purportedly secured under the Security Agreement and referred to therein as "Affiliate Liabilities." The FDIC-Receiver may not assert secured status under an agreement that it assigned to a third party (here, BB&T) together with the underlying secured obligations.

Turning to the FDIC-Receiver's asserted offset rights with respect to the Debtor Accounts, it is beyond dispute that these depository accounts are maintained at BB&T. It is BB&T, and not Colonial Bank or the FDIC-Receiver, that is the obligor to the Debtor with respect to those accounts. Equally fatal to the FDIC-Receiver's offset argument is that the Debtor owes no sum of money to Colonial Bank that could form the basis for the FDIC-Receiver to assert any right of offset.[3] The only obligations allegedly subject to offset and cited by the FDIC-Receiver in the Stay Relief Motion are the so-called "Affiliate Liabilities" under the Security Agreement, which as previously noted, were transferred to BB&T, and alleged capital maintenance obligations allegedly exceeding $1 billion and claimed to be owed by the Debtor under an agreement, discussed below, to which neither the FDIC-Receiver nor Colonial Bank is a party.

The FDIC-Receiver attempts to posit a counterfactual world by arguing that even though it sold the Security Agreement and associated Affiliate Liabilities to BB&T, it really did not; and even though BB&T is the unquestioned depository institution for the Debtor Accounts, it really is not because the FDIC-Receiver

---

[3] To be clear, the Debtor does not have any indebtedness to the FDIC-Receiver. Indeed, the reverse is true, as evidenced by the Debtor's proof of claim filed in the FDIC-Receiver's receivership proceeding.

(by contract with BB&T, and not with the Debtor) "controls" these accounts -- a fiction that is not recognized by Section 553 of the Bankruptcy Code or, to the Debtor's knowledge, any reported judicial decision.

**2.      Standard of Review**

Rule 56(c) of the Federal Rules is incorporated by reference under Rule 7006 of the Bankruptcy Rules and is made applicable to contested matters under Bankruptcy Rule 9014.  Rule 56(c) provides that summary judgment should be granted when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c);  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986);  Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).  Summary judgment is proper "if the pleadings [and] affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Peppers v. Coates, 887 F.2d 1493 (11th Cir. 1989);  Everett v. Napper, 833 F.2d 1507, 1510 (11th Cir. 1987); *see also* Celotex, 477 at 322, 106 at 2552.

The "purpose of summary judgment is to 'pierce the pleadings and to assess whether there is a genuine need for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  Once the moving party establishes that there are no disputed issues of material fact as to the determinative issue, the burden then shifts to the non-moving party to demonstrate that summary judgment is not appropriate.  FED.R.CIV.P. 56(e).  To sustain this burden, the non-moving party may not rest upon the mere allegations or denials in pleadings, but must set forth "specific facts showing that there is a genuine issue for trial."  Id.  *See also* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986);  Van T. Junkins & Assoc. v. U.S. Industries, Inc., 736 F.2d 656, 658 (11th Cir. 1984).  Under these well-established principles, "summary judgment is appropriate where the non-movant fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Johnson v. Fleet Finance, Inc., 4 F.3d 946, 948 (11th Cir. 1993) (*quoting* Celotex, 477 U.S. at 322).

To meet its burden of demonstrating a "genuine issue" for Rule 56 purposes, the FDIC-Receiver must produce "significant probative evidence" of an actual dispute as to a material fact. Anderson, 477 U.S. at 249 (*quoting* First Nat'l Bank of Arizona v. Cities Service Co., 391 U.S. 253, 290, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968)). A "broad, conclusory allegation . . . without more is not sufficient to withstand a motion for summary judgment." Clay v. Equifax, Inc., 762 F.2d 952, 959 (11th Cir. 1985). Likewise, "[s]elf-serving statements are not, alone, substantial enough evidence . . . to survive a motion for summary judgment." Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 714 (11th Cir. 1984). As demonstrated below, the FDIC-Receiver cannot sustain its burden of demonstrating a genuine issue of material fact and, therefore, the Debtor is entitled to summary judgment on the relief requested in the Stay Relief Motion.

### 3. Elements and Burden of Proof Under Section 362(d)

The burden of proof with respect to a motion for relief from stay is a shifting one. COLLIER ON BANKRUPTCY 362.10 (15th ed. rev. 2009). The party moving for relief from stay must first establish its *prima facie* case. Id.; *see also* In re Powell, 223 B.R. 225, 232 (Bankr. N.D. Ala. 1998) (holding a "movant must carry the initial burden of establishing a *prima facie* case for relief under § 362(d)(1) and/or (2) before the burden of proof shifts" (collecting cases)). Failure to prove a *prima facie* case requires denial of the requested relief. COLLIER ON BANKRUPTCY 362.10 (15th ed. rev. 2009).

The requirements for establishing a *prima facie* case under Section 362(d) differ slightly depending upon the subsection invoked by the movant. Under Section 362(d)(2), the party seeking relief "must demonstrate (1) the amount of its claim, (2) that its claim is secured by a valid, perfected lien in property of the estate, and (3) that the debtor lacks equity in the property." In re Elmire Litho, Inc., 174 B.R. 892, 900–01 (Bankr. S.D.N.Y. 1994). If the movant presents a *prima facie* case, the burden of going forward with the evidence shifts to the debtor to controvert the movant's showing. If the debtor controverts any of the elements of the *prima facie* case, the court must deny the Section 362(d)(2) motion "without regard to whether the property is necessary for an effective reorganization." Id. at 901.

Under Section 362(d)(1), the movant must also carry the initial burden of showing entitlement to relief before the debtor must respond. In re Elmire Litho, Inc., 174 B.R. 892, at 902 (Bankr. S.D.N.Y. 1994). The nature of the movant's interest both outlines the need for adequate protection and the scope of the *prima facie* case under this prong. Id. Thus, the movant's *prima facie* case again includes proof that an obligation is owed by the debtor to the movant, the amount of the obligation, evidence of a valid, perfected security interest in property of the estate to secure the obligation, and the basis of the movant's claim that adequate protection is not being provided. As to the final element, the movant must show either a decline in value of the collateral or the threat of such a decline. Id. at 902.

### 4. The FDIC-Receiver Is Not the Holder of a Security Interest in the Debtor Accounts

Pursuant to the Security Agreement, the Debtor purported to grant a security interest to Colonial Bank in certain certificates of deposit of the Debtor to secure payment of certain indebtedness that is referred to in the Security Agreement as "Affiliate Liabilities."[4]

While there are significant issues whether the security interest attached to the Debtor Accounts as alleged "proceeds" of the certificates of deposit, whether any Affiliate Liabilities even exist on this date (and, if so, the amount thereof) and whether the Security Agreement is even valid today (given that its purpose was to fulfill a regulatory function under Regulation W of the Federal Reserve Board, when a bank makes loans to "affiliates" of its holding company, which no longer applies), none of these issues needs to be resolved in the context of the Debtor's Motion. The reason that is the case is because both the Security Agreement and the Affiliate Liabilities described therein were sold and assigned to BB&T pursuant to the P&A Agreement. The P&A Agreement, on its face, transfers all Colonial Bank loans to BB&T (P&A Agreement, Appendix Exhibit

---

[4] The definition of Affiliate Liabilities in the Security Agreement is a bit confusing, as it refers to liabilities of the Debtor to Colonial Bank and then gives as examples loans made by Colonial Bank to third parties in which the Debtor made an equity investment. Neither the FDIC-Receiver (nor anyone else, including BB&T) have contended that the Debtor guaranteed or was otherwise liable for any of the loans made to the third parties.

A, at 15 of 128, ¶ 3.1 and 50 of 128 [Schedule 3.2]).[5] There is no evidence that the loans referred to in the Security Agreement as Affiliate Liabilities were excluded from the transfer. In footnote 4 of the Stay Relief Motion, the FDIC-Receiver even states that the underlying loans "may" have been transferred to BB&T, although no explanation is provided as to why the FDIC-Receiver, which executed this sale on behalf of Colonial Bank, would be in doubt on this subject (Stay Relief Motion, Appendix Exhibit C, at 7 of 20, fn. 4). The FDIC-Receiver instead seems to tell the Court in this footnote not to be concerned with this fact because there are other amounts owed to the FDIC-Receiver and that this Court lacks jurisdiction to inquire into this area. The Debtor respectfully submits that the FDIC-Receiver is incorrect on all points when it comes to the issue of the significance of the lack of ownership of the loans comprising the alleged Affiliate Liabilities.

Equally damaging to the FDIC-Receiver's position are its discovery responses, which further confirm that Colonial Bank sold its rights in the Affiliate Liabilities to BB&T. In the FDIC-Receiver Admissions, the FDIC-Receiver admits that BB&T is the assignee of the Security Agreement, which is the sole document they

---

[5] The P&A Agreement states as follows in Section 3.1:

> 3.1 **Assets Purchased by Assuming Bank.** With the exception of certain assets expressly excluded in Sections 3.5 and 3.6, the Assuming Bank hereby purchases from the Receiver, and the Receiver hereby sells, assigns, transfers, conveys, and delivers to the Assuming Bank, all right, title, and interest of the Receiver in and to **all of the assets (real, personal and mixed, wherever located and however acquired)** including all subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated, of the Failed Bank whether or not reflected on the books of the Failed Bank as of Bank Closing. **Schedules 3.1 and 3.1a attached hereto** and incorporated herein sets forth certain categories of Assets purchased hereunder. Such schedule is based upon the best information available to the Receiver and may be adjusted as provided in Article VIII. Assets are purchased hereunder by the Assuming Bank subject to all liabilities for indebtedness collateralized by Liens affecting such Assets to the extent provided in Section 2.1. The subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated being purchased by the Assuming Bank includes, but is not limited to, the entities listed on Schedule 3.1a. Notwithstanding Section 4.8, the Assuming Bank specifically purchases all mortgage servicing rights and obligations of the Failed Bank. (emphasis added)

Schedule 3.1 specifically lists "Loans" as being transferred and there is no exclusion relating thereto. The term Loans is broadly defined in the P&A Agreement (P&A Agreement, Appendix Exhibit A, at 10 of 128) and would clearly include the Affiliate Liabilities.

attach to the Stay Relief Motion to explain the alleged Affiliate Liabilities (FDIC-Receiver Admissions, Appendix Exhibit F, at 6-7, nos. 7-12).[6]

Furthermore, the Court may take judicial notice of the fact that, consistent with the Debtor's position, BB&T filed a proof of claim asserting that it holds a secured claim in the amount of $24,027,299.50 based on the same Affiliate Liabilities. The FDIC-Receiver attempts to skirt the whole issue in its proof of claim, failing even to identify the Affiliate Liabilities as an obligation owed to it or Colonial Bank (FDIC-Receiver Proof of Claim, Appendix Exhibit D).

Therefore, the FDIC-Receiver Admissions, the FDIC Receiver Interrogatory Responses and the proofs of claim filed in this Chapter 11 case all belie the FDIC-Receiver's assertions regarding ownership of the Affiliate Liabilities. The FDIC-Receiver may not both sell the Affiliate Liabilities and Security Agreement and thereafter attempt to use them as a basis for its Stay Relief Motion. Indeed, the FDIC-Receiver's election to include this ground for relief in its Stay Relief Motion is curious since the FDIC-

---

[6] In its response to the Debtor's Request for Admissions, the FDIC-Receiver "admitted" in response to the following admission request of the Debtor:

> 7. Admit that all of the Affiliate Liabilities arising from loans made by Colonial Bank to any of the borrowers listed on Exhibit B to the Security Agreement were owed to BB&T as of the Petition Date.
>
> 8. Admit that all of the Affiliate Liabilities arising from loans made by Colonial Bank to any of the borrowers listed on Exhibit B to the Security Agreement were owed to BB&T as of the date of the filing of the Stay Relief Motion.
>
> 9. Admit that, as of the Petition Date, BB&T was the assignee of the security interest granted to Colonial Bank under the Security Agreement.
>
> 10. Admit that, as of the Petition Date, BB&T was the assignee of all of Colonial Bank's rights and remedies under the Security Agreement.
>
> 11. Admit that, as of the date of the filing of the Stay Relief Motion, BB&T was the assignee of the security interest granted to Colonial Bank under the Security Agreement.
>
> 12. Admit that, as of the date of the filing of the Stay Relief Motion, BB&T was the assignee of all of Colonial Bank's rights and remedies under the Security Agreement.

(FDIC Receiver Admissions, Appendix Exhibit F, at 7-8).

Receiver, as the entity that completed the sale, knew better than anyone else that such rights were not held by Colonial Bank after the sale on August 14, 2009.

**5.      The FDIC-Receiver Has No Right of Offset**

Section 506(a)(1) of the Bankruptcy Code provides that the allowed claim of a creditor secured by a lien on estate property or that is subject to setoff under Section 553 is a secured claim to the extent of the value of the creditor's or estate's interest in such property or to the extent of the amount subject to setoff. 11 U.S.C. § 506(a)(1).

Section 553(a) in turn recognizes a right under applicable non-bankruptcy law[7] to offset a "mutual debt" owing by a creditor to the debtor that "arose before the commencement of the case" against a claim of such creditor against the debtor that "arose before the commencement of the case." 11 U.S.C. § 553(a).[8] For countervailing debts to be "mutual" so that setoff is allowed, the debts must be in the same right and between the same parties, standing in the same capacity. *See* Newbery Corp. v. Fireman's Fund Ins. Co., 95 F.3d 1392 (9th Cir. 1996). For purposes of setoff under the Bankruptcy Code, a bank account balance constitutes a "debt" owed by the bank to the depositor. In re Pineview Care Center, Inc., 152 B.R. 703 (D.N.J. 1993).

To the extent, therefore, that Colonial Bank had a right of offset on the Petition Date, then the FDIC-Receiver would arguably be authorized to assert such rights, subject to the other restrictions and limitations in

---

[7] Here, the applicable non-bankruptcy law would be the law of the State of Alabama. *See* In re Garden Ridge Corp., 338 B.R. 627 (Bankr. D. Del. 2006). The most recent case defining offset under Alabama law is Rainsville Bank v. Willingham, 485 So. 2d 319 (Ala. 1986). In Rainsville Bank, the Alabama Supreme Court noted that a deposit in a banking institution is a debt from the bank to the depositor. Id. at 323. "When the bank loans money to the depositor, mutual debts exist and the bank may, when the loan matures, apply the money it owes the depositor towards the depositor's debt to the bank." Id. The Alabama Supreme Court also summed up this right as "a bank has the right of set-off to a customer's account when the bank and the customer are in a debtor-creditor relationship and there is a mutuality of demands." Azalea City Motels, Inc. v. First Alabama Bank of Mobile, 551 So. 2d 967, 979 (Ala. 1989).

[8] Setoff under the Bankruptcy Code is a recognition of an established right of a creditor to cancel out mutual debts against one another in full or in part to avoid the absurdity of making A pay B when B owes A. In re Prudential of Florida Leasing, Inc., 478 F.3d 1291, 1297 (11th Cir. 2007).

Section 553.[9] On the Petition Date, however, there was no debt owed by the Debtor to Colonial Bank and the FDIC-Receiver has pointed to none in its Stay Relief Motion. The so-called Affiliate Liabilities under the Security Agreement were obligations arising from loans made by Colonial Bank to third parties other than the Debtor and were not guaranteed by the Debtor. In any event, prior to the Petition Date, the Affiliate Liabilities had been sold and transferred to BB&T. *See* In re Garden Ridge Corp., 338 B.R. 627 (Bankr. D. Del. 2006) (for mutuality to exist for setoff in bankruptcy to apply, each party must own his claim in his own right).

The only other liability of the Debtor that is identified by the FDIC-Receiver to support the Stay Relief Motion is an alleged capital maintenance obligation. The FDIC-Receiver asserts that the capital maintenance obligation arises under a Memorandum of Understanding dated January 21, 2009, among certain members of the Board of Directors of The Colonial BancGroup, Inc., the Federal Reserve Bank of Atlanta, and the State of Alabama, State Banking Department (Stay Relief Motion, Appendix Exhibit C, at 7 of 20, ¶ 12 and Exhibit C) (the "Debtor MOU") and purportedly exceeds $1 billion. Conspicuously absent as parties to the Debtor MOU are both the FDIC-Receiver and Colonial Bank. According to the FDIC-Receiver, the Debtor MOU represents a "commitment" to maintain the capital of Colonial Bank in favor of a "federal depository institutions regulatory agency" under Section 365(o) of the Bankruptcy Code. While the Debtor vigorously disputes these allegations and contends, among other things, that a memorandum of understanding is not, under applicable regulatory authority, an enforceable document that may constitute such a commitment or that the Debtor MOU on its face remotely approximates a commitment of the ilk argued by the FDIC-Receiver, the Court need not address these issues to resolve the Stay Relief Motion. Whatever obligation (if

---

[9] Although unnecessary to the Court's ruling on this Motion, it is the Debtor's position that certain of the Debtor Accounts were deposits made by the Debtor with Colonial Bank for a special purpose, to-wit: compliance by the Debtor with Regulation W of the Federal Reserve Board. It is commonly accepted that funds deposited in a bank for a special purpose, known to the bank, are not subject to setoff. *See* In re Ben Franklin Retail Store, Inc., 202 B.R. 955 (Bankr. N.D. Ill. 1996).

any) arose under the Debtor MOU, it is clear that neither Colonial Bank nor the FDIC-Receiver is a party to it and neither has standing to set off liabilities allegedly arising thereunder against the Debtor Accounts.[10]

The parties to the Debtor MOU are the Board of Directors of The Colonial BancGroup, Inc., the Federal Reserve Bank of Atlanta, and the State of Alabama, State Banking Department. In addition to not being a party to the Debtor MOU, Colonial Bank is not a "federal depository institutions regulatory agency" as defined in Section 101(21B) and used in Section 365(o) of the Bankruptcy Code, the touchstone provisions upon which the FDIC-Receiver relies. In fact, neither the FDIC-Receiver nor FDIC-Corporate are federal regulatory agencies with authority over the Debtor as a holding company. The Debtor submits that this is precisely why the FDIC is not a party to the Debtor MOU in any capacity, corporate or otherwise.

Putting aside the nonexistence of any claim on the Petition Date that was held by Colonial Bank (or the FDIC-Receiver standing in its shoes) against the Debtor, there was no "mutual debt" owing by Colonial Bank (or the FDIC-Receiver standing in its shoes) to the Debtor on the Petition Date in respect of any of the Debtor Accounts. Why? Quite simply because all of the responsibilities associated with the Debtor Accounts were transferred by the FDIC-Receiver from Colonial Bank to, and assumed by, BB&T. The P&A Agreement, on its face, transfers all of Colonial Bank's cash and the Assumed Deposits to BB&T (P&A Agreement, Appendix Exhibit A, at 15 of 128, ¶ 3.1 and at 49-50 of 128 [Schedules 3.1(a) and 3.2]). In addition, the orders authorizing use of cash collateral entered in this case (with the consent of the FDIC-Receiver) consistently have found that the Debtor Accounts are at BB&T (Final Cash Collateral Order, Appendix Exhibit E, at 1 of 7); the cash collateral was wire transferred by BB&T (not Colonial Bank) to the Debtor pursuant to the cash collateral orders; and BB&T's proof of claim and its consistent position in this

---

[10] Assuming for the sake of argument that a capital maintenance obligation could be construed to be owed under the Debtor MOU to the FDIC-Receiver, "mutuality" for setoff purposes would not exist as the FDIC-Receiver has no obligation to the Debtor with respect to the Debtor Accounts inasmuch as the FDIC-Receiver is not a depository institution. Nor could Colonial Bank offset the Debtor Accounts to satisfy a debt of the Debtor to the FDIC-Reciever or *vice versa*. There can be no right of setoff where a creditor seeks to offset its claim against one party in satisfaction of a debt owed to a third party. *See* In re Cullen, 329 B.R. 52 (Bankr. N.D. Iowa 2005).

case, to which the FDIC-Receiver has not objected, clearly indicate that the Deposit Accounts are maintained at BB&T.

The FDIC-Receiver attempts to escape the inescapable fact of this transfer by arguing that the FDIC-Receiver has a contractual right under the P&A Agreement by which it can "control" the withdrawal by the Debtor of the balances from the Debtor Accounts, citing to Section 9.5 of the P&A Agreement.[11] The FDIC-Receiver also maintains that it can contractually cause the transfer by BB&T of the Debtor Deposits back to the FDIC-Receiver at any time. Even assuming such a "clawback" were possible after the Debtor's bankruptcy, without the Debtor's consent, the undeniable truths are that, as of the Petition Date, such a clawback had not occurred; as of the filing of the Stay Relief Motion, such a clawback had not occurred; and as of the date of this Motion, the clawback had not occurred. Furthermore, under the clear language of Section 553, lawful rights of offset are unaffected to the extent the right existed as of the date of filing, but are not authorized to the extent the creditor's claim against the debtor was transferred to the creditor after commencement of the case. 11 U.S.C. § 552(a)(2)(A). As of the Petition Date, there was no right in Colonial

---

[11] Section 9.5 of the P&A Agreement provides as follows:

> 9.5 **Withheld Payments**. At any time, the Receiver or the Corporation may, in its discretion, determine that all or any portion of any deposit balance assumed by the Assuming Bank pursuant to this Agreement does not constitute a "Deposit" (or otherwise, in its discretion, determine that it is the best interest of the Receiver or Corporation to withhold all or any portion of any deposit), and **may direct the Assuming Bank to withhold payment** of all or any portion of any such deposit balance. Upon such direction, the Assuming Bank agrees to hold such deposit and not to make any payment of such deposit balance to or on behalf of the depositor, or to itself, whether by way of transfer, set-off, or otherwise. The Assuming Bank agrees to maintain the "withheld payment" status of any such deposit balance until directed in writing by the Receiver or the Corporation as to its disposition. At the direction of the Receiver or the Corporation, the Assuming Bank shall return all or any portion of such deposit balance to the Receiver or the Corporation, as appropriate, and thereupon the Assuming Bank shall be discharged from any further liability to such depositor with respect to such returned deposit balance. If such deposit balance has been paid to the depositor prior to a demand for return by the Corporation or the Receiver, and payment of such deposit balance had not been previously withheld pursuant to this Section, the Assuming Bank shall not be obligated to return such deposit balance to the Receiver or the Corporation. **The Assuming Bank shall be obligated to reimburse the Corporation or the Receiver, as the case may be, for the amount of any deposit balance or portion thereof paid by the Assuming Bank in contravention of any previous direction to withhold payment of such deposit balance or return such deposit balance the payment of which was withheld pursuant to this Section.**

(emphasis added) (P&A Agreement, Appendix Exhibit A, at 29-30).

Bank (as the FDIC-Receiver standing in its shoes) to offset the Debtor Accounts as those accounts were no longer maintained at Colonial Bank and therefore were not a "mutual debt" of Colonial Bank to the Debtor.

The FDIC-Receiver cannot base its Stay Relief Motion on hypothetical rights, unexercised under contractual provisions which it has not executed. If and when the FDIC-Receiver attempts to transfer the obligations and property rights associated with the Assumed Deposits (including the Debtor Accounts) back to Colonial Bank, the issue of the legal effect of that transfer will be ripe for adjudication. Until then, the FDIC-Receiver, acting on behalf of Colonial Bank, may not use the demand depository obligations owed by BB&T to the Debtor in connection with the Debtor Deposits to conjure up an obligation of Colonial Bank for purposes of setoff.

### D. Summary and Conclusion

For several days prior to the Petition Date and at all times thereafter, the FDIC-Receiver has placed a "freeze" on the Debtor Accounts and thereby denied the Debtor access to funds in those accounts and caused a number of checks issued by the Debtor prior to bankruptcy to bounce. The FDIC-Receiver's grounds for doing so are apparently the same grounds asserted for relief from the automatic stay pursuant to the Stay Relief Motion.

The first asserted ground is that the FDIC-Receiver is the holder of a security interest granted to Colonial Bank pursuant to the Security Agreement. As noted above, both the Security Agreement and the Affiliate Liabilities described therein were transferred and assigned to BB&T before the Debtor's commencement of its Chapter 11 case, are held by BB&T and cannot form the basis for a secured claim under Section 506(a) of the Bankruptcy Code or a motion for stay relief under Section 362 of the Bankruptcy Code.

The second asserted ground is that the FDIC-Receiver has offset rights with respect to the Debtor Accounts. Prior to the Petition Date, however, these accounts were transferred to and assumed by BB&T, where they are currently maintained. Furthermore, the purported obligations that are to be extinguished in part by offset against the Debtor Accounts allegedly arose pursuant to a memorandum of understanding to which neither Colonial Bank nor the FDIC-Receiver are parties.

For all of the foregoing reasons, the Debtor requests that summary judgment be granted in its favor with respect to the Stay Relief Motion.

Dated: January 11, 2010
Montgomery, Alabama

>C. Edward Dobbs
>Email: ced@phrd.com
>
>Rufus T. Dorsey, IV
>rtd@phrd.com
>
>PARKER, HUDSON, RAINER & DOBBS LLP
>1500 Marquis Two Tower
>285 Peachtree Center Avenue, N.E.
>Atlanta, Georgia  30303
>Telephone No.:  (404) 523-5300
>Facsimile:  (404) 522-8409
>
>
>By: /s/ *Rufus T. Dorsey, IV*
>    Rufus T. Dorsey, IV
>
>Attorneys for Debtor and Debtor in Possession

- 16 -
Case 09-32303   Doc 468   Filed 01/11/10   Entered 01/11/10 22:31:56   Desc Main
Document    Page 16 of 16