IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **THE COLONIAL BANCGROUP, INC.,** | **Case No. 09-32303(DHW)** |
| **Debtor.** | **Hearing Date:**　　　**April 15, 2010**<br>**Objection Deadline: To Be Established** |

**AMENDED MOTION OF THE FEDERAL DEPOSIT INSURANCE
CORPORATION, AS RECEIVER FOR COLONIAL BANK,
FOR AN ORDER MODIFYING THE AUTOMATIC STAY**

The Federal Deposit Insurance Corporation, in its capacity as receiver for Colonial Bank,

Montgomery, Alabama (the "FDIC-Receiver"), respectfully submits this amendment (the

"Amended Motion") of its pending motion, pursuant to 11 U.S.C. § 362 and Local Bankruptcy

Rule 4001-3, for an order modifying the automatic stay in this chapter 11 case of debtor and

debtor in possession The Colonial BancGroup, Inc. (the "Debtor" or "Colonial BancGroup") to

permit the FDIC-Receiver to exercise its setoff rights against the balances held in certain demand

deposit accounts (the "Motion") [D.I. 156].　In support of the Amended Motion, the FDIC-

Receiver respectfully states:

PRELIMINARY STATEMENT

1.　　　The FDIC-Receiver was appointed receiver of Colonial Bank in August 2009

when that bank was closed by its primary regulator.　The closing of Colonial Bank, the largest

United States bank failure in 2009, will cost the FDIC's Deposit Insurance Fund an estimated

$2.8 billion if not substantially more, making the Deposit Insurance Fund the principal victim of

the Debtor's alleged misconduct prior to the failure of its bank subsidiary.

2. By operation of law, the FDIC-Receiver succeeded to the rights, titles, powers and privileges of Colonial Bank, 12 U.S.C. § 1821(d)(2)(A), and it is empowered, among other things, to take over the assets of and operate that institution, collect all obligations and money due the institution, preserve and conserve the assets and property of the institution and place the institution in liquidation and proceed to realize upon its assets, 12 U.S.C. §§ 1821(d)(2)(D), (E). In this instance, the assets of Colonial Bank include substantial obligations that are owed to it by the Debtor, which have been described in a proof of claim filed by the FDIC-Receiver in this case. *See* FDIC-Receiver Proof of Claim (Claim No. 139).

3. The FDIC-Receiver originally filed its Motion for relief from the automatic stay in the first weeks of this chapter 11 case, in October 2009. Since filing the Motion, the FDIC-Receiver has filed its proof of claim setting forth substantial additional claims against the Debtor that also can be setoff against the account balances in dispute. This Amended Motion is filed to include these additional claims. The Amended Motion also makes clarifying changes to the original Motion.[1]

4. Although investigations into the Debtor's possible pre-receivership misconduct are still in their earliest stages, even based on information now available it is clear that the amounts owed by the Debtor to the FDIC-Receiver could exceed $1 billion. Neither the Debtor nor any other party has objected to the FDIC-Receiver's proof of claim detailing these substantial claims against the Debtor, which are prima facie valid.

---

[1] The FDIC-Receiver is in discussions with the Debtor and the Creditors Committee with respect to a variety of procedural matters relating to this Amended Motion and other pending proceedings, including the scope of discovery, the timing of those proceedings and the scope of the issues to be presented at the evidentiary hearing that has been scheduled with respect to this Amended Motion. The FDIC-Receiver anticipates that the parties will submit an agreed scheduling order that addresses these matters in the next several days.

5.     Notwithstanding its substantial obligations to Colonial Bank and the FDIC-Receiver, the Debtor has sought the authorization of this Court to use funds held in several deposit accounts that are under the control of the FDIC-Receiver, the balances of which are dwarfed by the FDIC-Receiver's claims, in order to pay the fees of professionals in this bankruptcy case.  The Debtor's use of such funds would, by itself, destroy the FDIC-Receiver's setoff rights with respect to the balances in the accounts.

6.     In this Amended Motion, the FDIC-Receiver therefore seeks an order modifying the automatic stay provided under section 362 of the Bankruptcy Code to permit it to enforce its setoff rights with respect to the disputed account balances.  To the extent stay relief is necessary to do so, the FDIC-Receiver further seeks modification of the automatic stay to permit third parties, including Branch Banking & Trust Co. ("BB&T"), to take such actions as may be necessary to effectuate the other relief requested by this Amended Motion.

JURISDICTION AND VENUE

7.     In seeking use of the balances under the FDIC-Receiver's control, the Debtor has asserted that the administrative hold placed on the accounts by the FDIC-Receiver pending the determination of its setoff rights somehow violates the automatic stay.  This assertion ignores controlling Supreme Court authority to the contrary.  *See Citizens Bank of Md. v. Strumpf*, 516 U.S. 16 (1995) (authorizing bank to place administrative hold on debtor's deposit accounts pending resolution of bank's setoff rights).

8.     Under 12 U.S.C. § 1821(j), "no court may take any action . . . to restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver."  Section 1821(j) "effect[s] a sweeping ouster of courts' power to grant equitable remedies" that would frustrate the FDIC's exercise of its statutory powers as receiver or conservator.  *Freeman v. F.D.I.C.*, 56 F.3d 1394, 1399 (D.C. Cir. 1995); *see RPM Investments, Inc. v. R.T.C.*, 75 F.3d 618,

622 (11th Cir. 1996) (*per curiam*); *Gross v. Bell Sav. Bank*, 974 F.2d 403, 408 (3d Cir. 1992) (reversing injunction directing RTC to release deposit funds that were withheld pursuant to 12 U.S.C. § 1822(d)). The FDIC-Receiver reserves all of its jurisdictional arguments, under section 1821(j) or otherwise. *See also* 12 U.S.C. § 1821(d)(13)(D) (in connection with statutory provisions setting forth receivership claims process, providing that "no court shall have jurisdiction" over specified claims or actions).

9.  Subject to the foregoing, subject matter jurisdiction for the Amended Motion arises under 28 U.S.C. § 1334. The Amended Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for the Amended Motion is proper in this district under 28 U.S.C. § 1409.

## BACKGROUND

10.  On August 25, 2009, the Debtor filed a voluntary petition in this Court under chapter 11 of the Bankruptcy Code. The Debtor continues as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code but currently has no business operations or reasonable prospects of generating future revenue or reorganizing.

11.  No trustee or examiner has been appointed. On September 28, 2009, the Court entered an order appointing the Official Committee of Unsecured Creditors (the "Creditors Committee"). [D.I. 130]

A.  The Colonial Bank Receivership

12.  By order of the Alabama State Banking Department dated August 14, 2009, Colonial Bank was closed and the FDIC-Receiver was appointed as its receiver. That day, the FDIC-Receiver entered into a Purchase and Assumption Agreement with BB&T, under which

BB&T purchased certain assets and assumed certain liabilities of Colonial Bank from the FDIC-Receiver (the "P&A Agreement").[2]

13.     The Debtor was a bank holding company that owned Colonial Bank until its receivership.

14.     Before Colonial Bank was closed, the Debtor publicly reported that it was the target of a "federal criminal investigation relating to the Company's mortgage warehouse lending division and related alleged accounting irregularities" and that it had "been informed that the alleged accounting irregularities relate to more than one year's audited financial statements and regulatory financial reporting . . ." Colonial BancGroup, Inc. Form 8-K dated August 7, 2009.

15.     The Debtor also reported (1) that it had produced documents to, and had been the subject of a search warrant executed by agents conducting an investigation on behalf of, the special inspector general for the Troubled Asset Relief Program, *see* Colonial BancGroup, Inc. Form 8-K dated August 4, 2009, and (2) that it had received a subpoena from the U.S. Securities and Exchange Commission "seeking documents related to, among other things, BancGroup's disclosures related to its participation in the U.S. Treasury Department's Troubled Asset Relief Program and BancGroup's disclosures respecting accounting for loan loss reserves . . . ," *see* Colonial BancGroup, Inc. Form 8-K dated August 7, 2009.

16.     The FDIC has estimated that resolution of the Colonial Bank failure – the largest bank failure in the United States in 2009 – will cost the Deposit Insurance Fund at least $2.8 billion.  *See* FDIC Press Release, "BB&T, Winston-Salem, North Carolina, Assumes All of the Deposits of Colonial Bank, Montgomery, Alabama," August 14, 2009 (publicly available at

---

[2] A copy of the P&A Agreement, in the form available on the FDIC's website, is attached as Exhibit B to this Amended Motion.

www.fdic.gov).  More recent news reports have suggested that the potential losses associated with the Colonial Bank failure will be even higher.

B.    The Disputed Deposit Accounts

17.    On September 18, 2009, the Debtor filed an emergency motion for entry of interim and final orders authorizing use of cash collateral and granting replacement liens (the "Cash Collateral Motion") [D.I. 87].  In the Cash Collateral Motion, the Debtor identified seven accounts that it asserts are demand deposit accounts in its name held by BB&T with account numbers ending in 1127, 5437, 5460, 5452, 5445 and 3218 (the "Accounts").  The Debtor asserted at the time of the Cash Collateral Motion that the aggregate balances in the Accounts was $38,408,337.34.  *See id.*, ¶ ¶ 9 & Exh. A.

18.    Weeks before the Debtor even filed its chapter 11 petition, the FDIC-Receiver instructed BB&T to withhold the balances in these Accounts pending the determination of the FDIC-Receiver's setoff rights, pursuant to section 9.5 of the P&A Agreement.[3]  Pursuant to the

---

[3] Section 9.5 of the P&A Agreement provides, in pertinent part:

> At any time, the Receiver or the Corporation may, in its discretion, determine that all or any portion of any deposit balance assumed by the Assuming Bank pursuant to this Agreement does not constitute a "Deposit" (or otherwise, in its discretion, determine that it is the best interest of the Receiver or Corporation to withhold all or any portion of any deposit), and may direct the Assuming Bank to withhold payment of all or any portion of any such deposit balance.  Upon such direction, the Assuming Bank agrees to hold such deposit and not to make any payment of such deposit balance to or on behalf of the depositor, or to itself, whether by way of transfer, set-off, or otherwise.  The Assuming Bank agrees to maintain the "withheld payment" status of any such deposit balance until directed in writing by the Receiver or the Corporation as to its disposition.  At the direction of the Receiver or the Corporation, the Assuming Bank shall return all or any portion of such deposit balance to the Receiver or the Corporation, as appropriate, and thereupon the Assuming Bank shall be discharged from any further liability to such depositor with respect to such returned deposit balance. . . .

P&A Agreement, § 9.5.

P&A Agreement, the FDIC-Receiver controls the accounts. *See Gross*, 974 F.2d at 405-06 (discussing hold pursuant to similar provision of purchase and assumption agreement).

19.     In the Cash Collateral Motion, the Debtor stated that the FDIC-Receiver had placed an administrative hold on the Accounts to protect its setoff rights with respect to claims owed by the Debtor to the FDIC-Receiver and asserted, contrary to controlling Supreme Court authority, that the FDIC-Receiver's administrative hold was a violation of the automatic stay. *Id.*, ¶¶ 11, 12.  The Debtor argued that its ability "to prosecute this Chapter 11 case is being held hostage by the position of the FDIC-Receiver . . ." *Id.*, ¶ 17.  The Debtor also listed a "parade of horribles" that it alleged it would suffer if the FDIC-Receiver's setoff rights were protected. *Id.*, ¶ 18.

20.     Four months later, none of the predicted hardships ever has happened.  In agreed interim and final orders granting the Cash Collateral Order in part, the FDIC-Receiver consented to the Debtor's use of $1.425 million from the Accounts.  [D.I. 128, 161, 199]  Since then, the Debtor has sold certain other assets and has sought the Court's authority to spend the proceeds from those sales to fund its cases, which the FDIC-Receiver has not opposed.  [D.I. 353] Nevertheless, the Debtor continues to reserve its rights to seek use of the disputed balances in the Accounts at some future time.

21.     The Accounts are subject to an Amended and Restated Security Agreement dated January 1, 2009 (the "Security Agreement"), under which Colonial BancGroup granted a security interest to Colonial Bank.  *See* Rich Decl., Exh. A.[4]  BB&T holds a security interest in certain funds in the Accounts pursuant to that agreement.

_____

[4] Citations to "Rich Decl." refer to the Declaration of Timothy D. Rich dated October 5, 2009 that was filed in connection with the Motion.  [D.I. 156-1]

22. In addition, the Debtors have asserted that the Alabama Department of Revenue has asserted a tax lien with respect to income and excise taxes in an aggregate principal amount exceeding $9 million. The Debtor disputes the validity of the asserted tax liability and has filed a motion seeking a judicial determination of any such liability. *See* Cash Collateral Motion, ¶ 13.

23. Even if the FDIC-Receiver's setoff rights are subject to these other claims, the FDIC-Receiver is a secured creditor by virtue of those setoff rights and its secured interest in the accounts is superior to any interest of the Debtor.

C.    The Debtor's Claims Against the FDIC-Receiver

24. Section 1821(d), which is part of the Federal Deposit Insurance Act, as amended *inter alia* by the Financial Institutions Reform, Recovery & Enforcement Act of 1989 ("FIRREA"), establishes an exclusive administrative claims process that must be followed by any person or entity holding a claim falling within its scope. Under 12 U.S.C. § 1821(d)(6), a claimant whose receivership claim has been disallowed may file an action in one of two specified federal district courts within 60 days after such a disallowance seeking a judicial determination of the disallowed claims. Other than as thus provided, however, "[n]o court shall have jurisdiction over" any claim that is subject to the claims process. *See* 12 U.S.C. § 1821(d)(13)(D).

25. On November 19, 2009, the Debtor filed a proof of claim with the Colonial Bank receivership pursuant to 12 U.S.C. § 1821(d). In its receivership claim, the Debtor asserted a variety of claims against the receivership and/or the FDIC-Receiver, including claims to the Accounts; tax-related claims, including claims to any tax refunds that may be received by the FDIC-Receiver; and claims relating to $300 million in REIT preferred securities issued in 2007 by CBG Florida REIT Corp., a subsidiary of Colonial Bank and many others.

26.     In a letter dated January 6, 2010, the FDIC-Receiver notified the Debtor that its receivership claim had been disallowed. *See* 12 U.S.C. § 1821(d)(5). The FDIC-Receiver is not aware of any action by the Debtor to date pursuant to 12 U.S.C. § 1821(d)(6) with respect to its disallowed receivership claim.

D.     The FDIC-Receiver's Claims Against the Debtor

27.     On November 30, 2009, the FDIC-Receiver filed a proof of claim in this chapter 11 case.[5] The FDIC-R Proof of Claim details a number of substantial claims held by the FDIC-Receiver against the Debtor, all of which can be setoff against the balances of the Accounts. Neither the Debtor nor any other party has objected to the FDIC-R Proof of Claim.[6]

1.     Summary of Claims[7]

28.     The claims asserted in the FDIC-R Proof of Claim include, among other things, (1) claims for the deficit with respect to the Debtor's uncured capital maintenance commitment in the amount of approximately $900 million; (2) claims arising from consolidated tax returns filed by Colonial BancGroup as fiduciary for Colonial Bank, including future tax refunds likely to amount to substantially more than $100 million, which are the property of Colonial Bank as a

---

[5] A copy of the FDIC-Receiver's Proof of Claim (the "FDIC-R Proof of Claim") as filed (without exhibits) is attached as Exhibit C to this Amended Motion. As a governmental unit, the FDIC-Receiver may file or amend a proof of claim in this case up to and including the date that is 180 days after the petition date. 11 U.S.C. § 507(b)(9). The FDIC-Receiver reserves all of its rights to amend its proof of claim for any reason.

[6] The FDIC-R Proof of Claim expressly noted the limitations on subject matter jurisdiction set forth in 12 U.S.C. § 1821. A defense of lack of subject matter jurisdiction cannot be waived. In setting forth in this Motion the claims it has asserted against the Debtor, the FDIC-Receiver does not waive any arguments as to the proper court for litigation regarding the matters in dispute between the Debtor and the FDIC-Receiver.

[7] The proof of claim as a whole, and certain of the larger specific claims, are described in this section. In only discussing certain of its claims, however, the FDIC-Receiver is not waiving any of its claims against the Debtor as a valid basis for setoff against the balances in the Accounts.

matter of federal law but as to which the Debtor has purported to assert some interest; (3) a contingent claim for up to $300 million relating to a 2007 offering of REIT preferred securities by a subsidiary of Colonial Bank as to which the Debtor has asserted a claim against the FDIC-Receiver; (4) claims relating to the proceeds of insurance policies or the return of premiums that were paid for by Colonial Bank; (5) claims for any unlawful dividends or fraudulent transfers extracted by the Debtor from Colonial Bank during the five years prior to its closure.

## 2. Uncured Capital Maintenance Commitment

29. The FDIC-Receiver holds a priority claim of approximately $900 million for the Debtor's failure to immediately cure the deficit under a pre-petition capital maintenance commitment. The Debtor first made that commitment in a Memorandum of Understanding dated January 21, 2009 with the Federal Reserve Bank of Atlanta and the Alabama State Banking Department. In the Memorandum of Understanding, the Debtor agreed and committed to "utilize its financial and managerial resources to assist its subsidiary bank in addressing weaknesses identified by its primary banking supervisors and achieving/maintaining compliance with [Colonial Bank's] December 15, 2008 Memorandum of Understanding with" the FDIC and the Alabama State Banking Department. *See id.,* ¶ 1. The board of directors of Colonial Bank, in turn, had agreed in the bank's own Memorandum of Understanding with bank regulators that by no later than February 28, 2009, Colonial Bank would bring its Tier I Leverage Capital ratio to a level of not less than 8 percent and its Total Risk-Based Capital Ratio to a level of not less than 12 percent. *See Rich Decl., Exh. B,* ¶ 14.

30. Both Colonial Bank and Colonial BancGroup failed to meet their obligations under their respective Memoranda of Understanding. As a result, on June 15, 2009, Colonial Bank consented and agreed to the entry of a cease and desist order by the FDIC and the Alabama Superintendent of Banks under which Colonial Bank repeated its agreement to raise its Tier 1

Leverage Capital Ratio to not less than 8 percent and its Total Risk-Based Capital Ratio to not less than 12 percent. *See* Rich Decl., Exh. D, at 6-7. Soon thereafter, on July 15, 2009, Colonial BancGroup consented and agreed to a similar cease and desist order by the Board of Governors of the Federal Reserve System and the Alabama State Banking Department in which Colonial BancGroup agreed, among other things, to "take appropriate steps to ensure that the [Colonial Bank] complies with the Cease and Desist Order, and any other supervisory action taken by [Colonial Bank's] federal or state regulators." Rich Decl., Exh. E, ¶ 1.

31.     For purposes of the "prompt corrective action" provisions of federal banking law, the Debtor's consent and agreement to the cease and desist order supplanted its earlier Memorandum of Understanding, thereby subjecting the Debtor to more exacting scrutiny and stricter enforcement for future violations. For purposes of section 365(o), however, the consent order incorporated and reaffirmed the capital maintenance commitment that the Debtor initially had made in the Memorandum of Understanding.

32.     As of June 30, 2009, the date of Colonial Bank's last quarterly Call Report, its Tier I leverage capital ratio was 4.18%, far below the 8% required under its Memorandum of Understanding. Translated into dollars, the shortfall from the capital level that Colonial Bank had agreed in its Memorandum of Understanding to achieve by no later than February 28, 2009 was $669,676,120 as of March 31, 2009 and $1,003,972,000 as of June 30, 2009.[8]

---

[8] For publicly reported quarters, the shortfall is readily calculable from statistics provided in Colonial Bank's Uniform Bank Performance Report, which is a publicly available financial report of statistics and data included in Colonial Bank's quarterly Call Reports. *See* Rich Decl., Exh. F. The amount of capital required to meet the agreed 8% Tier I leverage capital ratio is determined by multiplying the bank's total assets by .08. The shortfall from this agreed capital level is then determined by subtracting Colonial Bank's reported Tier I leverage capital from the product of this equation. For June 30, 2009, the calculation is as follows: ($26,210,000,000 * 0.08) = $2,096,800,000 - $1,092,828,000 = $1,003,972,000.

33.     Colonial Bank never filed a Call Report for the next quarter end, on September 30, 2009.  However, based on pro forma financial information as of August 11, 2009, three days before Colonial Bank was closed, the amount of the bank's shortfall from the required Tier 1 Leverage Capital level, and therefore the amount of the Debtor's deficit under its capital maintenance commitment, was $904,954,360.  This was also the amount of the deficit under that commitment as of the Debtor's petition date on August 25, 2009.[9]

34.     Pursuant to 11 U.S.C. § 365(o), the Debtor was deemed to have assumed its capital maintenance commitment as a condition to entering chapter 11 and is required to immediately cure this deficit.  Further, to the extent the deficit under this commitment is not immediately cured, this case must be converted and the FDIC-Receiver's claim for these amounts is entitled to administrative priority under section 507(a)(9) of the Bankruptcy Code.

### 3.     Tax Refunds and Other Tax-Related Assets

35.     As set forth in the FDIC-R Proof of Claim, the FDIC-Receiver also has claims against the Debtor arising from consolidated tax returns, and prepetition as well as anticipated claims for tax refunds, filed by the Debtor as agent and fiduciary for Colonial Bank and for tax related intercompany balances held by the Debtor that are the property of the FDIC-Receiver. The FDIC-Receiver believes that income tax refunds owed to Colonial Bank are higher than $100 million, including because of the possibility of refunds arising from additional net operating loss carrybacks that may be available as the result of a recent amendment of federal tax laws.

36.     Prior to the petition date, Colonial BancGroup applied for federal income tax refunds based on application of net operating losses, which refunds have not yet been paid.

---

[9] This amount takes into account the Debtor's contribution to Colonial Bank of REIT preferred stock on August 11, 2009, which is discussed below.

Because of the intervening amendment to federal tax laws, an amendment to this refund request is likely to be necessary to maximize the potential refunds available to Colonial Bank.

37.     To the extent that the Debtor has asserted some property interest in tax refunds generated from the operations, income or losses of Colonial Bank, such an assertion is contrary to applicable law.  Those refunds are owned by Colonial Bank and the FDIC-Receiver as its receiver.  *See, e.g., Capital Bancshares, Inc. v. F.D.I.C.*, 957 F.2d 203, 210 (5th Cir. 1992) ("[t]he refund is the property of the [subsidiary], which could have generated the refund on its own had it filed with the IRS as a separate entity" and therefore the FDIC as receiver of the subsidiary was entitled to the tax refunds attributable to the losses of the subsidiary); *Western Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp.)*, 473 F.2d 262, 265 (9th Cir. 1973).

38.     In its receivership proof of claim, the Debtor has asserted that an unsigned, undated putative internal tax policy somehow alters the *Bob Richards* rule in the case of Colonial Bank.  The document pointed to by the Debtor is not an "agreement" that in any way alters application of the *Bob Richards* rule.  In any event, as a matter of federal banking law no such "agreement" could alter the *Bob Richards* rule for a bank holding company such as the Debtor was until Colonial Bank was closed.

39.     In 1998, federal bank regulators, including the FDIC, the Office of the Comptroller of the Currency and the Board of Governors of the Federal Reserve System (the federal regulators of Colonial Bank and Colonial BancGroup) issued a uniform policy statement regarding intercompany tax allocation agreements for banking organizations that file an income tax return as members of a consolidated group.  *See* Interagency Policy Statement on Income Tax

Allocation In A Holding Company Structure 63 Fed. Reg. 64757 (Nov. 23, 1998) (the "Policy Statement").

40.     In the Policy Statement, the agencies stated that tax sharing arrangements among the members of a bank's or thrift's consolidated tax group "should result in no less favorable treatment to the [insured depository] institution than if it had filed its income tax return as a separate entity." *Id.* at 64757.  Consistent with pre-existing law discussed above, the Policy Statement provided that "a parent company that receives a tax refund from a taxing authority obtains these funds *as agent for the consolidated group* on behalf of the group members." *Id.* at 64759 (emphasis added).  As a result, a tax sharing agreement for a bank or thrift holding company group "*should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent.*" *Id.* (emphasis added).  Any provision that ran afoul of this prohibition would be considered an "unsafe and unsound" banking practice that could result in regulatory enforcement actions. *Id.* at 64758.

### 4.     REIT Preferred Securities

41.     On May 22, 2007, CBG Florida REIT, an indirect subsidiary of Colonial Bank, sold 300,000 shares of fixed-to-floating rate perpetual non-cumulative preferred stock with a liquidation preference of $1,000.00 per share.  Shares of the REIT preferred stock were subject to conditional exchange into shares of preferred stock issued by Colonial BancGroup under certain circumstances.

42.     On August 10, 2009, the FDIC, in its regulatory capacity, notified Colonial Bank that an exchange event had occurred.  In accordance with the operative documents, the conditional exchange of the REIT preferred stock into preferred stock of Colonial BancGroup

occurred automatically at 8 a.m. New York time on August 11, 2009. All of the REIT preferred stock then was contributed to Colonial Bank.

43.     Such a contribution to Colonial Bank in those circumstances was contemplated expressly under the operative documents for the REIT preferred stock offering. The exchange and contribution requirements were added at the insistence of federal bank regulators and agreed to by Colonial BancGroup in order to obtain regulatory approval for the offering and for the proposed treatment of the REIT preferred stock as Tier 1 capital of Colonial Bank.

44.     The Debtor has asserted a claim against the FDIC-Receiver for recovery of the REIT preferred stock or its value. The Debtor also has asserted that its contribution of the REIT preferred stock to its wholly owned subsidiary Colonial Bank is somehow subject to avoidance. This assertion is incorrect as a matter of law. *See* 12 U.S.C. § 1828(u). Nevertheless, if the Debtor succeeds in any respect on its claims against the FDIC-Receiver with respect to these issues, then the FDIC-Receiver is entitled to reimbursement from the Debtor to that extent and further is entitled to a replacement claim pursuant to section 502(h) of the Bankruptcy Code to the full extent of any avoidance.

45.     Although currently contingent and unliquidated, this claim against the Debtor could amount to as much as $300 million or higher.

### E.     Procedural Background to the Amended Motion

46.     On September 18, 2009, the Debtor filed its emergency Cash Collateral Motion in which it sought, on essentially three days' notice, an order directing the immediate turnover of the balances held in the Accounts which the Debtor alleged to be approximately $38 million. The FDIC-Receiver objected to the Debtor's motion on numerous grounds. [D.I. 105]

47.     On October 5, 2009, the FDIC-Receiver filed the Motion. Among other claims giving rise to setoff, the FDIC-Receiver identified an uncured capital maintenance commitment

owed by the Debtor that the Debtor was required to assume and cure as a condition to obtaining protection under chapter 11 of the Bankruptcy Code. 11 U.S.C. § 365(o). At a subsequent hearing, the Creditors Committee suggested that any final hearing on the Motion should not include issues relating to the Debtor's uncured deficiency under its capital maintenance commitment because the FDIC-Receiver had not separately moved to convert the Debtor's chapter 11 case pursuant to section 365(o) of the Bankruptcy Code. Thereafter, on November 5, 2009, the FDIC-Receiver filed its 365(o) Motion.[10]

48.    The Motion originally was scheduled for a preliminary hearing on October 29, 2009 and a final hearing on November 17, 2009. The FDIC-Receiver later agreed to postpone the hearing on both the Motion and its 365(o) Motion until December 9, 2009. Then, the FDIC-Receiver agreed to again postpone the hearing date for the Motions until February 24, 2010 at 10 a.m.

49.    On January 6, 2010, the FDIC-Receiver, the Debtor and the Creditors Committee exchanged their initial responses and objections to discovery requests in connection with the FDIC-Receiver's motions. The parties are actively engaged in discussions concerning the scope of discovery, the schedule of proceedings with respect to the FDIC-Receiver's two motions and the scope of proceedings to be addressed at an evidentiary hearing.

50.    To date, no party has filed an objection to the Motion. However, on January 11, 2010, the Debtor filed a motion for summary judgment that raised a variety of issues with respect to it. [D.I. 467] The parties are discussing a scheduling order with respect to the schedule of proceedings for the Amended Motion and the 365(o) Motion and related matters, which will

---

[10] On December 15, 2009, the Debtor commenced an adversary proceeding against the FDIC-Receiver in which it asserts that its own capital maintenance commitment was a fraudulent transfer. The FDIC-Receiver's response to the complaint in that action is not due until January 26, 2010.

Case 09-32303   Doc 499   Filed 01/22/10   Entered 01/22/10 15:01:48   Desc Main
Document      Page 16 of 31

include a deadline for objections to this Amended Motion and the 365(o) Motion. The hearing with respect to this Amended Motion, and the 365(o) Motion, currently is scheduled for April 15th and 16th, 2010.

## RELIEF REQUESTED

51.     By this Amended Motion, the FDIC-Receiver seeks an order pursuant to 11 U.S.C. §§ 362(d) and 553 modifying the automatic stay in order to permit setoff against the funds held in the Accounts in partial satisfaction of the FDIC-Receiver's various claims against the Debtor and in order for the FDIC-Receiver and any third party, including BB&T, to take such actions as may be necessary, under section 9.5 of the P&A Agreement or otherwise, to effectuate the foregoing.

ARGUMENT

## THE FDIC-RECEIVER IS ENTITLED TO MODIFICATION OF THE AUTOMATIC STAY TO EXERCISE ITS SETOFF RIGHTS

52.     The automatic stay should be modified to permit the FDIC-Receiver to exercise its setoff rights against the balances held in the Accounts and to permit the FDIC-Receiver and any third party, including BB&T, to take such actions as may be necessary, under section 9.5 of the P&A Agreement or otherwise, to effectuate the foregoing.

53.     Under section 362(d)(1) of the Bankruptcy Code, upon request of a party in interest and after notice and a hearing, the Court shall grant relief from the automatic stay "for cause, including lack of adequate protection of any interest in property of such party in interest." 11 U.S.C. § 362(d)(1). What constitutes "cause" is determined on the totality of the circumstances in a particular case. *See Baldino v. Wilson (In re Wilson)*, 116 F.3d 87, 90 (3d Cir. 1998). In this case, "cause" exists to grant the relief requested to preserve the FDIC-Receiver's setoff rights under applicable nonbankruptcy law.

## A.    The FDIC-Receiver Has Valid Setoff Rights

54.    "The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the 'absurdity of making A pay B when B owes A.'" *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995).  A deposit is a form of debt.  As the Supreme Court explained in *Strumpf*, "it consists of nothing more or less than a promise to pay, from the bank to the depositor . . ." *Id.* at 290 (citing *Bank of Marin v. England*, 385 U.S. 99, 101 (1966) ("The relationship of bank and depositor is that of debtor and creditor, founded upon contract.")).

55.    The Bankruptcy Code does not disturb a creditor's right to setoff if such right arose under non-bankruptcy law prior to the filing of a petition.  *See* 11 U.S.C. § 553(a) (Bankruptcy Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against the claim of such creditor that arose before the commencement of the case").

56.    There is "practically a presumption in favor of allowing setoff" where such rights exist under applicable non-bankruptcy law.  *Carlton Co. v. Jenkins (In re Jenkins)*, No. 03-60548, 2004 WL 768574, at* 2 (Bankr. S.D. Ga. Mar. 30, 2004) (citing *S.E.C. v. Elliott*, 953 F.2d 1560, 1572 (11th Cir. 1992)).  The FDIC-Receiver is entitled to setoff against the funds in the Debtor's Accounts on at least two different grounds under applicable nonbankruptcy law.

57.    First, 12 U.S.C. § 1822(d) provides the FDIC-Receiver with what courts have recognized to be a statutory right of setoff against any portion of a depositor's insured deposits with a failed bank to the extent required "to provide for the payment of any liability of [the]

depositor to the" failed institution.[11]  *See Villafane Neris v. Citibank, N.A.*, 845 F. Supp. 930, 934 (D.P.R. 1994) (collecting cases); *see also Gross*, 974 F.2d at 408; *Northern Trust Co. v. F.D.I.C.*, 619 F. Supp. 1340, 1342 (W.D. Okla. 1985).

58.     The Accounts at issue here are insured deposits that are subject to the FDIC-Receiver's setoff rights under section 1822(d).  While the standard maximum deposit insurance amount currently is $250,000, *see* 12 C.F.R. § 330.1(n), under FDIC regulations promulgated in connection with its Temporary Liquidity Guarantee Program, this deposit insurance limit does not apply to "a depositor's funds in a noninterest-bearing transaction account maintained at a participating entity that is an insured depository institution . . . ."  12 C.F.R. § 370.4(a).  The Accounts at issue here fall within this exception.

59.     In addition, the FDIC-Receiver is entitled to setoff under applicable state law. Under Alabama law:

> [a] bank customer's deposit in a banking account becomes a debt from the bank to the customer.  When . . . mutual debts exist . . . the bank may, when the [the debt owed by the depositor] matures, apply the money it owes the depositor towards the depositor's debt to the bank.  *Rainsville Bank v. Willingham*, 485 So.2d 319 (Ala. 1986).

*In re Peterson*, 967 F.2d 505, 510 (11th Cir. 1992).  Like every other debt owed to a debtor, a deposit is subject to setoff within the parameters set forth in the Bankruptcy Code.

---

[11] Section 1822(d) provides:

> The [FDIC] may withhold payment of such portion of the insured deposit of any depositor in a depository institution in default as may be required to provide for the payment of *any liability of such depositor to the depository institution in default or its receiver*, which is not offset against a claim due from such depository institution, pending the determination and payment of such liability by such depositor or any other person liable therefor.

12 U.S.C. § 1822(d) (emphasis added).

60.     Here, the FDIC-Receiver is entitled to protect these nonbankruptcy setoff rights, which section 553 of the Bankruptcy Code expressly preserves. *See* 11 U.S.C. § 553(a). Under that section, a right to setoff otherwise existing under nonbankruptcy law is preserved in bankruptcy where: (1) a creditor holds a prepetition claim against the debtor; (2) the creditor owes a prepetition debt to the debtor; (3) the claim and the debt are mutual; and (4) the claim and the debt are valid and enforceable. 11 U.S.C. § 553; *see In re Akincibasi*, 372 B.R. 80, 84 (Bankr. M.D. Fla. 2007); *In re Nase*, 297 B.R. 12, 19 (Bankr. W.D. Pa. 2003). All of these criteria are satisfied.

61.     The alleged deposit liabilities that comprise the Accounts are a prepetition debt owed by Colonial Bank to the Debtor. Indeed, the FDIC-Receiver placed its administrative hold on those accounts almost two weeks prior to the petition date, as the Debtor's Cash Collateral Motion recited. *See* Cash Collateral Motion, ¶ 11. Likewise, the FDIC-Receiver's many different claims against the Debtor arose prepetition. The Debtor's capital maintenance commitment was made in January 2009 and reaffirmed in July 2009, and the approximately $900 million deficit under that obligation is considered to be prepetition for purposes of setoff analysis even though, under 11 U.S.C. § 365(o), the Debtor was deemed to have assumed that commitment as a condition to obtaining relief under chapter 11 of the Bankruptcy Code.[12]

---

[12] By operation of law, the Debtor was deemed to have assumed its prepetition capital maintenance commitment as a condition to obtaining relief under chapter 11 of the Bankruptcy Code. *See* 11 U.S.C. § 365(o); *R.T.C. v. FirstCorp., Inc. (In re FirstCorp., Inc.)*, 973 F.2d 243, 247 (4th Cir. 1992). For purposes of setoff analysis, however, the fact that the Debtor is now obligated to cure its commitment as a post-petition obligation is not relevant. "[A] debt arises pre-petition for set-off purposes when some 'right to payment' exists prepetition; that is, when an enforceable obligation exists at the time the debtor files his bankruptcy petition." *United States v. Myers (In re Myers)*, 362 F.3d 667, 673 (10th Cir. 2004) (citation omitted); *see United States v. Gerth*, 991 F.2d 1428, 1432 (8th Cir. 1993) (amounts owed under prepetition contract assumed by debtor postpetition could be setoff against prepetition debts).

62.     The FDIC-Receiver's claims of substantially more than $100 million for income tax refunds and other tax-related assets are similarly viewed as prepetition claims under the facts presented here. *See United States v. Carey (In re Wade Cook Fin. Corp.)*, 375 B.R. 580, 595-96 (9th Cir. B.A.P. 2007) (claims for tax refunds arising from application of NOL carrybacks were prepetition claims even though tax year ended post-petition). Nor can there be any real dispute that the FDIC-Receiver's up to $300 million claims with respect to the REIT preferred stock arose prepetition, when the Debtor's contribution of those securities to Colonial Bank was completed weeks before the petition was filed. The FDIC-Receiver's various other claims would be deemed prepetition under a similar analysis.

63.     That certain of the FDIC-Receiver's claims were unliquidated, unmatured or even contingent as of the filing of the Debtor's chapter 11 petition does not prevent setoff. *See, e.g., Braniff Airways v. Exxon Co.*, 814 F.2d 1030, 1035 (5th Cir. Tex. 1987) ("setoff may be asserted in bankruptcy even though one of the debts involved is absolutely owing but not presently due when the petition is filed") (citing *In re Nickerson & Nickerson, Inc.*, 62 B.R. 83, 85 (Bankr. D. Neb. 1986)); *In re Morristown Lincoln-Mercury, Inc.*, 42 B.R. 413, 417-18 (Bankr. E.D. Tenn. 1984) ("§ 553 does not prohibit setoff of a creditor's claim arising pre-petition, unliquidated or unmatured as of the petition date, against a debtor's pre-petition claim")); *Wade Cook Fin. Corp.*, 375 B.R. at 595-96 (income tax refunds); *In re Glenn*, 207 B.R. 419 (Bankr. E.D. Pa. 1997); *In re Rozel Industries, Inc.*, 120 B.R. 944, 949 (Bankr. N.D. Ill. 1990). As the case law makes clear, setoff is available based on claims that are "absolutely owing," even if the amount of such claim is not determined or other steps to collection have not been completed until after the petition date. All of the FDIC-Receiver's claims against the Debtor are "absolutely owing."

64.     As for the Debtor's capital maintenance commitment, "the meaning and function of § 365(o) is plain from its language:  in every Chapter 11 case, the trustee -- or, as here, the debtor-in-possession -- 'shall be deemed to have assumed' any capital maintenance commitment made by the debtor, and if a deficit under such a commitment arises, he 'shall immediately cure [it]'."  *R.T.C. v. FirstCorp, Inc. (In re FirstCorp., Inc.)*, 973 F.2d 243, 247 (4th Cir. 1992).

65.     Similarly, federal law provides that income tax refunds such as those at issue here are the "property of the [subsidiary], which could have generated the refund on its own had it filed with the IRS as a separate entity . . ."  *Capital Bancshares.*, 957 F.2d at 210.   Holding companies, such as the Debtor here, cannot claim a property right to such refunds to the extent that they arise from the income and losses generated, and taxes paid, by their bank subsidiaries. Regulators have made clear that for a holding company to lay claim to such refunds would be considered an "unsafe and unsound banking practice." See Policy Statement, 63 Fed. Reg. at 64758  As for the REIT preferred stock, the Exchange Agreement dated as of May 21, 2007 among the Debtor, Colonial Bank and Colonial Bank's subsidiary CBG Florida REIT Corp. expressly provides that in the event a conditional exchange of those securities ever was directed by bank regulators, the holding company would contribute all of those securities to Colonial Bank and record that transfer as a capital contribution, just as it did in this instance.

66.     Mutuality also is satisfied.  The FDIC-Receiver has claims against the Debtor and controls the Accounts which the Debtor contends are debts owed to it.  *See Jenkins*, 2004 WL 768574, at *3 (citation omitted); *Travelers Indem. Co. v. Conner Ins. Agency (In re Conner Ins. Agency)*, No. 93-20279, 1994 WL 16006138 (Bankr. N.D. Ga. Nov. 4, 1994).

67.     In its summary judgment motion filed recently in response to the Motion, the Debtor asserted that there is no mutuality "because all of the responsibilities associated with the

Debtor Accounts were transferred by the FDIC-Receiver from Colonial Bank to, and assumed by, BB&T." [D.I. 468 at 13]. However, in its Cash Collateral Motion, the Debtor asserted that "[f]or several days prior to the Petition Date and continuing to the date of this Motion, the [FDIC-Receiver] has placed a 'hold' on the Bank Accounts, which has resulted in the Debtor's inability to access any funds in the Bank Accounts." Cash Collateral Motion, ¶ 11. Then, in its receivership proof of claim, the Debtor asserted a claim (characterized as "protective") against the FDIC-Receiver for the balances in the Accounts.

68. Section 9.5 of the P&A Agreement provides the FDIC-Receiver the contractual right to direct BB&T "to withhold payment of all or any portion of any" deposit balance assumed under the P&A Agreement and to direct BB&T to "return all or any portion of such deposit balance to the Receiver . . . " P&A Agreement, § 9.5. *See Gross*, 974 F.2d at 403; *see also F.D.I.C. v. McAtee*, 1988 U.S. Dist. LEXIS 12267, at *5-*6 (D. Kan. Oct. 5, 1988). While the formal transfer of the Accounts is unnecessary to perfect mutuality, as the Debtor's own prior statements and actions demonstrate, this Amended Motion expressly requests this Court's authority to provide such an instruction to BB&T, and for BB&T to carry it out, to the extent the automatic stay might be deemed to apply.

69. In sum, under section 553(a), the FDIC-Receiver is entitled to setoff against the Account balances.

### B. Cause Exists to Modify the Automatic Stay.

70. Cause exists for modification of the automatic stay as requested by the FDIC-Receiver in this Amended Motion. Given the substantial amounts owed by the Debtor, a substantial deficiency will still be owed the FDIC-Receiver on the Debtor's obligations after such setoff. Setoff is warranted, however, to eliminate the Debtor's continued attempts to use

the Account balances to fund professional fees that are largely being spent on actual or contemplated litigation against the FDIC-Receiver.

71.     "[T]he [automatic] stay is not meant to be indefinite or absolute, and in appropriate instances, relief may be granted." *Izzarelli v. Rexent Prods. Co. (In re Rexene Prods. Co.)*, 141 B.R. 574, 576 (Bankr. D. Del. 1992) (citing *Wedgewood Inv. Fund Ltd. v. Wedgewood Realty Group Ltd. (In re Wedgewood),* 878 F.2d 693, 697 (3d Cir. 1989)).   Under section 362(d)(1) of the Bankruptcy Code, the Court shall grant relief from the automatic stay "for cause, including lack of adequate protection of any interest in property of such party in interest." 11 U.S.C. § 362(d)(1).

72.     Courts generally recognize that once a creditor has established a right of setoff, as the FDIC-Receiver has done here, that creditor also has made a prima facie showing of "cause" for relief from the automatic stay under section 362(d)(1). *In re Ealy*, 392 B.R. 408, 414 (Bankr. E.D. Ark. 2008); *In re Orlinski*, 140 B.R. 600, 603 (Bankr. S.D. Ga. 1991); *see also U.S. v. Gould*, 401 B.R. 415, 426 (9th Cir. B.A.P. 2009); *In re Nuclear Imaging Systems, Inc.*, 260 B.R. 724, 730 (Bankr. E.D. Pa. 2000).   The right of setoff is the right not to part with one's own funds.   *Strumpf*, 516 U.S. at 21.   A creditor holding a right of setoff is said to be "the best secured of creditors" because his "security" is "his own justified refusal to pay[.]"   *United States v. Munsey Trust Co.*, 332 U.S. 234, 240 (1947).

73.     Thus, in the absence of a showing of adequate protection, a creditor such as the FDIC-Receiver here is entitled to relief from the automatic stay to exercise its setoff rights.   *See In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1019 (11th Cir. 1984); *In re Blanton*, 105 B.R. 321, 337 (Bankr. E.D. Va. 1989).   Adequate protection is a form of relief afforded to creditors whose interest in the debtor's property is such that the passage of time or

continuation of the debtor's business could cause prejudice to the creditor. *See, e.g.*, *In re Engle*, 93 B.R. 58, 61 (E.D. Pa. 1987).

74. Adequate protection is provided as an alternative to relief from the automatic stay and, conversely, relief from the automatic stay is justified where a lack of adequate protection exists. In short, adequate protection compensates a creditor for forebearing on its right to seek relief from the stay. *Id.* The purpose of adequate protection is to insure the creditor receives the value for which he bargained before the debtor's bankruptcy. *In re Swedeland Development Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 376, 386 (Bankr. E.D. Pa.), *aff'd*, 75 B.R. 819 (E.D. Pa. 1987).

75. Here, the FDIC-Receiver has received nothing in the way of adequate protection, either in the form of cash payments, a replacement lien, or other "indubitable equivalent." Relief from the automatic stay therefore is necessary and appropriate. Continuation of the automatic stay, on the other hand, would provide little or no benefit to the Debtor, its estate or creditors and is far outweighed by the benefit modification would provide the FDIC-Receiver. *See In re King*, No. 08-10892, 2008 Bankr. LEXIS 1983 (Bankr. N.D. Ga. May 29, 2008) (allowing modification of stay to permit setoff where turnover of funds could not be granted because it would destroy right to setoff and leaving stay in place would accomplish nothing). Given the FDIC-Receiver's right to setoff under both federal and state law, the FDIC-Receiver respectfully submits that it has met its initial burden of establishing cause for relief from the stay.

76. Modification of the stay also is warranted under section 362(d)(2) of the Bankruptcy Code, which permits modification of the stay "if – (A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization . . . ." 11 U.S.C. § 362(d)(2).

77. Relief from the automatic stay should be granted under section 362(d)(2) where, as in this case, the amount of a debtor's obligation to a creditor requesting relief exceeds the value of collateral securing those debts. *See In re Sunshine Books, Ltd.*, 41 B.R. 712 (Bankr. E.D. Pa. 1984). "Once the movant under 362(d)(2) establishes that he is an undersecured creditor, it is the burden of the debtor to establish that the collateral at issue is "necessary to an effective reorganization." *See* 11 U.S.C. § 362(g); *see also United Sav. Assoc. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 376 (1988).

78. Courts have interpreted the term "equity" to refer to the difference between the value of the property and all encumbrances against it. *See, e.g., Nantucket Investors II v. California Fed. Bank (In re Indian Palms Assocs., Ltd.)*, 61 F.3d 197, 207 (3d Cir. 1995). In the instant case, the Debtor does not have any equity in the deposit accounts since the amount owed to the FDIC-Receiver of more than $1 billion far exceeds the balances in the Accounts of less than $40 million.

79. Further, the funds in the Accounts are not necessary for an effective reorganization because the Debtor has shown no ability to cure the outstanding deficit under its capital maintenance commitment, and if the Debtor cannot cure that deficit then its case is subject to conversion to a liquidation under chapter 7 of the Bankruptcy Code pursuant to Bankruptcy Code section 365(o). *See Wolkowitz v. Imperial Credit Indus., Inc (In re Imperial Credit Indus., Inc.)*, 527 F.3d 959, 975 (9th Cir. 2008); *O.T.S. v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.)*, 236 F.3d 1246, 1253 (10th Cir. 2001); *FirstCorp.*, 973 F.2d at 247.[13]

---

[13] Separately, the FDIC-Receiver has filed the 365(o) Motion seeking to convert this case to a liquidation under chapter 7 of the Bankruptcy Code based on the Debtor's failure to immediately cure its deficit under its capital maintenance commitment.

## CONCLUSION

For the foregoing reasons, the FDIC-Receiver respectfully submits that cause exists to grant relief from the stay pursuant to Bankruptcy Code sections 362(d) to allow the FDIC-Receiver to exercise its setoff rights under applicable nonbankruptcy law and for the FDIC-Receiver and third parties to take such related actions as may be necessary to do so.

## NOTICE

80.     Notice of this Amended Motion has been provided to those parties who have filed in this chapter 11 case a request for notice.  In addition, the FDIC-Receiver previously served the Court's Order Setting Hearing, together with a copy of the original Motion and its supporting papers, on each party in interest in this chapter 11 case.  *See* Certificate of Service dated October 7, 2009.  [D.I. 164]  In light of the nature of the relief requested, the FDIC-Receiver submits that no other or further notice need be provided.

## PRIOR REQUEST

81.     The FDIC-Receiver has made one prior motion for the relief requested herein. [D.I. 156]  This Amended Motion is an amendment of that prior request.

**WHEREFORE**, the FDIC-Receiver respectfully requests that this Court enter an order substantially in the form attached hereto modifying the automatic stay to permit the FDIC-Receiver to exercise its setoff rights under nonbankruptcy law and granting the FDIC-Receiver such other relief as may be just and proper.

Dated:  Montgomery, Alabama
       January 22, 2010

Respectfully submitted,


 /s/ Michael A. Fritz, Sr.               
Michael A. Fritz, Sr.
Fritz & Hughes LLC
7020 Fain Park Drive Suite 1
Montgomery, AL 36117
(334) 215-4422

- and -

Thomas R. Califano
John. J. Clarke, Jr.
Jeremy R. Johnson
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York  10020-1104
Telephone:     212-335-4500
Facsimile:      212-335-4501

Attorneys for the
Federal Deposit Insurance Corporation
as Receiver for Colonial Bank

# Exhibit A

<u>(Form of Order)</u>

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **THE COLONIAL BANCGROUP, INC.,** | **Case No. 09-32303(DHW)** |
| **Debtor.** | |

### ORDER GRANTING MOTION OF THE  FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR COLONIAL BANK, FOR RELIEF FROM THE AUTOMATIC STAY

The Federal Deposit Insurance Corporation, as receiver for Colonial Bank, Montgomery, Alabama (the "FDIC-Receiver"), having moved for an order pursuant to 11 U.S.C. § 362(d) modifying the automatic stay (the "Motion") to permit the FDIC-Receiver to exercise its setoff rights with respect to the balances held in seven demand deposit accounts in the name of the debtor and debtor-in-possession The Colonial BancGroup, Inc. (the "Debtor") that are held by Branch Banking & Trust Company ("BB&T") under the control of the FDIC-Receiver, with account numbers ending in 1127, 5437, 5460, 5452, 5445 and 3218 (the "Accounts"); and the Court having reviewed the Motion and the responses thereto of the Debtor and other parties in interest; and a hearing having been held on the Motion on _____,

**NOW, THEREFORE**, the Court having determined that the legal and factual bases provided by the FDIC-Receiver in support of the Motion establish just cause for the relief granted herein, and due and sufficient notice having been provided;

**IT IS HEREBY ORDERED:**

1.      The Motion of the FDIC-Receiver is granted.

2.      The automatic stay provided under 11 U.S.C. § 362 in this bankruptcy case is hereby modified to permit the FDIC-Receiver to offset the aggregate balances held in the Accounts, $_____, against and in partial satisfaction of the FDIC-Receiver's claims against the Debtor (the "Setoff") pursuant to 11 U.S.C. § 362(d) and 553, Alabama law and 12 U.S.C. §1822(d).

3.      The FDIC-Receiver, BB&T, the Debtor and all other third parties are hereby authorized and directed to take such actions and file such documents as may be necessary to permit and facilitate the Setoff.

4.      This Court will retain jurisdiction to address all disputes related to the interpretation or enforcement of this Order.

       **SO ORDERED** this ___ day of _____, 2009.

                                          _____
                                          United States Bankruptcy Judge