# UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

```
-------------------------------------------------------------x
                                      :
In re                                 :        Chapter 11
                                      :
THE COLONIAL BANCGROUP, INC.,         :        Case No. 09-32303 (DHW)
                                      :
              Debtor.                 :
                                      :
-------------------------------------------------------------x
```

## OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO AMENDED MOTION OF THE FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR COLONIAL BANK, FOR AN ORDER MODIFYING THE AUTOMATIC STAY

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtor and debtor in possession (the "Debtor"), by its undersigned counsel, hereby submits this objection (this "Objection") to the amended motion (the "Amended Motion") of the Federal Deposit Insurance Corporation (the "FDIC-Receiver") for an Order modifying the automatic stay to enable the FDIC-Receiver to exercise purported setoff rights against certain of the Debtor's bank accounts (the "Debtor Deposits") held at Branch Banking & Trust Co. ("BB&T").

### Preliminary Statement

1.       The facts relating to the FDIC-Receiver's Amended Motion are clear and undisputed.  On August 14, 2009, the FDIC-Receiver seized and sold the assets of Colonial Bank, Montgomery, Alabama ("Colonial Bank") to BB&T pursuant to a Purchase and Assumption Agreement (the "Purchase and Assumption Agreement").  Pursuant to the Purchase and Assumption Agreement, all deposits, including the Debtor Deposits, were transferred to, and

assumed by, BB&T.  Since that time, as recognized by the FDIC-Receiver and BB&T in pleadings, filings and other documents, BB&T, and not Colonial Bank or the FDIC-Receiver, has been the obligor to the Debtor with respect to the Debtor Deposits.

2.      The law with respect to setoff is equally clear.  Section 553 of the Bankruptcy Code requires that to maintain a right of setoff, a creditor must establish that (1) a debt exists from the creditor to the debtor and that debt arose prior to the commencement of the bankruptcy case; (2) the creditor has a claim against the debtor which arose prior to the commencement of the bankruptcy case; and (3) the debt and the claim are mutual obligations. *See B.F. Goodrich Employees Fed. Credit Union v. Patterson (In re Patterson)*, 967 F.2d 505, 509 (11th Cir. 1992) ("In preserving the right of setoff, Section 553 requires that the obligation between the debtor and creditor arose before filing the bankruptcy petition and that mutuality of obligation exists."); *Braniff Airways, Inc. v. Exxon Co., USA. (In re Braniff)*, 814 F.2d 1030, 1035 (5th Cir. 1987).  Debts entitled to setoff are mutual only when "they are due to and from the same persons in the same capacity." *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 149 (2d Cir. 2002) (further citations omitted).

3.      Yet by the Amended Motion, the FDIC-Receiver seeks to set off (i) certain alleged and disputed pre-petition claims <u>of the FDIC-Receiver</u> against the Debtor against (ii) a pre-petition deposit liability <u>of BB&T</u> to the Debtor.[1]  The failure of the FDIC-Receiver to satisfy the mutuality requirement is self-evident.

---

[1] The FDIC-Receiver's alleged and disputed claims are the subject of significant, related litigation and briefing before both this Court and the District Court for the Middle District of Alabama.  Obviously, a prerequisite to the relief sought in the Amended Motion is that the FDIC-Receiver must establish that it has a legitimate claim against the Debtor's estate.  This Objection does not review and reiterate the disputes and arguments relating to the FDIC-Receiver's disputed claims.  Instead, this Objection focuses on whether -- even if the FDIC-Receiver were able to establish a valid pre-petition claim against the Debtor -- the FDIC-Receiver would be able to setoff such claim against the Debtor Deposits held by BB&T.  For the reasons set forth herein, the Committee respectfully submits that even if the FDIC-Receiver could establish pre-petition claims against the Debtor -- which it cannot -- the FDIC-Receiver would not be entitled to setoff such claims against the Debtor Deposits.

4.      The FDIC-Receiver argues that this Court should disregard the lack of mutuality and should instead focus on the FDIC-Receiver's "control" over the Debtor Deposits.  In support of this argument, the FDIC-Receiver cites a contractual provision in the Purchase and Assumption Agreement that allegedly allows the FDIC-Receiver to instruct BB&T as to whether and when to satisfy BB&T's liability to the Debtor relating to the Debtor Deposits.  Even if that were accepted as true, the clear and well-established test for mutuality is whether the relevant claim and debt exist between the same parties.  Whether or not the FDIC-Receiver has a contractual right to control or influence the decision-making of the entity that owes the debt is entirely irrelevant.[2]  The Debtor Deposits represent a liability of BB&T to pay the Debtor a sum certain upon demand.  The Debtor Deposits are not "debts" of Colonial Bank or the FDIC-Receiver, and accordingly, the Amended Motion and any effort by the FDIC-Receiver to effect a setoff of the Debtor Deposits must be denied.

## Background

5.      On August 14, 2009, the Alabama State Banking Department closed Colonial Bank, and the FDIC-Receiver was appointed as receiver.

6.      Upon closing Colonial Bank, the FDIC-Receiver entered into the Purchase and Assumption Agreement with BB&T.  Pursuant to the Purchase and Assumption Agreement, among other things, (i) the FDIC-Receiver sold a significant portion of Colonial Bank's assets to BB&T and (ii) BB&T agreed to assume all of the deposits of Colonial Bank.

---

[2] In addition to being irrelevant, the FDIC-Receiver's claim of "control" is incorrect.  A contractual right does not equal control.  If BB&T were to disregard the FDIC-Receiver's instructions, the FDIC-Receiver's recourse would be to seek damages under the Purchase and Assumption Agreement.  In fact, BB&T is the party with actual control over the Debtor Deposits.

7.      On August 14, 2009, the FDIC-Receiver issued a Press Release that stated: "To protect the depositors, the FDIC entered into a purchase and assumption agreement with [BB&T] to assume <u>all</u> of the deposits of Colonial Bank . . .BB&T's acquisition of <u>all</u> of the deposits was the "least costly" resolution for the FDIC's [Deposit Insurance Fund] compared to the alternatives." (emphasis added) A copy of this Press Release is attached as <u>Exhibit A</u>.

8.      On August 14, 2009, the Alabama State Banking Department also issued a Press Release, which stated that "[a]ll deposit accounts of Colonial Bank have been transferred to BB&T and are available immediately." (emphasis added) A copy of this Press Release is attached as <u>Exhibit B</u>.

9.      In addition, in connection with the FDIC's seizure and sale of Colonial Bank, the FDIC-Receiver posted "Failed Bank Information" on its website (www.fdic.gov). The Failed Bank Information included a question and answer guide relating to the Colonial Bank failure, which states, among other things, that "[i]f you had an account with Colonial Bank, you now have an account with BB&T. All deposit accounts, which include checking, savings, money market, CDs and retirement accounts, have been transferred to BB&T, regardless of the dollar amount. No one lost any money on deposit in Colonial Bank." Q&A at p. 2 of 4. A copy of the question and answer guide is attached hereto as <u>Exhibit C</u>.

10.      On August 25, 2009 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

11.      On September 28, 2009, upon recommendation by the Bankruptcy Administrator for the Middle District of Alabama, this Court appointed the Committee to serve as fiduciary to the many unsecured creditors in this case, who collectively hold claims against the Debtor in excess of $350 million.

12.     On October 5, 2009, the FDIC-Receiver filed an Emergency Motion of the Federal Deposit Insurance Corporation, as Receiver for Colonial Bank, for an Order Modifying the Automatic Stay [DE: 156] (the "Stay Relief Motion"), which sought relief from the automatic stay to exercise purported setoff rights against the Debtor Deposits at BB&T.

13.     On October 14, 2009, this Court entered its Agreed Final Order Granting Debtor's Emergency Motion for Use of Cash Collateral [D.E. 192] (the "Cash Collateral Order"), which states that "the Debtor seeks to use a portion of funds which, as of August 25, 2009 . . . were on deposit in its depository accounts . . . at Branch Banking & Trust Company . . ." Cash Collateral Order at 1.

14.     On November 19, 2009, the Debtor filed a proof of claim in the Colonial Bank receivership (the "Receivership Claim"), which included a "protective claim for the outstanding balance in each of the [Debtor Deposits] in the event the FDIC-Receiver purports to exercise any rights it may assert under the P&A Agreement or otherwise with respect to the [Debtor Deposits]."  Receivership Claim at ¶ 40.

15.     On January 6, 2010, the FDIC-Receiver sent the Debtor a notice purporting to disallow the Receivership Claim in full.  A copy of the FDIC notice of disallowance is attached as Exhibit D.

16.     On January 22, 2010, the FDIC-Receiver filed the Amended Motion [DE: 499].

<u>**Applicable Authority**</u>

**A. Requirements For Relief From The Automatic Stay**

17.     The automatic stay is "one of the fundamental debtor protections provided by the bankruptcy laws." *In re Patterson*, 967 F.2d at 512, fn. 9.  The filing of a bankruptcy petition operates as a stay "applicable to all entities" of, *inter alia*, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).

18.     By the Amended Motion, the FDIC-Receiver seeks relief from the automatic stay to effect a setoff against the Debtor Deposits.  Under section 362(d) of the Bankruptcy Code, the FDIC-Receiver, as the moving party, has the burden to make a *prima facie* case that it is entitled to the relief that it seeks.  *See In re Powell*, 223 B.R. 225, 232 (Bankr. N.D. Ala. 1998).  If the FDIC-Receiver fails to make a *prima facie* showing under sections 362(d)(1) and 362(d)(2), the Court must dismiss this motion without requiring the Debtor to offer any evidence.  *In re Worldcom, Inc.*, 2003 WL 22025051, at *4 (Bankr. S.D.N.Y. 1/30/03).

19.     In order to exercise a valid right of setoff, a creditor must move the court for relief from the automatic stay pursuant to the provisions in section 362(d) of the Bankruptcy Code.  *See In re Patterson*, 967 F.2d at 509.  The decision regarding whether to lift the stay lies in the sound discretion of the bankruptcy court.  *See id.*  A court may lift the automatic stay "for cause" under section 362(d)(1), but "cause" under section 362(d)(1) "has no clear definition and is determined on a case-by-case basis."  *In re Tuscon Estates, Inc.,* 912 F.2d 1162, 1166 (9th Cir. 1990).  Courts have found that by establishing a right of setoff, the moving party has made a prima facie showing of "cause" for relief from the stay under section 362(d)(1).  *See, e.g., In re*

*Orlinksi*, 140 B.R. 600, 603 (Bankr. S.D. Ga. 1991).  As detailed herein, because the FDIC-Receiver cannot establish a valid right of setoff with respect to the Debtor Deposits, it cannot establish a prima facie showing of "cause" for relief from the stay.

**B.  Requirements For Setoff**

20.     "Setoff is an established creditor's right to cancel out mutual debts against one another in full or in part.  The purpose of setoff is to 'avoid the absurdity of making A pay B when B owes A'." *In re Patterso*n, 967 F.2d at 508.  "Section 553 [of the Bankruptcy Code] merely 'preserves for the creditor's benefit any setoff right that it may have under applicable nonbankruptcy law', and 'imposes additional restrictions on a creditor seeking setoff' that must be satisfied for a creditor to effectuate a setoff against a debtor in bankruptcy." *In re Bill Heard Enter.,* 400 B.R. 813, 823 (Bankr. N.D.Ala. 2009) (citing *In re SemCrude, L.P.*, 399 B.R. 388, 393 (Bankr. D.Del. 2009) (further quotations omitted)).

21.     Section 553(a) of the Bankruptcy Code provides, in relevant part:

> [T]his title does not effect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case . . .

11 U.S.C. § 553(a).

22.     Thus, section 553 of the Bankruptcy Code requires that to maintain a right of setoff, a creditor must establish that (1) a debt exists from the creditor to the debtor and that debt arose prior to the commencement of the bankruptcy case; (2) the creditor has a claim against the debtor which arose prior to the commencement of the bankruptcy case; and (3) the debt and claim are mutual obligations.  *See In re Braniff*, 814 F.2d at 1035.

7

23.     "The threshold requirement of mutuality is that the relevant claim and debt exist between the 'same parties,' meaning simply enough that, whereas A and B may offset their mutual obligations, A may not offset an obligation that it owes to B against a debt that B owes to C."  5 *Collier on Bankruptcy*, ¶ 553.03[3][b] (15th ed. rev. 2009); *see also Westinghouse Credit Corp., 278 F.3d at 149* (further citations omitted) (stating that debts entitled to set off are mutual only when "they are due to and from the same persons in the same capacity"); *In re Braniff,* 814 F.2d at 1036 (further citations omitted) (stating that mutuality requires "that each party…own his claim in his own right severally, with the right to collect in his own name [and] in his own right and severally").

24.     Section 553 of the Bankruptcy Code requires a mutual debt and precludes "triangular" set off.  *See In re Berger Steel Co.,* 327 F.2d 401, 403-04 (7th Cir.1964); *Depositors Trust Co. v. Frati Enterprises, Inc.,* 590 F.2d 377, 379 (1st Cir.1979).  "[C]ourts have routinely held that triangular setoffs are impermissible in bankruptcy."  *In re SemCrude,* 399 B.R. at 393 (citing *Matter of United Sciences of America, Inc.,* 893 F.2d 720, 723 (5th Cir.1990) ("The mutuality requirement is designed to protect against 'triangular' set-off; for example, where the creditor attempts to set off its debt to the debtor with the latter's debt to a third party.") *and In re Elcona Homes Corp. (Green Tree Acceptance, Inc.),* 863 F.2d 483, 486 (7th Cir.1988) (noting the preclusion of "triangular set offs")).

25.     Thus, even if two parties are related, they may not aggregate their debts and claims for setoff purposes.  *See 5 Collier on Bankruptcy*, ¶ 553.03[3][b][i] (15th ed. rev. 2009) ("For example, a subsidiary may not offset a debt to the debtor against a debt the debtor owes to another related subsidiary.  Also, a parent corporation may not offset a debt owed to the debtor against its subsidiary's claim against the debtor.").

26. Mutuality is strictly construed against the party seeking setoff, and the party asserting setoff has the burden of proof by a preponderance of the evidence. *See In re Bennett Funding Group, Inc.*, 212 B.R. 206, 212 (2d Cir. BAP 1997); *In re Bill Heard*, 400 B.R. at 823-824; *In re EBW Laser, Inc.*, 2009 WL 116995, at *2 (Bankr. M.D.N.C. 1/15/09).

## Committee Objection

### A. The Debtor Deposits Are Not "Debts" Of Colonial Bank Or The FDIC-Receiver And Thus The FDIC-Receiver Cannot Establish Mutuality As Required For Setoff Of The Debtor Deposits.

27. On August 14, 2009, the FDIC-Receiver seized and sold the assets of Colonial Bank to BB&T pursuant to the Purchase and Assumption Agreement. All deposits, including the Debtor Deposits, were transferred to, and assumed by, BB&T.

28. The evidence that the Debtor Deposits were assumed by BB&T is overwhelming and uncontroverted, and includes the following:

- In the Amended Motion, the FDIC-Receiver does not assert that the Debtor Deposits constitute debts of Colonial Bank, but instead it argues that it has effective "control" over the Debtor Deposits;
- In the Amended Motion, the FDIC-Receiver seeks to enforce the provisions of section 9.5 of the Purchase and Assumption Agreement, which would be unnecessary if the Debtor Deposits were held at Colonial Bank;
- Plain language of the Purchase and Assumption Agreement provides for the assumption of deposit accounts by BB&T;
- On August 14, 2009, both the FDIC and the Alabama State Banking Department issued press releases stating that all deposit accounts of Colonial Bank had been transferred to BB&T;
- In numerous filings and pleadings in this case, including the Cash Collateral Order, the FDIC-Receiver has acknowledged that the Debtor Deposits are at BB&T;
- The FDIC denied any liability with respect to the Debtor Deposits by rejecting the Debtor's proof of claim in the Colonial Bank receivership, which proof of claim included a "protective claim for the outstanding balance in each of the [Debtor Deposits] in the event the FDIC-Receiver purports to exercise any rights it may assert under the P&A Agreement or otherwise with respect to the [Debtor Deposits]…";

- BB&T has issued numerous bank account statements reflecting that the Debtor Deposits are deposit accounts at BB&T; and
- Upon information and belief, all transfers of funds from the Debtor Deposits during the bankruptcy case have been made by BB&T.

29.     Notwithstanding that the Debtor Deposits have constituted obligations of BB&T - - and not Colonial Bank -- since August 14, 2009, the FDIC-Receiver asserts in the Amended Motion that it has (i) a federal statutory right of setoff under 12 U.S.C. § 1822(d) (Amended Motion at ¶¶ 57-58) and (ii) a right of setoff under Alabama state law (Amended Motion at ¶¶ 59-60) . The FDIC-Receiver cites no statutory or case authority that would suggest that either of these statutory rights of setoff lacks the requirement of mutuality.

30.     Section 1822(d) itself clearly requires mutuality. It provides: "The . . . [FDIC] may withhold payment of any such portion of the insured deposit of any depositor in a depository institution in default as may be required to provide for the payment of any liability of such depositor to the depository institution in default or its receiver." 12 U.S.C. § 1822(d). The statute thus clearly requires mutuality, providing that a failed bank can withhold the deposit of a depositor that is indebted to such failed bank. In addition, the deposit must be "in a depository institution in default." Here, the deposit is not with the defaulted depository institution, Colonial Bank, but rather is with BB&T. If the FDIC-Receiver had wanted to rely on section 1822(d), it could have done so by not transferring liability relating to the Debtor Deposits to BB&T on August 14, 2009. Having transferred the liabilities, however, the FDIC-Receiver cannot justifiably now assert a right of setoff under 1822(d).[3]

---

[3] FIRREA empowers the FDIC to organize thrift institutions to "take over such assets or such liabilities as [the FDIC] may determine to be appropriate", and courts interpret purchase and assumption agreements based on their plain language. *See Nashville Lodging Co. v. Resolution Trust Corp.*, 59 F.3d 236, 247 (D.C. Cir. 1995) (finding plaintiff could not setoff against successor bank because successor bank acquired asset but not liability pursuant to purchase and assumption transaction).

31.     Similarly, for setoff to be asserted under Alabama law, there must be "mutuality." *See Atkinson v. FDIC*, 635 F.2d 508, 511-12 (5th Cir. 1981) (FDIC was not entitled to setoff husband's debt against the husband and wife's joint deposit account because the demand between the bank and the depositor was not "mutual" under Alabama law); *King v. Porter*, 160 So. 101, 116 (Ala. 1938); *First Nat'l Bank of Abbeville v. Capps*, 94 So. 109, 110 (Ala. 1922). In fact, the FDIC-Receiver's Amended Motion cites the following as applicable Alabama law on setoff: "When . . . *mutual debt exists* . . . the bank may, when the debt owed by the depositor matures, apply the money it owes the depositor towards the depositor's debt to the bank." Amended Motion at ¶ 59 (citing *In re Peterson* [sic], 967 F.2d 505, 510 (11th Cir. 1992) (emphasis added)).

32.     The requirement that a creditor demonstrate mutuality is a prerequisite to setoff under both bankruptcy law and applicable non-bankruptcy law.  Even if the FDIC-Receiver were able to establish that applicable non-bankruptcy law permitted setoff without mutuality -- which it plainly cannot -- the FDIC-Receiver would still not be able to establish the right to setoff in bankruptcy, which requires both (i) an independent right of setoff under applicable nonbankruptcy law and (ii) that the proposed setoff meets the further Bankruptcy Code-imposed requirements and limitations set forth in section 553.  *See In re SemCrude*, 399 B.R. at 393; *see also In re Bill Heard*, 400 B.R. at 823.

33.     As such, in light of the fact that the "debt" owed to the Debtor in respect of the Debtor Deposits is owed by BB&T and not Colonial Bank, the FDIC-Receiver's efforts to establish a right of setoff relating to the Debtor Deposits is without basis and should be denied by this Court.

**B. Whether Or Not The FDIC-Receiver Is Able To Contractually Prohibit BB&T From Satisfying Its Liabilities With Respect To The Debtor Deposits Is Irrelevant To The Question Of Mutuality For Setoff.**

34.     The FDIC-Receiver attempts to sidestep the lack of mutuality by arguing that the FDIC-Receiver "controls the Accounts which the Debtor contends are debts owed to it." Amended Motion at ¶ 66. This argument has no basis, support or justification under the law.

35.     As an initial matter, the FDIC-Receiver's claim of "control" is incorrect. A contractual right does not equal control. If BB&T were to disregard the FDIC-Receiver's instructions, the FDIC-Receiver's recourse would be to seek remedies under the Purchase and Assumption Agreement. Thus, it is BB&T that is the party with actual control over the Debtor Deposits. As noted above, however, the question of who controls the Debtor Deposits is irrelevant to this legal analysis.

36.     More importantly, section 553 of the Bankruptcy Code requires that a party seeking to effectuate a setoff against a debtor must establish that it owes the Debtor a pre-petition "debt." As discussed above, in the Amended Motion, the FDIC does not assert that Colonial Bank owes the Debtor a pre-petition "debt" in respect of the Debtor Deposits. In fact, all of the facts and circumstances in this case confirm that the "debt" relating to the Debtor Deposits is owed by BB&T. It is for that reason that the FDIC-Receiver instead focuses on trying to establish that it has a right to control the actions of the party (BB&T) that owes the Debtor the pre-petition debt.

37.     If "control" were the applicable standard instead of "owing a debt", parent companies would arguably have an ability to use the debts of its subsidiaries to effectuate setoffs.[4] If "contractual control" were the applicable standard, then contracts could be drafted to include language that would enable parties to transfer debts but retain rights of setoff.  Such arguments have been rejected.[5]

38.     Simply stated, the concept of "control" is irrelevant.  The Debtor Deposits are not "debts" of the Colonial Bank receivership, and thus, the FDIC-Receiver cannot satisfy the mutuality requirement for setoff.

## C.  Any Post-petition Assumption By The FDIC Of The Debtor Deposits -- Whether Through Section 9.5 Of The Purchase And Assumption Agreement Or Otherwise -- Would Constitute A Post-petition Incurrence Of Debt That Could Not Be Set Off Against Pre-petition Claims.

39.     In paragraph 68 of the Amended Motion, the FDIC appears to request authority to exercise a purported contractual right in the Purchase and Assumption Agreement that would effectively require BB&T to convey both the cash and liabilities relating to Debtor Deposits to the FDIC-Receiver.[6]  The FDIC-Receiver's attempt to manufacture mutuality post-petition, however, is flawed in several respects and cannot form the basis for a valid setoff under section 553 of the Bankruptcy Code.[7]

---

[4] 5 *Collier on Bankruptcy*, ¶ 553.03[3][b][i] (15th ed. rev. 2009) ("[A] parent corporation may not offset a debt owed to the debtor against its subsidiary's claim against the debtor.").

[5] *See In re SemCrude*, 399 B.R. at 398 (finding that "non-mutual debts cannot be transformed into a 'mutual debt' under section 553 simply because a multi-party agreement allows for setoff of non-mutual debts between the parties to the agreement.").  The Delaware bankruptcy court further stated that "no exception to the 'mutual debt' requirement in section 553 [can] be created by private agreement."  *Id.* at 399.  Finally, the court noted that contracting around the mutuality requirement would undercut the very equities on which the Code was built.  "By allowing parties to contract around the mutuality requirement of section 553, one creditor or a handful of creditors could unfairly obtain payment from a debtor at the expense of the debtor's other creditors, thereby upsetting the priority scheme of the Code and reducing the amount available for distribution to all creditors."  *Id.* at 399.

[6] Section 9.5 of the Purchase and Assumption Agreement states, *inter alia*, "[a]t the direction of the Receiver or the Corporation, the Assuming Bank shall return all or any portion of such deposit balance to the Receiver or the Corporation, as appropriate, and thereupon the Assuming Bank shall be discharged from any further liability to such depositor with respect to such returned deposit balance."

40.    As an initial matter, the Debtor Deposits are property of the estate and any act to obtain possession of property of the estate or to exercise control over property of the estate is barred by the automatic stay. [8] *See* 11 U.S.C. § 362(a)(3). In the Amended Motion, the FDIC-Receiver cites to a number of cases that allowed relief from the automatic stay to effectuate a valid setoff. In the present case, however, the FDIC-Receiver is not seeking to effectuate a valid setoff but instead is asking for relief from the automatic stay in order to obtain possession of property of the estate so as to <u>create</u> a right of setoff. While the foregoing is not an appropriate ground for relief from the automatic stay, the issue is largely irrelevant because even if the FDIC-Receiver were able to assume the Debtor Deposits "debts", section 553 of the Bankruptcy Code prevents the FDIC-Receiver from using a debt incurred post-petition to create a right of setoff. *See* 11 U.S.C. § 553(a).

41.    As noted above, in order to establish a right to setoff under section 553 of the Bankruptcy Code, in addition to mutuality, a creditor must establish that (1) a debt exists from the creditor to the debtor and that debt arose prior to the commencement of the bankruptcy case and (2) the creditor has a claim against the debtor which arose prior to the commencement of the bankruptcy case. If the FDIC-Receiver were to assume the Debtor Deposits "debts" at this time, such debts would undeniably be incurred post-petition (i.e., the Debtor Deposits were not debts of Colonial Bank on the Petition Date and will only become debts of Colonial Bank if the FDIC-Receiver unilaterally chooses to assume those debts on behalf of the Colonial Bank receivership at some point in the future). Section 553 of the Bankruptcy Code does not permit the setoff of a

---

[7]  As noted above, Section 553 requires both (i) an independent right of setoff under applicable nonbankruptcy law and (ii) that the proposed setoff meets the further Bankruptcy Code-imposed requirements and limitations set forth in section 553. *See In re SemCrude*, 399 B.R. at 393.

[8]  In the Amended Motion, the FDIC-Receiver acknowledges the applicability of the automatic stay. Specifically, paragraph 68 of the Amended Motion states that "[w]hile the formal transfer of the Accounts is unnecessary to perfect mutuality . . . this Amended Motion expressly requests this Court's authority to provide such an instruction to BB&T, and for BB&T to carry it out, to the extent the automatic stay might be deemed to apply."

pre-petition claim against a post-petition debt.[9]  Accordingly, even if the FDIC-Receiver were able to assume the liabilities relating to the Debtor Deposits, it would not be able to include such liabilities as part of a setoff against pre-petition claims.

42.     In addition, section 553(a)(3) of the Bankruptcy Code provides that setoff is precluded where a debt owed the debtor (such as the Debtor Deposits) is transferred "(A) after 90 days before the date of the filing of the petition; (B) while the debtor was insolvent; and (C) for the purpose of obtaining a right of setoff against the debtor . . ." 11 U.S.C. § 553(a)(3).

43.     In the present case, the foregoing test is easily satisfied.  A post-petition incurrence of the liabilities relating to the Debtor Deposits would certainly satisfy the timing requirement found in subsection (A) of the test.  With respect to subsection (B), based on all of the facts and circumstances of this case, the Debtor is currently insolvent.[10]  Finally, the sole reason that the FDIC would pursue an assumption of the Debtor Deposits would be in an effort to manufacture a right of setoff, in which case subsection (C) would be satisfied.

44.     Section 553(a)(3) is intended to prevent a windfall for the benefit of one or more colluding creditors over the debtor and its other creditors.  *See In re U.S. Aeroteam, Inc.*, 327

---

[9] *See In re Delta Air Lines*, 359 B.R. 454, 466 (Bankr. S.D.N.Y. 2006) (citing, among others, *Davidovich v. Welton (In re Davidovich)*, 901 F.2d 1533, 1538 (10th Cir. 1990) (pre-petition obligation based on arbitration award may not be offset against post-petition claim) *and* 3 Norton Bankr. L. & Prac. 2d § 63:4, Part 11 § 553 (September 2006) ("where a debtor files for reorganization under Chapter 11, and thereafter performs work for a creditor holding a prepetition claim, the creditor may not set off its postpetition indebtedness against its prepetition claims")).

In *Delta*, the Government Services Administration (the "Government") established a statutory right of setoff under the Transportation Payment Act.  The bankruptcy court, however, noted that such statutory right of setoff does not override the fundamental mandates of the Bankruptcy Code embodied in the automatic stay and section 553, stating that the Government's right of set-off is "subject to the same constraints under Section 362(a)(3) and (6) and Section 553 of the Bankruptcy Code as the setoff rights of any other creditor."  *In re Delta Air Lines*, 359 B.R. at 465. Because the Government's liability was incurred post-petition, the bankruptcy court found that the Government was barred by sections 362(a) and 553 of the Bankruptcy Code from offsetting pre-petition claims against post-petition liabilities.  In doing so, the court stated that "[i]ndeed, the very purpose of these Bankruptcy Code provisions, among many others, is to insure [sic] equal treatment of all creditors so that no creditor, not even the Government, obtains an unfair advantage over others."  *Id.* at 468.

[10]  It is the setoff applicant's burden to establish otherwise. *See In re Balducci Oil Co.*, 33 B.R. 847, 850 (Bankr. D. Colo. 1983).

B.R. 852, 867 (Bankr. S.D. Ohio 2005) ("The purpose of [section 553(a)(3)] is to prevent a creditor from undertaking a build-up of its setoff rights in order to obtain a preference."); *In re Iowa Oil Co.,* 2004 WL 2326377, at *9 (N.D. Iowa 9/30/04) (section 553(a)(3) "is intended to eliminate an opportunity for a creditor to engage in some form of manipulation at the expense of other creditors.") (citation omitted).[11]  In the context of the FDIC-Receiver's efforts to manufacture a right of set-off to the detriment of all other creditors, these equitable considerations are of paramount importance.

**[remainder of page intentionally left blank]**

---

[11] Section 553(a)(2) is also grounded in equitable principles.  In drafting the statute, Congress aimed to "prohibit trafficking in claims against the debtor in order to effect setoff (which would provide a windfall to both parties to the transfer at the expense of the estate)."  *In re Denby Stores, Inc.*, 86 B.R. 768, 779 (Bankr. S.D.N.Y. 1988).

**Conclusion**

For the reasons set forth herein, the Committee respectfully submits that the Court enter an order denying the relief requested in the Amended Motion and granting such other and further relief as necessary and proper.

Dated: April 26, 2010

Respectfully submitted,

/s/ Robert B. Rubin
Robert B. Rubin
brubin@burr.com
Marc Solomon
msolomon@burr.com
**BURR FORMAN LLP**
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203
Telephone: 205-251-3000
Facsimile: 205-244-5733

- and -

Alan R. Glickman
(admitted *pro hac vice*)
alan.glickman@srz.com
Brian D. Pfeiffer
(admitted *pro hac vice*)
brian.pfeiffer@srz.com
**SCHULTE ROTH & ZABEL LLP**
919 Third Avenue
New York, New York 10022
Telephone: 212-756-2000
Facsimile: 212-593-5955

**ATTORNEYS FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

# EXHIBIT A

# Press Releases

## BB&T, Winston-Salem, North Carolina, Assumes All of the Deposits of Colonial Bank, Montgomery, Alabama

**FOR IMMEDIATE RELEASE**
**August 14, 2009**

**Media Contact:**
Andrew Gray: (202) 898-7192
Cell: 202-494-1049
E-mail: angray@fdic.gov

Colonial Bank, Montgomery, Alabama, was closed today by the Alabama State Banking Department, which appointed the Federal Deposit Insurance Corporation (FDIC) as receiver. To protect the depositors, the FDIC entered into a purchase and assumption agreement with Branch Banking and Trust (BB&T), Winston-Salem, North Carolina, to assume all of the deposits of Colonial Bank.

Colonial Bank's 346 branches in Alabama, Florida, Georgia, Nevada and Texas will reopen under normal business hours beginning tomorrow and operate as branches of BB&T. Depositors of Colonial Bank will automatically become depositors of BB&T. Deposits will continue to be insured by the FDIC, so there is no need for customers to change their banking relationship to retain their deposit insurance coverage. Customers should continue to use their existing branches until BB&T can fully integrate the deposit records of Colonial Bank.

This evening and over the weekend, depositors of Colonial Bank can access their money by writing checks or using ATM or debit cards. Checks drawn on the bank will continue to be processed. Loan customers should continue to make their payments as usual.

"The past 18 months have been a very trying period in the financial services arena, but the FDIC and its staff have performed as Congress envisioned when it created the corporation more than 75 years ago," said FDIC Chairman Sheila C. Bair. "Today, after protecting almost $300 billion in deposits since the current financial crisis began, the FDIC's guarantee is as certain as ever. Our industry funded reserves have covered all losses to date. In fact, losses from today's failures are lower than had been projected. I commend our staff for their excellent work in assuring once again a smooth transition for bank customers with these resolutions. The FDIC continues to stand by the nation's insured deposits with the full faith and credit of the U.S. government. No depositor has ever lost a penny of their insured deposits."

Customers who have questions about today's transaction can call the FDIC toll-free at 1-800-405-8739. The phone number will be operational this evening until 9:00 p.m., Central Daylight Time (CDT); on Saturday from 9:00 a.m. to 6:00 p.m., CDT; on Sunday from noon to 6:00 p.m., CDT; and thereafter from 8:00 a.m. to 8:00 p.m., CDT. Interested parties can also visit the FDIC's Web site at http://www.fdic.gov/bank/individual/failed/colonial-al.html.

As of June 30, 2009, Colonial Bank had total assets of $25 billion and total deposits of approximately $20 billion. BB&T will purchase approximately $22 billion in assets of Colonial Bank. The FDIC will retain the remaining assets for later disposition.

The FDIC and BB&T entered into a loss-share transaction on approximately $15 billion of Colonial Bank's assets. BB&T will share in the losses on the asset pools covered under the loss-share agreement. The loss-sharing arrangement is projected to maximize returns on the assets covered by keeping them in the private sector. The agreement is also expected to minimize the disruptions for loan customers.

The FDIC estimates that the cost to the Deposit Insurance Fund (DIF) will be $2.8 billion. BB&T's acquisition of all the deposits was the "least costly" resolution for the FDIC's DIF compared to alternatives. Colonial Bank is the 74th FDIC-insured institution to fail in the nation this year, and the first in Alabama. The last FDIC-insured institution to be closed in the state was Birmingham FSB, Birmingham, on August 21, 1992.

Case 09-32303    Doc 694    Filed 04/26/10    Entered 04/26/10 18:11:51    Desc Main
Document        Page 19 of 30

# # #

Congress created the Federal Deposit Insurance Corporation in 1933 to restore public confidence in the nation's banking system. The FDIC insures deposits at the nation's 8,246 banks and savings associations and it promotes the safety and soundness of these institutions by identifying, monitoring and addressing risks to which they are exposed. The FDIC receives no federal tax dollars -- insured financial institutions fund its operations.

FDIC press releases and other information are available on the Internet at www.fdic.gov, by subscription electronically (go to www.fdic.gov/about/subscriptions/index.html) and may also be obtained through the FDIC's Public Information Center (877-275-3342 or 703-562-2200). **PR-143-2009**

Last Updated 8/14/2009                                                                                      communications@fdic.gov

**Home    Contact Us    Search    Help    SiteMap    Forms**
Freedom of Information Act (FOIA) Service Center    Website Policies    USA.gov
FDIC Office of Inspector General    FDIC Open Government Webpage

# EXHIBIT B

# STATE OF ALABAMA
## STATE BANKING DEPARTMENT



**Bob Riley**
Governor

**John D. Harrison**
Superintendent of Banks

## FOR IMMEDIATE RELEASE FRIDAY, AUGUST 14, 2009

**Alabama State Banking Department Takes Possession of Colonial Bank.**

Montgomery, Alabama—The Alabama State Banking Department ("Department") took possession of Colonial Bank at 5:00 p.m. CDST on August 14, 2009. The Superintendent of Banks ("Superintendent") appointed the Federal Deposit Insurance Corporation ("FDIC") as Receiver of the Bank effective immediately pursuant to the authority granted him in section 5-8A-24 of the Code of Alabama.

The Department took possession of Colonial Bank pursuant to the provisions of Section 5-8A-20 of the Code of Alabama which allows the Superintendent to take possession of a bank, if so directed by the Banking Board, in such cases where the bank's capital is impaired or if any examination of the bank indicates that the bank is operating in an unsafe or unsound condition or other applicable grounds for such action.

Through an agreement with the FDIC, Colonial Bank will be acquired by BB&T Corporation. BB&T Corporation is headquartered in Winston-Salem, North Carolina and is among the nation's top financial holding companies with over $150 billion in assets and whose history dates back to 1872.

All deposit accounts of Colonial Bank have been transferred to BB&T and are available immediately. Depositors will be able to access their accounts at the former main office and branch locations of Colonial Bank. Customers of the former Colonial Bank should continue to use their existing branches until BB&T can fully integrate the deposit records of Colonial Bank. Additionally, former depositors of Colonial Bank can continue to access their accounts through automated teller machine transactions, checks and debit transactions.

The Department's Superintendent, John D. Harrison, reminds depositors that deposits of all Alabama banks are insured by the FDIC up to $250,000. Special rules are in place for accounts held in trust status and joint accounts and non interest bearing transaction accounts that may further expand deposit insurance coverage. Additional information can be found on FDIC deposit insurance at www.fdic.gov.

The FDIC has established a website and a toll-free number to answer questions from depositors, creditors and other interested parties regarding the receivership of Colonial Bank. Please refer to the FDIC's website for further information regarding the details of the purchase and assumption transaction. The website is www.fdic.gov and the toll-free phone number is 1-800-405-8739. The phone number is operational this evening until 9:00 p.m. CDST, on Saturday from 9:00 a.m. until 6:00 p.m. CDST, on Sunday from 12:00 p.m. until 6:00 p.m. CDST, and thereafter from 8:00 a.m. to 8:00 p.m. CDST.

CENTER FOR COMMERCE • 401 ADAMS AVENUE • P.O. BOX 4600 • MONTGOMERY, AL 36103-4600
TELEPHONE (334) 242-3452 • FAX (334) 242-3500 OR BUREAU OF LOANS (334) 353-5961


**Bob Riley**
Governor

**John D. Harrison**
Superintendent of Banks

TO ALL BANKS AND OTHER PARTIES OR CORPORATIONS KNOW TO BE HOLDING OR IN POSSESSION OF ANY ASSETS OF COLONIAL BANK, WHOSE PRINCIPAL PLACE OF BUSINESS IS IN MONTGOMERY, ALABAMA:

TAKE NOTICE that Sate of Alabama Superintendent of Banks took possession of the property and business of Colonial Bank on August 14, 2009, at 5:00 p.m. CDST. This notice is given pursuant to the provisions of Section 5-8A-23, Code of Alabama 1975. Pursuant to the provisions of Section 5-8A-24, Code of Alabama 1975, the Superintendent has appointed the Federal Deposit Insurance Corporation as receiver of Colonial Bank.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal of the State Banking Department on this the 14th day of August, 2009.



John D. Harrison
Superintendent of Banks
State of Alabama

SBD-106a

CENTER FOR COMMERCE • 401 ADAMS AVENUE • P.O. BOX 4600 • MONTGOMERY, AL 36103-4600
TELEPHONE (334) 242-3452 • FAX (334) 242-3500 OR BUREAU OF LOANS (334) 353-5961

Case 09-32303   Doc 694   Filed 04/26/10   Entered 04/26/10 18:11:51   Desc Main
Document   Page 23 of 30

# EXHIBIT C

Home > Industry Analysis > Failed Banks > Failed Bank List > Failed Bank Information – Question and Answer Guide

## Question and Answer Guide

### Colonial Bank, Montgomery AL

En Español

**FDIC Call Center**
**Toll free number 1-800-405-8739**
**Hours of Operation – Central Time**

| | |
|---|---|
| Friday, August 14, 2009: | Until 9:00 p.m. |
| Saturday, August 15, 2009: | 9:00 a.m. – 6:00 p.m. |
| Sunday, August 16, 2009: | Noon – 6:00 p.m. |
| Thereafter: | 8:00 a.m. – 8:00 p.m. |

On Friday, August 14, 2009, Colonial Bank, Montgomery, AL, was closed by the Alabama State Banking Department. The Federal Deposit Insurance Corporation (FDIC) was then named Receiver. Subsequent to the closure, **Branch Banking and Trust Company, (BB&T), Winston-Salem, NC**, acquired substantially all the deposits and assets of Colonial Bank from the FDIC as Receiver for Colonial Bank. Any claims by equity holders were not acquired. Share price does not trigger a bank closing and was not the reason for Colonial Bank's failure.

**The total balance in your account(s) has been transferred to BB&T and will be available for transactions during regular business hours at the former Colonial Bank branches. Each location will operate by the same schedule it did prior to this transaction.**

**You may continue to use your same checks, ATM cards and debit cards until notified.**

**All Direct Deposits, including Social Security checks, will continue as usual.**

1. **Account(s):** What about my account with Colonial Bank?

2. **ATM/debit card and/or Billpay:** What about my ATM/debit card and/or bill paying with Colonial Bank?

3. **Brokered Deposits:** I am a deposit broker or have brokered deposits. What do I do?

4. **Direct Deposits - Government Deposits:** What will happen to my direct deposits?

5. **Existing Deposits at BB&T:** I already have other deposit accounts with the new bank. When combined with balances at this bank, my deposits exceed $250,000. Are all funds insured?

6. **Interest Rates, Early Withdrawal Penalty:** Will I continue to earn interest at the same rate? Will I be charged an early withdrawal penalty?

7. **Loans/mortgages:** What about my loan or mortgage with Colonial Bank?

8. **Loans in Process:** What happens if I had a loan in process that had not closed or a line of credit not fully funded?

9. **Media:** I represent a TV/Newspaper/Radio and would like some information.

10. **Outstanding Checks:** What about checks that I have written on my account with Colonial Bank?

11. **Safe Deposit Boxes:** How can I claim the contents of my safe deposit box?

12. **Shareholders:** What about my shares of stock?

13. **Transaction Types:** Why do all deposits, insured or not, pass in some transactions but not in

others?

14. **Unpaid Bills:** I did some work for the bank and have not been paid. What should I do?

## 1. Account(s): What about my account with Colonial Bank?

If you had an account with Colonial Bank, you now have an account with BB&T. All deposit accounts, which include checking, savings, money market, CDs and retirement accounts, have been transferred to BB&T, regardless of the dollar amount. No one lost any money on deposit in Colonial Bank.

Customers of both banks should continue to use their existing branches until BB&T can fully integrate the deposit records of Colonial Bank.

**To forewarn you of any scams, please be advised that you will not receive any e-mail notification from the FDIC, the Receiver, or BB&T to claim/unlock/unsuspend your account or to provide any private information. Please be watchful for and resist any such scams to obtain information from you by individuals or entities purporting to act on behalf of Colonial Bank.**

Back to top

## 2. ATM/debit card and/or Billpay: What about my ATM/debit card and/or bill paying with Colonial Bank?

Your ATM/debit card will continue to work, and bill paying will work as it has in the past.

Back to top

## 3. Brokered Deposits: I am a deposit broker or have brokered deposits. What do I do?

As an **All-Deposit Transfer** transaction, the total of all deposit accounts, including brokered deposits, have been assumed by BB&T.

Be advised, however, that from and after the date of closing, BB&T will accrue and pay interest on deposit liabilities at a rate it shall determine; accordingly, BB&T shall permit depositors, including brokered depositors, impacted by reduced rates to withdraw their deposits without penalty for early withdrawal.

If you are a customer who has a Colonial Bank deposit through a broker, you **must** contact your broker with any questions.

Back to top

## 4. Direct Deposits - Government Deposits: What will happen to my direct deposits?

Direct Deposits, including Social Security checks, will continue as normal.

Back to top

## 5. Existing Deposits at BB&T: I already have other deposit accounts with the new bank.  When combined with balances at this bank, my deposits exceed $250,000.  Are all funds insured?

The accounts transferred to BB&T will be separately insured for **at least** six months after the merger. This grace period gives a depositor the opportunity to restructure the accounts, if necessary.

CDs from the failed bank are separately insured until the earliest maturity date after the end of the six-month grace period.

CDs that mature during the six-month period and are renewed for the same term and in the same dollar amount (either with or without accrued interest) continue to be separately insured until the first maturity date after the six-month period.

If a CD matures during the six-month grace period and is renewed on any other basis, it would be separately insured only until the end of the six-month grace period.

Back to top

## 6. Interest Rates, Early Withdrawal Penalty: Will I continue to earn interest at the same rate?  Will I be charged an early withdrawal penalty?

All interest on insured deposits accrued through Friday, August 14, 2009, will be paid at your same rate. BB&T will review rates and notify you if interest rates will change.

You may withdraw funds from any transferred account without an early withdrawal penalty until you enter into a new deposit agreement with your new bank. Entering into a new deposit agreement can be done by either renewing your CD or making a deposit to or a withdrawal from your account.

Back to top

## 7. Loans/mortgages: What about my loan or mortgage with Colonial Bank?

Your payment amount and due date remain the same. If you pay by check, you should continue to make your checks payable to Colonial Bank and send your payments to the same address. If your payment is deducted from your account, that payment procedure will continue as it has in the past. You may contact your loan officer to determine whether your loan is now held by BB&T or by FDIC as Receiver for Colonial Bank.

Back to top

## 8. Loans in Process: What happens if I had a loan in process that had not closed or a line of credit not fully funded?

You should contact your loan officer. All prior contacts remain the same.

Back to top

## 9. Media: I represent a TV/Newspaper/Radio and would like some information.

**Please contact the Office of Public Affairs:**

Andrew Gray
1-202-494-1049.
angray@fdic.gov

Back to top

## 10. Outstanding Checks: What about checks that I have written on my account with Colonial Bank?

Your checks will clear up to the available balance in your account. You can continue to use your existing checks.

Back to top

## 11. Safe Deposit Boxes: How can I claim the contents of my safe deposit box?

It is business as usual. You can go to your local branch and access your safe deposit box; however, no action on your part is required because of this transaction.

Back to top

## 12. Shareholders: What about my shares of stock?

All shares of Colonial Bank were owned by its holding company, The Colonial BancGroup, Inc., Montgomery, AL. The holding company was not included in the closing of the bank or the resulting receivership. If you are a shareholder of The Colonial BancGroup, Inc., **please do not contact or file a claim with the Receiver.** You may contact The Colonial BancGroup, Inc., directly for information as follows:

> The Colonial BancGroup, Inc.
> P.O. Box 1108
> Montgomery, AL
> 1-334-676-5151 (pre-recorded
> message)

Back to top

## 13. Transaction Types: Why do all deposits, insured or not, pass in some transactions but not in others?

The FDIC is required by law to employ the least-cost resolution measure for each failed financial institution. The most frequent result is for the FDIC to transfer only the insured deposits in a merger transaction. The FDIC has been able to transfer all deposits in about 25% of the failures over the past 15 years.

Back to top

## 14. Unpaid Bills: I did some work for the bank and have not been paid. What should I do?

All claims against Colonial Bank, together with proof of the claims, must be submitted in writing to the Receiver at the following address:

> FDIC as Receiver for Colonial Bank
> 1601 Bryan Street
> Dallas, TX 75201
> Attention: Claims Agent

Back to top

Last Updated 08/27/2009

cservicefdicdal@fdic.gov

**Home   Contact Us   Search   Help   SiteMap   Forms**
Freedom of Information Act (FOIA) Service Center    Website Policies    USA.gov
FDIC Office of Inspector General    FDIC Open Government Webpage

# EXHIBIT D

# FDIC

**Federal Deposit Insurance Corporation**
1601 Bryan Street, Dallas, TX 75201

Division of Resolutions and Receiverships

**CERTIFIED MAIL 7009 2820 0003 7873 2657**
**RETURN RECEIPT REQUESTED**

January 6, 2010

The Colonial BancGroup, Inc
100 Colonial Bank Boulevard
Montgomery, AL 36117

SUBJECT:  10103–COLONIAL BANK
MONTGOMERY, AL – In Receivership
**NOTICE OF DISALLOWANCE OF CLAIM**

Dear Claimant:

The Receiver of  COLONIAL BANK has reviewed your claim against the receivership.  After a thorough review of your filed claim along with your supporting documentation, the Receiver has determined to disallow your claim for the following reason(s) :

> The claims of Colonial BancGroup, Inc. for $514,420.78 were submitted without sufficient supporting documentation and have not been proven to the satisfaction of the Receiver.

Pursuant to 12 U.S.C. Section 1821 (d) (6), if you do not agree with this disallowance, you have the right to file a lawsuit on your claim (or continue any lawsuit commenced before the appointment of the Receiver), in the United States District (or Territorial) Court for the District within which the failed institution's principal place of business was located or the United States District Court for the District of Columbia within 60 days from the date of this notice.

**IF YOU DO NOT FILE A LAWSUIT** (or continue any lawsuit commenced before the appointment of the Receiver) **BEFORE THE END OF THE 60-DAY PERIOD, THE DISALLOWANCE WILL BE FINAL, YOUR CLAIM WILL BE FOREVER BARRED AND YOU WILL HAVE NO FURTHER RIGHTS OR REMEDIES WITH RESPECT TO YOUR CLAIM.  12 U.S.C. Section 1821(d)(6)(B).**

However, if a portion of your claim is for an insured deposit, your claim is not against the Receiver but rather is against the FDIC in its "corporate" capacity as deposit insurer.  An insured depositor's rights are prescribed in 12 U.S.C. Section 1821(f) and differ from the rights described in the preceding paragraphs.

If you have any questions about this letter, please contact the undersigned at (972) 761-8671.

Sincerely,

Creditor Claims Agent
Claims Department

RLS7218