<u>NOTICE:  THIS DOCUMENT IS A REDACTED VERSION</u>

*This submission is a redacted version of a memorandum of law that has been filed under seal to comply with the Confidentiality Stipulation and Protective Order, entered on April 7, 2010 in this Chapter 11 Case [Doc. 654].  This redacted version redacts references to Highly Confidential discovery materials that were referred to in the version filed under seal.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| **THE COLONIAL BANCGROUP, INC.,** | **Case No. 09-32303(DHW)** |
| Debtor. | **Hearing Date:**   **May 26, 2010**<br>**10 a.m. CDT** |

**[REDACTED] CONSOLIDATED PRE-HEARING MEMORANDUM OF
LAW IN FURTHER SUPPORT OF THE MOTIONS OF THE
FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER,
FOR RELIEF UNDER BANKRUPTCY CODE SECTIONS 362(d) AND 365(o)
<u>AND IN OPPOSITION TO DEBTOR'S MOTIONS FOR SUMMARY JUDGMENT</u>**

Of Counsel:

Kathryn R. Norcross
Senior Counsel

Jeffrey E. Schmitt
Counsel

Federal Deposit Insurance Corporation
3501 Fairfax Drive
Arlington, Virginia  22226
(703) 562-2429

Michael A. Fritz, Sr.
Fritz & Hughes LLC
7020 Fain Park Drive Suite 1
Montgomery, Alabama  36117
(334) 215-4422

- and -

Thomas R. Califano
John J. Clarke, Jr.
Michael D. Hynes
Spencer Stiefel
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York  10020-1104
(212) 335-4500

Attorneys for the
  Federal Deposit Insurance Corporation
  as Receiver for Colonial Bank

Dated:  May 17, 2010

**Table of Contents**

Page

Table of Authorities ...................................................................................................... ii

INTRODUCTION AND SUMMARY ........................................................................... 1

COUNTER-STATEMENT OF FACTS ......................................................................... 9

APPLICABLE LEGAL STANDARDS ......................................................................... 9

    A.    Relief from the Automatic Stay ........................................................... 9

    B.    Summary Judgment ........................................................................... 11

ARGUMENT --THE FDIC-RECEIVER'S MOTIONS TO SET OFF AGAINST
    THE ACCOUNTS AND CONVERT THIS CASE SHOULD BE GRANTED ............. 12

I.    THE FDIC-RECEIVER HAS ENFORCEABLE SETOFF RIGHTS
    AGAINST THE ACCOUNTS ....................................................................... 13

    A.    The Objecting Parties' Challenges to Mutuality
        Misapprehend the Relevant Facts ....................................................... 14

    B.    The Relief Sought By the FDIC-Receiver Will Not
        Violate Section 553(a)(3) of the Bankruptcy Code ............................. 19

    C.    The Debtor's Substantial Deficit Under Its Prepetition Capital
        Maintenance Commitment Is Only One of Many Liabilities
        Owed to the FDIC-Receiver ............................................................... 21

    D.    This Court Should Not Exercise Discretion to Deny
        the FDIC-Receiver's Statutory Right to Setoff ................................... 22

II.    THE DEBTOR'S FAILURE TO "IMMEDIATELY CURE" THE DEFICIT
    UNDER ITS CAPITAL MAINTENANCE COMMITMENT REQUIRES
    CONVERSION OF THIS CASE AND GIVES RISE
    TO A PRIORITY CLAIM ............................................................................ 23

    A.    The Debtor Made a "Commitment . . . to Maintain the Capital of an
        Insured Depositor Institution" (Colonial Bank) ................................... 26

        1.    What Is a "Capital Maintenance Commitment"? .................... 26

        2.    The Debtor's Capital Maintenance Commitment(s) ................ 30

        3.    The Debtor Cease & Desist Order ......................................... 35

i

4. The Deficit Under the Debtor's
Capital Maintenance Commitment ........................................................... 38

B. The FDIC-Receiver Has Standing to Enforce the
Debtor's Capital Maintenance Commitment ......................................................... 39

C. The September 30, 2009 Deadline in the Bank C&D Order
Does Not Provide the Debtor with a Defense to
Enforcement of its Commitment ........................................................................... 41

D. The Debtor's Fraudulent Transfer Defense Is Not
Available in Chapter 11 ........................................................................................ 44

III. THE DEBTOR'S MOTIONS FOR SUMMARY JUDGMENT
SHOULD BE DENIED ................................................................................................. 44

CONCLUSION ............................................................................................................................. 46

# Table of Authorities

Page

<u>Cases</u>

*Anderson v. Liberty Lobby,*
477 U.S. 242 (1986) ...................................................................................10

*Baldino v. Wilson (In re Wilson),*
116 F.3d 87 (3d Cir. 1998) .........................................................................9

*Bank of Marin v. England,*
385 U.S. 99 (1966) .....................................................................................13

*Carlton Co. v. Jenkins (In re Jenkins),*
No. 03-60548, 2004 WL 768574 (Bankr. S.D. Ga. Mar. 30, 2004) ..........10

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ...................................................................................11

*Citizens Bank of Md. v. Strumpf,*
516 U.S. 16 (1995) ........................................................................10, 13, 22

*F.D.I.C. v. Butler (In re Conner Corp.),*
127 B.R. 775 (E.D.N.C. 1991) ...................................................................29

*Gross v. Bell Sav. Bank,*
974 F.2d 403 (3d Cir. 1992) .......................................................................15

*Gunter v. Hutcheson,*
674 F.2d 862 (11th Cir. 1982) ...................................................................17

*Huisinga v. Nat'l Bank of Waterloo (In re Bohlen Enters., Ltd.),*
78 B.R. 556 (Bankr N.D. Iowa 1987), *rev'd on other ground,*
859 F.2d 561 (8th Cir. 1988) .....................................................................20

*In re Blanton,*
105 B.R. 321 (Bankr. E.D. Va. 1989) .........................................................10

*In re Ealy,*
392 B.R. 408 (Bankr. E.D. Ark. 2008) .......................................................10

*In re Engle,*
93 B.R. 58 (E.D. Pa. 1987) .........................................................................10

*In re George Ruggiere Chrysler-Plymouth, Inc.,*
727 F.2d 1017 (11th Cir. 1984) ........................................................................10

*In re Iowa Oil Co.,*
2004 WL 2326377 (N.D. Iowa Sept. 30, 2004) ..................................................19

*In re Nuclear Imaging Systems, Inc.,*
260 B.R. 724 (Bankr. E.D. Pa. 2000) .................................................................10

*In re Optical Techs, Inc.,*
246 F.3d 1332 (11th Cir. 2001) .................................................................... 11-12

*In re Orlinski,*
140 B.R. 600 (Bankr. S.D. Ga. 1991) .................................................................10

*In re Overland Park Fin. Corp.,*
217 B.R. 879 (Bankr. D. Kan. 1998), *rev'd sub nom.*
*Ofc. of Thrift Supervision v. Overland Park Fin. Corp.  (In re Overland Park*
*Fin. Corp.),* 232 B.R. 215 (D. Kan. 1999), *aff'd,*
236 F.3d 1246 (10th Cir. 2001) .................................................................... 26-27

*Izzarelli v. Rexene Prods. Co. (In re Rexene Prods. Co.),*
141 B.R. 574 (Bankr. D. Del. 1992) .....................................................................9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986).............................................................................................10

*MCorp. Fin. Corp. Inc. v. Board of Governors of the Federal Reserve,*
900 F.2d 852 (5th Cir. 1990), *rev'd on other grounds,* 502 U.S. 32 (1991)............38

*Northern Trust Co. v. F.D.I.C.,*
619 F. Supp. 1340 (W.D. Okla. 1985) .................................................................15

*Ofc. of Thrift Supervision v. Overland Park Fin. Corp.*
*(In re Overland Park Fin. Corp.),* 232 B.R. 215 (D. Kan. 1999) ................ 27-28, 40

*Office of Thrift Supervision v. Overland Park Fin. Corp. (In re Overland Park Fin.*
*Corp.),* 236 F.3d 1246 (10th Cir. 2001)....................................................... *passim*

*Official Comm. of Unsecured Creditors v. Mfrs. & Traders Tr. Co. (In re Bennett*
*Funding Group, Inc.),* 146 F.3d 136 (2d Cir. 1998) ............................................19

*Resolution Trust Corp. v. FirstCorp, Inc. (In re FirstCorp. Inc.),*
973 F.2d 243 (4th Cir. 1992) ..................................................................... *passim*

*Russello v. United States,*
464 U.S. 16 (1983)...............................................................................................20

Page

*S.E.C. v. Elliott,*
    953 F.2d 1560 (11th Cir. 1992) ........................................................................10

*Sherman v. First City Bank of Dallas (In re United Sciences of America, Inc.),*
    893 F.2d 720 (5th Cir. 1990) ..........................................................................20

*Turner v. Officers, Directors and Employees of Mid Valley Bank,*
    712 F. Supp. 1489 (W.D. Wash. 1988)...........................................................17

*U.S. v. Gould,*
    401 B.R. 415 (9th Cir. B.A.P. 2009)................................................................10

*United States v. Munsey Trust Co.,*
    332 U.S. 234 (1947).........................................................................................10

*Villafane Neris v. Citibank, N.A.,*
    845 F. Supp. 930 (D.P.R. 1994).......................................................................15

*Wedgewood Inv. Fund Ltd. v. Wedgewood Realty Group Ltd. (In re Wedgewood),*
    878 F.2d 693 (3d Cir. 1989).............................................................................9

*Wolkowitz v. F.D.I.C. (In re Imperial Credit Indus., Inc.),*
    527 F.3d 959 (9th Cir. 2008) .....................................................................25, 44

*Zeigler v. Ala. Dep't of Human Res.,*
    No. 2:09-cv-0284 (WHA), 2010 WL 1740834 (M.D. Ala. Apr. 29, 2010)............11

## Statutes and Rules

11 U.S.C. §101(21B) ............................................................................................41

11 U.S.C. § 362(d) ......................................................................................... *passim*

11 U.S.C. § 365(a) ..................................................................................................9

11 U.S.C. § 365(o) ......................................................................................... *passim*

11 U.S.C. § 507(a)(9) ..................................................................................... *passim*

11 U.S.C. § 553(a) ................................................................................................13

11 U.S.C. § 553(a)(2)............................................................................................20

11 U.S.C. § 553(a)(3)............................................................................................20

12 U.S.C. § 1813(q)(2)(F)......................................................................................41

12 U.S.C. § 1821(d)(2)(A) .............................................................................. *passim*

12 U.S.C. § 1821(d)(11) ...................................................................................2, 40

12 U.S.C. § 1821(g) .........................................................................................2, 40

12 U.S.C. § 1822(d) ........................................................................................ *passim*

12 C.F.R. § 225.3 ................................................................................................41

12 C.F.R. § 340.7 ...............................................................................................16

Bankruptcy Rule 9017 .......................................................................................12

Fed. R. Civ. P. 43 ..............................................................................................12

Fed. R. Civ. P. 56 ...........................................................................................1, 11

## Other Authorities

Black's Law Dictionary 248 (5th ed. 1979)........................................................28

H.R. Rep. No. 681(I), 101st Cong., 2d Sess. 179 (1990)...................................23

The Federal Deposit Insurance Corporation, as receiver for Colonial Bank, Montgomery, Alabama (the "FDIC-Receiver"), respectfully submits this consolidated pre-hearing memorandum of law in further support of (1) its motion, as amended, pursuant to section 362(d) of title 11 of the United States Code (the "Bankruptcy Code") for an order modifying the automatic stay in this chapter 11 case to permit the FDIC-Receiver to exercise its setoff rights against the balances held in certain demand deposit accounts [Doc. 156, 499] and (2) its motion for an order to require cure of deficiencies under section 365(o) of the Bankruptcy Code or, in the alternative, converting this case to a liquidation under chapter 7 [Doc. 257].

The FDIC-Receiver also submits this memorandum of law pursuant to Federal Rule of Civil Procedure 56, as incorporated by Rules 7056 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), in opposition to the motions filed by the debtor The Colonial BancGroup, Inc. (the "Debtor" or "BancGroup") for summary judgment with respect to both of the FDIC-Receiver's motions [Doc. 697, 698].

## INTRODUCTION AND SUMMARY

Before its subsidiary bank was closed by its primary regulator, the Debtor was a regulated bank holding company. Colonial Bank was the Debtor's principal operating subsidiary, was the source of substantially all of its income (in the form of dividends) and accounted for 99.3% of its consolidated assets.

In August 2008, Colonial Bank was closed soon after BancGroup announced that it was the "target" of a federal criminal investigation. At that time, the FDIC-Receiver was appointed receiver and succeeded to all of the failed bank's "rights, titles, powers and privileges." *See* 12 U.S.C. § 1821(d)(2)(A). The FDIC has estimated that the Colonial Bank failure will cost its

Deposit Insurance Fund approximately $3.8 billion, making it one of the most expensive bank failures in United States history.[1]

Among the many arguments presented by the parties, the FDIC-Receiver's motions raise two central questions:

1. Does bankruptcy law alter the FDIC-Receiver's statutory right of setoff under 12 U.S.C. § 1822(d) against a holding company's insured deposits with a failed bank when, in selling assets and assigning liabilities of the failed bank under a purchase and assumption agreement, the FDIC-Receiver expressly retains the power to exclude the holding company's deposits from such an assignment to preserve the FDIC-Receiver's setoff rights?

2. Can a bankrupt holding company evade its statutory obligation under section 365(o) of the Bankruptcy Code to "immediately cure" any deficit existing on the petition date under "*any* commitment by the debtor . . . to maintain the capital of an insured depository institution" by arguing that its promise to bank regulators to take steps "designed to ensure" that its subsidiary bank would raise its capital ratios to mandated levels was not a "capital maintenance commitment"?

The answer to both of these questions is "no." For the reasons that follow, both of the FDIC-Receiver's motions should be granted, the FDIC-Receiver should be authorized to setoff its substantial claims against the balances in the Debtor's prepetition deposit accounts with Colonial Bank, and the Debtor's chapter 11 case should be converted to a chapter 7 liquidation.

---

[1] The Deposit Insurance Fund, through the FDIC in its corporate capacity ("FDIC-Corporate"), is subrogated to the claims of insured depositors and therefore holds a substantial, priority claim against the Colonial Bank receivership based on the amounts expended for the failed bank's resolution. *See*, 12 U.S.C. §§ 1821(d)(11), 1821(g)(1), (2).

None of the many arguments advanced by the Debtor and its Official Committee of Unsecured Creditors (the "Committee") in opposition to the FDIC-Receiver's motions calls for a different conclusion. Several of the arguments have been rejected directly by appellate courts considering the issues in other holding company bankruptcy cases. Other arguments exalt form over substance, torture the plain language of the pertinent Bankruptcy Code provisions or require a distortion of the relevant facts. While specific arguments are discussed in further detail below, the fundamental flaws with those objections are summarized here.

　　1.　　Mutuality.　　The Debtor and the Committee mistakenly contend that setoff is not available for the FDIC-Receiver because it is an allegedly "undisputed fact" that the deposit accounts at issue on the FDIC-Receiver's stay relief motion were "Assumed Deposits" under the Purchase and Assumption Agreement dated as of August 14, 2009 (the "P&A Agreement") between the FDIC-Receiver and Branch Banking & Trust Company ("BB&T") and are now allegedly obligations of BB&T.

　　In fact, however, the P&A Agreement expressly provides that the Colonial Bank "Deposits" that were assumed by BB&T never included "all or any portion of such deposit balances which, in the discretion of the Receiver or the Corporation . . . may be needed to provide payment of any liability of any depositor to the Failed Bank or the Receiver . . ." P&A Agreement, at 4 (definition of "Deposit") (emphasis added). Since the disputed Debtor deposit balances *are* needed to provide payment, through setoff, of the Debtor's liabilities to the FDIC-Receiver, those balances *were not assumed* by BB&T on August 14, 2009, and (subject to the FDIC-Receiver's instruction to BB&T to return the balances associated with those deposits being

formally conveyed once this motion has been decided) they remain in relevant part obligations of the FDIC-Receiver.[2]

That BB&T has acted as custodian of those accounts under the FDIC-Receiver's instruction while this motion has been pending does not have any effect on mutuality. Under the P&A Agreement, the FDIC-Receiver always has been the obligor of that portion of the balances that does not constitute "Assumed Deposits" (and always has been entitled to require BB&T to return the corresponding balances to satisfy such an obligation). Further, nothing in section 553(a)(3) of the Bankruptcy Code, or in any other provision, prohibits setoff under these circumstances.

In this case, the FDIC-Receiver suspected that it would have claims against the Debtor given the facts surrounding the failure of Colonial Bank, and there is no dispute that the FDIC-Receiver placed a hold from the very beginning (and prior to the petition date) on all of the Debtor's deposit accounts while it investigated those claims. This is what the FDIC-Receiver means when it says that it "controls" the accounts, and all of the Debtor's and Committee's arguments that such "control" is a mere contract right ignore the context entirely.

The Debtor's and Committee's arguments in effect ask the Court to hold that the FDIC's statutory setoff right under 12 U.S.C. § 1822(d) is not available against a bankrupt holding

_____

[2] The Debtor makes much of the fact that BB&T has filed a proof of claim asserting a security interest in certain of the deposit balances at issue. The FDIC-Receiver has acknowledged that BB&T has a security interest in certain funds in certain of the accounts. *See* FDIC-Receiver Am. Motion, ¶ 21. The P&A Agreement permits the FDIC-Receiver to identify a "portion of" deposit balances as not having been assumed, and the FDIC-Receiver's motion does not seek to exercise setoff rights as to any portion of the deposit balances that is needed by BB&T as substitute collateral for Affiliate Liabilities under the relevant security agreement. Only those portions of the balances that are not needed by BB&T as collateral will be subject to the FDIC-Receiver's setoff rights.

company. The objections are contrary to the clearly expressed intent of Congress in granting the FDIC this express statutory setoff right under the Federal Deposit Insurance Act.

2.     The Claims to Be Set Off.     The Debtor asserts in one of its summary judgment motions that "the Debtor owes no sum of money to Colonial Bank that could form the basis for the FDIC-Receiver to assert any right of offset." Debtor Br. [Doc. 699] at 7. This statement is simply wrong.

Quite apart from the approximately $900 million deficit that existed on the petition date under the Debtor's prepetition capital maintenance commitment, which itself gives rise to a priority claim that can be offset against the deposit balances at issue, the FDIC-Receiver has filed a protective proof of claim in this case asserting claims amounting to hundreds of millions of dollars, all of which also can be set off against the deposit balances. *See* FDIC-Receiver Am. Motion [Doc. 499], ¶¶ 27-45.

The FDIC-Receiver had not completed its investigation at the time it filed its original motion for stay relief in October 2009, but after the proof of claim was filed it amended its stay relief motion to make this point clear. The Debtor and the Committee objected to expanding the scope of discovery and briefing with respect to the FDIC-Receiver's motion, however, and the parties therefore stipulated that setoff rights for these other FDIC-Receiver claims would not be addressed now but are expressly preserved.

As a result, even if the Court were to conclude that there is no uncured deficit under the Debtor's capital maintenance commitment, the FDIC-Receiver still would have substantial claims to set off against the deposit balances that would, at a minimum, prohibit any funds being released to the Debtor from the disputed accounts until those other claims have been litigated to

resolution before Judge Thompson of the United States District Court for the Middle District of Alabama, where litigation of those issues is now pending.

      3.    <u>Capital Maintenance Commitment.</u>  The cases applying section 365(o) of the Bankruptcy Code reject the narrow reading that is advocated by both the Debtor and the Committee here. Indeed, many of the arguments advanced in the objections to the FDIC-Receiver's motion for relief under section 365(o) have been expressly considered and expressly rejected in other holding company bankruptcy cases. Several central propositions can be gleaned from those prior decisions.

      *First*, as Judge Wilkinson of the Fourth Circuit has observed, section 365(o) of the Bankruptcy Code "places the financial interest of the federal deposit insurance system ahead of that of the holding company and its creditors." *Resolution Trust Corp. v. FirstCorp, Inc. (In re FirstCorp. Inc.)*, 973 F.2d 243, 248 (4th Cir. 1992). It does this by requiring a bankrupt holding company to "immediately cure" any deficit that exists under any prepetition capital maintenance commitment as a "prerequisite to reorganization under Chapter 11." *Id.* at 247 (quoting 11 U.S.C. § 365(o)). If the holding company is unwilling or unable to effect such a cure "immediately," then chapter 11 is not available, the holding company is not entitled to act as a debtor in possession and the case must be converted to a liquidation under chapter 7 of the Bankruptcy Code.

      *Second*, when section 365(o) refers to "any commitment by the debtor . . . to maintain the capital of an insured depository institution," it means *any commitment*. *See Office of Thrift Supervision v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.)*, 236 F.3d 1246, 1252 (10th Cir. 2001). The statute is not limited to net worth maintenance stipulations or "prompt corrective action" guarantees, nor must a "commitment" that is enforceable under section 365(o)

be supported by consideration or even "take the form of an enforceable contract." *Id.* Indeed, in *Overland Park*, the Tenth Circuit expressly rejected another bankrupt holding company's efforts, like the Debtor's here, "to import . . . constrictive requirements into the statute's express language." *Id.*

*Third*, there is no question that the FDIC-Receiver, as the receiver for and statutory successor in interest to a failed bank, is an intended beneficiary of the Debtor's capital maintenance commitment and has standing to enforce section 365(o). There can be no serious argument that it is for the failed bank's benefit, and ultimately the protection of the Deposit Insurance Fund, that any holding company "commitment to maintain capital" was made in the first place. *See Ofc. of Thrift Supervision v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.)*, 232 B.R. 215, 228 n.23 (D. Kan. 1999), *aff'd on other grounds*, 236 F.3d 1246, 1252 (10th Cir. 2001). The real function of such commitments is "to maintain the viability of the federal deposit insurance system by reducing the potential cost to that system of resolving failed depository institutions." *FirstCorp*, 973 F.2d at 249.

The factual challenges advanced by the Debtor and the Committee fare no better. Discovery has confirmed that BancGroup and its directors and officers understood that BancGroup had made a commitment to maintain the capital of Colonial Bank, and they acted accordingly. Their efforts to shore up the capital of Colonial Bank ultimately were not successful, however. A series of escalating supervisory actions failed to restore Colonial Bank to stability. On August 11, 2009, BancGroup disclosed that "as a result of uncertainties associated with BancGroup's ability to increase its capital levels to meet regulatory requirements, management has concluded that there is a substantial doubt about its ability to continue as a going concern." App'x at 731.

Days later, the bank was closed amidst a liquidity and capital crisis that worsened dramatically when a search warrant was executed by law enforcement officials and the Debtor revealed that it was the target of a federal criminal investigation. No argument has been advanced that Colonial Bank's capital was anything other than substantially below the level that Colonial Bank and BancGroup had committed to achieve when the Bank was closed, a deficit that continued in that amount until ten days later when the Debtor filed its chapter 11 petition.

When it added section 365(o) to the Bankruptcy Code, Congress made a choice as to who should receive the benefit of assets of the holding company under circumstances such as these. It chose the FDIC's Deposit Insurance Fund over the other creditors of the bankrupt holding company, as the Debtor and its creditor constituents well understood. In its Form 10-K filed on March 2, 2009, long before this bankruptcy case began, BancGroup issued the following warning to its investors, including the bondholders that appear to be driving the Debtor's litigation strategy in this case:

> *Support of Subsidiary Bank*
>
> Under Federal Reserve policy, BancGroup is expected to act as a source of strength to, and to commit resources to support, Colonial Bank. <u>This support may be required at times when, absent such Federal Reserve policy, BancGroup might not otherwise be inclined to provide it.</u> In the event of a bank holding company's bankruptcy, <u>any commitment by the bank holding company to a federal bank regulatory agency to maintain the capital of a subsidiary bank will be assumed by the bankruptcy trustee and entitled to priority of payment.</u>

App'x at 181 (emphasis added).[3] Similarly, in Form 10-K and Form 10-Q filings during 2009, the Debtor repeatedly told its investors that "BancGroup has agreed to use its resources to support Colonial Bank." *See* FDIC Statement of Facts, ¶ 49 (collecting citations).

---

[3] Citations to "App'x." refer to pages within the Appendix Submitted by the FDIC-Receiver in Support of Motions for Relief Under 11 U.S.C. § 362(d) and 365(o), and citations to "FDIC Statement of Facts" refer to the Statement of Facts in Support of the Motions of Federal

The Debtor's current arguments that it never made a capital maintenance commitment cannot be squared with the facts or its own contemporaneous public statements. Its failure or inability to cure the substantial deficit that existed under its capital maintenance commitment as of its petition date entitles the FDIC-Receiver to a priority claim under section 507(a)(9) of the Bankruptcy Code and requires conversion of this case to a chapter 7 liquidation.

## COUNTER-STATEMENT OF FACTS

The FDIC-Receiver refers to and incorporates by reference the Statement of Facts in Support of the Motions of Federal Deposit Insurance Corporation, as Receiver, for Relief Under 11 U.S.C. §§ 362(d) and 365(o) and in Opposition to Debtor's Motions for Summary Judgment, together with the supporting evidentiary materials discussed therein.

## APPLICABLE LEGAL STANDARDS

### A.    Relief from the Automatic Stay

Under section 362(d)(1) of the Bankruptcy Code, upon request of a party in interest and after notice and a hearing, the Court shall grant relief from the automatic stay "for cause, including lack of adequate protection of any interest in property of such party in interest." 11 U.S.C. § 362(d)(1). What constitutes "cause" is determined on the totality of the circumstances in a particular case. *See Baldino v. Wilson (In re Wilson)*, 116 F.3d 87, 90 (3d Cir. 1998).

"[T]he [automatic] stay is not meant to be indefinite or absolute, and in appropriate instances, relief may be granted." *Izzarelli v. Rexene Prods. Co. (In re Rexene Prods. Co.)*, 141 B.R. 574, 576 (Bankr. D. Del. 1992) (citing *Wedgewood Inv. Fund Ltd. v. Wedgewood Realty Group Ltd. (In re Wedgewood),* 878 F.2d 693, 697 (3d Cir. 1989)).

---

Deposit Insurance Corporation, as Receiver, for Relief Under 11 U.S.C. §§ 362(d) and 365(a) and in Opposition to Debtor's Motions for Summary Judgment, each of which is being filed (under seal) concurrently with the filing of this memorandum of law.

As the United States Supreme Court has observed, the right of setoff is the right not to part with one's own funds. *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 21 (1995). A creditor holding a right of setoff is said to be "the best secured of creditors" because his "security" is "his own justified refusal to pay[.]" *United States v. Munsey Trust Co.*, 332 U.S. 234, 240 (1947). As a result, there is "practically a presumption in favor of allowing setoff" where such rights exist under applicable non-bankruptcy law. *Carlton Co. v. Jenkins (In re Jenkins)*, No. 03-60548, 2004 WL 768574, at *3 (Bankr. S.D. Ga. Mar. 30, 2004) (citing *S.E.C. v. Elliott*, 953 F.2d 1560, 1572 (11th Cir. 1992)).

Courts generally recognize that once a creditor has established a right of setoff, as the FDIC-Receiver has done here, that creditor also has made a prima facie showing of "cause" for relief from the automatic stay under section 362(d)(1). *In re Ealy*, 392 B.R. 408, 414 (Bankr. E.D. Ark. 2008), *appeal dismissed*, 396 B.R. 20 (8th Cir. B.A.P. 2008); *Internal Rev. Serv. v. Orlinski (In re Orlinski)*, 140 B.R. 600, 603 (Bankr. S.D. Ga. 1991); *see also United States v. Gould (In re Gould)*, 401 B.R. 415, 426 (9th Cir. B.A.P. 2009); *In re Nuclear Imaging Systems, Inc.*, 260 B.R. 724, 730 (Bankr. E.D. Pa. 2000).

A creditor such as the FDIC-Receiver here is entitled to relief from the automatic stay to exercise its setoff rights unless there has been a showing that the creditor has been provided adequate protection. *See Chrysler Credit Corp. v. Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.)*, 727 F.2d 1017, 1019 (11th Cir. 1984); *Blanton v. Prudential Bache Sec., Inc. (In re Blanton)*, 105 B.R. 321, 337 (Bankr. E.D. Va. 1989). "[A]dequate protection is a form of relief afforded to creditors whose interest in the debtor's property is such that the passage of time or continuation of the debtor's business could cause prejudice to the creditor." *See, e.g.*, *In re Engle*, 93 B.R. 58, 61 (E.D. Pa. 1987). "Adequate protection is provided as an alternative to

relief from the automatic stay and, conversely, relief from the automatic stay is justified where a lack of adequate protection exists." *Id.* (citing 11 U.S.C. § 362(d)).

### B. <u>Summary Judgment</u>

Rule 56 of the Federal Rules of Civil Procedure is made applicable to contested matters in bankruptcy cases pursuant to Bankruptcy Rules 7056 and 9014. Under Rule 56, summary judgment may be rendered only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Gray v. Manklow (In re Optical Techs, Inc.)*, 246 F.3d 1332, 1334 (11th Cir. 2001); *see* Fed. R. Civ. P. 56 (c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Contrary to the Debtor's portrayal of the summary judgment standard, "[t]he party asking for summary judgment 'always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it  believes demonstrate the absence of a genuine issue of material fact.'" *See Zeigler v. Ala. Dep't of Human Res.*, No. 2:09-cv-0284 (WHA), 2010 WL 1740834, at *1 (M.D. Ala. Apr. 29, 2010) (quoting *Celotex*, 477 U.S. at 323).

"To avoid summary judgment, the nonmoving party 'must do more than show that there is some metaphysical doubt as to the material facts.'" *Zeigler*, 2010 WL 1740834, at *1 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor." *Id.* (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)); *see In re Optical Techs*, 246 F.3d at 1334 (in considering motion for summary judgment court must "view

all evidence and make all reasonable inferences in favor of the party opposing summary judgment").

The Debtor has not met its burden, and its summary judgment motions must be denied. Moreover, Bankruptcy Rule 9017 incorporates Rule 43 of the Federal Rules of Civil Procedure, under which the Court may hear any motion "wholly or partly on oral testimony or on depositions." Bankruptcy Rule 9017 (quoting Fed. R. Civ. P. 43(c)). Since the Debtor's summary judgment motions have been scheduled for hearing simultaneously with the evidentiary hearing on the FDIC-Receiver's motions, the Court should consider the evidence propounded at that hearing when considering whether there exists a genuine issue of material fact with respect to either of the Debtor's motions.

## ARGUMENT

### THE FDIC-RECEIVER'S MOTIONS TO SET OFF AGAINST THE ACCOUNTS AND CONVERT THIS CASE SHOULD BE GRANTED

"Cause" has been established to modify the automatic stay, to the extent the Court determines it even applies, to permit the FDIC-Receiver to exercise its setoff rights against that portion of the Debtor's Accounts not needed by BB&T as collateral under the security agreement and to take such ministerial actions as may be required under the P&A Agreement to effect such relief. In addition, the FDIC-Receiver has established the existence of a substantial uncured deficit under the Debtor's prepetition capital maintenance commitment. The Debtor is unwilling or unable to "immediately cure" that deficit and therefore is not entitled to proceed under chapter 11 of the Bankruptcy Code. This case therefore must be converted to a chapter 7 liquidation.

# I. THE FDIC-RECEIVER HAS ENFORCEABLE SETOFF RIGHTS AGAINST THE ACCOUNTS

The Bankruptcy Code does not disturb a creditor's right to setoff if such right arose under non-bankruptcy law prior to the filing of a petition. *See* 11 U.S.C. § 553(a) (Bankruptcy Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against the claim of such creditor that arose before the commencement of the case"). In this case, the FDIC-Receiver has an express statutory right of set off against the disputed deposit balances under section 12(d) of the Federal Deposit Insurance Act, 12 U.S.C. § 1822(d). It also has state law setoff rights as successor to Colonial Bank under the law of Alabama. *See* FDIC-Receiver Am. Motion, ¶¶ 57-59.[4]

A deposit is a form of debt, not an asset, and there is no dispute that a bank may offset a depositor's liability against that debt both under nonbankruptcy law and in bankruptcy. *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 21 (1995) (deposit "consists of nothing more or less than a promise to pay, from the bank to the depositor . . ." and bank's administrative hold pending stay relief motion did not violate section 362 of the Bankruptcy Code) (citing *Bank of Marin v. England*, 385 U.S. 99, 101 (1966) ("The relationship of bank and depositor is that of debtor and creditor, founded upon contract.")).

---

[4] Upon its appointment as the receiver for Colonial Bank, the FDIC-Receiver succeeded by operation of law to "all rights, titles, powers, and privileges of the insured depository institution . . . ," 12 U.S.C. § 1821(d)(2)(A), including the right to setoff against all or a portion of the balances in the disputed Accounts under state law. The Debtor and the Committee do not dispute this proposition but instead challenge the applicability of state law on the basis of the same flawed analysis of mutuality.

The Debtor understood that the Accounts would be subject to setoff when it established them. Indeed, Colonial Bank's rules and regulations for such accounts expressly included the following provision:

> **Set Off.** You acknowledge that we have the right to set off any indebtedness which you owe us . . . without any further notice to or demand to you, whether the indebtedness or other obligations are now existing or hereafter arise. We may set off against the account any claim that we have against any one or more of the account owners on a joint account . . . without regard to the joint or several ownership of the funds on deposit to the account and without requirement that the claim be owed to us by all of the account owners rather than only some of them.
>
> To the fullest extent permitted by the Uniform Commercial Code, and other applicable law, you grant to us a security interest in all of your accounts in order to secure any indebtedness that you owe us, regardless of the source of funds in the accounts . . . . The security interest granted herein is consensual and is in addition to our right of set off.

App'x at 400.

In their objections, neither the Debtor nor the Committee challenge these fundamental propositions of banking and bankruptcy law. Instead, they advance arguments that attempt to deprive the FDIC-Receiver of its setoff rights that are premised on an erroneous interpretation of the plain language of the P&A Agreement and an application of Bankruptcy Code provisions that is not supported on the facts presented here.

### A. The Objecting Parties' Challenges to Mutuality Misapprehend the Relevant Facts

The central premise of the objections to setoff is that BB&T, not the FDIC-Receiver, is the obligor with respect to the relevant deposit balances. This assertion is mistaken.

Under the P&A Agreement, BB&T did not assume liability for *all* deposits of Colonial Bank but only for "Assumed Deposits," P&A Agreement, § 2.1(a), a defined term that expressly excludes "all or any portion of [Colonial Bank] deposit balances which, in the discretion of the

Receiver or the Corporation . . . <u>may be needed to provide payment of any liability of any depositor to the Failed Bank or the Receiver</u> . . ." P&A Agreement, at 4 (emphasis added).[5]

The carve-out in the P&A Agreement definition essentially tracks the language of section 12(d) of the Federal Deposit Insurance Act, codified at 12 U.S.C. § 1822(d), which provides:

> **Offsets against insured deposits**
>
> The Corporation may withhold payment of such portion of the insured deposit of any depositor in a depository institution in default as <u>may be required to provide for the payment of any liability of such depositor to the depository institution in default or its receiver,</u> which is not offset against a claim due from such depository institution, pending the determination and payment of such liability by such depositor or any other person liable therefor.

12 U.S.C. § 1822(d) (emphasis added).

Courts have recognized that section 1822(d) grants the FDIC, as receiver for a failed bank, a statutory right of set off against "insured deposits." *Villafane Neris v. Citibank, N.A.*, 845 F. Supp. 930, 933-34 (D.P.R. 1994) (collecting cases); *see also Gross v. Bell Sav. Bank*, 974 F.2d 403, 408 (3d Cir. 1992); *Northern Trust Co. v. F.D.I.C.*, 619 F. Supp. 1340, 1342 (W.D. Okla. 1985).

---

[5] The definition of "Assumed Deposits" under the P&A Agreement reads: "'Assumed Deposits' means 'Deposits.'" P&A Agreement at 2. "Deposits" are, in turn, defined as follows:

> **"<u>Deposit</u>"** means a deposit as defined in 12 U.S.C. Section 1813(l), including without limitation, outstanding cashier's checks and other official checks and all uncollected items included in the depositors' balances and credited on the books and records of the Failed Bank; <u>provided, that</u> the term "Deposit" shall not include all or any portion of those deposit balances which <u>in the discretion of the Receiver</u> or the Corporation, (i) may be required to satisfy it for any liquidated or contingent liability of any depositor arising from an unauthorized or unlawful transaction, or (ii) <u>may be needed to provide payment of any liability of any depositor to the Failed Bank or the Receiver,</u> including the liability of any depositor as director or officer of the Failed Bank, whether or not the amount of the liability is or can be determined as of Bank Closing.

P&A Agreement at 4 (emphasis added).

 *see* 12 C.F.R. § 370.4.

Accordingly, the Accounts are subject to the FDIC-Receiver's statutory setoff right under its governing Act.

Section 9.5 of the P&A Agreement provides the contractual mechanism under which the FDIC-Receiver protects its setoff rights with respect to any deposit balance (or portion thereof). That provision states that the FDIC-Receiver may, "[a]t any time," "determine that all or any portion of any deposit balance . . . <u>does not constitute a 'Deposit'</u> . . . and may direct the Assuming Bank [BB&T] to withhold payment of all or any portion of any such deposit," and may direct the Assuming Bank to "return all or any portion of such deposit balance to the Receiver . . ." *See* P&A Agreement, § 9.5.[6]

---

[6] Section 9.5 of the P&A Agreement provides, in pertinent part:

> At any time, the Receiver or the Corporation may, in its discretion, determine that all or any portion of any deposit balance assumed by the Assuming Bank pursuant to this Agreement does not constitute a "Deposit" (or otherwise, in its discretion, determine that it is the best interest of the Receiver or Corporation to withhold all or any portion of any deposit), and may direct the Assuming Bank to withhold payment of all or any portion of any such deposit balance. Upon such direction, the Assuming Bank agrees to hold such deposit and not to make any payment of such deposit balance to or on behalf of the depositor, or to itself, whether by way of transfer, set-off, or otherwise. The Assuming Bank agrees to maintain the "withheld payment" status of any such deposit balance until directed in writing by the Receiver or the Corporation as to its disposition. At the direction of the Receiver or the Corporation, the Assuming Bank shall return all or any portion of such deposit balance to

16

The P&A Agreement provisions allowing the FDIC-Receiver, "at any time," to determine that a given deposit balance is not a "Deposit" make sense given the short time available to execute a purchase and assumption agreement successfully. Even the Debtor concedes that section 1822(d) "contemplates a situation when the 'insured deposit' is held by the failed depository institution and the FDIC, in its capacity as receiver, steps into the shoes of the failed institution . . ." Debtor Br. [Doc. 699] at 12. To continue the Debtor's reasoning, however, and conclude that the FDIC-Receiver did not retain its setoff rights here would be to ignore how purchase and assumption transactions work.

As the Eleventh Circuit has observed, "[t]o avoid the significant problems with liquidation [of a failed bank], the FDIC whenever feasible employs a 'purchase and assumption' transaction in which the Corporation attempts to arrange for another bank to 'purchase' the failed bank and reopen it without interrupting banking operations and with no loss to the depositors."[7] *Gunter v. Hutcheson*, 674 F.2d 862, 865 (11th Cir. 1982). When one is used, "a purchase and assumption must be consummated with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services." *Gunter,* 674 F.2d at 865; *see also Turner v. Officers, Directors and Employees of Mid Valley Bank*, 712 F. Supp. 1489, 1500 (W.D. Wash. 1988) ("[s]peed is an essential element of such agreements. A purchase and assumption transaction is only feasible if completed before the depositors know

---

the Receiver or the Corporation, as appropriate, and thereupon the Assuming Bank shall be discharged from any further liability to such depositor with respect to such returned deposit balance. . . .

P&A Agreement, § 9.5.

[7] In a liquidation, "the sight of a closed bank, even an insured one, does not promote the utmost confidence in the banking system," and there is an attendant disruption to depositors, who "may wait months to recover even the insured portion of their funds . . ." *Gunter*, 674 F.2d at 865.

that their bank is insolvent and in receivership.  Once they find out, they will begin withdrawing their deposits . . .").  Given the pressing need for a quick transaction, it is not surprising that purchase and assumption agreements provide the FDIC as receiver time after a bank's closing to investigate claims it might have against depositors and to preserve its statutory setoff rights so that the receivership is assured some recovery on such claims.

In this case, the FDIC-Receiver suspected as of the closing date that it might have claims against BancGroup that it would want to set off against the holding company's deposits.  There is no dispute that before the petition date, the FDIC-Receiver placed a hold on BancGroup's deposit accounts to preserve those rights while it investigated its potential claims.  *See* FDIC Statement of Facts, ¶¶ 22-23.  Indeed, the Debtor itself acknowledged as much when it filed its emergency cash collateral motion seeking use of those account balances only weeks into this bankruptcy case.  *See* Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral [Doc. 87] , ¶ 12 ( "The FDIC-Receiver attempts to justify the hold that it has placed on the Bank Accounts by contending that, as successor to Colonial Bank, it may have a claim against the Debtor and that it is authorized to offset that claim against funds on deposit in the Bank Accounts.").

Before the Debtor's petition date, a hold was in place and the FDIC-Receiver was taking steps to investigate whether all or a portion of the balances held in the Accounts should be excluded from the "Deposits" that were assumed by BB&T.  This motion merely requests modification of the automatic stay (to the extent the Court concludes the stay even applies) to

allow the FDIC-Receiver to complete that process and exercise its established setoff rights against those balances.[8]

### B. The Relief Sought By the FDIC-Receiver Will Not Violate Section 553(a)(3) of the Bankruptcy Code

Apart from their challenges to mutuality, both the Debtor and the Committee suggest in their filings that the relief sought by the FDIC-Receiver somehow will run afoul of section 553(a)(3) of the Bankruptcy Code. These arguments are also without merit

The Debtor only mentions the provision in passing. The Committee predicates its argument under section 553(a)(3) on the false premise that the relief sought here by the FDIC-Receiver would somehow amount to a "post petition incurrence of the liabilities relating to the Debtor Deposits." Committee Objection [Doc. 694], ¶ 43. This is inaccurate, for the reasons already discussed. There is no arguable basis to extend section 553(a)(3) to the facts at issue here. Nor is there any merit to the Committee's intimation that the FDIC-Receiver is seeking to engage in "collusion" or "some form of manipulation at the expense of other creditors," *id.*, ¶ 44 (citing *Iowa Oil Co. v. Citgo Petroleum Corp. (In re Iowa Oil Co.)*, No. C04-1012, 2004 WL 2326377, at *9 (N.D. Iowa Sept. 30, 2004)), as discussed in the cases applying section 553(a)(3) that the Committee cites in its objection.

However, even assuming for the sake of argument the Committee's mistaken premise, the plain language of section 553(a)(3) shows that it is inapplicable. In drafting section 553(a)(3),

---

[8] In a footnote, the Debtor suggests (but does not argue) that certain of the Accounts may be immune from setoff as "special deposits." *See* Debtor Br. at 13 n.5. If it were to actually make such an argument, which it has not done, the Debtor would bear the burden to establish that there was a mutual intent between BancGroup and Colonial Bank that the funds in those Accounts were to be "kept separate from the general funds of the bank." *Official Comm. of Unsecured Creditors v. Mfrs. & Traders Tr. Co. (In re Bennett Funding Group, Inc.)*, 146 F.3d 136, 140 (2d Cir. 1998) (citation omitted). The Debtor has made no attempt to make such a showing.

Congress expressly chose not to include a restriction against setoff based on a "debt" that is transferred post-petition even though it had done so expressly in the neighboring provision governing post-petition transfer of "claims." *Compare* 11 U.S.C. § 553(a)(2) (prohibiting setoff based on a "claim" that "was transferred by an entity other than the debtor, to such creditor – (A) after the commencement of the case; or (B)(i) after 90 days before the date of filing of the petition; and (ii) while the debtor was insolvent . . . .") *with* 11 U.S.C. § 553(a)(3) (omitting any restriction on setoff for "debts" obtained "after the commencement of the case"). It is well-recognized that "[where] Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion[.]" *Russello v. United States*, 464 U.S. 16, 23 (1983).

The case law recognizes that section 553(a)(3) is an anti-collusion provision that is designed to prevent a bank, prepetition, "from undertaking a build-up of the debtor's account in order to secure a preference." *Sherman v. First City Bank of Dallas (In re United Sciences of America, Inc.)*, 893 F.2d 720, 725 (5th Cir. 1990). Consequently, the provision has no application when a debt owed to a debtor was incurred by the creditor in good faith and in the ordinary course of business. *See, e.g., Huisinga v. Nat'l Bank of Waterloo (In re Bohlen Enters., Ltd.)*, 78 B.R. 556, 560-61 (Bankr N.D. Iowa 1987), *rev'd on other grounds,* 859 F.2d 561 (8th Cir. 1988). Here, it is the Debtor that is asserting that the disputed accounts were established and maintained in the ordinary course of business of Colonial Bank, and the FDIC-Receiver succeeded to the rights of Colonial Bank by operation of law. The Debtor cannot at the same time be heard to challenge setoff against those debts under section 553(a)(3).

**C.      The Debtor's Substantial Deficit Under Its Prepetition Capital Maintenance Commitment Is Only One of Many Liabilities Owed to the FDIC-Receiver**

As will be discussed in the following section, the evidence shows that the Debtor owes a substantial, uncured deficit of roughly $900 million to the FDIC-Receiver under its prepetition capital maintenance commitment.   To the extent the Debtor fails or refuses to "immediately cure" this substantial deficit, this case must be converted and the FDIC-Receiver is entitled to a priority claim in that amount under section 507(a)(9) of the Bankruptcy Code.   *See* 11 U.S.C. §§ 365(o), 507(a)(9).

Even besides that substantial claim, however, the FDIC-Receiver has asserted many other valuable claims that also can be set off against the disputed deposit balances.   *See* App'x 698-721.   Those additional claims include, without limitation, claims against the Debtor to the extent that it receives refunds of taxes paid by the consolidated group and fails to turn such amounts over to the FDIC-Receiver.   Such refunds could amount to substantially more than the aggregate total balances held in the accounts at issue.   Even under the Debtor's mistaken view of the relationship between BancGroup and Colonial Bank with respect to such tax refunds, Colonial Bank would be entitled to a claim against the Debtor in such circumstances that was equal to the amount of such tax refunds that the Debtor failed to remit to the FDIC-Receiver in accordance with what the Debtor calls Colonial Bank's "right to remittances" under a so-called "Tax Sharing Agreement."   *See* Complaint, ¶¶ 16, 18, *Colonial BancGroup, Inc. v. F.D.I.C.*, Adv. Proc. No. 10-03018 (DHW).   Further, the fact that the parties have agreed that such tax refunds shall be paid into an escrow account does not diminish the FDIC-Receiver's setoff rights with respect to such amounts, which could still be paid from that escrow account to the Debtor if a court of

competent jurisdiction were to accept the Debtor's erroneous position, giving rise to a substantial claim to be set off against the deposit balances.[9]

While the parties have agreed that the FDIC's other claims will not be presented at this time, they also have agreed that all of the FDIC-Receiver's rights to set off based on those claims have been preserved. *See* Stipulation and Scheduling Order [Doc. 633], ¶ 8. Accordingly even in the event that the Court agrees with the Debtor's view that there is no uncured deficit under a capital maintenance commitment, no funds can be released to the Debtor from any of the Accounts until all litigation of these issues between the Debtor and the FDIC-Receiver has been resolved in the matters that are now pending before U.S. District Judge Thompson.

### D.       This Court Should Not Exercise Discretion to Deny the FDIC-Receiver's Statutory Right to Setoff

The Debtor's plea to the Court to exercise its discretion to deny the FDIC-Receiver its statutory right of setoff should be rejected. Any such decision would be an abuse of discretion since the FDIC-Receiver's statutory setoff right is not qualified by any such equitable discretion. Similarly, the Debtor does not identify any provision of the Bankruptcy Code that would permit such an exercise of discretion.

In addition, the only basis asserted by the Debtor for imposition of such an extraordinary remedy is its contention that in placing a hold on the disputed Accounts the FDIC-Receiver somehow violated the automatic stay. But this assertion ignores Supreme Court authority that holds directly to the contrary. *See Strumpf*, 516 U.S. at 21 ("we will not give § 362(a)(3) or § 362(a)(6) an interpretation that would proscribe what § 542(b)'s "except[ion]" and § 553(a)'s

---

[9] The district court has withdrawn the reference as to this adversary proceeding and other pending matters. The district court caption for this proceeding is *Colonial BancGroup, Inc. v. F.D.I.C.*, No. 2:10-cv-00410 (MHT) (M.D. Ala.).

general rule were plainly intended to permit: the temporary refusal of a creditor to pay a debt that is subject to setoff against a debt owed by the bankrupt").

## II.  THE DEBTOR'S FAILURE TO "IMMEDIATELY CURE" THE DEFICIT UNDER ITS CAPITAL MAINTENANCE COMMITMENT REQUIRES CONVERSION OF THIS CASE AND GIVES RISE TO A PRIORITY CLAIM

Section 365(o) of the Bankruptcy Code was enacted "to prevent institution-affiliated parties from using bankruptcy to evade commitments to maintain capital reserve requirements of a Federally insured depository institution."  H.R. Rep. No. 681(I), 101st Cong., 2d Sess. 179 (1990).  As the Fourth Circuit explained:

> In the Thrift and Bank Fraud Act [part of the Crime Control Act of 1990], Congress determined that a depository institution holding company that has committed to maintain the capital of a depository institution subsidiary that has become unprofitable cannot use a Chapter 11 reorganization to jettison the subsidiary in an effort to enhance its own financial position and that of its creditors, while leaving the federal deposit insurance system (and ultimately the taxpayers) to bail out the capital-deficient subsidiary. If the holding company is not financially able to satisfy its capital maintenance obligations, then § 365(o) denies it the opportunity to reorganize, leaving liquidation under Chapter 7 as its only option. <u>Through this mechanism, § 365(o) places the financial interest of the federal deposit insurance system ahead of that of the holding company and its creditors</u>.

*Resolution Trust Corp. v. FirstCorp, Inc. (In re FirstCorp. Inc.)*, 973 F.2d 243, 248 (4th Cir. 1992) (emphasis added); *see* 11 U.S.C. § 365(o) ("[i]n a case under chapter 11 of this title, the trustee shall be deemed to have assumed . . . and shall immediately cure any deficit under any commitment by the debtor to a Federal depository institutions regulatory agency . . . to maintain the capital of an insured depository institution").

It is important to bear Judge Wilkinson's quotation in mind in considering the Debtor's entreaty that an order granting the FDIC-Receiver's motions here will "leav[e] approximately $400 million of pre-petition unsecured claims completely out of money."  Debtor Br. [Doc. 700] at 2.  Equally worthy of consideration in that regard is the express disclosure that BancGroup

included in its Form 10-K, filed on March 2, 2009, where it told those same pre-petition creditors that:

> In the event of a bank holding company's bankruptcy, <u>any commitment by the bank holding company to a federal bank regulatory agency to maintain the capital of a subsidiary bank will be assumed by the bankruptcy trustee and entitled to priority of payment</u>.

App'x at 181 (emphasis added).

Colonial Bank was a federally insured depository institution. Twice, it promised its regulators that it would raise its Tier 1 leverage capital ratio to 8% and its total risk-based capital ratio to 12%. BancGroup was the holding company for Colonial Bank. <u>Three separate times</u>, BancGroup, through its board of directors, promised its own regulators that it would "take steps designed to ensure" that Colonial Bank complied with the Bank's promises to its regulators, including these capital requirements.

There is no dispute that Colonial Bank failed to raise its capital to the required ratios. To the contrary, its Tier 1 leverage capital ratio steadily declined from the date of the Bank's memorandum of understanding in December 2008, when it first promised to take action to raise its capital ratios, until the Bank's closing on August 14, 2008. In reviewing the causes of Colonial Bank's failure, the FDIC's Inspector General concluded that:

> the FDIC properly implemented applicable [prompt corrective action] provisions of section 38 [of the Federal Deposit Insurance Act]. However, by the time Colonial's capital levels fell below the required thresholds necessary to implement PCA, <u>the bank's condition had deteriorated to the point at which the institution could not raise additional capital in the time period necessary to prevent its failure</u>. As a result, the [Alabama State Banking Department] closed Colonial on August 14, 2009

App'x at 337 (emphasis added).

The Debtor's failure to raise Colonial Bank's capital to appropriate levels when it promised regulators it would do so made it impossible to save the Bank when outside events –

the execution of a federal search warrant and BancGroup's disclosure that it was a "target" of a federal criminal investigation – placed the institution in a state of mortal distress. The result has been an estimated loss to the FDIC's Deposit Insurance Fund of $3.8 billion, one of the costliest bank failures in United States history.

In its objection and motion for summary judgment with respect to the FDIC-Receiver's section 365(o) motion, the Debtor contends that it made no "capital maintenance commitment" within the meaning of section 365(o). It parses the provisions of the Debtor MOU and the Debtor C&D Order and opines that because those documents do not use the term "commitment" or refer to section 365(o), they cannot be subject to enforcement. It reviews the prior case law, finding its own promises to regulators here to be neither a "prompt corrective action guarantee" or a "net worth maintenance stipulation" and therefore, somehow, outside of the scope of the statute. Casting itself as a supposedly "wholly disinterested" party, the Debtor shares with the Court its "conclusion that the positions advanced by the FDIC-Receiver in the 365(o) Motion are without merit." Debtor Br. [Doc. 700] at 2.

What the Debtor does not discuss in its submissions are the sections of appellate opinions that have considered and rejected precisely the same legal arguments that the Debtor advances here. Likewise, the Debtor studiously avoids any discussion of its own contemporaneous statements and actions, which demonstrate that BancGroup knew at the time that it had, indeed, made the type of capital maintenance commitment about which it had warned investors in its March 2009 Form 10-K. *See Wolkowitz v. F.D.I.C. (In re Imperial Credit Indus., Inc.)*, 527 F.3d 959, 967 (9th Cir. 2008) (rejecting holding company trustee's attempt to evade application of capital maintenance commitment as inconsistent with course of conduct demonstrating debtor's contemporaneous understanding of commitment).

BancGroup's bondholders and other creditors understood the risks that they were assuming in purchasing BancGroup bonds or extending BancGroup credit. The Debtor's failure to cure the substantial deficit as of the petition date under its prepetition capital maintenance commitment requires that this case be converted and entitles the FDIC-Receiver to a priority claim in the amount of the deficit.

### A. The Debtor Made a "Commitment . . . to Maintain the Capital of an Insured Depositor Institution" (Colonial Bank)

The first and central argument advanced by the Debtor in its summary judgment motion, and by the Committee in its objection, is that BancGroup made no "capital maintenance commitment" within the meaning of section 365(o) of the Bankruptcy Code. This central argument is not supported by either the law or the facts.

### 1. What Is a "Capital Maintenance Commitment"?

In 1998, a bankruptcy court in Kansas issued an opinion rejecting a capital maintenance claim for many of the same reasons advanced by the Debtor here. *See In re Overland Park Fin. Corp.*, 217 B.R. 879 (Bankr. D. Kan. 1998), *rev'd sub nom. Ofc. of Thrift Supervision v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.)* 232 B.R. 215 (D. Kan. 1999), *aff'd*, 236 F.3d 1246 (10th Cir. 2001). The bankruptcy judge there concluded that an "informal net worth stipulation" that was made by a holding company to the Federal Home Loan Bank Board, did not constitute a "capital maintenance commitment" within the meaning of section 365(o) for a number of different reasons: (1) "While the stipulation refer[red] to compliance with regulations, maintenance of capital levels, and the infusion of capital, it [was] otherwise open-ended," *id.* at 885; (2) "The form of the stipulation [was] not an agreement and it contain[ed] no statement that it is enforceable administratively by a cease-and-desist order like the formal net worth agreements the FHLBB developed after 1984," *id.*; and (3) based on the review of case

law from other contexts, informal stipulations such as the one before the court were "not enforceable contracts; they [were] merely part of the process" inherent in being a regulated holding company, *id.* at 886.

The bankruptcy court considered the Fourth Circuit decision in *FirstCorp*, applying section 365(o), and found it unpersuasive. *Id.* at 887-90. It also agreed with the Debtor's argument here that the inclusion of section 365(o) within section 365 of the Bankruptcy Code suggested some congressional intent to require a "capital maintenance commitment" to take the form of an "executory contract," which the court already had concluded the informal stipulation before it was not. *Id.* at 890-91; *see* Debtor Br. [Doc. 700] at 23 n.22. Accordingly, the bankruptcy court denied the section 365(o) motion.

While the Debtor's and the Committee's arguments in our case would have more persuasive effect if the bankruptcy court decision in *Overland* were the law of section 365(o), unfortunately for those parties it is not. On appeal, the district court reversed the bankruptcy court's decision, and that affirmance was again affirmed by the Tenth Circuit. *See Ofc. of Thrift Supervision v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.)*, 232 B.R. 215 (D. Kan. 1999), *affd*, 236 F.3d 1246 (10th Cir. 2001). The appellate courts in *Overland* did not just reverse the bankruptcy court, however, they also resoundingly rejected the reasons advanced by the bankruptcy court for its decision.

First, the district court found on appeal, there is no requirement that a "capital maintenance commitment" under section 365(o) take the form of an "executory contract" or, for that matter, even an "enforceable" one. *See Overland Park*, 232 B.R. at 221-22. To the contrary, "[s]ubsection (o) does not use the word 'executory,' nor does it even refer to a 'contract.' Had Congress intended subsection (o) to apply only in the case of executory

contracts, surely it would have said so." *Id.* at 222. Moreover, the "fact that the section heading [for section 365] contains the phrase 'executory contracts' . . . [did] not establish that subsection (o) only applies to such contracts. To the contrary, the mandatory language of subsection (o) clearly places a limitation on the broad powers the trustee ordinarily would have in the case of an executory contract or unexpired lease." *Id.* at 224.

Second, subsection (o) also did not "use the word 'consideration' or refer to an 'enforceable' commitment.'" *Id.* at 222. As the district court explained, the term "commitment" was "commonly defined simply as an agreement or pledge to do something," *id.*, a conclusion that also had been reached by the Fourth Circuit in its earlier decision in *FirstCorp*, *see FirstCorp.*, 973 F.2d at 249 n.5 (citing Black's Law Dictionary 248 (5th ed. 1979)). The district court therefore rejected the bankruptcy court's conclusion that section 365(o) required an enforceable contract, finding the lower court's reasoning to be unsupported by the authorities it had cited.

Finally, the district court reviewed the "detailed analysis" of section 365(o) that was provided in the *FirstCorp.* decision by the Fourth Circuit and, contrary to the lower court, found it to be persuasive. *Id.* at 226-27. On the basis of the foregoing, the district court reversed the bankruptcy court's decision and ordered that the holding company's bankruptcy case be converted to a liquidation under chapter 7 unless the debtor "fulfilled its obligation under its stipulation." *Id.* at 228.

The Tenth Circuit affirmed, substantially adopting the reasoning of the district court's decision. *Ofc. of Thrift Supervision v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.)*, 236 F.3d 1246, 1251-53 (10th Cir. 2001). It considered and rejected the debtor holding company's argument that a capital maintenance commitment must take the form of an executory

contract, disagreeing with its "strained reading of the statute and its attempt to re-characterize the stipulation as a 'mere acknowledgement.'" *Id.* at 1252. The plain language of the statute was what mattered, and in that regard the appellate court "refuse[d] to import Overland Financial's constrictive requirements into the statute's express language." *Id.* The plain language of section 365(o) referred to "any commitment by the debtor . . . to maintain the capital" of an insured bank, and nowhere mentioned that "the commitment must be contractual, executory, formal or post-1984." *Id.*

In a footnote in its brief in this case, the Debtor weakly asserts that this dispositive holding from the Tenth Circuit decision in *Overland* was somehow *dicta*, *see* Debtor Br. [Doc. 700] at 23 n.22, but even a cursory review of the opinion shows that this quotation is the centerpiece of the court's decision and its supporting rationale. Like the district court before it, the Tenth Circuit also found the *FirstCorp.* decision to be "well-reasoned and persuasive," *Overland*, 236 F.3d at 1253, and the court therefore held that before the debtor holding company could "proceed with Chapter 11, and acquire Chapter 11 protection, the debtor's commitment to assume and cure its capital deficit must be satisfied," *id.* For the reasons that follow, the same result plainly pertains in this case as well.[10]

Contrary to the implications of the Debtor's and the Committee's submissions here, there is nothing in the *Overland* decisions, or to our knowledge in any other decision applying section

---

[10] In its objection, the Committee asserts that the district court decision in *F.D.I.C. v. Butler (In re Conner Corp.)*, 127 B.R. 775 (E.D.N.C. 1991), supports its view that section 365(o) requires fully enforceable executory contracts. The opinion in *Conner* did not concern a motion under section 365(o), however, and the court did not discuss the decisions in *FirstCorp* and *Overland* holding that section 365(o) requires only a "pledge" and not a formal executory contract. Even if the court did consider those opinions (the Tenth Circuit opinion in *Overland* was issued only a month earlier and might not have been available), the court's reasoning is unpersuasive and, in any event, does not purport to construe the provision at issue on this motion.

365(o), that limits application of that provision to either "net worth maintenance stipulations" or holding company guarantees under the federal "prompt corrective action" regime. To the contrary, the decisions expressly reject the idea that a holding company can evade its commitment to regulators by importing such "restrictive requirements" that are nowhere to be found in the plain text of the provision. *Overland*, 236 F.3d at 1252.

Moreover, the lengthy discussions in the Debtor's and the Committee's objections as to whether section 365(o) requires an "enforceable" agreement fail to address the Debtor's ███████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████

### 2. The Debtor's Capital Maintenance Commitment(s)

BancGroup made three separate promises to its regulators during 2009 that it would take steps "designed to ensure" that Colonial Bank complied with its own agreements with regulators, including its agreement to raise its capital ratios to specified levels. Those three separate promises have similar wording; two of the three are worded almost identically. When it agreed in those documents to take steps "to ensure" that Colonial Bank would meet the promised capital ratios, the Debtor made a "commitment . . . to maintain the capital of an insured depository institution," and that commitment is enforceable under section 365(o) of the Bankruptcy Code.[11]

On December 15, 2008, Colonial Bank, acting through its board of directors, entered into a memorandum of understanding with its principal regulators, the FDIC and the Alabama State

---

[11] "Ensure" means "to make sure, certain, or safe: guarantee." Webster's Ninth New Collegiate Dictionary (1983).

Banking Department (the "Bank MOU").  *See* App'x at 129-34.  The Bank MOU recited that it

"represent[ed] an agreement between the Board of Directors of Colonial Bank and the [Bank's

regulators] whereby the Bank, through its Board, agrees that it will move in good faith to comply

with the requirements of the Memorandum and eliminate the problems of the Bank."  *Id.* at 1

(emphasis added).

Among other provisions, the Bank MOU expressly required Colonial Bank to restore its

capital to specified levels.   Under the heading "CAPITAL," it included the following

requirements:

> 14.   By February 28, 2009, the Bank shall have a Tier 1 Leverage
> Capital ratio of not less than 8 percent and a Total Risk-Based
> Capital Ratio of not less than 12 percent.  The Tier 1 Leverage and
> Total Risk-Based Capital ratios shall be calculated utilizing the
> definitions contained in Section 325.2 of the FDIC Rules and
> Regulations.   Thereafter, in the event that the Tier 1 Leverage
> Capital ration falls below 8 percent or the Total Risk Based Capital
> ration falls below 12 percent, the Supervisory Authorities should
> be notified and capital shall be increased in an amount sufficient to
> meet the ratios required by this provision within 30 days.

*Id.* at 4 (emphasis in original).

There is no dispute that the Bank MOU was required by regulators and that it was

prompted by the deteriorating financial condition of Colonial Bank (as well as other management

issues).  As a result, BancGroup's own condition was also deteriorating, leading its regulators –

the Federal Reserve Bank of Atlanta (the "Atlanta Fed") and the Alabama State Banking

Department – to take their own supervisory actions.

First, on January 6, 2009, ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



Then, on January 21, 2009, BancGroup entered into a Memorandum of Understanding with the Atlanta Fed and the Alabama State Banking Department (the "Debtor MOU").  *See*

Case 09-32303   Doc 728   Filed 05/21/10   Entered 05/21/10 15:56:12   Desc Main
Document   Page 39 of 53

App'x at 138-41. ████████████████████████████████ the Debtor MOU contained a provision that expressly required BancGroup to take steps to ensure that Colonial Bank complied with the Bank MOU, including the capital requirements set forth in that agreement. The Debtor MOU recited that it set forth "an agreement" for a "program of corrective action" that included the following provision, which was listed first among its six "operative" paragraphs:

> 1. Colonial [BancGroup, Inc.] will utilize its financial and managerial resources to assist its subsidiary bank in addressing weaknesses identified by its primary banking supervisors and achieving/maintaining compliance with its December 15, 2008 Memorandum of Understanding with the Federal Deposit Insurance Corporation's Atlanta Regional Office (FDIC) and the State of Alabama Banking Department.

App'x at 138 (emphasis added). ███████████████████████████

████████████████████████████████████████████████████████ the Debtor MOU provided that it was "not a 'written agreement' for purposes of Section 8 of the Federal Deposit Insurance Act, as amended." *Id.* at 2. Nevertheless, *Overland* makes clear that the holding company's commitment to utilize its resources to assist Colonial Bank to "achieve" and "maintain" compliance with the capital requirements set forth in the Bank MOU was a "capital maintenance commitment" within the meaning of section 365(o).

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████



To the contrary, BancGroup included precisely such disclosures in its Form 10-K filed on March 2, 2009.  In that filing, on repeated occasions, the Debtor informed its investors that in its agreements with its regulators "BancGroup ha[d] agreed to use its resources to support Colonial Bank."  App'x at 186; *see id.* at 258 ("BancGroup's resources will be used to support the Bank"), *id.* at 297 ("BancGroup has agreed to use its resources to support Colonial Bank.").  Similar disclosures were included in the Form 10-Q filed by the Debtor for the first quarter of 2009.  *See* App'x at 463 ("BancGroup's resources will be used to support the Bank."); *id.* at 488 ("BancGroup has agreed to use its resources to support Colonial Bank.").  These statements conflict dramatically with the Debtor's denials in their submissions on this motion that it ever entered into a commitment to maintain the capital of Colonial Bank.

BancGroup's course of conduct also demonstrates its understanding that it had made a commitment to maintain the capital of Colonial Bank. As the March 31, 2009 deadline for compliance with the Bank MOU's capital ratios neared, BancGroup hurried to enter into a definitive agreement with third party investors led by Taylor, Bean & Whitaker Mortgage Corporation ("TBW") for an investment of $300 million of capital in BancGroup to be contributed to the Bank, an investment which if it occurred would also result in an investment of $553 million from the U.S. Treasury Department under its Troubled Asset Relief Program ("TARP"). *See* FDIC Statement of Facts, ¶¶ 56-60.

The BancGroup board had a meeting on March 27th to discuss the proposed agreement,

█████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████ Then, the directors met again on March 30th ███████████████████████████████

███████████████████████ FDIC Statement of Facts, ¶¶ 63-64.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████

### 3. **The Debtor Cease & Desist Order**

BancGroup understood that if it failed to comply with the requirements of the Debtor MOU it was subject to more stringent supervisory actions. Indeed, it disclosed precisely that in both its March 2, 2009 Form 10-K and its Form 10-Q filed on May 8, 2009. *See* App'x at 172-

323, 453-526. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

On June 3, 2009, the members of the Colonial Bank board of directors each signed a stipulation and consent to the issuance of a cease and desist order by the FDIC and the Alabama State Banking Department. App'x at 630-38. The Bank's regulators issued their consented to cease and desist order on June 15, 2009 (the "Bank C&D Order"). *See* App'x at 163-71. Consistent with the Bank MOU, the Bank C&D Order included the following requirements with respect to the capital ratios of Colonial Bank:

### 3. CAPITAL

(a) By September 30, 2009, the Bank shall have a Tier 1 Leverage Capital Ratio of not less than 8 percent and a Total Risk Based Capital Ratio of not less than 12 percent. The Tier 1 Leverage and Total Risk Based Capital ratios shall be calculated using the definitions contained in Section 325.2 of the FDIC's Rules and Regulations, 12 C.F.R. § 325.2. Thereafter, in the event the Tier 1 Leverage Capital Ratio falls below 8 percent or the Total Risk-Based Capital Ratio falls below 12 percent, the Supervisory Authorities should be notified in writing and capital shall be increased in an amount sufficient to meet the ratios required by this provision within 30 days.

Bank C&D Order, § 3(a).

In a letter dated June 5, 2009, the Bank's two regulators informed the board of directors of Colonial Bank that the Bank MOU was "being discontinued and replaced by a new action in the form of a Cease and Desist Order." App'x at 639. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

In July 2009, BancGroup, in turn, consented to entry of a cease and desist order by its own regulators. On July 15, 2009, Mr. Sippial, the recently named chairman of BancGroup's board of directors, signed a consent cease and desist order on behalf of BancGroup with the Federal Reserve Board and the ASBD (the "Debtor C&D Order"). *See* App'x at 163-171. The Debtor C&D Order recited that Mr. Sippial was entering into the consent order "on behalf of BancGroup, and consenting to compliance with each and every provision of this Order by BancGroup and its institution-affiliated parties . . ." *Id.* at 1 (emphasis added).

Among other provisions, the Debtor C&D Order included the following paragraph:

> **Source of Strength**
>
> 1.      The board of directors of BancGroup shall take appropriate steps <u>to ensure that the Bank complies</u> with the Order to Cease and Desist entered into with the Federal Deposit Insurance Corporation (the "FDIC") and the Superintendent effective as of June 15, 2009, and any other supervisory action taken by the Bank's federal or state regulators.

*Id.* at 2 (emphasis added).[13]

 paragraph 1 of the Debtor MOU, this provision of the Debtor C&D constituted a "capital maintenance commitment" by BancGroup within the meaning of section 365(o) of the Bankruptcy Code and is enforceable

---

[13] The Debtor's suggestion that the FDIC-Receiver failed to discuss the Debtor C&D Order in its prior submissions on the 365(o) motion is belied by the filings themselves. *See* FDIC-Receiver Motion [Doc. 257], ¶ 5; Rich Decl., ¶ 8 & Exh. E.

under that section, even if the Debtor and the Committee claim the language of that commitment "is not a model of well-crafted prose."[14]  *FirstCorp.*, 973 F.2d at 249.



### 4.    The Deficit Under the Debtor's Capital Maintenance Commitment

In its decision in *In re Imperial Credit Industries*, the Ninth Circuit refused to accept a bankruptcy trustee's challenge to the FDIC's use of quarterly Call Report data that had been submitted by a failed bank to establish the amount of a deficit under the capital maintenance commitment at issue.  *Imperial Credit*, 527 F.3d at 970.  In the FDIC-Receiver's motion here, it also used such Call Report data, as filed by Colonial Bank, to perform its calculation, concluding that the deficit as of June 30, 2009 under BancGroup's capital maintenance commitment was $1,003,972,000.[15]

---

[14] The Committee argues that the "source of strength" doctrine "does not require a bank holding company to make capital contributions to its subsidiaries," Committee Obj. [Doc. 701], ¶ 36 (citing *MCorp. Fin. Corp. Inc. v. Board of Governors of the Federal Reserve*, 900 F.2d 852, 863 (5th Cir. 1990), *rev'd on other grounds*, 502 U.S. 32 (1991)), but unlike this case, *MCorp.* did not involve specific written commitments by a holding company to take steps to ensure that its bank subsidiary raised its capital to specified levels.

[15] The shortfall is readily calculable from statistics provided in Colonial Bank's Uniform Bank Performance Report, which is a publicly available financial report of statistics and data included in Colonial Bank's quarterly Call Reports.  *See* Rich Decl., Exh. F.  The amount of capital required to meet the agreed 8% Tier I leverage capital ratio is determined by multiplying the bank's total assets by .08.  The shortfall from this agreed capital level is then determined by subtracting Colonial Bank's reported Tier I leverage capital from the product of this equation.

Colonial Bank never filed a Call Report for the next quarter end, on September 30, 2009. However, Colonial Bank provided more regular informal reports of its capital and liquidity position to its regulators during 2009. Based on statistics set forth in one of those daily reports for August 11, 2009, three days before Colonial Bank was closed, the amount of the shortfall from the required Tier 1 Leverage Capital level, and therefore the amount of the Debtor's deficit under its capital maintenance commitment, was $904,954,360. This was also the amount of the deficit under that commitment as of the Debtor's petition date on August 25, 2009. *See* App'x at 693-97.[16]

### B. The FDIC-Receiver Has Standing to Enforce the Debtor's Capital Maintenance Commitment

The arguments that the FDIC-Receiver somehow does not have standing to enforce the Debtor's capital maintenance commitment are equally meritless. Under the Federal Deposit Insurance Act, the FDIC-Receiver succeeded by operation of law to all "rights, titles, powers and privileges" of Colonial Bank when it was appointed the failed bank's receiver. 12 U.S.C. § 1821(d)(2)(A). Without question, Colonial Bank was an intended beneficiary of the Debtor's capital maintenance commitment, and equally clear, the FDIC-Receiver succeeded to the failed bank's rights of enforcement. *See Overland Park*, 232 B.R. at 228 n.23 ("it would appear that the right to enforce the stipulation belongs to the RTC, as OPSL's conservator, and not to OTS");

---

For June 30, 2009, the calculation is as follows: ($26,210,000,000 * 0.08) = $2,096,800,000 - $1,092,828,000 = $1,003,972,000.

[16] In its submissions, the Debtor notes that holding company guarantees required under the federal "prompt corrective action" regime limit the amount of such guarantees to 5% of the institution's total assets. As of June 30, 2009, the total assets of Colonial Bank were $25,455,112,000. BancGroup's liability under a formal PCA guarantee therefore would have been limited to $1,272,755,600.00, substantially higher than the amount of the capital maintenance deficit at issue here.

*see, e.g., FirstCorp,* 973 F.2d at 245-46 (affirming decision granting motions of both RTC as receiver and OTS).

Similarly, the FDIC-Receiver is the party best positioned to enforce obligations that are unquestionably imposed for the protection and benefit of the FDIC's Deposit Insurance Fund. In *FirstCorp.*, the Fourth Circuit explained the purpose of section 365(o), in reasoning that is fully applicable to rebut the standing objections advanced here:

> [FirstCorp] misconceives the function of capital maintenance obligations. Such obligations ensure that subsidiaries of holding companies have adequate levels of capital. Contrary to FirstCorp's argument, capital does not serve to protect depositors; protection of depositors is the role of federal deposit insurance. . . . Rather, <u>capital functions to maintain the viability of the federal deposit insurance system by reducing the potential cost to that system of resolving failed depository institutions</u>. It does this both by diminishing the risk that a depository institution will become insolvent and thus require a federal bailout and by decreasing the cost to the insurance system if such a bailout becomes necessary. . . .

*FirstCorp.*, 973 F.2d at 249 (citations omitted; emphasis added).

Here, the FDIC's Deposit Insurance Fund has sustained an estimated loss of $3.8 billion as a result of the resolution of Colonial Bank. As subrogee to depositors claims, the Fund (through FDIC-Corporate) holds a sizeable priority claim against the Colonial Bank receivership and is a likely recipient of much of the FDIC-Receiver's recoveries on these motions (after deducting administrative claims against the receivership). *See* 12 U.S.C. §§ 1821(d)(11), (g). The FDIC-Receiver therefore is the best placed of all federal actors to enforce the Debtor's uncured capital maintenance commitment, since it is in the best position to achieve the primary objective of that commitment, the protection of the Deposit Insurance Fund.

Separately, both the Debtor and the Committee contend that the BancGroup commitments cannot constitute a "capital maintenance commitment" under section 365(o)

because, purportedly, they were not made to a "Federal depository institutions regulatory agency." It is difficult to understand how either party can credibly make this argument.

Section 101(21B) of the Bankruptcy Code provides that with respect to an insured bank, "Federal depository institutions regulatory agency" means "the appropriate Federal banking agency (as defined in section 3(q) of [the Federal Deposit Insurance Act]." 11 U.S.C. §101(21B). Section 3(q) of the FDI Act, in turn, expressly lists the Board of Governors of the Federal Reserve System (the "Federal Reserve Board") as the "appropriate Federal banking agency" with respect to holding companies such as the Debtor. *See* 12 U.S.C. § 1813(q)(2)(F). All of the three commitments made by BancGroup here were made to the Federal Reserve Board or, acting through its delegated authority, the Atlanta Fed. *See* App'x at 135-37, 138-41, 163-71; 12 C.F.R. 225.3 (delegation of authority).

Both the Debtor and the Committee seem to suggest that the Bankruptcy Code definition requires one to identify the federal agency that is responsible for regulating the "insured depository institution," but this reading is inconsistent with the incorporation by reference of the Federal Deposit Insurance Act definition of "appropriate federal banking agency" and would lead to nonsensical results. An "insured depository institution" is not an entity that can "commit to maintain" its own capital for purposes of enforcement under section 365(o). Indeed, none of the decisions applying section 365(o) that have been discussed by the parties would have been issued if this reading of the statute were possible, since all of those decisions involved commitments by bankrupt holding companies to maintain the capital of their subsidiary banks.

### C. The September 30, 2009 Deadline in the Bank MOU Does Not Provide the Debtor with a Defense to Enforcement of its Commitment

The next argument advanced by the Debtor and the Committee is that the Debtor's capital maintenance commitment cannot be enforced because the underlying Bank C&D Order (1)

provided Colonial Bank until September 30, 2009 to raise its capital to required levels, which was rendered impossible by the Bank's closing on August 14, 2009, and (2) was terminated by the FDIC on September 29, 2009, six weeks after Colonial Bank was closed and before the FDIC-Receiver brought this motion. As with their other arguments, these arguments cannot be squared with the decisions applying section 365(o).

The Debtor does not suggest, because it could not do so, that Colonial Bank had any prospect of raising its capital ratios to the required levels by the September 30th deadline set forth in the Bank C&D Order. The record establishes that the Bank's capital steadily diminished from the time that it entered into the Bank MOU, on December 15, 2008, until the date of its closing on August 14, 2009. By August 11, 2009, management was required to disclose its doubts about BancGroup's ability to continue as a "going concern" due to uncertainties associated with BancGroup's ability to increase its capital levels to meet regulatory requirements." App'x at 731.

Moreover, the condition of Colonial Bank's liquidity and capital was worsening at an accelerating pace at the time of its closing, precipitated by the execution of a federal search warrant at its facilities on August 3, 2009 and the disclosure by BancGroup soon thereafter that it was the "target" of a federal criminal investigation. *See* App'x at 334-71 (inspector general report conclusion that "by the time Colonial's capital levels fell below the required thresholds necessary to implement PCA, the bank's condition had deteriorated to the point at which the institution could not raise additional capital in the time period necessary to prevent its failure."). As already discussed, a substantial deficit existed under the capital maintenance commitment when Colonial Bank was closed.

To allow BancGroup to evade enforcement of its capital maintenance commitment under these circumstances would be to reward the very failure to abide by that commitment that contributed to the Bank's failure. As the Fourth Circuit explained in rejecting a similar holding company argument, under this reasoning:

> a holding company obligated to maintain the capital of a depository institution could avoid that obligation entirely simply by ignoring it: once the institution's financial position deteriorated to such an extent that federal regulators were forced to step in and take control, the holding company could argue that its liability under the capital maintenance obligation was thereby extinguished. Congress could not have intended such a result.

*FirstCorp.*, 973 F.2d at 251.

The Debtor's next argument, that the FDIC's termination of the Bank C&D Order on September 29th gives rise to a defense to enforceability of the Debtor's capital maintenance commitment, relies on an interpretation of the last sentence of section 365(o) that also has been rejected by the courts. That sentence of the statute provides: "This subsection shall not extend any commitment that would otherwise be terminated by any act of such agency." *See* 11 U.S.C. § 365(o). As the Fourth Circuit recognized, however, this part of the provision only prevents a debtor from being held responsible for "*further* deterioration" of the subsidiary bank's capital occurring after the termination. Termination "in no way absolve[s]" the Debtor for liability with respect to "the existing, matured liability that had attached" under its capital maintenance commitment as of the date that it filed for bankruptcy. *FirstCorp.*, 973 F.2d at 251 (emphasis in original).

Here, as of the petition date, the Bank C&D Order was still in place, as was the Debtor's capital maintenance commitment. ███████████████████████████████ ███████████████████████████████████████████ Under section 365(o), the Debtor was obligated to "immediately cure" the substantial deficit that existed on that date as a condition to

obtaining protection under chapter 11 of the Bankruptcy Code. *See Overland Park*, 236 F.3d at 1253; *FirstCorp.*, 973 F.2d at 247. The Debtor's failure or inability to do so requires that its case be converted to a liquidation under chapter 7 of the Bankruptcy Code.

### D. The Debtor's Fraudulent Transfer Defense Is Not Available in Chapter 11

Finally, the Debtor and the Committee both assert that if the Court is inclined to grant the FDIC-Receiver's motions, they first should be heard on the Debtor's thinly drafted fraudulent conveyance challenge to its capital maintenance commitment. The district court has withdrawn the reference with respect to that adversary proceeding, and the FDIC-Receiver's motion to dismiss the complaint for failure to state a claim therefore will be heard in that court. Even in the unlikely event that the pleading survives dismissal, however, the fraudulent conveyance defense cannot be raised to prevent conversion of the Debtor's case to a chapter 7 liquidation.

Under the Bankruptcy Code, avoidance actions such as the Debtor's fraudulent conveyance action against the FDIC-Receiver, are "trustee defenses," meaning that they can only be asserted in bankruptcy and, further still, that a debtor in possession can only assert them if it has validly invoked the protections of chapter 11 of the Bankruptcy Code. Since the Debtor here has never cured the deficit that exists under its capital maintenance commitment, however, it is not entitled to the protections of chapter 11 of the Bankruptcy Code. Until the Debtor either cures that deficit, and therefore stays in chapter 11, or this case is converted to a chapter 7 liquidation, the Debtor's capital maintenance commitment cannot be challenged as a fraudulent conveyance *See Imperial Credit*, 527 at 971 (discussing district court dismissal).

## III. THE DEBTOR'S MOTIONS FOR SUMMARY JUDGMENT SHOULD BE DENIED

For the same reasons that the FDIC-Receiver has established its entitlement to relief under sections 362(d) and 365(o), the Debtor's cross motions for summary judgment should be

44

denied.  In any event, given the substantial issues of disputed fact raised by the evidence

submitted by the FDIC-Receiver, the summary judgment motions must be denied even if the

Court is not prepared to grant the FDIC-Receiver's motions based on the current record.

## CONCLUSION

For all of the foregoing reasons, and for the reasons set forth in its other submissions in these matters, the FDIC-Receiver respectfully requests that its motions for relief under sections 362(d) and 365(o) be granted, that the Debtor's motions for summary judgment be denied, that the FDIC-Receiver be granted relief from the automatic stay to the extent require to allow it to exercise its setoff right against the relevant portion of the disputed deposit balances, that the Debtor's chapter 11 case be converted immediately to a chapter 7 liquidation and that the Court grant the FDIC-Receiver such other and further relief as it may deem just and proper.

Dated:  Montgomery, Alabama
        May 17, 2010

Respectfully submitted,

 /s/ Michael A. Fritz, Sr._____
Michael A. Fritz, Sr.
Fritz & Hughes LLC
7020 Fain Park Drive Suite 1
Montgomery, Alabama  36117
(334) 215-4422

Of Counsel:

Kathryn R. Norcross
Senior Counsel

- and -

Jeffrey E. Schmitt
Counsel

Thomas R. Califano
John. J. Clarke, Jr.
Michael D. Hynes
Jeremy R. Johnson
Spencer Stiefel
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York  10020-1104
212-335-4500
212-335-4501

Federal Deposit Insurance Corporation
3501 Fairfax Drive
Arlington, Virginia  22226
(703) 562-2429

Attorneys for the
Federal Deposit Insurance Corporation
as Receiver for Colonial Bank