UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

```
-----------------------------------------------------------x
                                                           :
In re                                                      :   Chapter 11
                                                           :
THE COLONIAL BANCGROUP, INC.,                              :   Case No.  09-32303 (DHW)
                                                           :
        Debtor.                                            :
                                                           :
-----------------------------------------------------------x
                                                           :
                                                           :
THE COLONIAL BANCGROUP, INC.,                              :
                                                           :
        Movant,                                            :
                                                           :
v.                                                         :   CONTESTED MATTER
                                                           :
PATRICIA CHONG, MICHELLE                                   :
CONDON, HOWARD DAVIS, KENNETH                              :
DELISLE, LISA FREE, ERNESTO                                :
GONZALEZ, WALTER HARGROVE,                                 :
PATTI  HILL, CHARLES MALCOLM                               :
HOLLAND, III, LEAH JUNKINS, KERRY                          :
KIMMEL-GEIGER, CATHERINE                                   :
KISSICK, LINA MACKI, LEE MARTINO,                          :
KENNETH MCCONWELL, JUDY MILLS,                             :
WILLIAM PAINTER, HARLAN PARRISH,                           :
RONALD PECK, JOSEPH ROYALS,                                :
JULIETTE STAPF, JAMES THARPE,                              :
AND PAMELA VITTO,                                          :
                                                           :
        Respondents.                                       :
                                                           :
-----------------------------------------------------------x
```

**SUPPLEMENTAL BRIEF IN SUPPORT OF SECOND MOTION OF
DEBTOR FOR ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO
EXERCISE OWNERSHIP RIGHTS OVER DEFERRED COMPENSATION PLAN ASSETS**

This Supplemental Brief is submitted by The Colonial BancGroup, Inc. (the "Debtor") in support of its *Second Motion of Debtor for Order Authorizing, But Not Directing, the Debtor to Exercise Ownership Rights Over Deferred Compensation Plan Assets* (the "Second Motion") [Doc. No. 255] and in opposition to

the multiple answers filed by Respondents in the above-captioned contested matter to the Second Motion [Doc. Nos. 325, 328, 329, 331 and 335].

## BACKGROUND

As more fully discussed in Debtor's original Brief in Support of Second Motion, filed on April 14, 2010 [Doc. No. 255] (the "Debtor's Brief"), the parties to this contested matter request the Court to determine ownership, as between the Debtor and Respondents, of assets held under a trust agreement (the "Trust Agreement") that were contributed by the Debtor, as grantor, with funds deferred from the compensation of Respondents and other plan participants pursuant to "The Colonial BancGroup, Inc. Non-Qualified Deferred Compensation Plan" (the "Plan"), a non-qualified deferred compensation plan.

At the evidentiary hearing on April 15, 2010 (the "Hearing"), the primary argument advanced by Respondents in support of their position was that the Plan did not qualify as a "top hat" plan within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). As support for that argument, Respondents asserted that language appearing in the Plan documents that participants were "100% vested" in their deferrals of compensation under the Plan transformed the Plan from a non-qualified "top hat" plan to a plan subject to Title I of ERISA (the assets of which would be excluded from the Debtor's estate under Section 541(b)(7)(A)(i)(I) of the Bankruptcy Code).[1]  In addition, Respondents urged the Court to find relevant the fact that, prior to the commencement of this Chapter 11 case, the assets and liabilities of the Plan were initially recorded on the books of Colonial Bank and were subsequently recorded on the books of the Debtor.

---

[1] As noted in the Debtor's Brief, a "top hat" plan under ERISA is:

> a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees.

29 U.S.C. § 1051(2). *See also* 29 U.S.C. §§ 1081(a)(3), 1101(a)(1). Whether a benefit plan provides that participants are vested or not vested in compensation they elect to defer under the plan has absolutely no bearing on whether the plan is a "top hat" plan.

At the time of the Hearing, the period for discovery had ended. After the Hearing, the Court entered an order permitting Respondents to supplement the Hearing record with the deposition testimony of a witness who was unable to attend the Hearing, Mr. John H. Nelson (the former director of accounting operations at Colonial Bank). The deposition scope was limited by order of the Court to: "(1) where the deferred compensation funds were recorded and (2) whether the location was moved, and if so, why." The order also authorized the Debtor to take the deposition of any rebuttal witnesses on the same issues. [*See* Doc. No. 680].[2]

On May 14, 2010, Mr. Nelson gave deposition testimony as contemplated by the Court's order, and on May 18, 2010, Ms. Sarah H. Moore, the Debtor's chief financial officer and Mr. Nelson's superior, gave deposition testimony as the Debtor's rebuttal witness.

## ARGUMENT

**1.  Overview.**

While the Debtor's Brief remains the primary explanation of its position and authority, this Supplemental Brief will address two narrow issues: (1) Respondents' claim that the use of the term "vested" in certain Plan documents evidences an intent that the assets held in trust pursuant to the Plan (the "Plan Assets") are not subject to the claims of the Debtor's creditors; and (2) the relevance (or lack thereof) of the internal accounting treatment accorded the assets and liabilities the Plan prior to the commencement of this Chapter 11 case.[3]

---

[2] The Court's order further authorized the Debtor and Respondents to file any post-trial briefs, if they so elected.

[3] The Debtor anticipates that Respondents will attempt to divert the Court's attention from the real issues in this contested matter by pointing to the existence of another non-qualified deferred compensation plan for the Debtor's directors (the "Directors Plan"). In designating certain deposition testimony after the Hearing, Respondents attempted to include in the record a document that mentions the Directors Plan. [*See* Doc. No. 744-3]. The Directors Plan is not a plan in which any of the Respondents participated. Indeed, there is no evidence that any officer or employee of the Debtor or its subsidiaries ever participated in the Directors Plan. Moreover, the Debtor is unaware of any assets being held in connection with the Directors Plan. To date, the Debtor has no knowledge of any person who has claimed that they are owed monies under the Directors Plan. In sum, the mere mentioning of this plan is irrelevant to any disputed issues in this contested matter.

As discussed below, neither of these issues changes the uncontested facts that the Plan was set up as a non-qualified "top hat" plan within the meaning of ERISA, the assets were expressly made subject to the claims of the Debtor's creditors in bankruptcy, and the risk of the Debtor's insolvency was the price for the tax-deferral benefits that Respondents sought by participating in the Plan.

As explained more fully in the Debtor's Brief and hereinbelow, the Debtor believes that it is entitled to an order and judgment in its favor, so that the Plan Assets may be used for the benefit of all creditors in this case. *See* McKee v. Paradise, 299 U.S. 119, 112-23 (1936) (assets must be available to the employer's creditors even if default to the employees is "an acute disappointment" or "especially regrettable").

### 2. The Term "Vested" Does Not Mean Plan Assets Are Exempt From Creditor Claims.

Counsel for Respondents has made much of the fact that certain Plan documents refer to the Respondents' deferred compensation as "100% vested." Citing Black's Law Dictionary, they contend that the term "vested" means that any assets held in connection with the Plan are "nonforfeitable" and beyond the reach of the Debtor's general creditors, despite explicit Plan and Trust Agreement language to the contrary. Respondents' argument misapprehends the concept of vesting in benefit plans and is at odds with the testimony of certain Respondents who occupied senior positions with the Debtor prior to its bankruptcy.[4]

In the benefit plan context, benefits "vest" when an employee has completed all the prerequisites under the plan for the employee to be entitled to his or her benefits. An employee's contributions to a benefit plan of any type usually are vested fully the moment those contributions are made. An employer's contributions, on the other hand, typically vest in increments over the period of the employee's employment with the employer. Once an employee becomes vested in his or her contributions, the employee can leave the employment of the employer without forfeiting the plan benefits.

---

[4] It also defies common sense. An individual is 100% vested in his or her bank account, but that does not mean that those funds cannot be garnished by a creditor.

Moreover, the concept of forfeiture in the benefit plan area means that benefits, having "vested" by virtue of the employee's having satisfied all plan requirements for entitlement, are not forfeited by an employee whose employment terminates or is terminated.[5] The fact that participants may have satisfied all requirements for entitlement to plan benefits, with the result that those benefits are vested and nonforfeitable *vis-à-vis* the employer, does not mean that they are exempt from the claims of the employer's creditors when the plan is a non-qualified "top hat" plan, like the Plan in question, and expressly provides that plan benefits are subject to creditors' claims in the event of the employer's insolvency.

At least three Respondents acknowledged that they understood this concept of vesting. They testified that Colonial had just such a "vesting" arrangement under its benefit plans, with employer matching of contributions to the 401(k) plan vesting over a 5-year period and employee contributions vesting immediately. [*See* Condon Dep., Doc. No. 690-2, at 45:17-47:4; Hill Dep., Doc. No. 690-3, at 113:15-115:2; Free Dep., Doc. No. 690-4, at 41:14-42:22]. Participants in the Debtor's Plan were 100% vested in the compensation they deferred pursuant to the Plan for the simple reason that the *participants* (as opposed to the Debtor) were deferring their own compensation for the purpose of garnering certain tax benefits (in exchange for an unsecured promise to pay, with the funds being subject to the claims of creditors). No additional employment prerequisites, such as working a certain period of time for the Debtor or its subsidiaries, existed.

---

[5] It bears emphasis that the concepts of "vesting" and "nonforfeitable" are primarily used in ERISA provisions dealing with benefit plans other than "top hat" deferred compensation plans, such as the Plan at issue. Despite its inapplicability to the Plan, 29 U.S.C. § 1002(19), which contains some of the definitional provisions in ERISA, defines "nonforfeitable" as follows:

> [W]hen used with respect to a pension benefit or right means a *claim* obtained by a participant… to that part of an immediate or deferred benefit under a pension plan *which arises from the participant's service, which is unconditional, and is legally enforceable against the plan*.

(emphasis added). The foregoing definition, which is not applicable to "top hat" plans, makes clear that "nonforfeitable" means that a claim of a participant is fixed, unconditional and legally enforceable (just like the unsecured claims of Respondents against the Debtor in this case in an amount equal to their respective compensation deferrals under the Plan, plus or minus earnings), but not exempt from the claims of creditors. Of course, under Section 541(b)(7)(A)(i)(I) of the Bankruptcy Code, assets contributed to an employee benefit plan subject to Tile I of ERISA do not constitute property of the estate and therefore are not subject to creditor claims. By contrast, the Plan, not being a plan subject to Title I of ERISA, does not fall within the scope of the exclusions in Section 541(b)(7)(A)(i)(I).

Here, the undisputed facts demonstrate that both the Plan and the Trust Agreement expressly provided that the Plan Assets were subject to the claims of the Debtor's creditors in the event of the Debtor's bankruptcy. The fact that Respondents were "vested" in compensation they deferred under the Plan can form no basis for ignoring the explicit language of the Plan documents and denying creditors recourse to the Plan Assets as assets of the Debtor's estate.

Notably, Respondents cite no statutory or case law support for their novel position that reference to "vesting" in the Plan documents somehow converts a non-qualified "top hat" plan to a plan subject to Title I of ERISA, the assets of which would be excluded from the Debtor's estate and therefore unavailable to the Debtor's general creditors. The Court's attention is directed to the opinion of the Fifth Circuit Court of Appeals in McAllister v. Resolution Trust Corp., 201 F.3d 570 (5th Cir. 2000). There, the appeals court confronted the issue of whether the funds of employees held in a Supplemental Executive Retirement Plan (another type of non-qualified "top hat" plan) were subject to the claims of the plan sponsor's creditors in the plan sponsor's insolvency proceeding. The Fifth Circuit found irrelevant the fact that the benefits may have been fully vested. Ruling that the plan assets were subject to creditor claims, the appeals court concluded that the "benefits at issue were fully vested and are in fact owed appellants as unsecured general creditors," 201 F.3d at 576. The court refused to alter the priority of distribution of the employer's assets as a result of the employer's insolvency and affirmed the trial court's grant of summary judgment in favor of the successor-in-interest to the insolvent employer. Respondents' position, then, is unsupported by law or fact.

### 3. The Internal "Booking" of Assets and Liabilities of the Plan Does Not Affect the Rights of the Parties.

The ownership of the Plan Assets is clear and beyond dispute. Respondents have stipulated that they were all participants in the Plan of the Debtor. [*See* Exhibit A to Debtor's Brief, ¶¶ a., f.] Several of them have also testified to this fact. [*See, e.g.,* Condon Dep., Doc. No. 690-2, at 73:21-74:6; Hill Dep., Doc. No. 690-3, at 14:16-23, 112:22-113:1]. All but three of the Respondents have filed claims in the Debtor's Chapter 11 bankruptcy case. The trust holding the Plan Assets is between The Charles Schwab Trust Company ("Charles Schwab") and the Debtor. [*See* Doc. No. 665-2, at 6 of 35]. The Plan and Trust Agreement name

only the Debtor as the Plan sponsor. Despite these uncontested facts, Respondents have argued that some of the assets and liabilities of the Plan were booked to Colonial Bank, the Debtor's wholly owned subsidiary; that these assets were "moved" or "transferred" to the books of the Debtor shortly after the Federal Deposit Insurance Corporation was appointed as receiver for Colonial Bank (the "FDIC-Receiver") and prior to the Debtor's Chapter 11 case; and that these facts somehow entitle Respondents to rescind their election to defer their compensation and associated taxes at the risk of loss upon the Debtor's insolvency. There are several problems, both factual and legal, with this argument.

First, the Debtor maintained accounting records for itself and each of its subsidiaries. Those books all "rolled up" and were combined into the consolidated books of the Debtor and its subsidiaries. [Nelson Dep., Doc. No. 741-2, at 25:21-26:21]. Contrary to the argument of Respondents, the assets and liabilities were *always* reflected on the books and records of the Debtor.

Second, the Plan Assets were not, in fact, "moved" or "transferred." The Plan Assets were at all relevant times, and remain today, in a single trust account at Charles Schwab in the Debtor's name. All that was "moved" or "transferred" was a pair of bookkeeping entries reflecting the internal accounting of the assets and liabilities associated with the Plan. [Moore Dep., Doc. No. 741-1, at 27:17-28:10]. As described above, this "movement" was entirely within the consolidated books of the Debtor and its consolidated subsidiaries.[6]

Third, the accounting treatment of the assets and liabilities of the Plan was not done for any improper purpose. As Respondents' witness, Mr. Nelson, fully admitted, the asset and liability accounting was "moved" because the Plan Assets were deemed an asset of the Debtor. [Nelson Dep., Doc. No 741-2, at 25:4-10 ("I understood that it was made because it was deemed a Colonial BancGroup plan, sponsored plan, and therefore it was an asset and liability of Colonial BancGroup.")]. Ms. Moore, the Debtor's chief financial

---

[6] It is anticipated that Respondents will endeavor to confuse the issues by arguing that the Plan Assets were transferred from Colonial Bank to the Debtor on the eve of bankruptcy, as opposed to a change in the accounting treatment of the Plan Assets (and associated liabilities to Respondents as unsecured creditors).

officer, further testified that her subordinates reported to her that the change was necessary because the FDIC-Receiver had instructed it be done.[7] [Moore Dep., Doc No. 741-1, at 18:8-19:1].

Finally, and most importantly, where the assets and liabilities were booked on the internal records of the Debtor and its subsidiaries is simply irrelevant. The fact that assets were reflected on the books of a subsidiary does not dictate the ownership of those assets anymore than listing the Empire State Building on one's personal balance sheet changes the ownership of that property. There is no dispute that Respondents' compensation was deferred as part of the non-qualified deferred compensation plan of the *Debtor*. How those assets were booked on a consolidated balance sheet for accounting purposes is simply inapposite, particularly in light of the fact that on a consolidated balance sheet of the Debtor and its subsidiaries *all* assets and liabilities are recorded at the parent (i.e. Debtor) level.[8]

## CONCLUSION

For all the reasons set forth in this Supplemental Brief and in the Debtor's Brief, the Debtor believes that it is entitled to an order and judgment in its favor, so that the Plan Assets may be used for the benefit of all creditors in this case. As detailed above, no additional arguments suggested by Respondents since the filing of the Debtor's Brief should change the result of this dispute.

---

[7] Respondents' counsel has argued that Ms. Moore's testimony on this point is inadmissible hearsay. This objection is ill-founded. First, the testimony is not offered for the truth of the matter asserted. The Debtor does not contend that, in this dispute with Respondents, the FDIC-Receiver's instructions were somehow legally binding. Rather, the relevance of the testimony is to explain the actions of the Debtor; although Ms. Moore did not personally make the change to the records, she became aware of it shortly thereafter and permitted it to stand. [Moore Dep., Doc. No. 741-1, at 28:11-29:6]. Second, Ms. Moore was the chief financial officer at the time the information was provided to her by her subordinates. The communication occurred in the ordinary course of business, and was offered by employees who had a duty to report to Ms. Moore. Like a written business record, such oral business communications have the indicia of trustworthiness, and are admissible.

[8] Respondents place great reliance upon the manner in which the assets and liabilities of the Plan were booked and that this booking is persuasive, if not dispositive, of the issues in the case. Even accepting Respondents' position that this accounting treatment is somehow relevant to the resolution of this contested matter, Respondents' theory proves too much. In making their arguments, Respondents would have to concede that the compensation deferred pursuant to the Plan was booked on the bank's and later the Debtor's records as an *asset* of the bank (and later the Debtor) and a *liability* owing to Plan participants. In other words, the compensation that participants deferred were not assets of the participants *at all*, but rather were assets of an entity that owed a corresponding liability to them.

Respectfully submitted, this 15th day of June, 2010,

                                C. Edward Dobbs
                                Email: ced@phrd.com

                                Rufus T. Dorsey, IV
                                rtd@phrd.com

                                PARKER, HUDSON, RAINER & DOBBS LLP
                                1500 Marquis Two Tower
                                285 Peachtree Center Avenue, N.E.
                                Atlanta, Georgia 30303
                                Telephone No.: (404) 523-5300
                                Facsimile: (404) 522-8409


                                By: /s/ *Rufus T. Dorsey, IV*
                                    Rufus T. Dorsey, IV

                                Attorneys for Debtor and Debtor in Possession