UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re                                             Case No. 09-32303-DHW
                                                  Chapter 11
THE COLONIAL BANCGROUP, INC.,

        Debtor.

MEMORANDUM OPINION

The Colonial Bancgroup, Inc. ("debtor") filed a motion for authority to exercise ownership rights over assets held in a deferred compensation plan (Doc. #255). The motion is opposed by twenty-one employees of the debtor and its subsidiary, Colonial Bank, who contributed to the plan.[1] An evidentiary hearing was held on April 15, 2010.

At issue is whether the debtor's deferred compensation plan is a "top hat" plan under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and whether the assets are excluded from property of the estate under 11 U.S.C. § 541.

For the following reasons, the court concludes that the deferred compensation plan is a "top hat" plan and that the assets of the plan are not excluded from property of the estate under 11 U.S.C. § 541. As a result, the assets of the plan are property of the estate, and the debtor's motion for authority to exercise ownership rights over those assets is due to be granted.

_____

[1] The following employees responded to the motion ("respondents"): Harlan Parrish, Lee Martino, Lina Macki, Kenneth McConwell, Kenneth DeLisle, Joseph Royals, William Painter, Juliette Staph, Lisa Free, Walter Hargrove, Patti Hill, Michelle Condon, and Ronald Peck (Doc. #325); Charles Malcolm Holland, III (Doc. #328); Pamela Vitto (Doc. #329); Leah Junkins (Doc. #331); James Tharpe, Howard Davis, Ernesto Gonzalez, Judy Mills, and Patricia Chong (Doc. #335).

## Jurisdiction

This court's jurisdiction over this disputed matter is derived from 28 U.S.C. § 1334 and from an order of the United States District Court for this district referring jurisdiction of title 11 matters to the Bankruptcy Court. See General Order of Reference of Bankruptcy Matters (M.D. Ala. Apr. 25, 1985). Further, because the dispute at issue concerns whether the assets of the plan are property of the debtor's estate, this is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2), thereby extending this court's jurisdiction to the entry of a final order or judgment.

## Findings of Fact

The debtor, The Colonial BancGroup, Inc., is the holding company for Colonial Bank.[2] In December 2005, the debtor gave notice to highly compensated employees of the debtor and Colonial Bank of their eligibility to participate in a newly established non-qualified deferred compensation plan sponsored by the debtor.

## 2005 Hill Memorandum

The notice was issued in the form of a memorandum on the debtor's letterhead by Patti Hill, senior executive vice-president and chief operating officer for Colonial Bank. Hill Memorandum, Ex. 4. The memorandum contains a summary of the plan and a chart comparing the attributes of the plan to the those of the debtor's 401(k) plan. Similar to the debtor's 401(k) plan, the assets of the plan will be held in participant accounts, and earnings will accumulate tax-free until distributed. Unlike the 401(k) plan, the assets will not "avoid claims of employer's general creditors in bankruptcy." The plan will be administered by Milliman, and employees will have the same investment options as those under the 401(k) plan.

---

[2] The debtor also owned Colonial Brokerage, Inc. The debtor had numerous subsidiaries, most of which were either business trusts, limited liability companies, or limited partnerships, in which the debtor had a partial interest.

2

Participants will be "100% vested in all amounts contributed." The bank will not make contributions to the plan, matching or otherwise.[3]

The memorandum states that the deferred funds will not be available for distribution until termination of employment except under rare circumstances, such as an employee's "financial hardship or a change in control of the Bank."

The memorandum also contains the following paragraph:

> <u>Substantial Risk of Forfeiture</u>. The Plan is not a qualified plan like the 401(k) Plan. For the amounts withheld to be tax deferred to you, the Internal Revenue Service requires that the funds be "subject to a substantial risk of forfeiture." This means that you would be a general creditor of the Bank with respect to collecting your money in the unlikely event that the Bank goes into bankruptcy or has other severe financial problems. There are currently steps that will be taken to help mitigate this issue. But you need to understand there is some risk associated with the Plan.

The memorandum instructs those with questions about the plan to telephone the Colonial BancGroup Benefits Department. Lisa Free, employee of the debtor, testified that a copy of the plan would have been distributed with the memorandum.[4] Participation in the plan was voluntary, and not all eligible employees chose to participate.

---

[3] The plan states that the "Company may, but is not obligated to, make additions to Participants' deferred accounts . . . " Plan, Ex. 1, § 4.3.

[4] The debtor had three employees during most of the relevant time period. Lisa Free was the only employee of the debtor to participate in the plan. Lisa Free was director of investor relations for the debtor.

3

## The Deferred Compensation Plan

The plan document is entitled, "The Colonial BancGroup, Inc. Non-Qualified Deferred Compensation Plan."[5]  Plan, p. 1.  The plan "provides deferred compensation to a select group of senior management or highly compensated employees" and has two express purposes.  The first is to further the growth and development of Colonial BancGroup Inc. by providing key executives the opportunity to defer a portion of their income, thereby encouraging their productive efforts.  The second is to provide participants with an opportunity to supplement their retirement income through deferral of their current income.  Plan, § 1.

The plan gives Colonial BancGroup, "acting through its Corporate Human Resources Director or his or her delegates," "final discretion, responsibility, and authority to administer and interpret the Plan," including "the discretion and authority to determine all questions of fact, eligibility, or benefits relating to the Plan."  Plan, § 3.  Lisa Free and Michelle Condon testified that the debtor did not have a Human Resources Department but that Colonial Bank did.  The debtor had a Benefits Administration Committee that was responsible for overseeing and implementing the plan.

The Plan requires the Company to "maintain a record of the participant's deferrals by accumulating the amount of his or her deferred compensation" and update the record at least monthly with any applicable gains and losses.  "All amounts shall be 100% vested at all times."  Plan, § 5.1.  A participant may not assign or transfer his rights and interest under the Plan.  Plan, § 6.1.

The plan also contains the following paragraph:

---

[5] The Plan was not executed until November 2, 2007 but was effective as of January 1, 2006.  Plan, § 1.

8. <u>Unsecured General Creditor</u>.  Except as provided in Section 10, Participants and their beneficiaries, heirs, successors, and assigns shall have no legal or equitable rights, interest, or claims in any property or assets of the Company.  Except as provided in Section 9, the assets of the Company shall not be held under any trust for the benefit of Participants, their beneficiaries, heirs, successors , or assigns, or held in any way as collateral security for the fulfilling of the obligations of the Company under this Plan.  Any and all Company assets shall be, and remain, the general, unpledged, unrestricted assets of the Company.  The company's obligation under the Plan shall be an unfunded and unsecured promise of the Company to pay money in the future.

Section 9 authorizes the transfer of the Plan assets into a rabbi trust in the event of a change of control of the company.  Lisa Free testified that there was no such change of control.  Section 10 specifies the procedure for filing a claim under the Plan.  Section 12 provides that the plan will be administered in accordance with the requirements of Internal Revenue Code Section 409A.

The Charles Schwab Trust

In January 2006, the debtor established "The Charles Schwab Nonqualified Deferred Compensation Plan Trust Agreement" to hold the plan assets (deferred compensation) for investment purposes.  The trust was intended as a grantor trust with the debtor as grantor and owner of the trust assets.  Trust Agreement, ¶ 1.4.  The trust was revocable by the debtor, "provided, however, that the Trust shall become irrevocable upon a Change of Control, as defined in the Plan."  Trust Agreement, ¶ 1.5.  The Trust Agreement states:

It is the intention of the parties that this Trust shall constitute an unfunded arrangement and shall not affect the status of the Plan as an unfunded plan maintained for the purpose of

5

> providing deferred compensation for a select group of
> management or highly compensated employees for purposes
> of Title I of the Employee Retirement Income Security Act of
> 1974. It is the intention of the Employer to make contributions
> to the Trust to provide itself with a source of funds to assist in
> the meeting of its liabilities under the Plan.

Trust Agreement, Preamble. The Preamble further states that the debtor wishes to contribute to the trust "assets that shall be held therein, subject to the claims of the Employer's . . . creditors in the event of the Employer's . . . Insolvency." An employer is deemed insolvent if the employer is unable to pay its debts as they become due or if the employer is a debtor under the United States Bankruptcy Code.

Upon notification of insolvency, the trustee is required to discontinue all payment of benefits to participants and hold the trust assets for the benefit of the employer's creditors pending court order. Trust Agreement, ¶ 5.7. The trustee of the trust "shall be fully protected in delivering any property held in the Trust in which a court of competent jurisdiction may direct to satisfy the claims of the general creditors of the Employer." Trust Agreement, ¶ 1.3. The Trust further states:

> Any rights created under the Plan or this Trust Agreement shall
> be mere unsecured contractual rights of the Plan Participants
> and their beneficiaries against the Employer . . . . Participants
> and their beneficiaries shall have no preferred claim on, or any
> beneficial interest in, any assets of the Trust.

Trust Agreement, ¶ 1.3. The Trust prohibits plan participants from assigning or encumbering their interest in benefits under the Trust, and those benefits will not be subject to claims of the Participants' creditors. Trust Agreement, ¶ 12.3. The Trust assets "shall remain subject to the claims of the general creditors" of the debtor in the event of the debtor's insolvency. Trust Agreement, ¶ 12.3 and 5.7.

6

The assets of the trust (plan contributions) were placed in one account at Charles Schwab, and Schwab sent statements to the debtor reflecting, *inter alia*, contributions received, distributions made, and net realized gains and losses. *See* Trustee Account Statements, Ex. 9.

2007 Brochure

A copy of the plan and the election deferral form were sent to eligible employees each year. In November 2007, the debtor's Compensation & Benefits Director sent a memorandum to eligible employees written on Colonial Bank letterhead with a brochure entitled "2008 Benefits Update." Brochure, Ex. 6.[6] The debtor's name and logo are printed at the top of the first page. According to the memorandum and brochure, eligibility in the plan will be determined annually based on an employee's salary from the prior year.[7] The dollar amount for eligibility changes annually based on IRS Rules. The brochure contains a chart similar to the one in the 2005 memorandum comparing the plan to the debtor's 401(k) plan. The brochure also contains the following language:

---

[6] In deposition testimony, Patti Hill stated that Andrew Wilson, the drafter of the memorandum, was actually an employee of Colonial Bank in HR Compensation. Therefore, he would have used the bank's letterhead. However, Wilson signed the memorandum as "SVP, Compensation & Benefits Director" above the name of Colonial BancGroup, Inc. Patti Hill stated that Andrew would have known that he was not a BancGroup employee, but yet, as benefits director, he probably saw himself in a position of helping to administer a Group plan.

[7] The memorandum states:

Eligibility is determined annually after consideration of current IRS limits for highly compensated executives (HCE's), the executive's current base salary and the amount of compensation earned by the executive in the prior twelve (12) months. Therefore, eligibility in one year does not guarantee eligibility to participate in future years.

Memorandum, Ex. 6.

7

The 401(k) Plan is a funded "qualified" plan. The Deferred Compensation Plan is a "non-qualified" plan. These plans are subject to different IRS rules. Amounts deferred under the Non-Qualified Plan cannot actually be set aside for each participant as they are under the 401(k) Plan. Amounts deferred under the Non-Qualified Plan must be made available to pay the employer's creditors in the unlikely event of bankruptcy or insolvency.

Brochure, Ex. 6. The brochure further states: "You are immediately vested 100% in your deferrals." The brochure recommends that employees speak with a financial advisor for assistance in making a decision whether to participate. *See* Ex. 6.

## Additional Facts

Even though the plan assets were held by Charles Schwab, employees could direct the investment of the funds they deferred by selecting from various investment options on Milliman's website.[8] Participants received quarterly statements from Milliman. The statements reflected an employee's name and address, the amount of contributions, gains or losses since the last statement, and a "vested balance," which was always the same as the "ending balance." The statement also reflected the asset allocation.

Michelle Condon, a respondent and member of the debtor's benefits administration committee, testified that all of the statements from Milliman contained the "vested balance" language. She is not aware of any negotiating power with respect to the plan held by any employees other than those who served on the committee. She signed the trust agreement as an officer of the debtor.

---

[8] This is the same website at which employees selected from various investment options for the funds in their 401(k) plan.

8

The debtor and the bank had a close relationship. The debtor is the holding company of the bank. Stock for the Colonial companies was issued only by the debtor. Therefore, stock in the debtor was tantamount to stock in the bank. The entities filed consolidated tax returns. Payroll and human resource functions for the debtor were handled by employees of the bank. The debtor sponsored not only the deferred compensation plan for employees of both entities but other benefit plans for both entities, such as the 401(k) plan and a pension plan.

Some employees of the bank who participated in the deferred compensation plan served as officers of the debtor.[9] One witness testified that during his employment, there was period of time when he did not know for which entity he was working. The confusion between the two entities was not infrequent in terms of letterheads, documents, cross-references, and people holding multiple titles. Within the companies, Bank and BancGroup were often used interchangeably.

The respondents who testified essentially stated that they either did not understand or appreciate the risk that their deferred funds would be subject to the claims of the debtor's unsecured creditors in the event of insolvency. There is no evidence that the respondents were defrauded, and the respondents have not made that allegation.

At the time the debtor filed the chapter 11 petition on August 25, 2009, the plan assets totaled approximately $1.9 million. On August 14, 2009, the date the Alabama State Banking Department closed Colonial Bank, over $1.8 million of these assets were recorded on the general ledger of the bank. Only $6,200 of the plan assets were recorded on the general ledger of the debtor. Presumably these amounts are attributable to the respective contributions made by the employees of each entity.

---

[9] For instance Sarah Moore, Senior Vice-President of the debtor, was an employee not of the debtor but of Colonial Bank. Also, Michele Condon, an employee of the bank, served as an officer of both the debtor and the bank. Patti Hill, employee of the bank, was also an officer of the debtor.

9

John Nelson, Senior Vice-President and Director of Accounting Operations, testified in deposition to the accounting treatment of the plan contributions. A salary deferral of a bank employee would be booked as a salary expense to the bank, and it would be booked as an expense at the time it was earned. The deferred amount would then be transferred to the bank's plan asset account instead of to payroll.[10] Distributions under the plan, at least to former bank employees, were processed from the Schwab account back through the bank to the employee. *See* Ex. 9.

Within 2 or 3 weeks after the bank was closed on August 14, 2009, the accounting entry for the plan assets on the bank's books was deleted and transferred to the general ledger of the debtor.[11] The evidence does not reveal who made the transfer. Nelson did not make the transfer; nor does he recall at whose direction the transfer was made. He understood that the adjusting entry was made because "it was deemed a Colonial BancGroup plan, sponsored plan, and therefore it was an asset and liability of Colonial BancGroup." Nelson Deposition, Doc. #741, Attach. 2, p. 25. Sarah Moore, Senior Executive Vice-President and Chief Financial Officer of both the bank and the debtor, confirmed the accounting change.[12]

---

[10] Nelson testified to the accounting treatment of the plan assets for "book" purposes. He did not know how the assets were treated for "tax" purposes.

[11] The location of the plan assets did not change. The plan assets were at all relevant times, and remain today, in a single trust account at Charles Schwab in the debtor's name. All that was "moved" or "transferred" was a pair of bookkeeping entries reflecting the internal accounting of the assets and liabilities associated with the plan.

[12] The respondents have objected to Sarah Moore's testimony regarding the reason for the accounting change because she obtained this information from someone else. However, the court need not consider her testimony to make a decision in this case. The critical fact is that almost all of the plan assets were originally recorded on the books of the bank, irrespective of why the bookkeeping entry for those assets was later moved.

10

In addition, the respondents presented evidence of a check in the amount of $750 issued by the bank to the U.S. Department of Labor for an ERISA Civil Penalty connected with the deferred compensation plan. Respondent's Ex. 42. The check was apparently submitted as a penalty for the late filing of a Form 5500. Nelson testified that the debtor did not reimburse the bank for this expense.

The respondents introduced into evidence the letter from Andrew Wilson, Compensation and Benefits Director for Colonial Bank, to the Department of Labor enclosing the check. The letter regards the "Top Hat Plan Exemption for The Colonial BancGroup, Inc. Non-Qualified Deferred Compensation Plan." The letter identifies the debtor and not the bank as the employer and provides the tax identification number of the debtor.

## Stipulations

The parties stipulate that the respondents paid no income taxes on the compensation that they deferred under the plan. Each participant's combined compensation (consisting of wages, bonuses, commissions, and/or salary for the relevant year) was in excess of the threshold for eligibility in the deferred compensation plan. Other than Lisa Free, each respondent was an employee of Colonial Bank during the years in which such Respondent deferred compensation pursuant to the deferred compensation plan. There is no evidence that Colonial Bank or Colonial Brokerage, Inc. were ever added as "adopting employers" of the deferred compensation plan.

## Law

The Third Circuit Court of Appeals has described a deferred compensation plan as follows:

> A deferred compensation plan "is an agreement by the employer to pay compensation to employees at a future date. The main purpose of the plan is to defer the payment of taxes."

11

The idea is to defer the receipt of compensation until retirement or termination of employment, when the employee is in a lower tax bracket, thus reducing the overall amount of taxes paid.

*Accardi v. IT Litigation Trust (In re IT Group, Inc.)*, 448 F.3d 661, 664 (3rd Cir. 2006) (citations omitted).

A "top hat" plan is a deferred compensation plan "'which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees.'" *Holloman v. Mail-Well Corporation*, 443 F.3d 832, 837 (11th Cir. 2006). "Top hat plans are subject to ERISA, but notably,"

> they are excluded from many individual ERISA provisions on the basic assumption that high-level employees are in a "strong bargaining position relative to their employers and thus do not require the same substantive protections that are necessary for other employees."

*Holloman*, 443 F.3d at 837 (citations omitted).[13] Top hat plans are subject to ERISA's administrative and enforcement provisions but are exempt from provisions regarding participation and vesting, funding, and fiduciary responsibility. *See* 29 U.S.C. §§ 1051, 1081 and 1101.

ERISA does not state what criteria render a plan "unfunded." The Third Circuit has examined decisions by other circuits and concluded that these courts have

---

[13] The Department of Labor has explained that management and highly compensated employees are also capable of evaluating the risks inherent in such plans. *IT Group*, 448 F.3d at 664, n.1.

focused primarily on what are essentially two sides of the same coin: whether the corporation has set aside funds, separate from its general assets, for payment of plan benefits and whether the beneficiaries have a legal right greater than that of a general, unsecured creditor to the corporation's assets.

*IT Group,* 448 F.3d at 667. The Second Circuit enunciated the following:

> the question a court must ask in determining whether a plan is unfunded is: "can the beneficiary establish, through the plan documents, a legal right any greater than that of an unsecured creditor to a specific set of funds from which the employer is, under the terms of the plan, obligated to pay the deferred compensation?"

*Demery v. Extebank Deferred Comp. Plan*, 216 F.3d 283, 287 (2nd Cir. 2000). The Second Circuit concluded that a plan was "unfunded" because the assets of the plan, though kept in a separate account, were nevertheless part of the general assets of the corporation.

The Third Circuit has acknowledged that a plan's intended and actual tax treatment are factors to consider in determining whether a plan is unfunded. If a plan meets the requirements for deferred tax treatment, it is also very likely that the plan is unfunded. As stated by the Third Circuit:

> [A] plan under which the beneficiaries do not incur tax liability during the year that the contributions to the plan are made is "more likely than not" an "unfunded" plan. *Miller v. Heller*, 915 F.Supp. 651, 659 (S.D.N.Y. 1996). This is so because the tests for taxation of deferred compensation and for funding status overlap — deferred compensation is not taxable as current income only where the future payment of the compensation is somehow uncertain, *i.e.,* where the assets used to pay participants' claims are also subject to other creditors' claims. Thus the fact that a plan qualifies for

13

deferred tax treatment strongly supports the conclusion that it was unfunded.

*IT Group*, 448 F.3d at 669, n.4. "The employee is not subject to tax on the compensation until he or she actually receives the deferred amount because 'the employee may never receive the money if the company becomes insolvent.'" *Id.* at 665 (citation omitted). The Fifth Circuit has also considered the tax consequences of the plan. *See Reliable Home Health Care, Inc. v. Union Central Ins. Co.*, 295 F.3d 505 (5th Cir. 2002).

## Application of Law to Facts

As stated above, a "top hat" plan is a deferred compensation plan which is (1) "unfunded" and (2) "'is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees.'" *Holloman v. Mail-Well Corporation*, 443 F.3d 832, 837 (11th Cir. 2006).

The debtor's plan satisfies the second element. The stated purpose of the plan is to provide "key executives" the "opportunity to defer a portion of their compensation." Plan, § 1. The plan tracks the language of the statute by stating that it "provides deferred compensation to a select group of senior management or highly compensated employees." Plan, § 1.

The respondents have made the general allegation that participation in the plan was broader than intended under the plan. However, the respondents have also stipulated that "[e]ach participant's combined compensation . . . was in excess of the threshold for eligibility in the deferred compensation plan." Joint Stipulation, Doc. #663, p. 27. In addition, the evidence reflects that "eligibility [was] determined annually after consideration of current IRS limits for highly compensated executives (HCE's)." 2007 Brochure, Ex. 6. There is no evidence that participation in the plan was broader than that intended or legally permissible.

14

The first element is also satisfied. To determine whether a plan is unfunded, a court should consider "whether the corporation has set aside funds, separate from its general assets, for payment of plan benefits and whether the beneficiaries have a legal right greater than that of a general, unsecured creditor to the corporation's assets." *IT Group,* 448 F.3d at 667.

The plan specifies that participants have "no legal or equitable rights, interest, or claims in any property or assets of the Company." Plan, § 8. The participants merely have the right to file a claim under the plan for payment of benefits. The plan prohibits the Company from holding its assets in trust for the benefit of the participants or pledging its assets as security for payment of its obligations under the plan. "Any and all Company assets shall be, and remain, the general, unpledged, unrestricted assets of the Company. The Company's obligation under the Plan shall be an unfunded and unsecured promise of the Company to pay money in the future." Plan, § 8.

The trust agreement is equally clear. The trust is a revocable grantor trust.[14] The trust is intended as an "an unfunded arrangement" that "shall not affect the status of the Plan as an unfunded plan." Trust Agreement, Preamble. Participants have no beneficial interest in or preferred claim on trust assets, and participants have only mere unsecured contractual rights. Further, the trust assets shall remain subject to the claims of the employer's general creditors in the event of the employer's insolvency.

Under the terms of both the plan and trust documents, the assets of the plan are general assets of the debtor, and the participants have merely a general unsecured claim for payment from the debtor. In addition, notices issued to the respondents in 2005 and 2007 clearly state that, in the event of bankruptcy, the assets of the plan will be subject to the claims of general creditors.

---

[14] The debtor set up the trust, not for the benefit of the participants, but for its own benefit to enable it to fulfill its obligations under the plan.

15

Courts of appeal have also considered the tax treatment of the plan a relevant factor. The parties stipulate that none of the respondents paid income taxes on the compensation that they deferred under the plan. As stated by the Third Circuit, "the fact that a plan qualifies for deferred tax treatment strongly supports the conclusion that it was unfunded." *IT Group*, 448 F.3d at 669, n.4.

Contentions of Respondents Addressed

The respondents advance a number of arguments in support of their contention that the deferred compensation plan does not meet the requirements of a "top hat" plan.

The respondents first contend that the plan document is ambiguous. The plan states that "[a]ny and all Company assets shall be, and remain, the general, unpledged, unrestricted assets of the Company. The Company's obligation under the Plan shall be an unfunded and unsecured promise of the Company to pay money in the future." Plan, § 8. The respondents contend that this language creates an ambiguity in that the plan also contains the following "unambiguous" language: "All amounts shall be 100% vested at all times." Plan, § 5.1. The respondents contend that, under ERISA, vested means "nonforfeitable."[15] *See* 29 U.S.C. §§ 1002(25) and 1053. Further, the Milliman statements reflect a "vested balance." The respondents ask the court to construe the alleged ambiguity against the drafter and conclude that it destroys the status of this plan as a "top hat" plan.

The court concludes that the two phrases do not create an ambiguity. "Top hat" plans are exempt from ERISA's provisions regarding vesting. *See* 29 U.S.C. § 1051(2). Therefore, the meaning of the word "vested" in ERISA is not controlling. However, the plan does not offend the ERISA definition.

_____

[15] ERISA defines the term "vested liabilities" as "the present value of the immediate or deferred benefits available at normal retirement age for participants and their beneficiaries which are nonforfeitable." 29 U.S.C. § 1002(25).

ERISA defines "nonforfeitable" as "a <u>claim</u> obtained by a participant . . . to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan." 29 U.S.C. § 1002(19) (emphasis added).[16]

The claim possessed by the respondents is not forfeitable. The claim accrued when funds were deferred into the plan, and the claim remains despite the pending bankruptcy. The claim is not conditional and is legally enforceable against the debtor. The respondents are, and always have been, unsecured creditors of the debtor.[17]

ERISA recognizes a difference between the terms "vested" and "funded" and provides minimum standards for each. *See* 29 U.S.C. §§ 1053 and 1082; *see also* 29 U.S.C. § 1002(25) and (30) (defining "vested liabilities" and "unfunded accrued liability"); *Victor v. Home Savings of America*, 645 F. Supp. 1486, 1496 (E.D. Mo. 1986) (holding that trust agreement guaranteed the vesting of benefits but not the funding of all vested benefits).

Although ERISA sets out minimum vesting requirements for an employer's contributions, ERISA requires that "an employee's rights in his accrued benefit derived from his own contributions" be "nonforfeitable." *See* 29 U.S.C. § 1053(a)(1). In the instant case, all contributions to the plan

---

[16] "[A]n interest in a pension benefit program is 'vested' if the employee is entitled to retain benefits even if his or her employment is terminated prior to retirement." *Hein v. TechAmerica Group, Inc.,* 17 F.3d 1278, 1280 (10th Cir. 1994).

[17] The respondents have no ownership interest in these funds that could be forfeited. Neither have the funds been forfeited. The funds remain part of the general assets of the corporation subject to the claims of its general creditors.

were made by the employees.[18]

Black's Law Dictionary defines "vested pension" as follows: "A pension in which an employee (or employee's estate) has rights to benefits purchased with the employer's contributions to the plan, even if the employee is no longer employed by this employer at the time of retirement." Black's Law Dictionary (7th ed. 1999). Therefore, an employee with a vested interest in a pension plan cannot lose that interest on termination of his employment.

Black's Law Dictionary defines "vested" as "fixed," "accrued," "absolute." Black's Law Dictionary (5th ed. 1979). The claim of the respondents became fixed and accrued when they made contributions to the plan. The fact that payment of that claim was subject to certain risks, like insolvency of the company, does not render the claim any less fixed, accrued or vested.[19] As explained above, vested and funded are different concepts. The court concludes that the plan is not ambiguous in that a vested interest in an unfunded plan is not an incongruity.

Second, the respondents contend that the debtor had no authority under section 8 of the plan to set up the Charles Schwab Trust. As quoted above, section 8 restricts the debtor from holding the plan assets in trust "for the benefit of Participants, their beneficiaries, heirs, successors, or assigns." However, the debtor did not establish the trust for the benefit of the respondents. The debtor established the trust "to provide itself with a source of funds to assist in the meeting of its liabilities under the Plan." Trust Agreement, Preamble. The trust is a revocable grantor trust, and the

---

[18] A "top hat" plan would carry little advantage if employees were not vested to the extent of their own contributions. It would amount to an unvested interest in an unfunded plan.

[19] The respondents seem to imply that "vested" means an interest in a particular set of funds. However, for this to be true, the plan would have to be "funded." Under that definition, one could never be vested in a "top hat" plan, because "top hat" plans are by definition unfunded.

18

debtor is the owner of the trust assets.

In addition, the terms of the trust do not, and were not intended to, affect the status of the plan. The trust is intended as an "unfunded arrangement" that will not "affect the status of the Plan as an unfunded plan." Trust Agreement, Preamble. The Preamble states that the trust assets will be held subject to the claims of the debtor's creditors in the event of the debtor's insolvency and that any rights under the trust agreement "shall be mere unsecured contractual rights of the Plan Participants" against the debtor. The trust, therefore, did not destroy the status of the plan as a "top hat" plan.

Third, the respondents point to their receipt of periodic statements reflecting the balances in their "accounts" and to their ability to direct the investment of their contributions. However, the plan requires the debtor to maintain a record, for each participant, of the participant's deferrals. Plan, § 5.1. Without such a record, the debtor would not know its liability to each participant under the plan. This record-keeping function does not change the legal ownership of the funds in question.

Neither does the ability of the participants to direct the investment of their contributions. It does not appear that this ability emanated from the plan itself. And the trust agreement merely states that the authority to direct investment of trust assets resides in the "Administrator and Investment Manager." Trust Agreement, ¶ 3.1. Whatever privileges with respect to the funds that the respondents were permitted to exercise, the plan and trust are very clear that the respondents had no legal or equitable rights in the assets of the plan.

Fourth, the respondents contend that only one of the respondents had any bargaining power with respect to the terms of the plan. However, such is not a prerequisite. The First Circuit Court of Appeals has expressed "grave doubts" that bargaining power is an element of proving a "top hat" plan. *See Alexander v. Brigham and Women's Physicians Org., Inc.,* 513 F.3d 37 (1st Cir. 2008). In *Brigham*, the Court noted that neither the statute

nor the legislative history mentions bargaining power as a requirement for a top hat plan. *Id*. at 48; *see* 29 U.S.C. § 1051(2). The reference to bargaining power emanates from an opinion of the Department of Labor ("DOL") suggesting that Congress exempted "top hat" plans from the "broad remedial provisions" of ERISA because the individuals covered by those plans would,

> by virtue of their position or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan, taking into consideration any risks attendant thereto, and, therefore, would not need the substantive rights and protections of Title I [of ERISA].

*Brigham*, 514 F.3d at 47 (quoting DOL Op. No. 90-14A). The First Circuit declined to "depart from the plain language of the statute and jerry-build onto it a requirement of individual bargaining power." *Id*. at 47. The Court noted that this requirement could render any top hat plan "noncompliant" by a "single covered employee" who demonstrates a lack of individual bargaining power despite the "overall characteristics of the 'select group' . . . to which he belongs." *Id*. at 47-48. The Court stated that "it would be highly unorthodox to convert a rationale (like the one set forth in the DOL opinion letter) into an independent statutory test." *Id*. at 48.

This court finds the reasoning of the *Brigham* court on this issue persuasive. In the instant case, the respondents who testified stated that if they had possessed the ability to negotiate the terms of the plan, there is nothing they would have changed.

Fifth, respondents who were employees of Colonial Bank contend that the assets of the plan became due and payable to them on August 14, 2009 when their employment with the bank ceased. The State Banking Department closed the bank on that date. However, the plan establishes a procedure for filing a claim. There is no evidence that the respondents followed this procedural process in the 11 days before the debtor filed a

chapter 11 petition on August 25, 2009.[20] Indeed, a claim is timely if made within 90 days after the event giving rise to a claim.[21]

Irrespective of the above, if the closing of the bank on August 14, 2009 was an "event giving rise to a claim," the respondents nevertheless occupied the position on that date of mere unsecured creditors of the debtor. Plan, Sections 8 and 10.

Sixth, the respondents state that the memorandum and brochure confuse and misuse terms such as Bank, BancGroup, and employer. However, the testimony made clear that this misnomer was not uncommon within the Colonial companies. The plan, which was distributed to respondents, is clearly titled "The Colonial BancGroup, Inc. Non-Qualified Deferred Compensation Plan." Plan, p. 1. In addition, the plan clearly defines "Company" as Colonial BancGroup, Inc. Plan, § 1. As stated above, the debtor sponsored several employee benefit plans for both Bank and BancGroup employees. Therefore, it would not be unexpected for the debtor to sponsor the deferred compensation plan.

The respondents may not have understood that "Company assets" in Section 8 of the plan embraced "plan assets" or employee contributions. However, Section 8 clearly states: "Except as provided in Section 10, Participants and their beneficiaries . . . shall have no legal or equitable rights, interest or claims in any property or assets of the Company."

_____

[20] Further, if the debtor was insolvent on August 14, 2009, a payment would be a potential avoidable preference under 11 U.S. § 547.

[21] The Trust Agreement makes clear that the assets of the trust will be "subject to the claims of the Employer's . . . creditors in the event of the Employer's . . . Insolvency." Trust Agreement, ¶ 1.3. An employer is deemed insolvent if the employer is unable to pay its debts as they become due or if the employer is a debtor under the United States Bankruptcy Code. *Id.* Upon notification of the employer's insolvency, the trustee had a duty to discontinue payments to participants and hold the assets for the benefit of the employer's creditors pending court order. Trust Agreement, ¶ 5.7.

Section 10 sets forth the process for filing a claim under the plan. Therefore, it is certainly deducible from the language of the text. In addition, Section 10 states that the "Company's obligation under the plan shall be an unfunded and unsecured promise of the Company to pay money in the future." The memorandum and the brochure also indicated that contributions would be subject to the claims of general creditors.[22]

Participation in the plan was voluntary. The 2005 memorandum directed questions about the plan to the Colonial BancGroup Benefits Department. The 2007 also brochure suggested the aid of a financial advisor for help in making "the best decisions for you and your family." Brochure, Ex. 6. Of the respondents who testified, none sought advice before making the decision to participate in the plan.

The court concludes that the documents are not misleading. Internal memoranda often used Bank and BancGroup interchangeably, and the debtor sponsored the other employee benefit plans of the Colonial companies. In addition, both the memorandum and the brochure refer to the plan as the "Colonial BancGroup" plan, irrespective of by whom they were signed or on which letterhead they were written. Further, the plan is clearly titled, "The Colonial BancGroup, Inc. Non-Qualified Deferred Compensation Plan."[23] The plan was disseminated to employees, and the plan is controlling.

---

[22] The Hill Memorandum states on page one that the assets of the plan will not "avoid claims of employer's general creditors in bankruptcy" and on page two that participants will "be a general creditor of the Bank . . . in the unlikely event that the Bank goes into bankruptcy or has other severe financial problems." Hill Memorandum, Ex. 4.

[23] The respondents do not contend that the debtor does not qualify as an employer under ERISA. ERISA defines "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity." 29 U.S.C. § 1002(5). ERISA defines "employee" as "any individual employed by an employer." 29 U.S.C. § 1002(6).

The respondents also contend that the overwhelming majority of the plan assets belong to Colonial Bank and not to the debtor. In other words, the plan assets are not property of the debtor's bankruptcy estate. In support, the respondents contend that over $1.8 million of the plan assets were treated as an asset of the bank for accounting purposes and that most of the assets contributed to the plan were contributed by the bank.[24]

However, the bookkeeping treatment of an asset, while relevant, is not dispositive of the ownership of an asset. The plain language of the plan – from the title to the contents – consistently reflects that the plan is a Colonial BancGroup plan, that the assets of the plan are "Company" assets, and that "Company" means Colonial BancGroup, Inc. In addition, even though the location of the accounting entry changed, the location of the assets did not. At all relevant times, the assets were invested in a trust account by and for the benefit of the debtor at Charles Schwab.

The bank's payment of the $750 penalty bears little weight on the issue of ownership of the plan assets. The bank's payment is consistent with how the majority of the assets were booked. However, the letter enclosing the check regards the "Top Hat Plan Exemption for The Colonial BancGroup, Inc. Non-Qualified Deferred Compensation Plan." The letter identifies the debtor and not the bank as the employer and provides the tax identification number of the debtor. The letter shows that, notwithstanding the check, the bank's human resource department considered the plan a non-qualified, top hat plan with the debtor as the employer.

The court notes that neither the FDIC or BB&T has asserted an interest in the plan assets or challenged their status as property of the debtor's estate. Assuming, for the sake of argument, that the plan assets are property of the bank, the assets would be subject to the bank's creditors instead of the debtor's creditors. Under either scenario, the

---

[24] All but one of the participants were employees of Colonial Bank. Presumably $1.8 million amount represents the collective contributions made by bank employees.

23

respondents would have to compete with the entity's other unsecured creditors for payment of their claim.

The respondents also contend that there is no legal requirement to file Form 5500 for a top hat plan. The inference is that because the form was filed, the plan is not a top hat plan. However, the form expressly identifies the plan as a "non-qualified plan" of "Colonial Bancgroup, Inc." To the extent the mere filing of the form bears evidentiary weight on the issue of the nature of the plan, it is slight and far outweighed by the evidence to the contrary.

Finally, the respondents contend that even if the plan is a top hat plan, the assets of the plan are excluded from property of the estate under three subsections of 11 U.S.C. § 541. First, the respondents point to 11 U.S.C. § 541(d). Section 541(d) excludes from the estate the equitable interest in property in which the debtor holds only legal title and not an equitable interest. However, that section is not applicable because the debtor held both the legal and equitable interests in the plan assets. The Plan provides: "Participants . . . shall have no legal or equitable rights, interest, or claims in any property or assets of the Company." Plan, § 8. The debtor also held the legal and equitable interests in the trust: "Participants . . . shall have no preferred claim on, or any beneficial interest in, any assets of the Trust." Trust Agreement, ¶ 1.3.

Second, the respondents point to 11 U.S.C. § 541(b)(1). That section excludes from property of the estate "any power that the debtor may exercise solely for the benefit of an entity other than the debtor." However, the trust was voluntarily established by the debtor solely for the benefit of the debtor – not the respondents – to enable the debtor to fulfill its obligations under the plan. The trust agreement is clear that the respondents have no beneficial interest in the trust assets.

Third, the respondents point to 11 U.S.C. § 541(b)(7)(A) and (B). Subsection (A) excludes from the estate any amount "withheld by an employer from the wages of employees for payment as contributions" to

"(I) an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974." Subsection (B) excludes from the estate any amount "received by an employer from employees for payment as contributions" to "(I) an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974."[25]

Top hat plans are not subject to all of the provisions of title I of ERISA. 29 U.S.C. § 1003. Top hat plans are subject to ERISA's administrative and enforcement provisions but are exempt from provisions regarding participation and vesting, funding, and fiduciary responsibility. 29 U.S.C. §§ 1051, 1081 and 1101. These sections are exceptions to the coverage of subchapter I of ERISA. 29 U.S.C. § 1003(a). Indeed, a top hat plan is not a qualified ERISA plan.

This court is aware of only two cases interpreting 11 U.S.C. § 541(b)(7) in the context of an alleged top hat plan. In *Synovus Trust Co. v. Bill Heard Enterprises, Inc. (In re Bill Heard Enterprises, Inc.)*, 419 B.R. 858 (Bankr. N.D. Ala. 2009), the court held that "a deferral of income is neither a withholding by an employer nor an amount received by an employer from employees." *Id.* at 868. The court stated that "income is 'withheld' when an employee has a present entitlement to the income, but for some reason the employer declines to give it to the employee." *Id.* at 867. The court concluded that because the employees deferred funds into the plan, they had no present entitlement to the income.

The court relied on *Schroeder v. New Century Holdings, Inc. (In re New Century Holdings, inc.)*, 387 B.R. 95, 114 (Bankr. D. Del. 2008). The *New Century* court held that the issue of whether the plan assets were properly characterized as amounts withheld or received by employers was a factual issue that could not be decided on a motion to dismiss. In so holding, the court stated:

---

[25] The balance of the subsections (A) and (B) are not applicable.

25

An annual deferral of income strikes this Court as potentially very different from a "withholding" or an "amount received by an employer from employees." The latter two categories imply that the employee possessed the income at some point, whereas a deferral of income implies that the employee agreed to receive the income at a later date and never actually possessed it.

*Id.* at 114. This argument is particularly strong in the context of a top hat plan where the deferred funds are not held for the benefit of the employees, and the deferred amounts remain part of the general assets of the company.

But there are two weaknesses with this view. First, 11 U.S.C. § 541(b)(7) expressly embraces certain deferred compensation plans. *See* 11 U.S.C. § 541(b)(7)(A)(II) and (B)(II). In addition, except for the voluntary election by the employees to make a contribution to the plan, they had a present entitlement to the income. The amounts deferred had been fully earned at the time the contributions were made. The is consistent with the deposition testimony of John Nelson that the deferred amounts were booked as salary expense at the time the salary was earned.

The court discerns a more organic problem with excluding the assets of the top hat plan from property of the estate under 11 U.S.C. § 541(b)(7). ERISA expressly recognizes "top hat" plans (though not by that name). 29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1). A "top hat" plan is "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." *Id.; Holloman v. Mail-Well Corp.*, 443 F.3d 832, 837 (11th Cir. 2006). A plan is unfunded if the corporation has not set aside funds, separate from its general assets, for payment of plan benefits and if the beneficiaries have no legal right greater to those assets than that of a general, unsecured creditor. *See IT Group*, 448 F.3d at 667. By definition, amounts deferred into an unfunded plan remain part of the general assets of the company subject to the claims of

26

general unsecured creditors.[26]

To exclude the assets of an unfunded plan from property of the estate and remove those assets from the reach of general unsecured creditors would therefore fly in the face of the very purpose, structure and function of a top hat plan. It would place 11 U.S.C. § 541(b)(7) at odds with ERISA and essentially nullify a top hat plan in the bankruptcy context. It would upend the policy of ERISA and the tax law that the deferred amounts in a top hat plan remain part of the general assets of the company subject to the claims of its general creditors.

Further, if the plan assets are excluded from property of the estate, it would not give the plan participants any greater claim to the funds than they now have. The plan and trust are very clear that the participants have no ownership interest (legal or equitable) in the plan assets and have only a contractual, unsecured claim against the debtor. In fact, excluding the assets from property of the estate in the bankruptcy context would effectively remove the assets beyond the reach of the participants.

If the purpose of 11 U.S.C. § 541 is to protect retirement assets for the benefit of employees, excluding the assets of a top hat plan from property of the estate would accomplish the opposite result. "The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242 (1989) (citation omitted). "In such cases, the intention of the drafters, rather than the strict language, controls." *Id.* at 242.

The court concludes that the plan assets are not excluded from property of the estate under 11 U.S.C. § 541(b)(7).

---

[26] In fact, if such were not the case, the amounts deferred would be taxed as income to the participants.

27

Conclusion

For the above reasons, the court finds that the deferred compensation plan is a "top hat" plan and that the assets of the plan are not excluded from property of the estate under 11 U.S.C. § 541. Therefore, the assets of the plan are property of the estate, and the debtor's motion for authority to exercise ownership rights over those assets will be granted by separate order.

Done this 25th day of June, 2010.

/s/ Dwight H. Williams, Jr.
United States Bankruptcy Judge

c: C. Edward Dobbs, Attorney for Debtor
   Richard D. Shinbaum, Attorney for Respondents