UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

-----------------------------------------------------------x
                                                      :

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **THE COLONIAL BANCGROUP, INC.,** | : | **Case No.  09-32303 (DHW)** |
| | : | |
| Debtor. | : | |
| | : | |

-----------------------------------------------------------x
                      :

| | | |
|---|---|---|
| | : | |
| **FEDERAL DEPOSIT INSURANCE** | : | |
| **CORPORATION, AS RECEIVER FOR** | : | |
| **COLONIAL BANK,** | : | |
| | : | |
| Movant, | : | |
| | : | |
| v. | : | **CONTESTED MATTER** |
| | : | |
| **THE COLONIAL BANCGROUP, INC.,** | : | |
| | : | |
| Respondent. | : | |
| | : | |

-----------------------------------------------------------x

**DEBTOR'S BRIEF IN SUPPORT OF OBJECTION TO MOTION OF
FDIC-RECEIVER FOR AN ORDER (1) CONFIRMING THAT THE AUTOMATIC
STAY DOES NOT APPLY OR, (2) IN THE ALTERNATIVE, MODIFYING THE AUTOMATIC
<u>STAY TO PERMIT THE FDIC-RECEIVER TO EXERCISE CERTAIN TAX RIGHTS</u>**

      The Colonial BancGroup, Inc., debtor and debtor in possession herein (the "<u>Debtor</u>"), hereby files this

Brief in support of its Objection [Doc. No. 855] (the "<u>Objection</u>") to the *Motion of the FDIC-Receiver for an*

*Order (1) Confirming that the Automatic Stay Does Not Apply or, (2) in the Alternative, Modifying the*

*Automatic Stay to Permit the FDIC-Receiver to Exercise Certain Tax Rights, and Motion for Expedited*

*Hearing* [Doc. No. 836] (the "<u>Stay Relief Motion</u>").

The Debtor respectfully requests the Court to deny the Stay Relief Motion for the reasons set forth in the Objection and set forth below.[1]

## A.     SUMMARY OF STAY RELIEF MOTION

In the Stay Relief Motion, the FDIC-Receiver seeks entry of an order either (a) confirming that the automatic stay does not prohibit or (b) granting relief from the automatic stay to permit, the filing of competing tax returns (the "Competing Returns") to:

(i) pursue a claim for a refund and/or a loss return for the 2009 tax year; and

(ii) effect any amendments to prior years' returns of the Debtor as may be permitted under the law as a fiduciary of Colonial Bank.[2]

On August 29, 2010, the FDIC-Receiver filed its *Reply in Further Support of FDIC-Receiver's Motion for an Order (1) Confirming that the Automatic Stay Does Not Apply or, (2) in the Alternative, Modifying the Automatic Stay to Permit the FDIC-Receiver to Exercise Certain Tax Rights* [Doc. No. 857] (the "Reply Brief"). The Reply Brief attempts to rebut the Objection, largely by reiterating arguments previously made in the Stay Relief Motion.[3]

---

[1]  Reflecting a "let's throw it on the wall and see if it sticks" attitude, the FDIC-Receiver also asserts, by mischaracterizing the Court's case management order [Doc. No. 168], that this Brief is not timely. The Objection was timely filed on the third calendar date (August 27, 2010) before the hearing date on the Stay Relief Motion (August 30, 2010), as authorized by paragraph 12 of the case management order. The case management order is completely silent on the deadline for filing supporting briefs.

[2]  The Stay Relief Motion does not expressly seek entry of an order granting stay relief to permit the filing of a Form 56-F ("Notice Concerning Fiduciary Relationship of Financial Institution") with the Internal Revenue Service (the "IRS"). If the FDIC-Receiver has already filed the Form 56-F, in anticipation of filing the Competing Returns, as the Debtor believes to be the case, the FDIC-Receiver has already violated the automatic stay. As the Eleventh Circuit made clear in In re Albany Partners, Ltd., 749 F.2d 670, 675 (11th Cir. 1984), violations of the automatic stay are void *ab initio*.

[3]  In the Reply Brief, the FDIC-Receiver faults the Debtor for not accepting the settlement proposal from the FDIC-Receiver's counsel, which is (despite the FDIC-Receiver's repeated insistence on the confidentiality of all settlement discussions) annexed to the Reply Brief. The proposed "settlement" is not a compromise of anything -- it gives the FDIC-Receiver everything it wants and allows the Debtor to do what no one disputes it has an absolute right to do. The Debtor suspects that it was written as a litigation tactic, to serve as an exhibit in an effort to show the supposed reasonableness of the FDIC-Receiver and the supposed recalcitrance of the Debtor.

## B.  SUMMARY OF DEBTOR'S OBJECTION

The Debtor's rights to apply for and receive a tax refund, and to utilize its tax attributes to that end, constitute property of the Debtor's estate under Section 541 of the Bankruptcy Code.  The proposed filing of the Competing Returns would constitute an act to assert dominion over property of the estate, as well as an act to collect, assess or recover an asserted claim of the FDIC-Receiver, in violation of the automatic stay.  The FDIC-Receiver is subject to the automatic stay and the filing of the Competing Returns without lifting of the stay by this Court would subject the FDIC-Receiver to punishment by contempt.

To obtain relief from the automatic stay, the FDIC-Receiver must make out a *prima facie* case of "cause" for such relief.  The Stay Relief Motion does not set forth any causal basis for stay relief.  Inasmuch as the Debtor's consolidated tax return for the 2009 tax year (the "2009 Consolidated Tax Return") will enable the Debtor to request the maximum amount of recoverable tax refunds (the "Maximum Refund Amount"), the Competing Returns will not result in an increase in the amount of possible tax refunds, the Debtor and the FDIC-Receiver have agreed by stipulation (and the Court has ordered) that any tax refunds received by either party must be deposited in a segregated debtor-in-possession account, and the issue of ownership of any tax refunds is the subject of a pending adversary proceeding before the United States District Court for the Middle District of Alabama (the "District Court"), there is no causal basis to warrant the requested relief.  On the other hand, allowing the FDIC-Receiver to file the Competing Returns, not only with respect to refunds associated with the 2009 Consolidated Tax Return but also prior year returns, could result in a significant delay in the processing and ultimate payment of those refunds by the Internal Revenue Service (the "IRS").[4]

---

[4]  The FDIC-Receiver's position in this case that it is entitled to file the Competing Returns, owns or is entitled to assert all of the tax attributes of the consolidated group, and is the sole beneficiary of all of the tax refunds is no surprise.  Its position stems from its view, in this and other bank holding company cases throughout the country, that FIRREA trumps the Bankruptcy Code; all assets of the Debtor's estate are either owned by or held in trust for Colonial Bank (and therefore the FDIC-Receiver); the Court is without jurisdiction to rule on the FDIC-Receiver's proof of claim (*see* Claim No. 139 at 2-3, ¶¶ 5-6); it is substantially exempt from the automatic stay (the FDIC-Receiver reserved rights with respect to the Court's jurisdiction to bar it from exercising asserted setoff rights); and issues regarding property ownership and the merits of claims filed by or against it must be decided in the receivership proceeding rather than by this Court (with the exception of its Section 365(o) motion which, by virtue of the fact that the rights that it sought to enforce are conferred only by the Bankruptcy Code, it was forced to concede could be entertained by this Court).

Case 09-32303    Doc 858    Filed 08/30/10    Entered 08/30/10 07:25:18    Desc Main
Document      Page 3 of 25

## C.    BACKGROUND

### 1.    Commencement of Chapter 11 Case

On August 25, 2009 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor continues to manage its affairs as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtor is a corporation formed under the laws of the State of Delaware and, prior to the Petition Date, was headquartered at 100 Colonial Bank Boulevard, Montgomery, Alabama 36117.  As a bank holding company, the Debtor owned Colonial Bank and other non-banking, non-debtor subsidiaries (the "Subsidiaries").  A complete chart of the pre-petition corporate family of the Debtor is attached hereto as Exhibit A.

### 2.    Pre-Bankruptcy Tax Procedures of Consolidated Group

For many years prior to the Petition Date, the Debtor and its Subsidiaries elected to file consolidated federal tax returns pursuant to the Internal Revenue Code  (26 U.S.C. § 1501) (the "Tax Code").  During the relevant years of 2003 through 2008, the Debtor, as the parent of the consolidated group, filed consolidated federal tax returns with the IRS.  Each of these returns were filed under the Debtor's name and federal tax identification number.  The Debtor believes that during each of these years the Debtor made the quarterly estimated tax payments to the IRS under its name and using its tax identification number.  As a result of these quarterly estimated tax payments, the group's tax liability for each year was paid in advance of the filing of any final tax return.

The Debtor and its Subsidiaries, including Colonial Bank, established and operated in the ordinary course of business pursuant to the terms of a certain intercompany tax allocation policy (the "Tax Allocation Agreement").  The Debtor's actions with regard to tax matters were in each case implemented pursuant to the Tax Allocation Agreement, including its annual filing of the consolidated federal income tax returns, the payment of estimated tax liabilities to the IRS, and, as discussed below, the Debtor's request for a refund for its 2008 tax year.

For each of the tax years from 2003 through 2007, the Debtor's consolidated federal income tax return reflected a positive income, thereby generating a tax liability. For tax year 2008, however, the consolidated group's performance suffered significant operating losses and it became apparent that the Debtor would be entitled to tax refunds because of such losses.

On or about March 15, 2009, the Debtor, as the parent for the consolidated entities, filed a request for extension of the filing date for the 2008 federal income tax return through September 15, 2009. Based on the apparent losses of the consolidated group, the Debtor also filed in May of 2009 an estimate of its 2008 losses and a Form 1139 request for refund in the approximate amount of $166 million. This filing was made with the assistance of PricewaterhouseCoopers LLP ("PwC"), which had been engaged over the years to perform various services for the Debtor, including the preparation and filing of tax returns. Consistent with its consolidation election and the Tax Allocation Agreement, the Debtor filed Form 1139 in its name and under its federal tax identification number.

By June of 2009, the IRS responded to the Debtor's Form 1139 and paid to the Debtor the estimated tax refund of $166 million and thereafter the Debtor transferred that approximate amount to Colonial Bank in connection with the Debtor's receipt of such tax refund.

3.    **Receivership of Colonial Bank**

On August 14, 2009 (the "Receivership Date"), Colonial Bank was closed by the Alabama State Banking Department. On the same date, the Federal Deposit Insurance Corporation (the "FDIC") was appointed as receiver for Colonial Bank (in such capacity, the "FDIC-Receiver"). The commencement of the receivership and the appointment of the FDIC-Receiver vested all assets of Colonial Bank in the resulting receivership estate as of August 14, 2009.

Concurrently with its appointment, the FDIC-Receiver seized all tangible records and all electronically stored information (the "ESI") of the Debtor and its Subsidiaries (collectively, the "Seized Records"). In doing so, the FDIC-Receiver made no attempt to differentiate between tangible records and ESI of the Debtor (including confidential and privileged information) and Colonial Bank.

On the Receivership Date, the FDIC-Receiver sold substantially all of the assets of Colonial Bank to Branch Banking and Trust Company ("BB&T") pursuant to a Purchase and Assumption Agreement dated as of August 14, 2009, among the FDIC-Receiver, the FDIC in its corporate capacity, and BB&T (as amended, the "P&A Agreement"). As part of this transaction, the FDIC-Receiver transferred to BB&T custody and control of all of the Seized Records. Thereafter, while BB&T retained custody of all of the Seized Records, its ability to release any of the Seized Records to the Debtor or others, including federal agencies issuing subpoenas for some of the Seized Records, was largely subject to the whim of the FDIC-Receiver, which obstructs access to such records by virtue of contractual rights allegedly conferred upon it under the P&A Agreement.

**4.    2008 Consolidated Return**

After the Petition Date, and within the time period allowed in connection with its request for extension filed in March, 2009, the Debtor, as the parent of the consolidated entities, filed its 2008 consolidated federal tax return on September 15, 2009. The final tax return indicated that the consolidated tax losses for 2008 were in excess of the estimated losses filed in May, 2009. As filed and without taking into consideration any five-year carryback election as discussed below, the tax return entitles the Debtor to an additional refund for the year 2008 in the approximate amount of $4,600,000. Because of pending issues relating to the five-year carryback election and other related issues, the Debtor has not yet formally requested or received the payment of this additional refund.

**5.    Congressional Extension of Carryback Period**

Effective as of November 6, 2009, Congress amended the Tax Code to allow taxpayers (other than TARP recipients) to make an election to carry back losses for an extended period of five years for either the 2008 or 2009 tax years. See Worker, Homeownership, and Business Assistant Act of 2009, Pub. L. No. 111-92, § 13, 123 Stat. 2992-93 (2009). This one-time election allows a taxpayer to extend the usual two-year carryback period to a five-year period for either the taxable year 2008 or 2009, but not for both. The election must be made in connection with the timely filing of the 2009 Consolidated Tax Return.

6.    **Tax Stipulation**

Shortly after the commencement of this Chapter 11 case, it became apparent that there would be significant disputes between the Debtor and the FDIC-Receiver regarding the Debtor's tax attributes and the ownership of any tax refunds received in connection with consolidated tax returns of the Debtor.[5]   To eliminate any issues with regard to the disposition of a tax refund, the Debtor and the FDIC-Receiver entered into a Stipulation dated February 24, 2010 (the "Tax Stipulation"), under which the parties agreed that any tax refunds received by either of them would be deposited into a segregated debtor-in-possession account (the "Segregated Tax Account") pending a final determination as to the ownership of and property rights in the tax refunds.   On March 10, 2010, the Court entered an Order approving this Stipulation (the "Stipulated Tax Order") [Doc. No. 621].

7.    **541 Proceeding**

To address the ownership dispute with respect to tax refunds, the Debtor filed an adversary proceeding in this Chapter 11 case styled The Colonial BancGroup, Inc. v. FDIC, Adversary Proceeding No. 10-03018 (the "541 Proceeding").   The 541 Proceeding requested the Court to resolve disputes between the Debtor and the FDIC-Receiver over ownership of various assets, including the right to tax refunds attributable to the Debtor's consolidated tax returns.

The FDIC-Receiver subsequently sought withdrawal of reference of the 541 Proceeding to the District Court.   The Debtor ultimately consented to the withdrawal.   As a result, the 541 Proceeding is currently pending in the District Court as The Colonial BancGroup, Inc. v. FDIC, Case No. 2:10-cv-00410

---

[5]  The Court may recall that the FDIC-Receiver insisted upon a "reservation of rights" and a "no-adjudication" caveat in the Court's order granting the Debtor's stock trading motion [Doc. No. 311].   The stock trading motion was filed by the Debtor in an effort to prevent trading in the Debtor's equity securities from diminishing the Debtor's tax attributes, including net operating loss carryfowards and possibly carrybacks.  See In re Phar-Mor, Inc., 152 B.R. 924 (Bankr. N.D. Ohio 1993).   Irrespective of any ultimate determination of ownership of refunds attributable to those tax attributes, absent preservation of those attributes through the stock trading motion, the amount of tax refunds of the Debtor's consolidated group could have been significantly and adversely impacted.

Case 09-32303    Doc 858    Filed 08/30/10    Entered 08/30/10 07:25:18    Desc Main
Document        Page 7 of 25

(M.D. Ala.). The District Court, therefore, will be responsible for adjudicating the competing claims to ownership of all tax refunds.[6]

**8.     2009 Tax Return Extension Request**

With the disposition of the tax refunds resolved by the Tax Stipulation and Stipulated Tax Order and the adversary proceeding to determine ownership of tax refunds lodged in the District Court, the only remaining task for the Debtor was to prepare and file the 2009 Consolidated Tax Return.

Prior to March 15, 2010, the Debtor, as the parent of the consolidated entities and consistent with prior practice, filed with the IRS a Form 7004 (the "Extension Request"), requesting an extension of the time for filing the 2009 Consolidated Tax Return. Pursuant to this Extension Request, the Debtor's time for filing both the 2009 Consolidated Tax Return and making the five-year carryback election was extended to September 15, 2010. The Debtor kept the FDIC-Receiver advised of the Debtor's intent to file the Extension Request, the preparation thereof and the actual filing of the Extension Request. At no time did the FDIC-Receiver object to or protest the Extension Request or seek to file one in its own name.

**9.     Debtor's Renewed Attempts to Gain Records Access**

In order to prepare the 2009 Consolidated Tax Return for the period through August 14, 2009, the Debtor understandably required access to the Seized Records, including, without limitation, the portion of the Seized Records containing financial data relevant to the preparation of the return (and especially data that would enable the Debtor to calculate the basis in its stock ownership in Colonial Bank).

The Debtor hoped to obtain this access pursuant to a previously executed non-waiver stipulation entered into with the FDIC-Receiver and BB&T (the "Non-Waiver Stipulation").[7] It was the Debtor's expectation that the Non-Waiver Stipulation would pave the way for the FDIC-Receiver granting access to

---

[6] Also pending before the District Court are the Debtor's objection to FDIC-Receiver's proofs of claim in the Chapter 11 case (The Colonial BancGroup, Inc. v. FDIC, Case No. 2:10-cv-00409 (M.D. Ala.) (the "Claim Objection")), and the civil action commenced by the Debtor to obtain allowance of its proof of claim in the Colonial Bank receivership (The Colonial BancGroup, Inc. v. FDIC, Case No. 2:10-cv-00198 (M.D. Ala.) (the "Receivership Claim Action")).

[7] On March 2, 2010, the Debtor filed with this Court a motion to approve this Non-Waiver Stipulation [Doc. No. 589]. By Order entered on March 12, 2010 [Doc. No. 626], the Court approved the Non-Waiver Stipulation.

and allow downloading of Seized Records consisting of critical ESI, including ESI relating to tax and accounting aspects of the consolidated entities. However, shortly after entry of the Non-Waiver Stipulation, the FDIC-Receiver opted to withdraw its consent in general to the Debtor's access to virtually all of the Seized Records.[8]

After completion of the hearings in May 2010 on the FDIC-Receiver's stay relief motion with respect to the Debtor's deposit accounts at BB&T and the motion to convert the Chapter 11 case under Section 365(o) of the Bankruptcy Code, the Debtor again attempted to obtain access to various Seized Records, including those relating to the tax and accounting records of the consolidated enterprise. On June 17, 2010, the Debtor filed a motion under Rule 2004 of the Federal Rules of Bankruptcy Procedure, seeking, among other things, the right to access and inspect Seized Records in the possession of BB&T, including the tax and accounting records essential to finalizing the 2009 Consolidated Tax Return. Both the FDIC-Receiver and BB&T filed written objections to the 2004 motion [Doc. Nos. 784, 788] and the matter was set for hearing initially on June 30, 2010.[9] After three continuances of the hearing on the 2004 motion in an effort to obtain a "protocol" for the production of documents as insisted upon by the FDIC-Receiver, BB&T and the FDIC-Receiver only last week agreed to the entry of an order granting the 2004 motion. Notwithstanding the granting of the motion, the Debtor has received only a portion of the Seized Records that were embraced by the document

---

[8]  The FDIC-Receiver's supposed justification for this wholesale denial of access to the Debtor's own records was that the Debtor had declined to allow the FDIC-Receiver to review certain records of the Debtor that were in the Debtor's possession until the Debtor's counsel had had an opportunity to review the records to identify privileged documents. The Debtor completed the privilege review in May and the FDIC-Receiver has yet to take the Debtor up on its invitation to review them.

[9]  Even though the Rule 2004 motion was directed at BB&T, the FDIC-Receiver filed an objection, stating that the motion should be denied because the Debtor had "chosen a path of litigation" rather than agreeing upon a "protocol" for the exchange of "relevant documents and information"; virtually all of the Seized Records allegedly consisted of documents owned by Colonial Bank (unsurprising who made that unilateral determination); the Debtor had already received copies of some of the Seized Records (none of which consisted of ESI or information relevant to the 2009 Consolidated Tax Return); and the Debtor was unwilling "to bear the cost of making copies" of the Seized Records, including those that were clearly owned by it [Doc. No. 788].

requests in the 2004 motion -- some 60 days after the filing of the 2004 motion and almost a year after the commencement of this Chapter 11 case.[10]

### 10.    Retention of PwC

The Debtor determined that the most efficient approach to preparing the 2009 Consolidated Tax Return was to retain the services of PwC.  Because it possessed historical information derived from pre-petition services rendered to the Debtor, PwC was in the best position to absorb quickly the 2009 tax information (once fully obtained from the FDIC-Receiver and BB&T) and prepare the necessary filings.  In order to complete such retention, the Debtor had to work through certain issues with PwC, enter into an engagement letter, and file the necessary affidavit with the Court.  This process was completed and the necessary retention documents were filed on July 8, 2010.

### 11.    Debtor's Ongoing Dialogue with FDIC-Receiver Regarding Tax Matters

By the end of July, 2010, the Debtor had received, pursuant to settlement negotiations with BB&T and the FDIC-Receiver with respect to the 2004 motion, certain tax and accounting data relating to the consolidated entities and was for the first time in a position to provide that information to PwC, although such data was in a raw state and the Debtor was unable to verify its completeness.  In an effort to be cooperative with the FDIC-Receiver and to keep it fully informed on the Debtor's strategies for filing of the 2009 Consolidated Tax Return, the Debtor advised the FDIC-Receiver that the Debtor hoped to be able in mid-August to facilitate a meaningful conversation between the Debtor's and the FDIC-Receiver's accountants regarding the Debtor's intended tax return filings on September 15, 2010.  The Debtor's ability to meet that

---

[10] In the Reply Brief, the FDIC-Receiver states that the Debtor's counsel "*admitted* on August 20th that by that date at the latest the Debtor had all the information it needed to prepare its returns and refund requests." (emphasis added).  As support for this assertion, the FDIC-Receiver attaches an August 20 e-mail from Gus H. Small, the Debtor's conflicts counsel for BB&T matters.  Were it not for the fact that the FDIC-Receiver attached the e-mail so the Court can ascertain the degree of overstatement in the FDIC-Receiver's unqualified assertion, this excess of advocacy would clearly have crossed the line.  The assertion for which the e-mail is attached as support is clearly belied by a full reading of the e-mail.  In his e-mail, Mr. Small qualifies his statement that "We *think* we have enough for the tax returns," with the observation that someone "above his pay grade" will decide that shortly and the Debtor is "still reviewing the accounting data." (emphasis added).  In any event, it is noteworthy that Mr. Small merely states a tentative conclusion about the adequacy of the tax data produced as of August 20 -- more than 60 days after the 2004 motion was filed and 7 days after the filing of the Stay Relief Motion.

timetable was conditioned upon the Debtor being able to confirm accessibility and completeness of the recently received tax and accounting data.

The FDIC-Receiver filed the Stay Relief Motion on August 13, 2010.[11] Thereafter, in a series of deliveries during the week of August 16, 2010, the FDIC-Receiver provided, for the first time and for informational purposes only, certain information relating to the FDIC-Receiver's view on the 2009 Consolidated Tax Return. The Debtor promptly provided this information to PwC to facilitate a meaningful direct conversation on August 20, 2010, between the tax professionals of the Debtor and the FDIC-Receiver with respect to the 2009 Consolidated Tax Return. In short, the Debtor has been more than forthcoming and cooperative with the FDIC-Receiver regarding the Debtor's plans for the 2009 Consolidated Tax Return, despite the Debtor's having to bargain for and quickly analyze voluminous accounting information ultimately received from BB&T and the FDIC-Receiver from late July through mid-August.

As of this date, with the assistance of PwC, the Debtor is ready, willing and able to file the 2009 Consolidated Tax Return by the September 15 deadline. The Debtor will also elect a five-year carryback and will seek the Maximum Refund Amount, which is approximately $247 million. This refund is no less than could be recovered by any independent filing by the FDIC-Receiver. Pursuant to the Stipulated Tax Order, the refund will be deposited in the Segregated Tax Account and the issue of ownership will ultimately be resolved by the District Court in the 541 Proceeding.

---

[11] The FDIC, as receiver for various failed financial institutions in the current economic crisis, has filed pleadings substantially similar to the Stay Relief Motion in bankruptcy cases throughout the country. *See, e.g.*, Advanta Bank Corp. v. Advanta Corp. (In re Advanta Corp.), Adv. Proc. No. 10-50795-KJC (Bankr. D. Del.) [Docs. No. 25-26]; In re BankUnited Financial Corporation, Case No. 09-19940-LMI (Bankr. S.D. Fla.) [Doc. No. 574]; In re Downey Financial Corp., Case No. 08-13041-CSS (Bankr. D. Del.) [Doc. No. 286]; In re Georgian Bancorporation, Inc., Case No. 09-85446-MGD (Bankr. N.D. Ga.) [Doc. No. 52]; In re Integrity Bancshares, Inc., Case No. 08-80512-PWB (Bankr. N.D. Ga.) [Doc. No. 131]; In re Silverton Financial Services, Inc., Case No. 09-74623-JEM (Bankr. N.D. Ga.) [Doc. No. 196].

**D.     ARGUMENT AND CITATION OF AUTHORITY**

**1.     Debtor Alone is Obligated to File the 2009 Consolidated Tax Return**

Where a corporation is a subsidiary member of a consolidated group, the duty to file the group's tax return falls upon the parent rather than the subsidiary. *See* 26 C.F.R. § 1.1502-75(h)(1) ("The consolidated return shall be made on Form 1120 for the group by the common parent corporation."). Contrary to the FDIC-Receiver's assertion, the Tax Code does not require the FDIC-Receiver to file the Competing Returns or otherwise alter the obligation of the Debtor, as the parent corporation, to file the 2009 Consolidated Tax Return.

Section 6012(b)(3) of the Tax Code states that a fiduciary of a corporation has the same obligation with respect to tax return filings for the corporation as the corporation had. If, however, the corporation is a subsidiary member of a consolidated group, it is the parent rather than the subsidiary that has the duty to file the group's tax return. *See* 26 C.F.R. § 1.1502-75(h)(1) ("The consolidated return shall be made on Form 1120 for the group by the common parent corporation.").

In addition, Section 6402(k) of the Tax Code, which the FDIC-Receiver relies upon for its requested relief, provides:

> Notwithstanding any other provision of law, in the case of an insolvent corporation which is a member of an affiliated group of corporations filing a consolidated return for any taxable year and which is subject to a statutory or court appointed fiduciary, the Secretary *may* by regulation provide that any refund for such taxable year may be paid on behalf of such insolvent corporation to such fiduciary *to the extent that the Secretary determines that the refund is attributable to losses or credits of such insolvent corporation.*

26 U.S.C. § 6402(k) (emphasis added). The applicable regulations are found in Treas. Reg. § 301.6402-7 and 26 C.F.R. § 301.6402-7 (the "6402-7 Regulations").

As is evident from the text of Section 6402(k), its purpose is to provide a mechanism for requesting the Secretary of the Treasury (the "Secretary") to exercise qualified discretion and, under the proper circumstances, pay some portion of an anticipated tax refund directly to the fiduciary for the insolvent member institution of the consolidated group rather than the parent. The statute does not relieve the parent entity of its duty to file a consolidated return on behalf of the consolidated entities. 26 C.F.R. § 301.6402-7(f)

("Nothing in this section relieves the common parent of a loss year group of its duty to file a consolidated return taking into account an institution's items of income, gain, loss, deduction, and credit for any taxable year…"). It also does not obligate the Secretary to pay a claim for refund, or accept a claim for refund, filed by the fiduciary. Id.

The design of Section 6402(k) and the 6402-7 Regulations is also reactive to the return required to be filed by the parent. Under such regulations, the fiduciary may submit a competing refund request only in instances where the parent has not filed a return or the return, as filed, is not acceptable to the fiduciary for the insolvent group member. *See* 26 C.F.R. § 301.6402-7(e)(3). The actual filing of a competing return is only ancillary to the request to have the refund paid directly to the fiduciary.[12]

Given the limited purpose of Section 6402(k), it is curious that the FDIC-Receiver feels compelled to bring the Stay Relief Motion, much less request an expedited hearing. The issue of disposition of any tax refund has long been resolved in this case by the Stipulated Tax Order, which mandates that any refund be deposited into the Segregated Tax Account pending further order of the Court. Further, the Debtor has not yet filed the 2009 Consolidated Tax Return and the prerequisites contemplated by Section 6402(k) have not been satisfied.[13]

### 2. <u>Automatic Stay Applies to the FDIC-Receiver and the Relief Requested.</u>

The automatic stay is one of the fundamental debtor protections provided by the Bankruptcy Code, which gives a debtor a breathing spell from his creditors. <u>In re Prestwood</u>, 185 B.R. 358 (M.D. Ala. 1995); <u>In re Henry</u>, 213 B.R. 45 (Bankr. M.D. Ala. 1997). The automatic stay operates to enjoin creditors from attempting to possess or exercise control over property of the estate once the bankruptcy petition has been filed. <u>In re Striblin</u>, 349 B.R. 301 (Bankr. M.D. Fla. 2006).

---

[12] Of course, in cases where the parent company that has the obligation to file a return is in bankruptcy, the filing of any competing return would be subject to the automatic stay.

[13] Furthermore, the 6402(7) Regulations clearly are not effective *prior* to a fiduciary being authorized to act as a receiver for a financial institution. *See* 26 C.F.R. § 301.6402-7(a)(1), (b)(4). Otherwise, the 6402-7 Regulations could be interpreted to allow the FDIC-Receiver to file competing returns for taxable years for which the tax filing deadline has run. Such an interpretation would create considerable havoc in the tax system.

The scope of the stay is necessarily broad, so that debtors may reorganize their affairs in an orderly and equitable fashion. In re Briskey, 258 B.R. 473 (Bankr. M.D. Ala. 2001). Violations of the automatic stay (which is the equivalent of an injunction with the force of a court order) may give rise to civil contempt sanctions against the offending party. Patti v. Fred Ehrlich, PC, 304 B.R. 182 (E.D. Pa. 2003).

Section 362(a)(3) of the Bankruptcy Code stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Courts have held that actions interfering with intangible rights of a debtor, or substantially diminishing the value of the estate's intangible property rights, constitute prohibited "control" and consequently violate Section 362(a)(3). See Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n, 997 F.2d 581, 594 (9th Cir. 1993) (state agency's post-petition dissolution of corporate debtor constituted the exercise of control over estate property in violation of § 362(a)(3)); In re Lehigh Valley Professional Sports Clubs, Inc., 2001 WL 1188409 at *4 (Bankr. E.D. Pa. September 7, 2001) (intangible right to operate baseball team in minor league is subject to § 362(a)(3)); In re Burgess, 234 B.R. 793, 799 (D. Nev. 1999) (revoking the debtor's license found to be exercise of control over property of the estate); Slater v. Town of Albion (In re Albion Disposal), 217 B.R. 394, 408-10 (W.D.N.Y. 1997) (applying § 362(a)(3) to debtor's "estoppel claims" against township which enacted land use ordinances); Stern v. Commonwealth (In re J. F. D. Enters.), 183 B.R. 342, 348-49 (Bankr. D. Mass. 1995) (government designation of "delinquency status" to entity which purchased packaged goods store license from debtor violates § 362(a)(3)); In re National Cathole Congress, 179 B.R. 588, 597 (Bankr. N.D. Iowa 1995) (racing and gaming commission's revocation of debtor's dog-racing license destroyed value of property to the estate and automatic stay was violated). Because the filing of the Competing Returns is an act clearly asserting dominion over estate property, such a filing would be violative of Section 362(a)(3).

The filing of a Competing Return would also be a violation of Section 362(a)(6), which prohibits, among other things, acts to "collect, assess, or recover" pre-petition claims against the Debtor. 11 U.S.C. § 362(a)(6). The FDIC-Receiver has filed a proof of claim in this Chapter 11 case in which it has asserted entitlement to all tax refunds. As the Debtor will demonstrate in the 541 Proceeding, the FDIC-Receiver has, at best, a mere unsecured claim against the Debtor for the allocation of any tax refunds owed by the Debtor to

Colonial Bank under the Tax Allocation Agreement. The filing of a Competing Return would be an act seeking to collect, assess or recover the FDIC-Receiver's pre-petition claims against the Debtor under the Tax Allocation Agreement.

It cannot seriously be argued that the Debtor's tax attributes and its right to file for and seek a refund of income taxes do not constitute property of the Chapter 11 estate. Section 541(a)(1) of the Bankruptcy Code provides that the property of a debtor's estate includes "all legal or equitable interest of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Congress intended Section 541 to be given broad construction to include all interests of the debtor in property, so as to bring anything of value that the debtors have into the estate. United States v. Whiting Pools, Inc., 462 U.S. 198, 203-04 (1983).

Although the precise issue does not appear to have been addressed in the Eleventh Circuit, it is well established in other courts that a debtor's tax attributes, including net operating losses and worthless stock deductions, constitute property of its estate that is protected by Section 362 of the Bankruptcy Code. *See, e.g.*, Segal v. Rochelle, 382 U.S. 375, 380 (1966) (tax refunds attributable to mid-year net operating losses constitute property of bankruptcy estate); In re Prudential Lines, Inc., 928 F.2d 565 (2d Cir. 1991) (parent corporation's attempt to claim worthless stock deduction in stock of its debtor subsidiary would effectively eliminate value of debtor's net operating losses and therefore constitute unauthorized exercise of control over estate property violative of stay); In re Beery, 116 B.R. 808 (D. Kan. 1990); In re TOUSA, 406 B.R. 421, 432 (Bankr. S.D. Fla. 2009) (recognizing under Segall and progeny that tax attributes are estate property); In re White Metal Rolling & Stamping Corp., 222 B.R. 417, 424 (Bankr. S.D.N.Y. 1998) ("It is beyond peradventure that NOL carrybacks and carryovers are property of the estate of the loss corporation that generated them."); In re Phar-Mor, Inc., 152 B.R. 924 (Bankr. N.D. Ohio 1993). *See also* United States v. Kapila, 402 B.R. 56 (S.D. Fla. 2008) (finding that NOL carryback waiver is an interest in property falling within the ambit of section 541); In re Fruehauf Trailer Corp., 444 F.3d 203, 211 (3d Cir. 2006) ("Property of the estate `includes all interests, such as... contingent interests and future interests, whether or not transferable

by the debtor.'") (*quoting* <u>Prudential Lines</u>, 928 F.2d at 572); <u>In re Russell</u>, 927 F.2d 413, 417 (8th Cir. 1991) (concluding the "right to carry forward the [debtor's] NOLs" was a "property interest" of the estate).[14]

While Section 362(b)(4) of the Bankruptcy Code exempts from the automatic stay proceedings to enforce a governmental unit's "police or regulatory power," that exception was intended to be given a "narrow construction" and not to apply "to actions by a governmental unit to advance its own 'pecuniary interest.'" <u>In re Benalcazar</u>, 283 B.R. 514, 530 (Bankr. N.D. Ill. 2002).[15] *Accord*, <u>In re NextWave Personal Commc'n Inc.</u>, 244 B.R. 253, 273-74 (Bankr. S.D.N.Y. 2000). Some courts have held that the exception does not apply to a governmental unit that is not acting in its capacity as a regulator. *See, e.g.*, <u>In re Birchall</u>, 2007 WL 1992089, at *7 (Bankr. D. Mass. July 3, 2007); <u>Javens v. City of Hazel Park (In re Javens)</u>, 107 F.3d 359 (6th Cir. 1997). In <u>Sunshine Dev. Inc. v. FDIC</u>, 33 F.3d 106, 114, n.8 (1st Cir. 1994), the Court of Appeals for the First Circuit stated that the FDIC, acting in its capacity as a receiver, is not exercising "regulatory powers" that would exempt it from the automatic stay.

The FDIC-Receiver frequently contends (as it has in this Chapter 11 case) that it is immune from the operation of the automatic stay by virtue of 12 U.S.C. § 1821(j). That section provides as follows:

> Except as provided in this section, no *court* may take any action, except at the request of the Board of Directors [of the Federal Deposit Insurance Corporation] by regulation or order, to restrain or affect the exercise of powers or functions of the Corporation as a conservator or a receiver.

(emphasis added). By its plain language, Section 1821(j) bars only *court* issued restraining orders and not injunctions or other restraints that arise from legislative enactment, such as the automatic stay. *See* <u>Sunshine Dev. Inc.</u>, 33 F.3d at 114 ("On that basis [Section 1821(j)'s plan language], we are confident that the automatic stay does not violate FIRREA's anti-injunction provision because it arises directly from the

---

[14] In connection with this pending Stay Relief Motion, the FDIC-Receiver essentially concedes the *prima facie* issue that these tax attributes are property of the estate by affirmatively stating that the Court does not have to address the issue of ownership in order to rule on the requested stay relief.

[15] While the phrase "policy or regulatory power" is not defined in the Bankruptcy Code, it has been interpreted to refer to the "enforcement of laws affecting health, welfare, morals and safety, but not regulatory laws that directly conflict with the control of the *res* or property by the bankruptcy court." <u>City & County of San Francisco v. PG&E Corp.</u>, 433 F.3d 1115, 1123 (9th Cir. 2006).

operation of legislative enactment, not by a court order."); <u>In re Colonial Realty Co.</u>, 980 F.2d 125, 137 (2d Cir. 1992) ("We accordingly conclude that the § 1821(j) ban upon '*court*… action… to restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver'… does not inhibit the operation of the automatic *statutory* stay imposed by § 362(a).") (emphasis and alteration in original).

So long as the automatic stay remains in place, a bankruptcy court has the necessary authority to enforce it. *See* <u>Sunshine Dev. Inc.</u>, 33 F.3d at 114 ("if at this point the FDIC were to ignore the stay and [take actions in violation of the stay], the bankruptcy court would be acting within its authority to issue an injunction.").[16]

### 3. <u>Cause Does Not Exist to Lift the Automatic Stay</u>

Section 362(d) of the Bankruptcy Code provides, in relevant part, as follows:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay - (1) for cause…

11 U.S.C. § 362(d). "Cause" is a flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to ascertain whether sufficient cause exists to lift the stay. *See e.g.*, <u>In re Wilson</u>, 116 F.3d 87, 90 (3d Cir. 1997); <u>In re Laguna Assocs. Ltd.</u>, 30 F.3d 734, 737 (7th Cir. 1994); <u>Beane v. United States (In re Beane)</u>, 404 B.R. 942, 948 (M.D. Fla. 2008); <u>In re Continental Airlines, Inc.</u>, 152 B.R. 420, 424 (D. Del. 1993). The FDIC-Receiver, as the movant, has the burden to establish a *prima facie* case under Section 362(d)(1), failing which the stay relief requested should be denied. <u>In re Elmira Litho, Inc.</u>, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994). *See also* <u>Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)</u>, 907 F.2d 1280, 1285 (2d Cir. 1990) ("Section 362(d)(1) requires an initial showing of cause by the movant ... If the movant fails to make an initial showing of cause, however, the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection."); <u>In re Powell</u>, 223 B.R. 225, 232 (Bankr. N.D. Ala. 1998) (holding a "movant must

---

[16] The reason the bankruptcy court is empowered to enforce the automatic stay against the FDIC is that Section 1821(j) "only prohibits court actions restraining FDIC's exercise of its *lawful* powers or functions." <u>Sunshine Dev. Inc.</u>, 33 F.3d at 114 (emphasis in original).

Case 09-32303   Doc 858   Filed 08/30/10   Entered 08/30/10 07:25:18   Desc Main
Document      Page 17 of 25

carry the initial burden of establishing a *prima facie* case for relief under § 362(d)(1) and/or (2) before the burden of proof shifts") (collecting cases); In re Eatman, 182 B.R. 386, 390 (Bankr. S.D.N.Y. 1995) ("While section 362(g) allocates the burden of ultimate persuasion, under either ground, the movant must still make a *prima facie* showing that it is entitled to the relief that it seeks."); COLLIER ON BANKRUPTCY ¶ 362.10 (16th ed., 2010).

There is no rigid test for determining when an unsecured creditor has established cause to warrant relief from the automatic stay. Rather, the reported cases recognize that a bankruptcy court's discretion in resolving stay relief motion for "cause" must consider the policies underlying the Bankruptcy Code as well as the competing interest of the creditor, debtor and other interested parties, with the result that each request for stay relief for "cause" must be considered on its own facts. *See* In re Lincoln, 264 B.R. 370 (E.D. Pa. 2001) (*citing* In re Hohol, 141 B.R. 293, 297 (N.D. Pa. 1992)).

The FDIC-Receiver argues that cause exists for relief from the automatic stay under the three-factor balancing test in which a court should (a) balance the prejudice to the Debtor against the hardship to the FDIC-Receiver if the stay remains in effect; (b) consider the efficient use of judicial resources; and (c) examine whether the FDIC-Receiver has a probability of success on the merits of its case. For the reasons set forth below, the FDIC-Receiver has failed to demonstrate cause [Stay Relief Motion at 16-18, ¶¶ 35-37].

Through a series of unsubstantiated arguments, the FDIC-Receiver suggests, but invariably fails to establish, the existence of any "substantial hardship" if the requested stay relief is denied. The FDIC-Receiver maintains that the relief is necessary to allow it to "officially state its claim" to the anticipated tax refund [Stay Relief Motion at 16, ¶ 36]. Yet, the FDIC-Receiver has already "officially" stated its claim on numerous occasions and in numerous forums. It has filed a proof of claim in the Chapter 11 case contending that it is the owner of all refunds [Claim No. 139 at 3-4, ¶¶ 7-12]; it has asserted its alleged ownership interest in the 541 Proceeding [*see, e.g.*, Doc No. 22 at 12-13], the Receivership Claim Action [*see, e.g.*, Doc No. 22 at 5, ¶ 36], and the Claim Objection [*see, e.g.*, Doc No. 15 at 8]; and it has argued its position yet again in the Stay Relief Motion, while observing that ownership issues need not be decided at this time in light of the pending 541 Proceeding [*see, e.g.*, Stay Relief Motion at 3]. A desire (without adverse consequence if it goes

unfulfilled) to reiterate its position through the filing of Competing Returns hardly is a causal basis for stay relief under Section 362(d)(1). This is particularly the case when such an inconsequential assertion promises to disrupt the orderly processing and timely payment of the tax refunds.

The FDIC-Receiver's other explanations of "cause" are equally baseless [Stay Relief Motion at 16, ¶ 36]. For example, the FDIC-Receiver suggests that denial of the requested relief will "hinder [] its ability to seek the equitable allocation" of tax refunds. Id. This statement cannot be squared with the fact that the issue of ownership is pending before the District Court in the 541 Proceeding; and, as conceded in the Stay Relief Motion and as expressly stated in the underlying regulations (*see* Treas. Reg. § 301.6402-7(j)), any payment that might be made by the IRS on a Competing Return under Section 6402(k) has no impact on the issue of ultimate ownership.[17]

The FDIC-Receiver protests that, absent the requested stay relief, it may be deemed to have "waived" its rights [Stay Relief Motion at 16, ¶ 36]. No explanation is provided as to the alleged "right" that may be waived, how it is not preserved by the pending District Court litigation and the Stipulated Tax Order, or how it is preserved by a demand upon the IRS for direct payment to the FDIC-Receiver under Section 6402(k).

---

[17] The FDIC-Receiver concedes in the Stay Relief Motion that the issue of ownership of the tax refunds (and presumably tax attributes) is not before the Court. Having requested withdrawal of reference to the District Court of all issues relating to ownership of the tax refunds, it would have been inappropriate for the FDIC-Receiver to request this Court to conduct a "mini trial" on the merits of its asserted ownership of the tax refunds.

Notwithstanding its stated position that such ownership is not before the Court, the FDIC-Receiver sprinkles throughout its Stay Relief Motion and its Reply Brief allegations of ownership [*See* Reply Brief at 1 (complaining that the Objection filed by the Debtor does not attempt to rebut authorities purportedly cited in the Stay Relief Motion "demonstrating" that the tax refunds are property of the FDIC-Receiver and "not the Debtor")]. Significantly, on pages 3 and 4 of the Reply Brief, the FDIC-Receiver accuses the Debtor of attempting to "claim for itself tax refunds that are unquestionably property of Colonial Bank" and pursuing a strategy to file a 2009 Consolidated Tax Return in which it will "attempt to claim for itself (in flagrant breach of the Debtor's fiduciary duties)" tax refunds that "are the property of the FDIC-Receiver as a matter of law." Of course, it is easy to say that ownership is not in issue in this contested matter when the movant assumes ownership in itself. It is difficult to follow the FDIC-Receiver's reasoning that a Chapter 11 debtor-in-possession can be a fiduciary for anyone other than creditors of its estate and how it can be deemed to have "flagrantly" breached that duty in pursuing assets for the benefit of that estate.

To the extent that the FDIC-Receiver is asserting that the Debtor, as the parent company of Colonial Bank, owes fiduciary duties to Colonial Bank, there is little support (and the FDIC-Receiver cites none) for the notion that a parent owes any fiduciary duty to its subsidiaries in a tax allocation dispute. A parent's decision regarding allocation of tax benefits among affiliated group members should be reviewed under the deferential business judgment rule. Meyerson v. El Paso Natural Gas Co., 246 A.2d 789 (Del. Ch. 1967); Case v. N.Y. Cent. R.R. Co., 204 N.E.2d 643 (N.Y. 1965); W. Pac. R.R. Corp. v. W. Pac. R.R. Co., 197 F.2d 994 (9th Cir. 1951), *vacated on procedural grounds*, 345 U.S. 247 (1953).

Case 09-32303    Doc 858    Filed 08/30/10    Entered 08/30/10 07:25:18    Desc Main
Document    Page 19 of 25

The FDIC-Receiver raises the specter of a "windfall" to the Debtor if it is not allowed to seek direct payment of the refund. Yet, there is no possibility of a windfall here -- the segregation of the funds is assured until the District Court determines ownership in the 541 Proceeding.

The FDIC-Receiver does not argue that its Competing Return for 2009 will yield a higher tax refund than a refund request based on the Debtor's 2009 Consolidated Tax Return. Indeed, such an argument cannot be made. The Maximum Refund Amount, which is approximately $247 million,[18] is mathematically derived by utilizing the consolidated group's substantial operating losses to recoup tax payments by the Debtor over the five-year carryback period. As the aggregate losses under any use of tax attributes exceed the federal income taxes paid during the relevant period, the Maximum Refund Amount is capped at approximately $247 million. Hence, whether the Debtor alone files a tax return and tax refund request or the FDIC-Receiver also files a similar request in connection with its Competing Return, there is no monetary difference at issue as the ultimate dollar amount is the same and the resulting refund will be deposited in the Segregated Tax Account.

Taken together, the assertions by the FDIC-Receiver fail to demonstrate any cognizable harm or any compelling need to "preserve rights." To be contrasted with the FDIC-Receiver's failure to show harm to itself is the high likelihood of harm to the Debtor if the relief is granted. The filing of a Competing Return by the FDIC-Receiver would disrupt the orderly review, processing and payment of the anticipated refund, materially delaying the receipt of money by the Debtor and increasing the expense of the estate in trying to unravel with the IRS the inevitable conflict created by multiple requests for refund.

A vivid example of such harm occurred in In re Downey Financial Corp., Case No. 08-13041-CSS (Bankr. D. Del.). In that case, the FDIC was appointed as the receiver of a federally charted savings association. Shortly thereafter, the parent of the failed savings association filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. The FDIC as receiver then filed a Form 56-F with the IRS, thereby setting the stage for a refund request under Section 6402(k) of the Tax Code by notifying the IRS of its appointment as receiver for the failed savings association. On September 15, 2009, the Chapter 7 trustee filed

---

[18] This calculation is based upon information currently available to the Debtor.

a 2008 consolidated tax return (as the trustee was obligated to do for the consolidated entities) based upon a worthless stock deduction resulting from the commencement of the receivership against the subsidiary. The day after the filing, the trustee requested a tax refund for the preceding two tax years. One month later, the IRS informed the Chapter 7 trustee that it could not "process" the refund request due to the Form 56-F that the FDIC had previously filed.

Therefore, as a result of the FDIC's preliminary act under applicable regulations, the Chapter 7 trustee's ability to obtain a tax refund in a timely fashion was seriously derailed. Contending that the FDIC had violated the automatic stay, the trustee filed a motion for sanctions. The trustee and the FDIC ultimately resolved the dispute by agreeing that (1) the trustee's return and request for refund would be the *sole* return submitted to the IRS; (2) the parties reserved all of their rights with respect to the refund; and (iii) the refund would be placed in a designated account pending further order of the court. Nevertheless, the delay and damage in the interim was significant.

Thus, even assuming the FDIC-Receiver could demonstrate some modicum of harm, the likelihood of significant harm to the Debtor from the granting of the Stay Relief Motion warrants its denial. The <u>Downey Financial</u> settlement appears to be an appropriate resolution of this Stay Relief Motion. The Debtor's filing of the 2009 Consolidated Tax Return will seek the Maximum Refund Amount, with assurance that any tax refund will be deposited into the Segregated Tax Account. As in <u>Downey Financial</u>, the Debtor is prepared to stipulate that its filing is without prejudice to any arguments that the FDIC-Receiver (or any other interest party, including the Debtor) would otherwise be permitted to make to the District Court in the pending 541 Proceeding.

**4.**     **The Stay Relief Motion is Premature and Should be Continued**

The Stay Relief Motion should be continued as it is premature to consider the requested relief under the very regulations cited by the FDIC-Receiver.

Under such regulations, the FDIC-Receiver may submit a competing refund request as a fiduciary for an insolvent entity, Colonial Bank, only in instances where the parent has not filed a return or the return, as filed, is not acceptable to it as a fiduciary. *See* 26 C.F.R. § 301.6402-7(e)(3). This is not to suggest that the

Case 09-32303    Doc 858    Filed 08/30/10    Entered 08/30/10 07:25:18    Desc Main
Document      Page 21 of 25

FDIC-Receiver, in the context of this Chapter 11 case, can simply dispense with the automatic stay by expressing dissatisfaction with the Debtor's 2009 Consolidated Tax Return. Indeed, the FDIC-Receiver has not as yet received or reviewed the Debtor's proposed 2009 Consolidated Tax Return, as the finalization of that return is near completion but not as yet completed. Furthermore, it is difficult to foresee how the FDIC-Receiver could object to the Debtor's 2009 Consolidated Tax Return given that the Debtor's current intent is to file a return that supports a tax refund in the Maximum Refund Amount and will assert all legitimate tax attributes to that end.

Because of the delayed receipt of relevant tax information in the possession of the FDIC-Receiver and BB&T (occasioned by delaying tactics of the FDIC-Receiver), the Debtor has been forced to undertake analysis of significant data and comprehensive tax planning (which is near completion but not yet fully complete) on an extremely expedited schedule. It is also relevant that the September 15 deadline is two weeks away. The extension of time (through September 10, 2010) proposed by the Debtor in the Objection will not only afford the Debtor the opportunity to finalize its 2009 Consolidated Tax Return but also enable the Court to consider the Stay Relief Motion on a more fully developed record.

The FDIC-Receiver's complaint in its Reply Brief that the Debtor's request for an extension of the hearing is an attempt to "run out the clock" should fall on deaf ears, given the FDIC-Receiver's conduct throughout this case in withholding the Seized Records and dribbling them out over time as hearings on motions of the Debtor for access neared. If anyone has attempted to utilized the "clock" to its advantage, it has been the FDIC-Receiver. It should not now be heard to bemoan the fact that the deadline for the 2009 tax filing is nigh.

On information and belief, the Debtor understands that the FDIC-Receiver's Competing Return for 2009 has been prepared and is ready to be filed subject to a favorable ruling by the Court on the Stay Relief Motion. It is not the case that the FDIC-Receiver awaits this Court's ruling to position itself to file the Competing Return. Accordingly, a brief continuance of the hearing to September 10 will not prejudice the FDIC-Receiver.

**5.**     **The FDIC-Receiver's Request for Waiver of the 14-Day Stay Should Not Be Granted**

If the Court grants the relief requested in the Stay Relief Motion on August 30, 2010, the Debtor respectfully requests that the mandatory 14-day stay period provided in Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure not be waived. The FDIC-Receiver does not have to file anything with the IRS prior to September 15, 2010, and the continuance of this matter will provide the Debtor with the necessary time to file its mandatory consolidated return and otherwise preserve its rights.

**E.**     **CONCLUSION**

For the foregoing reasons, the Debtor respectfully requests that the relief requested in the Stay Relief Motion be denied and that the Debtor be granted such other and further legal or equitable relief to which the Debtor may be entitled.

Dated: August 30, 2010
           Montgomery, Alabama

                      C. Edward Dobbs
                      Email: ced@phrd.com

                      Rufus T. Dorsey, IV
                      rtd@phrd.com

                      PARKER, HUDSON, RAINER & DOBBS LLP
                      1500 Marquis Two Tower
                      285 Peachtree Center Avenue, N.E.
                      Atlanta, Georgia 30303
                      Telephone No.: (404) 523-5300
                      Facsimile: (404) 522-8409

                      By: _/s/ *Rufus T. Dorsey, IV*_____
                          Rufus T. Dorsey, IV

                      Attorneys for Debtor and Debtor in Possession

**Exhibit A**

**Organizational Chart of The Colonial BancGroup, Inc.** (As of June 30, 2009)

1625502_4

# The Colonial BancGroup, Inc
## Legal Organizational Chart
### As Of June 30, 2009



**(1)** The Colonial BancGroup, Inc. Montgomery, AL

**(24)** Colonial Bank Montgomery, AL 100%

**(2)** Colonial Capital Trust IV Montgomery, AL 3%

**(3)** P.C.B. Bancorp Statutory Trust II Hartford, CT 3%

**(4)** Colonial Crabapple, LLC Dunwoody, GA 60%

**(5)** Crabapple White Columns Development, LLC Dunwoody, GA 40%

**(6)** Colonial Mead, LLC Atlanta, GA 60%

**(7)** Lake Avenue Associates, LLC Atlanta, GA 60%

**(8)** Colonial Deerfield, LLC Alpharetta, GA 60%

**(9)** CD Lake Deerfield, LLC Alpharetta, GA 75%

**(10)** CD Peachtree Corners, LLC Alpharetta, GA 50%

**(11)** Denton 1385 Partners, LP Dallas, TX 50%

**(14)** CB Habersham, LLC Dunwoody, GA 45%

**(15)** CB Habersham II, LLC Alpharetta, GA 45%

**(16)** CB Dogwood, LLC Dunwoody, GA 45%

**(17)** MCOL Development One, L.P. Alpharetta, GA 80%

**(18)** MCOL Development II, L.P. Alpharetta, GA 80%

**(19)** MCOL Development III, L.P. Alpharetta, GA 80%

**(20)** MCOL Development IV, L.P. Alpharetta, GA 80%

**(21)** BP HWY 10 San Antonio, LTD. Dallas, TX 50%

**(22)** BP 395 Nashville, LTD Dallas, TX 45%

**(23)** Peachtree Hills Place, LLC Atlanta, GA 18.75%

**(12)** Colonial Brokerage, Inc. Montgomery, AL 100%

**(25)** CBG Real Estate, LLC Montgomery, AL 100%

**(26)** CBG, Inc. Reno, NV 100%

**(27)** Colonial REMIC, LLC Wilmington, DE 100%

**(28)** CBG Nevada Holding Corp. Las Vegas, NV 100%

**(29)** CBG Florida REIT Corp. Orlando, FL 100%

**(30)** Colonial Asset Management, Inc. Montgomery, AL 100%

**(31)** Colonial CDE, Inc. Montgomery, AL 100%

**(32)** Lake County Service Corporation Leesburg, FL 100%

**(33)** MWL Funding, Inc. Montgomery, AL 100%

**(34)** Colonial Investment Services, Inc. Montgomery, AL 100%

**(35)** Colonial Investment Services of Florida, Inc. Eustis, FL 100%

**(36)** Colonial Investment Services of Georgia, Inc. Dunwoody, GA 100%

**(37)** Colonial Investment Services of Nevada, Inc. Reno, NV 100%

**(38)** Colonial Investment Services of Tennessee, Inc. Knoxville, TN 100%

**(39)** CBG Florida Real Estate LLC Montgomery, AL 100%

Colonial Bank Subsidiaries

Capital Trusts - Deconsolidated

Joint Ventures - Consolidated

Joint Ventures - Unconsolidated

Case 09-32303    Doc 858    Filed 08/30/10    Entered 08/30/10 07:25:18    Desc Main
Document    Page 25 of 25