UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re                                              Case No. 09-32303-DHW
                                                   Chapter 11
THE COLONIAL BANCGROUP, INC.,

        Debtor.

AMENDED MEMORANDUM OPINION

        The Federal Deposit Insurance Corporation ("FDIC") filed a motion
on November 5, 2009 to require the Debtor to immediately cure the deficit
under an alleged commitment to maintain the capital of Colonial Bank or,
in the alternative, to convert the case to a case under chapter 7 of the
Bankruptcy Code.  The FDIC calculates the deficit at $904,954,360 – an
amount far in excess of the Debtor's ability to pay.  The FDIC also filed a
motion for relief from the automatic stay to collect the deficit in part by
exercising setoff rights against the balances of the Debtor in certain
demand deposit accounts.[1]

        The Debtor filed a motion for summary judgment on each of the
FDIC's motions, and the motions for summary judgment came on for
hearing on May 26, 2010.  The Committee of Unsecured Creditors
("Committee") filed briefs in support of the Debtor's motions.  Following
the hearing, the parties submitted the deposition testimony of seven
witnesses. Upon consideration of the briefs and oral arguments of counsel,
the verified materials of record, and the deposition testimony, the court
concludes that there is no genuine issue of material fact and that the

_____

        [1] The FDIC later amended the motion to request relief from the stay to
enforce other claims in addition to its claim under 11 U.S.C. § 365(o).  The FDIC
asserts a security interest and setoff rights in the demand deposit accounts
predicated on these claims.  By agreement of the parties, the court will consider
the stay motion in this opinion only as it relates to the relief requested by the
FDIC under section 365(o).

Debtor is entitled to summary judgment on both motions as a matter of law.

## Jurisdiction

The court's jurisdiction over this disputed matter is derived from 28 U.S.C. § 1334 and from an order of the United States District Court for this district referring jurisdiction of title 11 matters to the Bankruptcy Court. See General Order of Reference of Bankruptcy Matters (M.D. Ala. Apr. 25, 1985). Further, this is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(B) and (G), thereby extending this court's jurisdiction to the entry of a final order or judgment.

## Undisputed Facts

The Debtor and the FDIC filed separate statements of fact. However, there are no genuine issues of material fact, and the material facts, as adopted from the briefs of the parties, are set forth below.

Prior to August 14, 2009, the Debtor was a bank holding company that owned Colonial Bank. The Debtor also owned certain non-banking, non-debtor subsidiaries. In its Form 10-K for 2008, the Debtor reported that the Bank accounted for approximately 99.3% of the Debtor's consolidated assets.

On June 10, 2008, Colonial Bank converted from a national bank to an Alabama state-chartered, non-member bank, and its name was changed from Colonial Bank, N.A. to Colonial Bank. As a result of this conversion, the Bank's chartering authority and its principal regulator changed from the Office of the Comptroller of the Currency to the Alabama State Banking Department ("ASBD"). At the same time, the Bank's principal federal regulator became the Federal Deposit Insurance Corporation ("FDIC").

In a letter dated October 9, 2008, the FDIC and the ASBD notified Colonial Bank's board of directors ("Bank Directors") that the regulators

2

were downgrading the Bank's composite rating to a "3" due to declining trends in asset quality and the results of targeted reviews since the conversion.

In a letter dated November 7, 2008, the Federal Reserve Board informed the Debtor's board of directors ("Debtor Directors") that due to the Bank's ratings downgrade, the Debtor was not in compliance with requirements of the Bank Holding Company Act and the Federal Reserve Board's Regulation Y, which among other things require holding companies to maintain their depository institution subsidiaries in a well-capitalized and well-managed condition. As a result, the Debtor would be required under section 4(m)(2) of the Act to execute an agreement acceptable to the Board of Governors to correct the management deficiencies at the Bank.

On December 15, 2008, the Bank Directors entered into a Memorandum of Understanding ("Bank MOU") with the Regional Director of the Atlanta Division of the FDIC and the Superintendent of Banks for the Alabama State Banking Department. By its terms and design, the Bank MOU is an agreement of the Bank Directors regarding a program of "corrective action" for the Bank in a number of areas.

In the MOU, the Bank Directors agreed that "the Bank through its Board, will move in *good faith to comply* with the requirements of the Memorandum and eliminate the problems of the Bank." Bank MOU at p. 1 (emphasis added). Paragraph 14 of the Bank MOU states: "By February 28, 2009, the Bank shall have a Tier 1 Leverage Capital ratio of not less than 8 percent and a Total Risk-Based Capital Ratio of not less than 12 percent."[2]

On January 6, 2009, Robert E. Lowder, who was the chairman and chief executive officer of the Debtor at the time, executed on behalf of the holding company an "Agreement Under the Bank Holding Company Act"

_____

[2] While the Bank MOU initially established a date of February 28, 2009 as the deadline for achieving the target capital ratios, that deadline was subsequently extended to March 31, 2009 by agreement.

3

with the Federal Reserve Bank of Atlanta ("4(m) Agreement").  Among other provisions, the 4(m) Agreement included the following paragraph:

> By May 11, 2009 (or such additional time as the Board of Governors may permit), Colonial shall address the factors resulting in the less than satisfactory CAMELS composite and management component ratings assigned to the Bank by the FDIC and the SBD by taking steps designed to ensure that the Bank complies with the Memorandum of Understanding between the Bank and the FDIC, dated December 15, 2008, and any other supervisory action regarding the Bank taken by the FDIC and SBD during the term of this agreement.

4(m) Agreement, ¶ 2.  The Debtor later requested an extension of the May 11, 2009 deadline but received no response from the Federal Reserve Bank of Atlanta.  The Debtor's chief financial officer is not aware of the agreement having been terminated.

On January 21, 2009, the Debtor and its directors signed a separate Memorandum of Understanding ("Debtor MOU") with the Alabama Banking Department and the Federal Reserve Bank of Atlanta.  The FDIC is not a party to the Debtor MOU.  The Debtor MOU is an undertaking in "good faith" to implement a program of "corrective action" in a number of areas. Debtor MOU, p. 1. The corrective action program contemplated that the Debtor would "utilize its financial and managerial resources to assist its subsidiary bank in addressing weaknesses identified by its primary banking supervisors and achieving/maintaining compliance" with the Bank MOU. Debtor MOU, ¶ 1.  The Debtor MOU states that it is "not a 'written agreement' for the purposes of Section 8 of the Federal Deposit Insurance Act, as amended."  Debtor MOU, p. 2.[3]

---

[3] The term "written agreement" has a specific regulatory meaning in the context of "formal supervisory action," and the Debtor MOU makes clear that it is not a formal supervisory action.

4

On March 2, 2009, the Debtor filed its Form 10-K for 2008. In that filing, the Debtor informed investors that in agreements with regulators the Debtor had agreed to use its resources to support the Bank. FDIC App., p. 186. Similar disclosures were included in the Form 10-Q filed by the Debtor for the first quarter of 2009. *Id.* at 463. The Form 10-K also included the following language under a heading labeled *Support of Subsidiary Bank*:

> Under Federal Reserve policy, BancGroup is expected to act as a source of financial strength to, and to commit resources to support, Colonial Bank. This support may be required at times when, absent such Federal Reserve policy, BancGroup might not otherwise be inclined to provide it. In the event of a bank holding company's bankruptcy, any commitment by the bank holding company to a federal bank regulatory agency to maintain the capital of a subsidiary bank will be assumed by the bankruptcy trustee and entitled to priority of payment.

FDIC App., p. 181. In the Debtor's SEC filings in March and May of 2009, the Debtor informed investors about the two memoranda of understanding and stated that, "in the event the debtor is not successful in raising additional capital in the near term, both Colonial Bank and BancGroup would likely become subject to even greater regulatory supervision, which could result in additional restrictions." FDIC App., p. 175. The restrictions could include "the imposition of a cease and desist order pursuant to Section of the [FDI] Act," which could, in turn, preclude Colonial Bank from being considered well capitalized and/or impose other restrictions or prohibitions of certain activities by BancGroup or Colonial Bank." FDIC App. pp. 187 and 298.

On May 13, 2009, the FDIC and the Alabama Banking Department informed Bank representatives that they intended to take formal supervisory action in the form of a cease and desist order. On or about June 3, 2009, the Bank entered into a stipulation and consent to the

Case 09-32303    Doc 869    Filed 09/01/10    Entered 09/01/10 10:46:38    Desc Main
Document    Page 5 of 43

issuance of a cease and desist order with representatives of the Legal Division of the FDIC and the Alabama Banking Department. In connection with that consent, the FDIC confirmed in a letter dated June 5, 2009, that the cease and desist order would replace the Bank MOU.

On June 15, 2009, a cease and desist order was entered as to Colonial Bank ("Bank C&D"). Paragraph 3(a) of the Bank C&D states that "[b]y September 30, 2010, Bank shall have a Tier 1 Leverage Capital ratio of not less than 8 percent and a Total Risk-Based Capital Ratio of not less than 12 percent." The target capital ratios in the Bank C&D were the same as the target capital ratios in the Bank MOU, but with a new deadline -- September 30, 2009. Bank C&D, p. 6. The Bank C&D also required that "within 60 days from the effective date of this ORDER, the Bank shall submit to the Supervisory Authorities a written capital plan." *Id.* at 7. The written capital plan was to detail the steps the Bank would take to achieve and maintain the target capital ratios. Because the effective date of the Bank C&D was June 15, 2009, the deadline for submission of the required capital plan was August 14, 2009.

On July 15, 2009, the Debtor Directors authorized the Chairman, Simuel Sippial, Jr., to consent to the entry of a cease and desist order against the Debtor. This order ("Debtor C&D") was issued on July 22, 2009 by the Board of Governors of the Federal Reserve System ("Board of Governors") and the Alabama Banking Department. Under a heading titled "Source of Strength," the Debtor C&D directed the Debtor Directors to "take appropriate steps" to ensure that the Bank complied with the Bank C&D. Debtor C&D, ¶ 1. In addition, the Debtor C&D required the Debtor to submit a capital plan that would "address, consider and include," among other things, the Bank's current and future capital requirements, the source and timing of additional funds to fulfill the Bank's future capital requirements, and the requirements of section 225.4(a) of Regulation Y that the Debtor serve "as a source of strength to the Bank." Debtor C&D, ¶ 2.[4]

_____

[4] Paragraph 15 of the Debtor C&D made clear that the provisions in the Debtor C&D did not "bar, estop or otherwise prevent" any state or federal

On August 14, 2009, which was the deadline for the Bank to submit a written capital plan, the Alabama Banking Department closed the Bank and appointed the FDIC as receiver for the Bank. On the same day, the FDIC-Receiver sold substantially all of the assets of Colonial Bank to Branch Banking & Trust Company ("BB&T") pursuant to a Purchase and Assumption Agreement ("P&A") among BB&T, the FDIC-Receiver and the FDIC.

Among the assets transferred to BB&T were all of Colonial Bank's commercial loans and collateral securing such loans, including all rights and interests of Colonial Bank under a Security Agreement dated January 1, 2009, executed by the Debtor in favor of the Bank. In addition, pursuant to the P&A Agreement, the FDIC Receiver transferred to BB&T, and BB&T assumed responsibility for, certain demand deposit accounts of Colonial Bank, referred to as the "Assumed Deposits" in the P&A Agreement. P&A Agreement, App. Exhibit A, at 12, ¶ 2.1. There appears to be a factual dispute whether the Assumed Deposits include the Debtor's deposit accounts that had been maintained at Colonial Bank.

On September 29, 2009, the FDIC terminated the Bank C&D. This termination occurred one day prior to the September 30 deadline in the Bank C&D for Colonial Bank to achieve the target capital ratios.

Since the closing of the Bank, neither the Federal Reserve nor the Alabama Banking Department has taken any action in connection with the Debtor C&D, and neither entity has made any appearance in this bankruptcy case.

On November 5, 2009, the FDIC-Receiver filed the 365(o) motion. The FDIC-Receiver asserts in the motion that the Debtor MOU constitutes a commitment to maintain the Bank's capital, that as of June 30, 2009, a deficit existed in the Bank's capital of approximately $1 billion, and that the

---

regulatory agent from taking any other action affecting the Debtor. However, the Debtor is unaware of any other action taken against it by any such authority.

Debtor is obliged to cure such deficit immediately. *See* Doc. #257, p. 6, at ¶¶ 7-8.

The Debtor's assets include depository balances in bank accounts at BB&T (which BB&T acquired pursuant to the P&A Agreement). As of the Petition Date, these demand depository accounts or the Debtor (collectively, the "Debtor Accounts") held aggregate balances of approximately $38,408,337.74.[5]

The FDIC-Receiver placed a "freeze" on the Debtor Accounts, with the result that the Debtor was unable to make withdrawals from any of these accounts (which freeze has continued to the present date), and numerous checks issued by the Debtor did not clear and were returned to the applicable payees.[6]

On or about November 20, 2009, BB&T filed a proof of claim

---

[5] The money is divided among the various accounts as follows: Account No. XXXXXX1127 (the "Operating Account"), the amount of $14,381,038.24; Account No. XXXXXX5437, the amount of $4,000,000; Account No XXXXXX5460, the amount of $5,091,170.82; Account No. XXXXXX5452, the amount of $5,045,815.06; Account No. XXXXXX5445, the amount of $2,282,904.24; and Account No. XXXXXX3218, the amount of $7,607,409.38 (collectively, the "Debtor Deposits"). According to the Debtor's September 18, 2009 cash collateral motion, the Debtor also had Account No. XXXXXX3234 with a zero balance as of the date of the petition. The Debtor opened a number of these accounts during the summer of 2009 to take advantage of the unlimited FDIC insurance available for non-interest bearing transaction accounts under the Transaction Account Guarantee Program.

[6] Shortly before the Petition Date, but during the period that the FDIC-Receiver had "frozen" the Debtor Accounts at BB&T, the Debtor received a substantial wire transfer from SunTrust Bank in Atlanta, Georgia, in the approximate amount of $1,425,000. The Court authorized the Debtor to use the amount of that wire transfer ultimately with the consent of the FDIC-Receiver, as purported cash collateral of the FDIC-Receiver.

asserting a secured claim of $24,027,299.50. It is apparent from the BB&T Proof of Claim that its secured claim is based on the portions of the Debtor Deposits in the following Debtor Accounts: XXXXXX5437, XXXXXX5460, XXXXXX5452, XXXXXX5445, and XXXXXX3218. BB&T alleges in the BB&T Proof of Claim that $24,027,299.50 in the Debtor Deposits secures outstanding loans made by Colonial Bank and sold by the FDIC-Receiver to BB&T. BB&T does not assert in the Proof of Claim or otherwise any lien or interest in or offset right with respect to the $14,381,038.24 balance in the Debtor Account that is the Operating Account.[7] As of the Petition Date and at all times thereafter, the Debtor Accounts were demand deposit accounts held at BB&T and not at Colonial Bank.

BB&T is not the only party asserting a security interest in the Debtor's accounts. The FDIC-Receiver also asserts in its Amended Stay Relief Motion a security interest in and a right of offset with respect to the Debtor Deposits that is duplicative of the claim and lien asserted by BB&T.

Proffered Testimony

By stipulation, the testimony of several witnesses was made by proffer. Mr. Rich, a representative of the FDIC, would testify that the 365(o) deficit as of August 11, 2009, three days before the Bank was closed, was $904,954,360.

Simuel Sippial (Chairman of the Debtor's Board of Directors), Sarah Moore, (Debtor's CFO), and David Byrne (Debtor's General Counsel) would testify that Jack Miller was the vice-chairperson of the Board of Directors of the Debtor, that he was a bank regulatory lawyer, that he was present at meetings of the board at which the Debtor MOU was discussed, that he never told any of them or the board that the documents at issue

---

[7] The Operating Account is, and remains, one of the Debtor Accounts at BB&T. The Debtor disputes the validity, extent and priority of BB&T's alleged lien or interest in the Debtor Deposits, but this dispute is not material to the FDIC's Amended Stay Relief Motion.

constituted either a commitment to maintain capital, a guaranty of the levels of capital, a pledge of assets by the holding company to assure achievement of capital levels by the Bank, or an undertaking to infuse capital into the Bank.

Byrne would further testify that the "4(m) Agreement" was never considered by the board of directors of the Debtor prior to its having been signed and that there was no resolution of the board of directors that authorized the execution of the document. Further Byrne would testify that the portion of the SEC filings that discuss the effect in bankruptcy of a bank holding company entering into a capital maintenance commitment was a disclosure that had been made by the Debtor consecutively, with one year exception, over a period of twelve years.

Byrne would further testify that he had not formed a belief that any of the documents that are alleged to create the capital commitment did in fact create such a capital commitment. In his view, they did not create a guarantee, an obligation to infuse capital into the Bank, and did not constitute an obligation that was a pledge of the Debtor's assets to assure the Bank's achieving the target capital ratios. Had he thought or been informed otherwise, he would have taken steps to ensure that all of the SEC filings had prominent and conspicuous disclosures of the commitment that had been undertaken.

Deposition Testimony
Lewis Beville

Lewis Beville has been a member of the Debtor's board of directors since 1997. He has served as chairman of the Debtor's audit committee for about eight years. He became interim CEO effective June 23, 2009.

He attended the January 21, 2009 meeting of the board of directors where the Debtor MOU was discussed. The Federal Reserve did not discuss or convey that the Debtor was agreeing to any type of guarantee.

10

## Herb Biern

Herb Biern testified as an expert. He started his career as an attorney in the Honors program with the FDIC, becoming familiar with all aspects of its legal division. He then became a senior attorney in the compliance and enforcement section of the FDIC's legal division. He worked as an enforcement lawyer, addressing problem banks, developing cease and desist orders against those banks, and presenting those orders to the directors of the banks. He worked there for over four years.

After a short stint with the Small Business Administration, he began to work with the Federal Reserve. He worked in the enforcement section in the Federal Reserve Board's Division of Banking Supervision and Regulation.

While at the Board, Biern developed language templates that could be used in a variety of enforcement actions by the Federal Reserve. The language templates he developed were compiled into a form book that continues to be used today. He did not draft many MOUs. He drafted the language from which the staff could "pluck out" whatever language they wanted to use to address the particular circumstances.

The Debtor MOU, the Debtor C&D, and the 4(m) Agreement all include language that he drafted and used when he was at the Federal Reserve. The language is substantially similar, if not identical, to the language templates he developed. Having drafted and used the language, he understood what the Federal Reserve meant when it used the language at issue in this case.

The Federal Reserve was not intending by the language in those documents to obtain a capital maintenance commitment from the Debtor. When the Federal Reserve wanted to trigger 365(o), it knew how to do it, and it used exact language. The Federal Reserve did not set "traps" for boards of directors. There is nothing in the documents requiring the Debtor to ensure or guarantee the Bank's capital at a certain level.

Case 09-32303   Doc 869   Filed 09/01/10   Entered 09/01/10 10:46:38   Desc Main
Document    Page 11 of 43

The language in the documents requiring the assistance of the holding company is very important because it is very difficult for an entity to raise additional capital without the approval of its principal shareholder. The intent was for the Debtor holding company to develop a corrective action program subject to the approval of the respective Reserve bank.

The "Source of Strength" paragraph in the Debtor C&D is directed not to the Debtor but to the Debtor's directors.[8]  Therefore, it has very little effect.  The Debtor already had an obligation to act as a source of strength to its subsidiary bank.  Biern used this language only for "belts and suspenders" to help the board of directors understand what their obligations were under the Federal Reserve's source-of-strength policy.

Biern was not involved in the enforcement actions in the instant case. He retired from the Federal Reserve in 2005.  However, he ran the enforcement division for 25 years and knows 25 years of Federal Reserve policy and practices.  His review of the record in this case and the language used by the Federal Reserve lead him to conclude that the Federal Reserve did not intend by that language to obtain a capital maintenance commitment from the Debtor in this case.

### Kurt Casebolt

Kurt Casebolt has worked for the Federal Reserve since 1981.  In July 2008, he became the "central point of contact" between the Debtor and the Federal Reserve Bank of Atlanta.

Casebolt did not draft the 4(m) Agreement.  The Federal Reserve Board had responsibility for both drafting and implementing the 4(m) Agreement.  Casebolt's involvement was basically bringing it to the

---

[8] He stated that the Federal Reserve added headings to the cease and desist orders after Congress required the documents be made public.  The headings are an effort to help the public understand the document.

attention of the enforcement division that such an agreement was needed. Casebolt, however, did have some responsibility for monitoring compliance with the agreement. There was never any board meeting at which he presented the 4(m) Agreement to the Debtor's directors. The 4(m) Agreement had to do with management rather than capitalization.

Casebolt did not understand that the 4(m) Agreement constituted an obligation by the Debtor to pay the capital deficiency of the Bank. Nor did he understand that it was a guarantee or a commitment to maintain capital. At the time of the 4(m) Agreement, the Debtor MOU did not exist.

Casebolt was responsible for drafting the Debtor MOU. In drafting the MOU, he reviewed other MOUs the Reserve had in place for other institutions. All of the MOUs he reviewed had been executed within the prior twelve months. He had not had any experience drafting an MOU since the 1980's. However, the language in the MOUs he reviewed was very similar to the language he recalled using in the 1980s.[9] He did not have the assistance of counsel when he drafted the MOU.[10]

Casebolt met with the Debtor Directors on January 21, 2009 to present the proposed MOU. He wanted to discuss the MOU with the full board and give them any opportunity to raise any questions they might have. His objective was to make sure that each board member understood the exact terms of the Debtor MOU. Their understanding was important because the Reserve wanted their commitment to abide by the provisions of the MOU. Each member was provided a copy of the MOU, and Casebolt went through each of the provisions, explaining what the Reserve was requesting.

---

[9] He did not draft the Debtor C&D. His job was to recommend the entry of the C&D Order to the Enforcement Division at the Federal Reserve Board.

[10] The State of Alabama Banking Department asked to join as a party to the MOU. He submitted a draft of the MOU to the Department, but they did not make any changes to the language.

Casebolt described the MOU as a plan for improvement. He did not indicate at the board meeting that by agreeing to the MOU the Debtor would be obligating itself for the dollar amount of the Bank's capital deficiency. He did not describe the MOU as a guarantee of payment or a commitment to maintain capital. He did not mention 365(o) or the Bankruptcy Code. Nor does he know anything about the Code. That was the only time he discussed the meaning or requirements of the MOU with the Debtor's board.

After the MOU was executed, Casebolt had responsibility for monitoring the Debtor's compliance. Casebolt did not track the Bank's compliance with the Bank MOU nor was he responsible for doing so. He was responsible only for monitoring the Debtor's compliance with the Debtor MOU. The Debtor sent him information assessing the Bank's compliance with the Bank MOU.

In May, Casebolt attended a joint meeting of the boards of the Debtor and the Bank. He informed the boards that, based on the further financial deterioration in the organization, he would recommend that the MOU be replaced by a written agreement (formal supervisory action).

The Reserve Board decided to accept the recommendation. The Board of Governors was responsible for drafting the Debtor C&D. Casebolt then presented the C&D to a joint meeting of the boards of the Bank and Debtor. It was important to Casebolt that the directors understand its exact terms. Casebolt did not tell any of the directors that the C&D constituted an obligation to pay the capital deficiency of the Bank. Nor did he tell them that the C&D was a guarantee by the holding company or a commitment to maintain capital. Casebolt did not believe that any of these things were implicated by the C&D.

Casebolt is not aware of any demand made by the Federal Reserve Bank of Atlanta or the Board of Governors of the Federal Reserve with regard to the Debtor MOU, the Debtor C&D, or the 4(m) Agreement. Casebolt is not aware of any consideration or forbearance offered to the

Debtor in exchange for entering into the Debtor MOU, Debtor C&D or 4(m) Agreement. The Debtor always filed in a timely manner the progress reports due under the three instruments.

## Brent Hicks

Brent Hicks is the Senior Vice-President, Senior Finance Executive for BB&T. He is a certified public accountant and served as chief accounting officer for the Debtor and Colonial Bank. He worked there for four years before the Bank was closed. He testified in deposition regarding the assumption of Colonial accounts by BB&T. Accounts held by one or two entities were not assumed by BB&T.[11]

However, the Debtor's accounts were assumed. The accounts were included as deposits in the Purchase and Assumption Agreement between the FDIC and BB&T. The FDIC would have paid BB&T an amount of money for assuming the deposits, and BB&T would have paid a deposit premium[12] to FDIC. Neither of these payments has been reversed, and the FDIC has not asked BB&T to return any part of the deposits. Nor has BB&T returned any part of the deposits to the FDIC. FDIC placed a legal hold on

---

[11] The OFAC ("Office of Foreign Asset Control") accounts were not assumed. The OFAC is an agency of the U.S. Treasury. The accounts total about $185,000 and remained with the FDIC. Hicks was not sure whether the accounts of Taylor, Bean & Whitaker were assumed. Those accounts were transferred to BB&T's trust department and held in "custodial" accounts instead of deposit accounts. The intent was to segregate the accounts and protect them from inadvertent action.

The Taylor, Bean & Whitaker accounts were originally included in a calculation of the deposit premium to be paid from BB&T to the FDIC as part of the purchase price of the assets. However, the calculation was adjusted to remove the Taylor, Bean & Whitaker accounts, thereby reducing the premium that BB&T would have paid to the FDIC.

[12] The premium was a percentage of the total deposits assumed.

15

the accounts, and no payments from the accounts have been made except as permitted by FDIC.

The accounts of the Debtor remain on the deposit platform of BB&T. BB&T began sending the Debtor statements of its accounts in August 2009. The statements have continued despite the legal hold on the accounts. FDIC did not request BB&T to stop sending out the statements. BB&T included the amount of the Debtor's deposits in reports filed with the SEC, shareholders, the FDIC, and the Federal Reserve. BB&T pays deposit insurance on its deposit liabilities, including the Debtor's accounts.

A pro forma jacket prepared by the FDIC reflects that the accounts of only one entity remained with the FDIC but that no other non-interest bearing accounts, including those of the Debtor, remained with the FDIC.

Sarah Moore

Sarah Moore is a CPA and serves as the Debtor's chief financial officer. She has worked with Colonial since 1996. From January 1, 2008 to August 14, 2009, she was responsible for accounting, finance, treasury, compliance, and enterprise risk management (except credit risk). She was responsible, along with the CEO and general counsel, for interaction with state and federal bank regulators. Her testimony largely addresses events occurring in the months leading up to the closing of the Bank.

In October 2008, the Debtor received notice that the Bank's rating had been downgraded. Also in October, the Debtor applied for funds under the Troubled Asset Relief Program ("TARP") through the FDIC, the Bank's primary federal banking regulator.

On November 7, 2008, the Federal Reserve Board of Governors determined and notified the Debtor's CEO that the Bank was not "well-managed." The letter culminated with the execution of the 4(m) Agreement with the Federal Reserve designed to correct the management deficiencies at the Bank. The 4(m) Agreement contained a May 11, 2009

compliance deadline. The Debtor requested an extension of the deadline but received no response. Sarah Moore is not aware of the 4(m) Agreement having been terminated, but it is likely no longer in effect because the Debtor is no longer a bank holding company.

On December, 2, 2008, the Debtor's TARP application was approved contingent upon a private equity solution or additive capital of $300 million. The Debtor hoped to receive $553 million in TARP funds. The Debtor planned to contribute any money received from TARP to the Bank.

Sarah Moore understood the importance of helping the Bank raise capital and the Debtor's obligation to do so. The Debtor had an obligation to its shareholders to protect the largest asset of the corporation. That included helping the Bank to comply with any regulatory order it had.

Under the Bank MOU, the Bank was required to increase its tier 1 leverage ratio to 8%. In January 2009, the Bank's tier 1 leverage ratio was 6.20%. In terms of dollars, the difference between 6.20% and 8% was somewhere between $600 and $850 million.

The Debtor actively undertook to help the Bank reach the target capital ratios. The Debtor worked diligently to attract private equity investments. However, the Bank did not meet the target ratios by the deadline of Feb. 28, 2009, and that deadline was extended to March 31, 2009.

By March 26, 2009, the Debtor expected to execute an investment agreement with Taylor, Bean & Whitaker Mortgage Corporation. The Taylor, Bean agreement never materialized.[13]

---

[13] The Taylor, Bean agreement was subject to a number contingencies and conditions, including confirmation that TARP funds would be invested in the Debtor, receipt of regulatory approvals including approvals necessary to permit the conversion of Colonial Bank from a state-chartered bank to a thrift that would be regulated by the Office of Thrift Supervision, and completion of due diligence

Case 09-32303   Doc 869   Filed 09/01/10   Entered 09/01/10 10:46:38   Desc Main
Document   Page 17 of 43

The Debtor also considered other possibilities such as a franchise agreement with Toronto-Dominion. The Debtor did not work alone but engaged outside assistance, including Citigroup Global Markets and Promontory Financial Group, in developing ideas and plans.

On March 31, the FDIC suggested that the Debtor contribute capital to the Bank. The Debtor contributed securities – approximately $24 million. The Debtor also contributed loans of about $60 million.

In mid-April, 2009, the Debtor had $88 million in cash. That amount would enable the Debtor to service debt for a period of only 28 to 30 months. On June 30, 2009, the Debtor made a capital contribution of $50 million to the Bank.

On August 13, 2009, the Bank submitted a "capital plan" to the FDIC and the State of Alabama Banking Dep't, its primary regulators. Promontory Financial Group helped develop the plan, and Sarah Moore assisted. The Bank was closed on August 14, 2009.

The regulators never stated to Sarah Moore or to anyone else in her presence that the Debtor was liable for any dollar amount equal to the capital ratio deficiency. The statement would have been important to her had it been made because the liability would need to be recorded in the Debtor's financial statements, and it would potentially affect the Debtor's ability to attract investment.

Promontory Financial Group worked with the Debtor and the Bank to attempt to attain compliance with the respective cease and desist orders. Promontory never informed Sarah Moore that the Debtor's cease and desist order constituted a guarantee of the Bank's capital shortfall.

---

by Taylor, Bean and the other investors by April 30, 2009. FDIC App., pp. 561-71. The Debtor announced on July 31, 2009 that the agreement had been terminated by mutual agreement. *Id.* at 677-81.

## Timothy Rich

Timothy Rich has worked for the FDIC for 23 years. He has worked in several capacities for the FDIC, having been promoted to higher levels of responsibility over time. Between 1987 and 2008, he served in such capacities as a bank examiner, a senior examiner, a review examiner, and case manager. In December 2008, he became a senior examiner for large financial institutions.

The senior examiner for large financial institutions is generally dedicated to a single bank, and Rich was responsible for all aspects of the examination program for Colonial Bank until it closed in August 2009. As such, he participated in the decisions regarding corrective actions taken with respect to the Bank. He also participated in discussions with other regulatory authorities such as the Federal Reserve and the Alabama Banking Department, and the Federal Reserve Bank of Atlanta.

During the course of his career, he has been involved with dozens of MOUs. As part of his involvement in most of those, he met with the Bank's board of directors to discuss what the MOU was about. The FDIC does not have supervisory authority over bank holding companies, and in the bulk of the cases, he did not attend meetings where an MOU was being entered with the board of a holding company.

The Federal Reserve has authority over holding companies, and the Federal Reserve decides what language to put into an enforcement action or MOU for a holding company. The FDIC does not control or even have a significant participation in the development of a Federal Reserve initiative. The FDIC was therefore not a party to the Debtor MOU or Debtor C&D, and Rich had no participation in the drafting of those documents. Neither did Rich participate in the drafting of the Bank MOU.

Rich stated that the Debtor MOU obligated the Debtor to either pay the amount of the capital deficiency of the Bank or infuse capital into the Bank necessary to bring the level up to the required level. Timothy Rich

19

is not an attorney and is not familiar with § 365(o) of the Bankruptcy Code. He testified solely based on his work and experience with the FDIC over 23 years.

When questioned as to the earliest date the Federal Reserve could have called on the Debtor to pay the money, Rich stated that the earliest date would have been February 28, 2009. However, that date could be extended "if alternate agreements were reached." He was not sure if the Debtor was obligated to pay the deficit on March 31 because he is not sure what the Federal Reserve's stance was on that date in regard to the Debtor MOU. However, the obligation to pay money or infuse capital originated on January 30, 2009, the date of the Debtor MOU.

Rich attended a May 27, 2009 joint meeting of the boards of directors of the Bank and the Debtor. When questioned whether he instructed the board that by entering the C&D they would be undertaking an obligation to pay or infuse capital into the Bank, he stated that he does not recall making that statement. In fact, he doesn't remember telling other holding companies that their financial commitment was any more than what it has always been as a holding company. He later stated that the documents don't just reiterate an obligation that already exists – it holds holding companies to a more stringent standard with potential repercussions by the time you reach a formal enforcement action.

Rich also attended the July 15, 2009 joint meeting of the boards of the Debtor and the Bank. He does not recall anyone telling the boards that if the Debtor signed the C&D, it would be financially obligated for any deficiency in the capital of the Bank if the Bank failed to comply with its own C&D. Rich stated that no assurances of forbearance were given to the Debtor or the Bank in exchange for entering into the MOUs or the C&Ds.

Rich thinks the holding company was obligated to pay the deficit because it was under the Debtor's supervision that the Bank came to be in the predicament it was in and because the Debtor was slow to recognize the depth of the Bank's problems. The Debtor did not have adequate

20

controls and procedures in place to identify the problems.

Rich later stated that he only works with banks in an open status and he is not aware of the legal remedies after a bank is closed. He denied knowing whether the holding company would be financially liable.

Rich acknowledged the numerous and diligent efforts made by the boards to obtain or infuse capital into the Bank – from the application for TARP funds, to the proposed Taylor Bean transaction, to the Debtor's infusion of $50 million, to retaining Citigroup to explore different avenues of raising capital. Citigroup contacted dozens and dozens of potential acquirers for the Bank – from regional to international.

Rich stated that he thinks the boards of the Debtor and the Bank acted in good faith in their efforts to try to raise capital. However, they were not successful. Therefore, they were in violation of the two MOUs. As of August 14, 2009 when the Bank was closed, the shortfall was roughly $800 million.

Rich made the decision to freeze the Debtor's operating account at the Bank the day the Bank was closed. His role as examiner ceased on that date, and he had no involvement in the purchase and assumption agreement between the FDIC and BB&T.

Simuel Sippial

Simuel Sippial joined the boards of directors of Colonial Bank and the Debtor in 1997. He served on the Bank's board until the Bank closed, and, effective June 3, 2009, he became chairman of the Debtor's board.

Sippial served on the boards at all times critical to the facts of this case. He signed the Bank and Debtor MOUs and the Debtor C&D and attended board meetings at which they were discussed. He was present when Casebolt reviewed both the Debtor MOU and the Debtor C&D with the Debtor's board. Neither Casebolt nor any other regulator ever stated

that the Debtor was agreeing to guarantee a specific dollar amount, to guarantee the capital deficiency, or to guarantee anything at all. The regulators never mentioned section 365(o) or a commitment to maintain capital.

Sippial stated that his understanding was that, by signing these documents, the Debtor was promising to assist the Bank. The Debtor was not making a guarantee. Only the Debtor could issue securities, and only the Debtor could make transactions with third parties involving a change in control.

Sippial understood that if the Debtor was not successful in raising the capital ratios of the Bank specified in the MOU, a C&D order might enter. He understood that a C&D, unlike an MOU, is a public document and could negatively affect the Debtor's ability to raise capital and the Bank's ability to retain deposits. He also understood that if the C&D requirements were not met, the Bank could be placed in receivership.

The Debtor did not assist the Bank because it thought it had guaranteed the amount of the capital deficiency. The Debtor assisted the Bank because that's the responsibility of a parent company. In addition, the Debtor had obligated itself to assist the Bank in the documents that it signed.

## Conclusions of Law

### Summary Judgment Standard

The standard for summary judgment established by Fed. R. Civ. Proc. 56 is made applicable to adversary proceedings in bankruptcy by Fed. R. Bankr. Proc. 7056. The rule provides in part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

22

that there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. Proc. 56(c).

Summary judgment is appropriate when "there is no genuine issue
as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106
S.Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). In deciding a motion for
summary judgment, the court is not "to weigh the evidence and determine
the truth of the matter but to determine whether there is a genuine issue
for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).
"Where the record taken as a whole could not lead a rational trier of fact
to find for the non-moving party, there is no 'genuine issue for trial.'"
*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587
(1986).

The non-moving party cannot rest on mere allegations in response:

When a motion for summary judgment is properly made and
supported, an opposing party may not rely merely on
allegations or denials in its own pleading; rather, its response
must – by affidavits or as otherwise provided in this rule – set
out specific facts showing a genuine issue for trial.

Fed. R. Civ. Proc. 56(e), as incorporated by Fed. R. Bankr. Proc. 7056.
"[A]ll inferences drawn from the evidence must be viewed in the light most
favorable to the non-moving party." *Mize v. Jefferson City Bd. Of Educ.*, 93
F.3d 739, 742 (11th Cir. 1996). However, "when the inferences that are
drawn from the evidence, and upon which the non-movant relies, are
'implausible,'" those inferences will not preclude summary judgment. Id.
at 743.

"Summary judgment procedure is properly regarded not as a
disfavored procedural shortcut, but rather as an integral part of the Federal
Rules as a whole, which are designed 'to secure the just, speedy and

23

inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

Statutory Law

11 U.S.C. § 365 addresses a trustee's rights and responsibilities regarding the assumption or rejection of the debtor's executory contracts and unexpired leases. "Section 365(o) creates an exception to the trustee's" powers to assume or reject an executory contract by requiring assumption of a capital maintenance agreement. *Wolkowitz v. FDIC (In re Imperial Credit Industries, Inc.)*, 527 F.3d 959, 975 (9th Cir. 2008).

Section 365(o) seeks "to prevent institution-affiliated parties from using bankruptcy to evade commitments to maintain capital reserve requirements of a Federally insured depository institution."[14] *Resolution Trust Corp. v. Firstcorp, Inc. (In re Firstcorp)*, 973 F.2d 243, 246 (4th Cir. 1992) (quoting H.R.Rep. No. 681(I), 101st Cong., 2d Sess. 179 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6472, 6585). It states as follows:

> In a case under chapter 11 of this title, the trustee shall be deemed to have assumed (consistent with the debtor's other obligations under section 507), and shall immediately cure any deficit under, any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution, and any claim for a subsequent breach of the obligations thereunder shall be entitled to priority under

_____

[14] *Firstcorp* notes further that Congress enacted section 365(o) to prevent a bank holding company that has committed to maintain the capital of its depository institution subsidiary from using Chapter 11 "to jettison the subsidiary in an effort to enhance its own financial position and that of its creditors." *Firstcorp*, 973 F.2d at 248.

Case 09-32303    Doc 869    Filed 09/01/10    Entered 09/01/10 10:46:38    Desc Main
                        Document        Page 24 of 43

section 507. This subsection shall not extend any commitment that would otherwise be terminated by any act of such agency.

Section 507(a)(9) gives ninth priority to such claims: "Ninth, allowed unsecured claims based upon any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency), to maintain the capital of an insured depository institution."

Section 101(21B) defines the term "Federal depository institutions regulatory agency." The term means —

(A) with respect to an insured depository institution (as defined in section 3(c)(2) of the Federal Deposit Insurance Act) for which no conservator or receiver has been appointed, the appropriate Federal banking agency (as defined in section 3(q) of such Act). . . .

(D) with respect to any insured depository institution for which the Federal Deposit Insurance corporation has been appointed conservator or receiver, the Federal Deposit Insurance Corporation.

"Appropriate Federal banking agency" means, in the case of a State nonmember insured bank, the Federal Deposit Insurance Corporation. 12 U.S.C. § 1813(q).

If a chapter 11 debtor does not have the financial ability to cure a deficit as required by 11 U.S.C. § 365(o), it has been held that the consequence is conversion of the case to chapter 7:

If the holding company is not financially able to satisfy its capital maintenance obligations, then § 365(o) denies it the opportunity to reorganize under Chapter 11, leaving liquidation under Chapter 7 as its only option. Through this mechanism, § 365(o) places the financial interest of the federal

25

deposit insurance system ahead of that of the holding company and its creditors.

*Firstcorp*, 973 F.2d at 248.

Contentions of the Parties

The Debtor contends that it did not make a commitment to a Federal depository institutions regulatory agency to maintain the capital of Colonial Bank. The Debtor further contends that any commitment made by the Debtor is not enforceable and that, in any event, the FDIC has no standing to enforce such commitment.

The FDIC contends that the Debtor made a commitment to maintain the capital of the Bank and that the FDIC has standing to enforce the commitment. The FDIC further contends that it has the right to setoff its claim under the commitment against the balances in the Debtor's demand deposit accounts at BB&T.

Commitment to Maintain Capital of Bank

The FDIC contends that the Debtor made a commitment to maintain the capital of Colonial Bank in each of the following documents: 4(m) Agreement, Debtor MOU, and Debtor C&D.

"In construing a contract, the primary concern of the court is to ascertain the true intent of the parties." *Gwaltney v. Russell*, 984 So.2d 1125, 1131 (Ala. 2007). "The words of a contract are to be given their ordinary meaning, and the intention of the parties is to be derived from the provisions of the contract." *Smith v. Citicorp Person-to-Person Financial Centers, Inc.*, 477 So.2d 308, 310 (Ala. 1985). "An agreement that by its terms is plain and free from ambiguity must be enforced as written." *Meyer v. Meyer*, 952 So.2d 384, 391 (Ala. Civ. App. 2006).

In summary of the operative language of the above agreements, the

January 6, 2009 4(m) Agreement required the Debtor to

> address the factors resulting in less than satisfactory . . . ratings assigned to the Bank by the FDIC and the SBD by taking steps designed to ensure that the Bank complies with the Memorandum of Understanding between the Bank and the FDIC, dated December 15, 2008, and any other supervisory action regarding the Bank taken by the FDIC and SBD during the term of this agreement.

4(m) Agreement, ¶ 2. The January 21, 2009 Debtor MOU required the Debtor to move in good faith to

> utilize its financial and managerial resources to assist its subsidiary bank in addressing weaknesses identified by its primary banking supervisors and achieving/maintaining compliance with its December 15, 2008 Memorandum of Understanding with the Federal Deposit Insurance Corporation's Atlanta Regional Office (FDIC) and the State of Alabama Banking Department.

Debtor MOU, ¶ 1. Under a paragraph titled, "Source of Strength," the July 22, 2009 Debtor C&D required the board of directors of the Debtor to "take appropriate steps to ensure that the Bank complies with the Order to Cease and Desist entered into with the Federal Deposit Insurance Corporation (the "FDIC") and the Superintendent effective as of June 15, 2009."[15] Debtor C&D, ¶ 1.

------

[15] The source-of-strength doctrine provides that a bank holding company shall "serve as a source of financial and managerial strength to its subsidiary banks and shall not conduct its operations in an unsafe or unsound manner." 12 C.F.R. § 225.4(a)(1) (2010). However, the source-of-strength doctrine does not require a bank holding company to make capital contributions to its subsidiaries. See *MCorp. Fin. Corp. Inc. v. Board of Governors of the Federal Reserve*, 900 F.2d 852, 863 (5th Cir. 1990), *rev'd on other grounds*, 502 U.S. 32 (1991).

Each of the documents requires the Debtor to assist the Bank in complying with the Bank MOU or the Bank C&D, whether by "taking steps designed to ensure that the Bank complies," or by utilizing "its financial and managerial resources to assist" the Bank, or by taking "appropriate steps to ensure that the Bank complies." The documents do not require the Debtor to comply on behalf of the Bank or impose liability on the Debtor in the event the Bank fails to reach the required capital ratios. In other words, the language in the documents does not make the Debtor either primarily or secondarily liable for the Bank's obligations.

The language is broad and general and requires only that the Debtor "assist" the Bank. The language does not specify any particular method of assistance or prescribe specific steps that the Debtor must take. The language does not dictate what financial and managerial resources the Debtor must utilize. Nor does it require the Debtor to serve as a guarantor of the capital ratios or to pledge any assets to secure any capital deficiency. Most importantly, the language does not require the Debtor to make a capital infusion, in any amount, in the Bank.[16]

The court has found no case law supporting the FDIC's position that these documents create a commitment within the meaning of 11 U.S.C. § 365(o). There are cases in which a commitment has been found. However, the commitment language in those cases differs from the language in the instant documents. In addition, the circumstances under which those commitments were made differ as well. Three of those cases involve commitments made as a condition of approval of an acquisition. The fourth involves the prompt corrective action statute.

In *Franklin Savings Corporation v. Office of Thrift Supervision*, 303

---

[16] In addition, the operative paragraph in the Debtor C&D calls on the directors of the Debtor – not the Debtor – to act as a source of strength for the Bank. The Debtor already had that obligation under Federal Reserve Policy. As stated above, Herb Biern testified that this paragraph therefore has very little effect.

28

B.R. 488 (D. Kan. 2004), the Franklin Savings Corporation ("FSC") made a capital maintenance commitment in connection with an application to acquire a thrift and merge the thrift into its subsidiary thrift, Franklin Savings Association ("FSA"). The Federal Home Loan Bank Board ("FHLBB"), the operating head of the Federal Savings and Loan Insurance Corporation ("FSLIC"), conditioned approval of the acquisition and merger on the following:

> [FSC] shall stipulate to [FSLIC] that so long as [FSC] controls [FSA], [FSC] will cause the net worth of [FSA] to be maintained at a level consistent with that required of institutions insured twenty years or longer by Section 563.13(b) of the Rules and Regulations for Insurance of Accounts, as now or hereafter in effect, infusing sufficient additional equity capital to effect compliance with such requirement whenever necessary.

*Franklin Savings*, 303 B.R. at 491. In *Franklin*, the debtor did not dispute that it had made a capital maintenance commitment. Similarly, in *Resolution Trust Corp. v. Firstcorp, Inc. (In re Firstcorp)*, 973 F.2d 243 (4th Cir. 1992), FHLBB required Firstcorp to make the following commitment as a condition of approving Firstcorp's application to acquire First Federal Savings and Loan Association of Raleigh ("FF-Raleigh"):

> For as long as Firstcorp controls [FF-Raleigh], the regulatory net worth of [FF-Raleigh] shall be maintained at the *greater* of: (1) three percent of total liabilities ..., or (2) a level consistent with that required by Section 563.13(b) of the Rules and Regulations for Insurance of Accounts ..., as now or hereafter in effect, and where necessary, to infuse sufficient additional equity capital, in a form satisfactory to the Supervisory Agent, to effect compliance with such requirement.

*Firstcorp*, 973 F.2d at 244. In *Office of Thrift Supervision v. Overland Park Fin'l Corp. (In re Overland Park)*, 236 F.3d 1246 (10th Cir. 2001), Overland Financial applied to FSLIC for approval of its acquisition of Overland

Savings & Loan Corporation. FHLBB, the operating head of FSLIC, conditionally approved the acquisition. With commitment language similar to that required in the above two cases, Overland Financial agreed that it "would maintain the net worth of Overland Savings & Loan, and, if necessary, infuse sufficient additional capital." *Overland Park*, 236 F.3d 1249.

The language in these three cases required the debtors to maintain the net worth of its subsidiary and to infuse additional capital as necessary in order to maintain the specified capital ratios. No such language can be found in the 4(m) Agreement, the Debtor MOU, or the Debtor C&D.

The fourth case involves a guaranty made in response to a prompt corrective action notification letter from the FDIC. In *Wolkowitz v. FDIC (In re Imperial Credit Industries, Inc.)*, 527 F.3d 959 (9th Cir. 2008), the FDIC "issued a Prompt Corrective Action notice informing SPB [Southern Pacific Bank] that it was undercapitalized and requiring SPB to submit a capital restoration plan." *Id.* at 962. SPB submitted several plans, the last of which was approved, calling for "a capital infusion of approximately $55 million . . . through private placement and/or the sale of assets." *Id.* at 964. Pursuant to federal law, Imperial, SPB's holding company, executed a guaranty that SPB would perform under the plan.[17] Under the performance guaranty, Imperial committed itself to:

> absolutely, unconditionally and irrevocably guarantee[ ] the performance of [SPB] under the terms of the Capital Plan and . . . pay the sum demanded to [SPB] or as directed by the [FDIC] in immediately available funds promptly after receipt by [Imperial] of such demand; provided, that the aggregate liability of [Imperial] under this Guaranty shall be the lesser of an amount equity to five percent (5%) of [SPB]'s total assets as

---

[17] The guaranty was submitted in connection with only the first plan. However, the court held that the guaranty applied to the plan that was ultimately approved.

Case 09-32303   Doc 869   Filed 09/01/10   Entered 09/01/10 10:46:38   Desc Main
Document      Page 30 of 43

of December 31, 2001 or the amount which is necessary or would have been necessary to restore the relevant capital measures of [SPB] to the levels required to be 'adequately' capitalized, as those measures and levels are defined at the time that [SPB] initially fails to comply with its approved Capital Plan . . .

*Id.* at 964. The court held that the above language constituted a commitment under 11 U.S.C. § 365(o). The holding company's limited guarantee of the capital restoration plan was required by federal law. *See* 12 U.S.C. § 1831o(e)(2)(C). However, the documents in the instant case contain no language of guarantee.

The language in these four cases is vastly different from the language in the 4(m) Agreement, the Debtor MOU, and the Debtor C&D. The language in the three documents did not require the Debtor to maintain the net worth of the Bank or to infuse additional capital as necessary in order to achieve the target ratios. Further, unlike the fourth case, the documents contained no language of guarantee. The language only required the Debtor to "assist" the Bank in reaching target capital ratios.[18]

In addition, the circumstances of this case are factually distinguishable from the cases under which a commitment has been found. The instant Debtor did not make this alleged commitment as a condition of approval of the acquisition of the Bank nor in response to a prompt corrective action notification following guarantee of a capital restoration plan.

The court has considered the language of the 4(m) Agreement, the Debtor MOU, and the Debtor C&D. The language is not ambiguous, and

---

[18] It is of note that the targets that the Debtor agreed to help the Bank achieve were not particular capital levels, but rather ratios, such as equity to total assets. A ratio could have been increased by selling assets as well as by infusing additional capital.

giving the words their ordinary meaning, the court concludes that the Debtor and the Federal Reserve did not intend to create a commitment in the Debtor to maintain the capital of Colonial Bank within the meaning of 11 U.S.C. § 365(o). As explained above, the reported case law is consistent with this conclusion.

"Generally, courts will not look beyond the four corners of an instrument unless the instrument contains latent ambiguities." *Meyer v. Meyer*, 952 So.2d 384, 391 (Ala. Civ. App. 2006). However, parol or other extrinsic evidence is admissible to explain or clarify a latent ambiguity. A latent ambiguity is one "that arises not from the face of the document but instead from a 'collateral matter that makes its meaning uncertain.'" *Walton v. Beverly Enterprises-Alabama, Inc.*, 4 So.3d 537, 543 (Ala. Civ. App. 2008).

The parties have submitted extensive deposition testimony. Most of the testimony relates to the issue of the intent and understanding of the parties in the drafting and execution of the 4(m) Agreement, the Debtor MOU, and the Debtor C&D. However, the testimony does not reveal any latent ambiguities in the documents. Therefore, to the extent this testimony constitutes extrinsic evidence of the meaning of the three documents, the testimony is not admissible.

However, if the court were to consider the testimony, the court would conclude that the parties did not intend to create a commitment in the Debtor to maintain the capital of the Bank within the meaning of 11 U.S.C. § 365(o). Nor did they understand that they had done so.

Herb Biern ran the enforcement division of the Federal Reserve for 25 years and developed the language templates from which the instant documents were drafted. He stated that nothing in the documents required the Debtor to ensure or guarantee the Bank's capital at a certain level. The language requiring assistance from the holding company is important because it is very difficult for an entity to raise additional capital without the approval of its principal shareholder. He further testified that the paragraph entitled "Source of Strength" in the Debtor C&D has very

little effect as it is directed not to the Debtor but to the Debtor's directors. The Debtor already had an obligation to operate as a source of strength for the Bank.

Kurt Casebolt worked for the Federal Reserve and served as the central point of contact between the Debtor and the Federal Reserve Bank of Atlanta and drafted the Debtor MOU. He introduced both the Debtor MOU and the Debtor C&D to the directors of the Debtor. His objective was to make sure that each board member understood the exact terms of the documents. He did not tell the directors that they were obligating the Debtor to pay the Bank's capital deficiency or guaranteeing payment or making a commitment to maintain the Bank's capital. Nor did he understand the 4(m) Agreement to similarly obligate the Debtor.

Lewis Beville, director of the Debtor and interim CEO effective June 23, 2009, attended the meeting of the board where the Debtor MOU was discussed. Casebolt did not discuss or convey that the Debtor was agreeing to any type of guarantee. Simuel Sippial, director and chairman of the Debtor's board effective June 3, 2009, stated that neither Casebolt nor any other regulator ever stated that the documents constituted a guarantee of the deficiency or a commitment to maintain the Bank's capital. His intent in signing the documents was a promise of assistance. Similarly, Sarah Moore, the Debtor's chief financial officer, stated that regulators never stated to her that the Debtor was liable for any dollar amount equal to the capital ratio deficiency. She believed such a liability would need to be disclosed in the Debtor's financial statements and could affect the Debtor's ability to attract investment.

Finally, Timothy Rich worked with the FDIC for 23 years and served as senior examiner for large financial institutions. Rich stated that the Debtor MOU obligated the Debtor to either pay the amount of the capital deficiency of the Bank or infuse capital into the Bank necessary to bring the level up to the required level.

However, Rich's testimony is weak in several respects. The FDIC

does not have supervisory authority over bank holding companies, and in the bulk of the cases, Rich did not attend meetings where an MOU was being entered with the board of a holding company. The FDIC does not control or even have significant participation in the development of Federal Reserve initiatives. The FDIC was not a party to the Debtor MOU or Debtor C&D, and Rich had no participation in their drafting. Rich's testimony regarding the date on which the Debtor was obligated to pay the deficiency was not persuasive. Rich attended the Debtor's board meeting at which the Debtor C&D was presented. However, he does not recall anyone telling the board that the C&D would make the Debtor financially obligated for the Bank's capital deficiency. Rich's opinion that the Debtor is liable is predicated, in part, on the fact that he believes the Debtor was at least partly responsible for the Bank's condition at that time. Rich's testimony is contrary to the plain language of the documents and does not reveal a latent ambiguity.

The FDIC contends that the conduct of the Debtor between the date of the agreements and the closing of the Bank reflect that the Debtor believed it had entered into a capital maintenance commitment. The court notes that "[w]hen there is no ambiguity, any subsequent conduct of the parties to an agreement cannot be considered as aids in its construction." *F.W. Woolworth Co. v. Grimmer*, 601 So. 2d 1043 (Ala. Civ. App. 1998).

However, the contention of the FDIC is without merit. As Sarah Moore testified, the Debtor had an obligation to its shareholders to protect the largest asset of the corporation. That included helping the Bank to comply with any regulatory order it had. The Debtor actively undertook to help the Bank reach the target capital ratios. The Debtor worked diligently to attract private equity investments to increase the Bank's capital ratios to that required by the Bank MOU. The Debtor's involvement was critical. Sippial testified that only the Debtor could issue securities, and only the Debtor could make transactions with third parties involving a change in control. The Debtor's actions are consistent with the obligations it made under the three agreements and its obligations as a parent/holding company. The Debtor's actions are also consistent with its own financial

34

interest in the health of the Bank.

The FDIC further contends that the Debtor's 10-K filing on March 2, 2009 reflects that the Debtor believed it had entered into a capital maintenance commitment. As stated above, the 10-K filing included the following language:

> In the event of a bank holding company's bankruptcy, any commitment by the bank holding company to a federal bank regulatory agency to maintain the capital of a subsidiary bank will be assumed by the bankruptcy trustee and entitled to priority of payment.

FDIC App., p. 181. However, the Debtor states that this was standard language that was included in every 10-K filing, with the exception of one, over a period of twelve years. The language does not indicate that such a commitment was made by the Debtor. The language merely recites the legal effect of such a commitment, if any, in bankruptcy.

In fact, the Debtor did not state in any of its financial reports that it had made a commitment to maintain the capital of Colonial Bank. The statements that were made by the Debtor in its disclosures are consistent with the obligation that the Debtor undertook – to assist the Bank.

The court concludes that both the unambiguous language of the documents and the intent of the parties to the contract evince that the Debtor did not make a commitment to maintain the capital of Colonial Bank within the meaning of 11 U.S.C. § 365(o). The Debtor's subsequent actions are consistent with this conclusion.

"Federal Depository Institutions Regulatory Agency"

11 U.S.C. § 365(o) embraces only commitments made to a Federal depository institutions regulatory agency to maintain the capital of an insured depository institution. The Debtor contends that it made no

commitment to a Federal depository institutions regulatory agency.

11 U.S.C. § 101(21B) defines the term "Federal depository institutions regulatory agency." With respect to an insured depository institution for which no receiver has been appointed, the Federal depository institutions regulatory agency is "the appropriate Federal banking agency." In the case of a State nonmember insured bank, the "appropriate Federal banking agency" is the FDIC. 12 U.S.C. § 1813(q). If a receiver has been appointed, the federal depository institutions regulatory agency is the FDIC. Therefore, at all relevant times in this case, the Federal depository institutions regulatory agency was the FDIC.

The 4(m) Agreement was executed between the Debtor and the Federal Reserve Bank of Atlanta. The Debtor MOU was executed between the Debtor, the Federal Reserve Bank of Atlanta, and the State of Alabama Banking Department. The Debtor C&D was executed between the Debtor, the Board of Governors of the Federal Reserve System, and the Alabama State Banking Department. The FDIC has not pointed to any other documents as the source of the purported commitment. However, none of these agreements was made with the Federal depository institutions regulatory agency – the FDIC.

In the four cases discussed above relating to section 365(o), the commitments in each of those cases were made to the subsidiary bank's regulator. *See Overland*, 236 F.3d at 1249; *Firstcorp*, 973 F.2d at 244; *Wolkowitz*, 527 F.3d at 963-964; and *Franklin*, 303 B.R. at 491.

The court concludes that any commitment contained in the documents to maintain the capital of the Colonial Bank does not come within the meaning of 11 U.S.C. § 365(o) because it was not made to the Federal depository regulatory agency for Colonial Bank.[19]

---

[19] The FDIC has not suggested that it did not have the ability to seek a commitment from the Debtor as a part of its regulation of the Bank, and the court knows of no reason why it could not have done so.

36

The FDIC contends that this conclusion leads to nonsensical results because an "insured depository institution" is not an entity that can "commit to maintain" its own capital for purposes of enforcement under section 365(o). However, the statute does not require this. The statute merely requires that, for such a commitment to be embraced by 365(o), it must have been made to the insured depository institution's regulatory agency – not to the Debtor's regulatory agency.

## Enforceability of Commitment

The Debtor and Committee contend that a commitment under 11 U.S.C. § 365(o) must be enforceable. First, they note that claims that are not enforceable are subject to disallowance in bankruptcy.[20] The fact that section § 365(o) accords priority claim status to a debtor's subsequent breach of a commitment reflects that § 365(o) contemplates only enforceable commitments. *See* 11 U.S.C. § 507(a)(9); 11 U.S.C. § 365(o).

Second, the Debtor and Committee argue that it would make no sense to require a debtor to assume an unenforceable commitment. Indeed, section 365(o) seeks "to prevent institution-affiliated parties from using bankruptcy to evade commitments to maintain capital reserve requirements of a Federally insured depository institution." *Resolution Trust Corp. v. Firstcorp, Inc. (In re Firstcorp)*, 973 F.2d 243, 246 (4th Cir. 1992) (citations omitted). If a commitment is not enforceable, a party need not file chapter 11 to avoid performing it. *See* Committee Brief, Doc. #701, p. 8.

The court concurs that 11 U.S.C. § 365(o) embraces only enforceable

---

[20] A claim is not allowable to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law . . ." 11 U.S.C. § 502(b)(1).

commitments. The Debtor and Committee argue that the regulatory documents in question are not enforceable for a variety of reasons.

The Committee contends that the 4(m) Agreement is not enforceable because it was based on the Bank MOU, which was superseded by the Bank C&D. However, this does not mean that the 4(m) Agreement was not enforceable during its term.

The agreement expressly states that it "is enforceable" under the Bank Holding Company Act and section 8 of the Federal Deposit Insurance Act. 4(m) Agreement, FDIC Ex. 5, ¶ 7. There is no evidence that the 4(m) Agreement was expressly terminated. However, there is also no evidence that the Reserve sought to enforce the agreement after the May 11, 2009 deadline, and the Reserve did not respond to the Debtor's request to extend that deadline. Sarah Moore testified that the 4(m) Agreement is likely no longer in effect because the Debtor ceased being a bank holding company on August 14, 2009.

The Committee contends that the Debtor MOU was not enforceable. They point out that a memorandum of understanding is expressly unenforceable under the Federal Reserve's own guidelines. The Federal Reserve's manual for examiners, which describes the Federal Reserve's enforcement powers, distinguishes between formal and informal enforcement actions. The manual includes memoranda of understanding in the category of informal supervisory actions. The manual states as follows regarding informal actions:

> Informal actions are not enforceable and their violation cannot serve as a basis for assessing a civil money penalty or initiating a removal and prohibition action. Informal actions are not published or publicly available. . . . Although an informal action, imposition of an MOU may require disclosure to the Securities and Exchange Commission and to the bank's liability bond issuer.

*Commercial Bank Examination Manual*, (Bd. Of Governors of the Fed. Reserve Sys. Div. Of Banking Supervision and Regulation, 4th Printing 1994), sec. 5040.1 (Formal and Informal Corrective Actions, Eff. Nov. 2003), Doc. #701, Ex. 8, p. 59.

The Debtor MOU expressly states that it "is not a 'written agreement' for the purposes of Section 8 of the Federal Deposit Insurance Act, as amended." Debtor MOU, p. 2. A "written agreement," unlike a memorandum of understanding, would be a formal, enforceable enforcement action. *Commercial Bank Examination Manual*, Doc. #701, Ex. 8, p. 56. The Debtor MOU, as an informal supervisory action, is not enforceable, and violation of the Debtor MOU cannot serve as a basis for assessing a civil money penalty.

The parties do not dispute that the Debtor MOU was superseded by the Debtor C&D.[21] And the Committee concedes that the Debtor C&D was enforceable, because it constituted a formal enforcement action rather than an informal one.

However, the Committee argues that the Debtor's obligation under the C&D was terminated by the FDIC before it matured. The FDIC terminated the Bank C&D on September 29, 2009 before the September 30, 2009 deadline for performance. Therefore, the obligation never matured.

The court finds this argument weak. There is no evidence that one day would have made any difference in the Debtor's ability to perform under the C&D. The evidence indicates that the Bank's condition had steadily deteriorated during 2009. By the time the Bank C&D was terminated, the Debtor had already filed the chapter 11 petition.

---

[21] Actually, the Debtor MOU was effectively terminated on June 15, 2009 when the Bank MOU was replaced by the Bank C&D. The Debtor C&D was not issued until July 22, 2009.

39

The Committee also argues that the Bank C&D was terminated by the closing of the Bank on August 14, 2009 before the Debtor filed the chapter 11 petition on August 25, 2009.  This raises an interesting question.

Does section 365(o) apply to a commitment that can no longer be assumed and cured on the date of the petition because the insured depository institution is no longer operating?  The court holds that section 365(o) does not apply to such a commitment.

Section 365(o) contemplates a commitment that, on the date of the petition, can be assumed and cured:

> In a case under chapter 11 of this title, the trustee shall be <u>deemed to have assumed</u> (consistent with the debtor's other obligations under section 507), and <u>shall immediately cure any deficit</u> under, any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution, and <u>any claim for a subsequent breach of the obligations thereunder shall be entitled to priority</u> under section 507. <u>This subsection shall not extend any commitment that would otherwise be terminated by any act of such agency</u>.

11 U.S.C. § 365(o) (emphasis added).  Section 365(o) contemplates that after the commitment is assumed and cured, it will continue in force.  This is evident because it provides that "any claim for a <u>subsequent</u> breach," will be entitled to priority under section 507.  *Id.* (emphasis added).  Further, the section makes clear that, in any event, section 365(o) does not extend any commitment "that would otherwise be terminated by any act of such agency."

In the instant case, the Debtor had no commitment that, on the date of the petition, could be assumed and cured and thereafter continue in effect.  With the closing and sale of the Bank, the purpose for the commitment could no longer be fulfilled, and performance under the

40

commitment was impossible.[22]  Therefore, section 365(o) does not apply to the Debtor's commitment.

To require a debtor to immediately pay a claim based upon a commitment that can no longer be assumed and cured would disrupt the ninth priority status accorded to such commitments by section 507(a)(9).[23] It would also deprive a debtor of the opportunity to proceed under chapter 11 at a time when such payment could no longer serve its purpose of aiding an operating insured depository institution.

The court concludes that 11 U.S.C. § 365(o) does not apply to a capital maintenance commitment where the commitment cannot be assumed and cured because the underlying depository institution is no longer operating.  To hold otherwise would ignore the statutory framework of the Code.   Congress intended to address claims based on such commitments under 11 U.S.C. § 507(a)(9).[24]

## Standing

The Debtor and the Committee contend that the FDIC does not have

---

[22]  The FDIC's termination of the Bank C&D on September 29, 2010 would appear to constitute a ministerial act based more on the realities of the situation than a substantive determination.

[23]  Such a payment would be more akin to damages for a breach than a payment to cure a deficit.

[24] The debtor has argued that any commitment was no longer enforceable after the bank closed on August 14, 2009.  The FDIC argues that this construction would effectively eviscerate section 365(o) because most bank failures occur before the holding company files chapter 11.   The court is not holding that, because the bank closed, there can be no claim for any prepetition breach of an enforceable commitment.  The court is holding merely that section 365(o) does not apply to such commitments, and any claim for a prepetition breach must be addressed through 11 U.S.C. § 507(a)(9).

41

standing to enforce the supervisory documents in this case. Indeed, the Federal Reserve has not filed a proof of claim in this case or joined in the FDIC's motion under § 365(o).

The Debtor argues that the FDIC is not a party to any of the regulatory agreements, and the FDIC is not the federal agency responsible for regulating a bank holding company. The FDIC is not purporting to act in its capacity in this action as a regulatory agency, but rather in its capacity as receiver for the Bank. As receiver, the FDIC's rights are limited to those held by the Bank, which do not include the right to enforce the terms of the agreements — to which the Bank was not a party. Nor has the FDIC shown that it has any private right of action against the Debtor by statute.

The FDIC argues that the Bank was an intended beneficiary of the Debtor's capital maintenance commitment and that the FDIC-Receiver succeeded to the failed Bank's rights of enforcement. The FDIC further argues that it is the party best positioned to enforce obligations that are unquestionably imposed for the protection and benefit of the FDIC's Deposit Insurance Fund.

Because of the holding in this case, the court need not decide the issue of standing under 11 U.S.C. § 365(o).

Conclusion

For the reasons stated above, the court holds that the Debtor did not make a commitment to a Federal depository institutions regulatory agency to maintain the capital of Colonial Bank within the meaning of 11 U.S.C. § 365(o). Even had the Debtor made a commitment to maintain the capital of the Bank, section 365(o) does not apply to such commitment because the Bank was no longer operating on the date of the petition. The court need not decide the issue of standing.

To the extent the FDIC seeks relief from the automatic stay under 11 U.S.C. § 362 predicated on a claim under § 365(o), the motion for relief

42

from stay is likewise due to be denied.

A separate order will enter granting the Debtor's motions for summary judgment on the FDIC's motions under 11 U.S.C. §§ 365(o) and 362.

Done this 1st day of September, 2010.

/s/ Dwight H. Williams, Jr.
United States Bankruptcy Judge