UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| THE COLONIAL BANCGROUP, INC., | Case No. 09-32303(DHW) |
| Debtor. | Hearing Date: November 4, 2010<br>Objection Deadline: October 25, 2010 |

## MOTION OF THE FDIC-RECEIVER FOR AN ORDER MODIFYING THE AUTOMATIC STAY TO PRESERVE AND PERMIT EXERCISE OF SETOFF RIGHTS

In accordance with the scheduling order of this Court entered on September 13, 2010, the Federal Deposit Insurance Corporation, in its capacity as receiver for Colonial Bank, Montgomery, Alabama (the "FDIC-Receiver"), respectfully submits this renewed motion pursuant to 11 U.S.C. § 362(d) and Local Bankruptcy Rule 4001-3, for an order modifying the automatic stay in this chapter 11 case of the debtor and debtor-in-possession The Colonial BancGroup, Inc. (the "Debtor" or "Colonial BancGroup"), to the extent deemed applicable, (1) to permit the FDIC-Receiver to exercise its setoff rights against the balances held in certain demand deposit accounts upon the final determination of claims that are currently subject to litigation with the Debtor that is pending before the United States District Court for the Middle District of Alabama and (2) to preserve the status quo until such final adjudication has occurred.

## PRELIMINARY STATEMENT

1.      In a prior motion, the FDIC-Receiver sought relief from the automatic stay to authorize the FDIC-Receiver to exercise its setoff rights against the balances in certain demand deposit accounts that were established by the Debtor with its bank subsidiary, Colonial Bank, based on the FDIC-Receiver's claims under 11 U.S.C. §§ 365(o) and 507(a)(9). This Court denied that motion in a memorandum opinion entered on August 31, 2010 (as amended on

September 1, 2010), based on the Court's determination that the FDIC-Receiver had no claim under those provisions of the Bankruptcy Court to set off against the account balances.[1]

2.      In its decision on the prior motion, the Court did not reach other objections, and the Court expressly acknowledged that the FDIC-Receiver's right to pursue setoff against the account balances based on claims other than those asserted under sections 365(o) and 507(a)(9) of the Bankruptcy Code had been preserved by stipulation. *See* Am. Opinion, at 1 n.1; *see also* Stipulation and Scheduling Order for Proceedings with Respect to FDIC-Receiver Motions, entered on Mar. 16, 2010 [Doc. No. 633], ¶ 8.

3.      In its proof of claim, as amended, the FDIC-Receiver has asserted a number of claims against the Debtor other than its claims under sections 365(o) and 507(a)(9), and the amounts potentially recoverable with respect to those additional claims far exceed the $36 million balance that is now held in the disputed accounts. These claims include, among others, claims with respect to tax refunds potentially amounting to more than $250 million, claims with respect to the proceeds under certain insurance policies amounting to $25 million or more, and replacement claims under section 502(h) of the Bankruptcy Code potentially amounting to hundreds of millions of dollars. These "additional claims" are described in greater detail below. The Debtor has objected to the FDIC-Receiver's proof of claim, and that contested matter is pending in the district court in a matter that currently is scheduled for trial beginning in July 2011. *See* Uniform Scheduling Order entered on Aug. 9, 2010, *Colonial BancGroup, Inc. v. F.D.I.C.*, No. 2:10-cv-0409 (MHT) (M.D. Ala.) [Doc. No. 36].

4.      Notwithstanding its substantial obligations to Colonial Bank and the FDIC-Receiver, the Debtor has sought the authorization of this Court to use funds held in the disputed

---

[1] On September 13, 2010, the FDIC-Receiver filed a timely notice of appeal from the memorandum opinion and related orders. [Doc. No. 892]

deposit accounts to pay the fees of professionals in this bankruptcy case and may seek to distribute such funds in connection with a liquidating plan. The Debtor's use of such funds would, by itself, destroy the FDIC-Receiver's setoff rights with respect to the balances in the accounts.

5.     In seeking to use the disputed deposit balances, the Debtor has asserted that the administrative hold placed on the accounts by the FDIC-Receiver pending the determination of its setoff rights violates the automatic stay. This assertion ignores controlling Supreme Court authority to the contrary. *See Citizens Bank of Md. v. Strumpf*, 516 U.S. 16 (1995) (authorizing bank to place administrative hold on debtor's deposit accounts pending resolution of bank's setoff rights).

6.     In this motion, the FDIC-Receiver therefore seeks an order modifying the automatic stay provided under section 362 of the Bankruptcy Code, to the extent that it may be deemed to apply, to permit the FDIC-Receiver to enforce its setoff rights with respect to the disputed account balances upon a final determination of the parties' respective claims against one another in the pending district court proceedings and to preserve the status quo pending such final adjudication.

## JURISDICTION AND VENUE

7.     By order of the district court, the reference of jurisdiction to this Court has been withdrawn to the district court over all proceedings with respect to the Debtor's objection to the FDIC-Receiver's proof of claim.[2] *See Colonial BancGroup, Inc. v. F.D.I.C.*, No. 2:10-cv-0409 (MHT) (M.D. Ala.).

---

[2] By agreement of the parties, proceedings were referred again to this Court to the extent that they concern disputes between the Debtor and the FDIC-Receiver regarding certain real property located on Garland Avenue in Orlando, Florida, and improvements and claims against

8.     Also pending in the district court is an action against the FDIC-Receiver in which the Debtor seeks a *de novo* judicial determination with respect to its disallowed claims against the Colonial Bank receivership.  *See Colonial BancGroup, Inc. v. F.D.I.C.*, No. 2:10-cv-0198 (MHT) (M.D. Ala.).  Under the Federal Deposit Insurance Act, as amended, "no court shall have jurisdiction" over the matters at issue in that action other than as pursued through the receivership claims process set forth in that Act.  *See* 12 U.S.C. § 1821(d)(13)(D).

9.     Separately, under 12 U.S.C. § 1821(j), "no court may take any action . . . to restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver."  *See Gross v. Bell Sav. Bank*, 974 F.2d 403, 408 (3d Cir. 1992) (reversing injunction directing RTC to release deposit funds that were subject to an administrative hold pending determination of RTC setoff rights under 12 U.S.C. § 1822(d)); *see also Bank of America, N.A. v. Colonial Bank*, 604 F.3d 1239, 1243 (11th Cir. 2010) (section 1821(j) "has been interpreted broadly to bar judicial intervention whenever the FDIC is acting in its capacity as a receiver or conservator, even if it violates its own procedures or behaves unlawfully in doing so"); *RPM Investments, Inc. v. R.T.C.*, 75 F.3d 618, 622 (11th Cir. 1996) (*per curiam*).

10.     The FDIC-Receiver reserves all of its jurisdictional arguments.  Subject to the foregoing, subject matter jurisdiction for the motion arises under 28 U.S.C. § 1334.  The motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue for the motion is proper in this district under 28 U.S.C. § 1409.

---

third parties associated with that property.  *See Colonial BancGroup, Inc. v. F.D.I.C.*, Adv. Proc. No. 10-3019 (DHW) (Bankr. M.D. Ala.).

## BACKGROUND

### A.     BancGroup and Colonial Bank

11.     The Debtor is a Delaware corporation with its principal place of business in Montgomery, Alabama.  It was organized as a bank holding company and later elected to become a financial holding company.  Colonial Bank, also based on Montgomery, Alabama, was the Debtor's principal operating subsidiary and, according to the Debtor's Form 10-K dated March 2, 2009, accounted for "approximately 99.3% of BancGroup's consolidated assets."

12.     By order of the Alabama State Banking Department dated August 14, 2009, Colonial Bank was closed and the FDIC-Receiver was appointed its receiver.  Upon its appointment as receiver for Colonial Bank, the FDIC-Receiver succeeded by operation of law to "all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution."  12 U.S.C. § 1821(d)(2)(A).

13.     As of the closing date, the FDIC-Receiver, together with the FDIC in its corporate capacity, entered into a Purchase and Assumption Agreement dated as of August 14, 2009 (the "P&A Agreement") with Branch Banking & Trust Company ("BB&T"), under which BB&T purchased certain assets and assumed certain liabilities of Colonial Bank from the FDIC-Receiver.

14.     In a press release announcing the closing, the FDIC estimated that the loss to its Deposit Insurance Fund arising from the resolution of Colonial Bank would be approximately $2.8 billion.  As of March 2010, the amount of that estimated loss had been revised upward to $3.8 billion.  Before the closing, Colonial Bank's holding company – the Debtor here – disclosed that it was the target of a federal criminal investigation "relating to the Company's mortgage warehouse lending division and related alleged accounting irregularities" with respect to "more

than one year's audited financial statements and regulatory financial reporting." Colonial BancGroup, Inc. Form 8-K dated August 7, 2009.

15.     On August 25, 2009, the Debtor filed a voluntary petition for relief in this Court pursuant to chapter 11 of the Bankruptcy Code. The Debtor continues as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code but currently has no business operations or reasonable prospects of generating future revenue or reorganizing.

**B.     The Disputed Accounts**

16.     On September 18, 2009, the Debtor filed an emergency motion for entry of interim and final orders authorizing use of cash collateral and granting replacement liens (the "Cash Collateral Motion") [Doc. 87]. In the Cash Collateral Motion, the Debtor identified seven accounts that it asserts are demand deposit accounts in its name held by BB&T with account numbers ending in 1127, 5437, 5460, 5452, 5445, 3234 and 3218 (the "Accounts").

17.     The Debtor asserted at the time of the Cash Collateral Motion that the aggregate balances in the Accounts was $38,408,337.34. *See id.*, ¶ 9 & Exh. A. The balances as of August 25, 2009, according to the Debtors' Cash Collateral Motion, were as follows:

| Account No. | Aug. 25, 2009 Balance |
| --- | --- |
| XXXX3234 | $0.00 |
| XXXX1127 | 14,381,038.24 |
| XXXX5437 | 4,000,000.00 |
| XXXX5460 | 5,091,170.82 |
| XXXX5452 | 5,045,815.06 |
| XXXX5445 | 2,282,904.24 |
| XXXX3218 | 7,607,409.38 |

18.     In agreed interim and final orders with respect the Debtor's Cash Collateral Motion, the FDIC-Receiver consented to the Debtor's use of $1.425 million from the account with account number ending 1127, which the Debtor has identified as its former "operating account" (the "1127 Account"). [Doc. 128, 161, 199]. In a subsequent stipulated order entered

into in connection with the scheduling of proceedings relating to the FDIC-Receiver's prior motion for stay relief, the FDIC-Receiver consented to the release of an additional $500,000.00 from the 1127 Account. [Doc. No. 632].

19.     The balance in the 1127 Account is now $12,458,207.89. The balances of the other Accounts are unchanged. *See* Colonial BancGroup, Inc. Monthly Operating Report for August 2010, filed on September 20, 2010 [Doc. No. 903].

20.     All of the Accounts are "insured deposits" within the meaning of that term under 12 U.S.C. § 1822(d). While the standard maximum deposit insurance amount currently is $250,000, *see* 12 C.F.R. § 330.1(n), under FDIC regulations promulgated in connection with its Temporary Liquidity Guarantee Program ("TLGP"), this deposit insurance limit does not apply to "a depositor's funds in a noninterest-bearing transaction account maintained at a participating entity that is an insured depository institution . . . ." 12 C.F.R. § 370.4(a).

21.     In summer 2009, Colonial BancGroup established the accounts with account numbers ending 5437, 5460, 5452, 5445 and 3218 and moved cash into those accounts expressly to take advantage of the extension of FDIC deposit insurance that was provided for under TLGP regulations. *See* Statement of Facts, ¶ 20.[3]

22.     On August 14, 2009, the date of the closing of Colonial Bank, FDIC representatives on site at the bank placed an administrative hold on the 1127 Account. Even before the FDIC-Receiver placed that hold on the 1127 Account, all of the other Accounts were

---

[3] Citations to "Statement of Facts" refer to paragraphs within the Statement of Facts in Support of Motions of Federal Deposit Insurance Corporation, as Receiver, for Relief Under 11 U.S.C. §§ 362(d) and 365(o) and in Opposition to Debtor's Motion for Summary Judgment, filed under seal in this case on May 17, 2010. *See* Notice of Filing Documents Under Seal dated May 17, 2010 [Doc. No. 715]. The Statement of Facts and the evidentiary materials supporting the statement of facts are incorporated herein by reference.

already subject to account holds that had been placed on them by Colonial Bank. Those holds were continued by the FDIC-Receiver after the closing date. *See* Statement of Facts, ¶ 21.

23. In an email sent on August 17, 2009, a representative of the FDIC-Receiver formally notified BB&T that the FDIC-Receiver had placed an administrative hold against 68 separate deposit accounts for various depositors, including all six of the active Accounts in the name of Colonial BancGroup, Inc. On October 6, 2009, the same representative of the FDIC-Receiver sent a follow-up email to BB&T confirming that the FDIC-Receiver had placed an administrative hold as to 119 accounts, including all six of the active Accounts that were in the name of Colonial BancGroup, Inc.[4] *See* Statement of Facts, ¶ 22.

24. The Debtor does not dispute that all of the Accounts have been subject to an administrative hold at the direction of the FDIC-Receiver since the date of the closing of Colonial Bank. *See* Cash Collateral Motion, ¶ 11.

25. All of the Accounts were subject to Colonial Bank's policies, rules and regulations for depository accounts. Those rules and regulations included the following provision, which BancGroup well understood it was subject to as a depositor with Colonial Bank:

> **Set Off.** You acknowledge that we have the right to set off any indebtedness which you owe us . . . without any further notice to or demand to you, whether the indebtedness or other obligations are now existing or hereafter arise. We may set off against the account any claim that we have against any one or more of the account owners on a joint account . . . without regard to the joint or several ownership of the funds on deposit to the account and without requirement that the claim be owed to us by all of the account owners rather than only some of them.
>
> To the fullest extent permitted by the Uniform Commercial Code, and other applicable law, you grant to us a security interest in all of your

---

[4] Neither of these notices listed the Account with account number ending 3234 as the subject of such a hold, probably because that Account had a balance of $0.00.

accounts in order to secure any indebtedness that you owe us, regardless of the source of funds in the accounts . . . . The security interest granted herein is consensual and is in addition to our right of set off.

Statement of Facts, ¶ 25.

26. The rules and regulations also included the following provision:

> **Other Restrictions on Withdrawals.** In the event of a controversy between you and any third party . . . or with us, such as a dispute over who has the right to make withdrawals from the account or who is the owner of the funds on deposit in the account, we may (but do not have to) refuse to allow certain withdrawals until we are satisfied that the dispute is resolved or the demand is withdrawn. <u>We will not be responsible for any damages you may suffer as a result of our refusal to allow you to withdraw money due to the dispute or demand</u>. . . .

Statement of Facts, ¶ 26 (emphasis added).

27. BB&T holds a security interest in certain funds in the Accounts pursuant to an Amended and Restated Security Agreement dated January 1, 2009 (the "<u>Security Agreement</u>"). The Debtor states that BB&T has asserted a secured claim in the Debtor's bankruptcy case for up to $24,027,299.50 against "portions of the Debtor's Deposits in the following Debtor Accounts: XXXXXX5437, XXXXX5460, XXXXXX5452, XXXXXX5445, and XXXXXX3218." Debtor Br. [Doc. 699] at 4.

28. According to the Debtor, BB&T does not assert any security interest in the 1127 Account. Further, the loans secured by the balances in these Accounts are also subject to security interests in underlying real estate collateral. As a result, it is likely that less than the full amount of the security interest claimed by BB&T in the Accounts other than the 1127 Account will be necessary to make it whole with respect to the relevant loans.

C. <u>The Debtor's Claims Against the FDIC-Receiver</u>

29. 12 U.S.C. § 1821(d), which is part of the Federal Deposit Insurance Act, as amended *inter alia* by the Financial Institutions Reform, Recovery & Enforcement Act of 1989

("<u>FIRREA</u>"), establishes an exclusive administrative claims process that must be followed by any person or entity holding a claim falling within its scope. Under 12 U.S.C. § 1821(d)(6), a claimant whose receivership claim has been disallowed may file an action in one of two specified federal district courts within 60 days after such a disallowance seeking a judicial determination of the disallowed claims. Other than as thus provided, however, "[n]o court shall have jurisdiction over" any claim that is subject to the claims process. *See* 12 U.S.C. § 1821(d)(13)(D).

30. On November 19, 2009, the Debtor filed a proof of claim with the Colonial Bank receivership. In its receivership claim, the Debtor asserted a variety of claims against the receivership and/or the FDIC-Receiver, including claims to the Accounts; tax-related claims, including claims to any tax refunds that may be received by the FDIC-Receiver; claims relating to $300 million in REIT preferred securities issued in 2007 by CBG Florida REIT Corp., a subsidiary of Colonial Bank, claims to recover capital contributions made by the Debtor to Colonial Bank as alleged fraudulent transfers, and many others.

31. In a letter dated January 6, 2010, the FDIC-Receiver notified the Debtor that its receivership claim had been disallowed. *See* 12 U.S.C. § 1821(d)(5). Thereafter, the Debtor sued the FDIC-Receiver in district court in an action seeking a judicial determination of its disallowed receivership claims. *See Colonial BancGroup, Inc. v. F.D.I.C.*, No. 2:10-cv-0198 (MHT) (M.D. Ala.). The FDIC-Receiver has filed an answer to the Debtor's amended complaint in that action, and a scheduling order has been entered that provides for proceedings leading up to a scheduled trial date in July 2011. The parties are engaged in discovery in that action.

### D. The FDIC-Receiver's Claims Against the Debtor

32. On November 30, 2009, the FDIC-Receiver filed a proof of claim in this chapter 11 case, and on February 19, 2010 the FDIC-Receiver filed an amendment to that proof

Case 09-32303    Doc 922    Filed 09/27/10    Entered 09/27/10 17:24:17    Desc Main
                 Document       Page 10 of 31

of claim. *See* Exhibits A, B.[5] The FDIC-R Proof of Claim details a number of substantial claims held by the FDIC-Receiver against the Debtor, all of which can be set off against the balances of the Accounts.

### 1. <u>Summary of Claims</u>[6]

33. The claims asserted in the FDIC-Receiver's proof of claim include, among other things, (1) claims for the deficit with respect to the Debtor's uncured capital maintenance commitment in the amount of approximately $900 million; (2) claims arising from consolidated tax returns filed by Colonial BancGroup as fiduciary for Colonial Bank, including future tax refunds likely to amount to substantially more than $100 million, which are the property of Colonial Bank as a matter of federal law but as to which the Debtor has purported to assert some interest; (3) a contingent claim for up to $300 million relating to a 2007 offering of REIT preferred securities by a subsidiary of Colonial Bank as to which the Debtor has asserted a claim against the FDIC-Receiver; (4) claims relating to the proceeds of insurance policies or the return of premiums that were paid for by Colonial Bank; (5) claims for any unlawful dividends or fraudulent transfers extracted by the Debtor from Colonial Bank during the five years prior to its closure; and (6) claims relating to ownership of real property located at 715 N. Garland Avenue, Orlando, Florida, the improvements and personal property related thereto, and the proceeds from a pending condemnation action with respect to that property.

---

[5] The proof of claim expressly noted the limitations on subject matter jurisdiction set forth in 12 U.S.C. § 1821. A defense of lack of subject matter jurisdiction cannot be waived. In setting forth in this motion the claims it has asserted against the Debtor, the FDIC-Receiver does not waive any arguments as to the proper court for litigation regarding the matters in dispute between the Debtor and the FDIC-Receiver.

[6] The proof of claim as a whole, and certain of the larger specific claims, are described in this section. In only discussing certain of its claims, however, the FDIC-Receiver is not waiving any of its claims against the Debtor as a valid basis for setoff against the balances in the Accounts.

## 2. Uncured Capital Maintenance Commitment

34.     In its memorandum opinion and order dated August 31, 2010, this Court granted summary judgment against the FDIC-Receiver with respect to its claim for enforcement of the Debtor's uncured capital maintenance commitment and held that the FDIC-Receiver had no claim based on such a commitment that could be set off against the balances of the Accounts. The FDIC-Receiver has appealed those rulings, which are not a subject of the current motion.

## 3. Tax Refunds and Other Tax-Related Assets

35.     The FDIC-Receiver also has claims against the Debtor arising from consolidated tax returns, and prepetition as well as anticipated claims for tax refunds, filed by the Debtor as agent and fiduciary for Colonial Bank and for tax related intercompany balances held by the Debtor that are the property of the FDIC-Receiver.  The FDIC-Receiver believes that federal income tax refunds owed to Colonial Bank are approximately $254 million and that state and local tax refunds also may be owing in addition to this amount.

36.     To the extent that the Debtor has asserted some property interest in tax refunds generated from the operations, income or losses of Colonial Bank, such an assertion is contrary to applicable law.  Those refunds are owned to Colonial Bank and the FDIC-Receiver as its receiver.  *See, e.g., Capital Bancshares, Inc. v. F.D.I.C.*, 957 F.2d 203, 210 (5th Cir. 1992) ("[t]he refund is the property of the [subsidiary], which could have generated the refund on its own had it filed with the IRS as a separate entity" and therefore the FDIC as receiver of the subsidiary was entitled to the tax refunds attributable to the losses of the subsidiary); *Western Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp.)*, 473 F.2d 262, 265 (9th Cir. 1973).

37.     In other proceedings, the Debtor has asserted that an unsigned, undated putative internal tax policy alters the *Bob Richards* rule in the case of Colonial Bank.  The document

pointed to by the Debtor is not an "agreement" that in any way alters application of the *Bob Richards* rule.[7] *See, e.g., F.D.I.C. v. Brandt (In re Florida Park Banks, Inc.)*, 110 B.R. 986, 989 (Bankr. M.D. Fla. 1990); *see also* 12 U.S.C. § 1823(e)(1).

38.     Nevertheless, even if the Debtor were to prevail in its argument that the unsigned tax allocation policy alters the *Bob Richards* rule in this case, then the result would not be a disallowance of the FDIC-Receiver's claim for tax refunds.   Instead, the Debtor's argument would merely recast the parties in a debtor-creditor relationship with respect to tax-related assets, and the FDIC-Receiver would have a claim against the Debtor for breach of contract or breach of duty for the full amount of tax refunds based on taxes paid or losses sustained by Colonial Bank that are received by the Debtor from taxing authorities and that are not paid over to the FDIC-Receiver as the successor to Colonial Bank (in addition to any claims arising from intercompany balances or transactions related to taxation).

39.     The parties have agreed that any tax refunds received by either of them will be deposited into an escrow account pending a final determination of ownership by a court of competent jurisdiction.   *See* Stipulation and Order Regarding Establishment of Segregated Account for Tax-Related Payments, entered on March 10, 2010 [Doc. No. 621].   However, the

---

[7] As a matter of federal banking law no such "agreement" could alter the *Bob Richards* rule for a bank holding company such as the Debtor.  *See* Interagency Policy Statement on Income Tax Allocation In A Holding Company Structure 63 Fed. Reg. 64757 (Nov. 23, 1998) (the "Policy Statement").   In the Policy Statement, the agencies stated that tax sharing arrangements among the members of a bank's or thrift's consolidated tax group "should result in no less favorable treatment to the [insured depository] institution than if it had filed its income tax return as a separate entity." *Id.* at 64757.  Consistent with pre-existing law discussed above, the Policy Statement provided that "a parent company that receives a tax refund from a taxing authority obtains these funds *as agent for the consolidated group* on behalf of the group members." *Id.* at 64759 (emphasis added).   As a result, a tax sharing agreement for a bank or thrift holding company group "*should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent.*" *Id.* (emphasis added).

Case 09-32303    Doc 922    Filed 09/27/10    Entered 09/27/10 17:24:17    Desc Main
                  Document        Page 13 of 31

existence of the escrow account does not alter the FDIC-Receiver's right to setoff against the Account balances to the full extent of any claim it may have against the Debtor with respect to tax refunds.

### 4. REIT Preferred Securities

40.     On May 22, 2007, CBG Florida REIT, an indirect subsidiary of Colonial Bank, sold 300,000 shares of fixed-to-floating rate perpetual non-cumulative preferred stock with a liquidation preference of $1,000.00 per share.  Shares of the REIT preferred stock were subject to conditional exchange into shares of preferred stock issued by Colonial BancGroup under certain circumstances.

41.     On August 10, 2009, the FDIC, in its regulatory capacity, notified Colonial Bank that an exchange event had occurred.  In accordance with the operative documents, the conditional exchange of the REIT preferred stock into preferred stock of Colonial BancGroup occurred automatically at 8 a.m. New York time on August 11, 2009.  All of the REIT preferred stock then was contributed to Colonial Bank.

42.     Such a contribution to Colonial Bank in those circumstances was contemplated expressly under the operative documents for the REIT preferred stock offering.  The exchange and contribution requirements were added at the insistence of federal bank regulators and agreed to by Colonial BancGroup in order to obtain regulatory approval for the offering and for the proposed treatment of the REIT preferred stock as Tier 1 capital of Colonial Bank.

43.     The Debtor has asserted a claim against the FDIC-Receiver for recovery of the REIT preferred stock or its value.  The Debtor also has asserted that its contribution of the REIT preferred stock to its wholly owned subsidiary Colonial Bank is subject to avoidance.  This assertion is incorrect as a matter of law.  *See, e.g.,* 12 U.S.C. § 1828(u).  Nevertheless, if the Debtor succeeds in any respect on its claims against the FDIC-Receiver with respect to these

Case 09-32303    Doc 922    Filed 09/27/10    Entered 09/27/10 17:24:17    Desc Main
Document      Page 14 of 31

issues, then the FDIC-Receiver is entitled to reimbursement from the Debtor to that extent and further is entitled to a replacement claim pursuant to section 502(h) of the Bankruptcy Code to the full extent of any avoidance.

44.     Although currently contingent and unliquidated, this claim against the Debtor could amount to as much as $300 million or more.

### 5.     Insurance Policy Proceeds

45.     The FDIC-Receiver has asserted claims against BancGroup for the proceeds under certain insurance policies that the FDIC-Receiver contends are the property of Colonial Bank or the FDIC-Receiver as its statutory successor in interest.  These policies include without limitation, the Federal Insurance Company Financial Institution Bond Form A and Form B (81158390 DFI, 81910594 DFI), the Federal Insurance Company Financial Institution Electronic and Computer Crime Policy (81260198 DFI), the Federal Insurance Company Financial Institution Portfolio Policy (7144-2614), the National Union Fire Insurance Company of Pittsburgh, Pa. Excess Insurance Policy (01-384-68-10), the Allied World Assurance Company, Ltd. All Products Excess Follow Form Policy (C010937/001), the Federal Insurance Company Employee Benefits Liability Policy (if different than the preceding), the Westchester Surplus Lines (ACE) Umbrella Liability Policy (G21984875004), and the Ohio Casualty Insurance Company Excess Liability Policy (ECO (10) 52 50 38 01).

46.     The Debtor has disputed the FDIC-Receiver's assertion of ownership of such insurance policy proceeds and has claimed that any recovery under the applicable insurance policies are its property and that the FDIC-Receiver is merely a creditor with respect to such amounts even if based on losses suffered by Colonial Bank.  The FDIC-Receiver disputes these assertions and reserves all of its rights with respect to them.

Case 09-32303    Doc 922    Filed 09/27/10    Entered 09/27/10 17:24:17    Desc Main
Document    Page 15 of 31

47.      In the event that the Debtor prevails on any of its arguments, however, then the FDIC-Receiver will have damages for the full amount of insurance proceeds that may be recovered by, paid to, or withheld by BancGroup in respect of losses suffered by Colonial Bank, in an amount up to $25,000,000 or potentially more depending on the bond policies that may be implicated by such actions and in an amount up to an additional $35,000,000 or potentially more depending on the directors and officers liability insurance policies that may be implicated by such actions.

### 6.      Other Replacement Claims

48.      As mentioned above, in its receivership claim and in the district court action seeking a *de novo* judicial determination of that claim, the Debtor has asserted other avoidance claims against the FDIC-Receiver amounting to $899 million based on capital contributions that were allegedly made by the Debtor to its wholly owned subsidiary Colonial Bank between 2007 and 2009.  *See* Amended Complaint, *Colonial BancGroup, Inc. v. F.D.I.C.*, No. 2:10-cv-0198 (MHT) (M.D. Ala.) (attached hereto as Exhibit C).  The FDIC-Receiver believes these claims are meritless and intends to defend against them vigorously.  However, in the event that the Debtor prevails on any aspect of these avoidance claims, then the FDIC-Receiver will have a general unsecured replacement claim against the Debtor under section 502(h) of the Bankruptcy Code for the full amount of any recovery with respect to these claims.

### E.      Procedural Background

49.      On September 18, 2009, the Debtor filed its emergency Cash Collateral Motion on essentially three days' notice seeking interim and final orders authorizing use of cash collateral held in the Accounts.  The FDIC-Receiver objected to that motion on various grounds.  Ultimately, the FDIC-Receiver agreed to orders authorizing the release of $1.425 million from

the Accounts for payment of professional fees and other administrative expenses of the Debtor's estate.

50.     On October 5, 2009, the FDIC-Receiver filed an emergency motion for an order modifying the automatic stay to permit the FDIC-Receiver to exercise its setoff rights against the balances held in the Accounts.  [Doc. No. 156].  Although at the time the FDIC-Receiver's investigation of potential claims against the Debtor was ongoing, the motion sought authority to exercise setoff based on the FDIC-Receiver's substantial claim against the Debtor for the deficit under its commitment to maintain the capital of Colonial Bank, which under section 365(o) of the Bankruptcy Code the Debtor was deemed to have assumed as a condition to filing for relief under chapter 11.

51.     At a subsequent hearing on unrelated matters, counsel for the Official Committee of Unsecured Creditors (the "Committee") asserted that any hearing with respect to the FDIC-Receiver's motion should not consider conversion of this case to a chapter 7 liquidation based on the Debtor's failure to cure the substantial deficit under its capital maintenance commitment because the FDIC-Receiver had not filed a motion for relief under that section.  Accordingly, on November 5, 2009, the FDIC-Receiver filed a motion under section 365(o) to require the Debtor to immediately cure the substantial deficiencies that existed under its capital maintenance commitment or, in the alternative, to convert the case to a chapter 7 liquidation.  [Doc. No. 257]

52.     On January 22, 2010, the FDIC-Receiver amended its motion for relief under section 362(d) to make clear that the FDIC-Receiver's setoff rights were not limited to claims arising from the Debtor's failure to cure its capital maintenance commitment but extended to all of the FDIC-Receiver's claims, which had since the filing of the original motion been set forth in a protective proof of claim.  [Doc. No. 499].

53.     The Debtor and the Committee objected to expanding proceedings with respect to

the FDIC-Receiver's motion for relief under section 362(d) to address these "additional claims."

As a result, the parties agreed to the following stipulation in an agreed scheduling order that was

submitted to the Court on February 25, 2010:

> 8.     The FDIC-Receiver has asserted claims against the Debtor
> in its Amended Motion for an Order Modifying the Automatic Stay [Doc.
> 499] and in its proof of claim, as amended (the "Additional Claims") that
> are in addition to the FDIC-Receiver's claims based on the Debtor's
> alleged capital maintenance commitment that were described in the FDIC-
> Receiver's original motion for relief from the automatic stay.  The Debtor
> and the Committee stipulate that all of rights the FDIC-Receiver may
> have, if any, with respect to the Additional Claims shall be preserved
> notwithstanding the Court's determination with respect to the Stay Relief
> Motion.  On the basis of that stipulation, the FDIC-Receiver agrees that
> issues relating to the Additional Claims and any objections thereto shall
> not be the subject of the briefing or hearing schedule contained herein.

[Doc. No. 578].   The Court approved the stipulated scheduling order in an order entered on

March 16, 2010 [Doc. No. 633].

54.     As so limited, a hearing was held on May 26, 2010 with respect to the FDIC-

Receiver's motions for relief under section 362(d) and 365(o) of the Bankruptcy Code.   On

August 31, 2010, the Court issued a memorandum opinion and order granting the Debtor's

motion for summary judgment against the FDIC-Receiver's motion under section 365(o) of the

Bankruptcy Code on the ground that the documents identified in that motion did not constitute

commitments to maintain the capital of Colonial Bank within the meaning of that section.   The

Court also granted summary judgment for the Debtor against the FDIC-Receiver's motion for

relief from the automatic stay solely on the basis that the FDIC-Receiver did not have a claim

under section 365(o) of 507(a)(9) of the Bankruptcy Code that would allow setoff.   [Doc. No.

863, 864].[8]  The FDIC-Receiver has timely appealed from those decisions, and that appeal is pending.

55.    In its memorandum opinion, the Court noted the parties' stipulation that the FDIC-Receiver's setoff rights with respect to its other claims would not be addressed in connection with the motion, and the Court stated that it would "consider the stay motion in this opinion only as it relates to the relief requested by the FDIC under section 365(o)."  Mem. Opinion at 1 n.1.

56.    The Court held a status conference on September 13, 2010 with respect to this reserved issue.  At the hearing, counsel for the FDIC-Receiver proposed that the FDIC-Receiver file a new motion for relief from the automatic stay with respect to its claims other than those predicated on the Debtor's capital maintenance commitment.  On September 13, 2010, the Court entered a submission order requiring such a motion to be filed no later than September 27, 2010. [Doc. No. 895].

## RELIEF REQUESTED

57.    The FDIC-Receiver seeks an order pursuant to 11 U.S.C. §§ 362(d) and 553 modifying the automatic stay, to the extent it may be deemed to apply, (1) to permit the FDIC-Receiver to take such actions as shall be necessary, whether under the P&A Agreement or otherwise, to exercise its setoff rights against the funds held in the Accounts in partial satisfaction of the FDIC-Receiver's various claims, subject to the final determination of the

---

[8] On September 1, 2010, the Court filed an amended memorandum opinion that corrected certain typographical errors.  [Doc. No. 869]

Case 09-32303    Doc 922    Filed 09/27/10    Entered 09/27/10 17:24:17    Desc Main
Document    Page 19 of 31

parties' respective claims against one another in pending district court proceedings, and (2) to preserve the status quo pending such determination.[9]

ARGUMENT

**THE FDIC-RECEIVER IS ENTITLED TO MODIFICATION OF
THE AUTOMATIC STAY TO EXERCISE ITS SETOFF RIGHTS**

58.     The automatic stay should be modified to permit the FDIC-Receiver to exercise its setoff rights against the balances held in the Accounts and to preserve the status quo with respect to those rights until the parties claims against each other have been litigated to resolution.

59.     Under section 362(d)(1) of the Bankruptcy Code, upon request of a party in interest and after notice and a hearing, the Court shall grant relief from the automatic stay "for cause, including lack of adequate protection of any interest in property of such party in interest." 11 U.S.C. § 362(d)(1).   What constitutes "cause" is determined on the totality of the circumstances in a particular case.  *See Baldino v. Wilson (In re Wilson)*, 116 F.3d 87, 90 (3d Cir. 1997).

60.     "[T]he [automatic] stay is not meant to be indefinite or absolute, and in appropriate instances, relief may be granted."  *Izzarelli v. Rexene Prods. Co. (In re Rexene Prods. Co.)*, 141 B.R. 574, 576 (Bankr. D. Del. 1992) (citing *Wedgewood Inv. Fund Ltd. v. Wedgewood Realty Group Ltd. (In re Wedgewood),* 878 F.2d 693, 697 (3d Cir. 1989)).

**A.     The FDIC-Receiver Has Valid Setoff Rights**

61.     As the United States Supreme Court has observed, the right of setoff is the right not to part with one's own funds.  *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 21 (1995).   A

---

[9] The FDIC-Receiver does not seek to setoff against the portion of the Account balances that secure the Debtor's obligations under the Security Agreement.   The FDIC-Receiver understands that BB&T does not assert any secured claim against the balance in the 1127 Account and further understands that substantially less than the full balances in the other Accounts will be needed as collateral under the Security Agreement.

creditor holding a right of setoff is said to be "the best secured of creditors" because his "security" is "his own justified refusal to pay[.]" *United States v. Munsey Trust Co.*, 332 U.S. 234, 240 (1947). As a result, there is "practically a presumption in favor of allowing setoff" where such rights exist under applicable non-bankruptcy law. *Carlton Co. v. Jenkins (In re Jenkins)*, No. 03-60548, 2004 WL 768574, at *3 (Bankr. S.D. Ga. Mar. 30, 2004) (citing *S.E.C. v. Elliott*, 953 F.2d 1560, 1572 (11th Cir. 1992)).

62.  "The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the 'absurdity of making A pay B when B owes A.'" *Strumpf*, 516 U.S. at 18. The Bankruptcy Code does not disturb a creditor's right to setoff if such right arose under non-bankruptcy law prior to the filing of a petition. *See* 11 U.S.C. § 553(a) (Bankruptcy Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against the claim of such creditor that arose before the commencement of the case").

63.  A deposit is a form of debt, not an asset, and there is no dispute that a bank may offset a depositor's liability against that debt both under nonbankruptcy law and in bankruptcy. *Strumpf*, 516 U.S. at 21 (deposit "consists of nothing more or less than a promise to pay, from the bank to the depositor . . ." and bank's administrative hold pending stay relief motion did not violate section 362 of the Bankruptcy Code) (citing *Bank of Marin v. England*, 385 U.S. 99, 101 (1966) ("The relationship of bank and depositor is that of debtor and creditor, founded upon contract.")). In this case, the FDIC-Receiver has two separate grounds for exercising setoff against the balances in the Accounts under applicable non-bankruptcy law.

Case 09-32303    Doc 922    Filed 09/27/10    Entered 09/27/10 17:24:17    Desc Main
Document    Page 21 of 31

64.     *First*, 12 U.S.C. § 1822(d) provides the FDIC-Receiver with what courts have recognized to be a statutory right of setoff against any portion of a depositor's insured deposits with a failed bank to the extent required "to provide for the payment of any liability of [the] depositor to the" failed institution.[10]  *See Villafane Neris v. Citibank, N.A.*, 845 F. Supp. 930, 934 (D.P.R. 1994) (collecting cases); *see also Gross*, 974 F.2d at 408; *Northern Trust Co. v. F.D.I.C.*, 619 F. Supp. 1340, 1342 (W.D. Okla. 1985).

65.     The Accounts at issue here are insured deposits that are subject to the FDIC-Receiver's setoff rights under section 1822(d).  While the standard maximum deposit insurance amount currently is $250,000, *see* 12 C.F.R. § 330.1(n), under FDIC regulations, this deposit insurance limit does not apply to "a depositor's funds in a noninterest-bearing transaction account maintained at a participating entity that is an insured depository institution . . . ." 12 C.F.R. § 370.4(a).  The Accounts at issue here fall within this exception.

66.     *Second*, and in addition, the FDIC-Receiver is entitled to setoff under applicable state law as the statutory successor to "all rights, titles, powers and privileges" of Colonial Bank. *See* 12 U.S.C. § 1821(d)(2)(A).  Under Alabama law:

> [a] bank customer's deposit in a banking account becomes a debt from the bank to the customer.  When . . . mutual debts exist . . . the bank may, when the [the debt owed by the depositor] matures, apply the money it owes the depositor towards the depositor's debt to the bank.  *Rainsville Bank v. Willingham*, 485 So.2d 319 (Ala. 1986).

---

[10] Section 1822(d) provides:

> The [FDIC] may withhold payment of such portion of the insured deposit of any depositor in a depository institution in default as may be required to provide for the payment of *any liability of such depositor to the depository institution in default or its receiver*, which is not offset against a claim due from such depository institution, pending the determination and payment of such liability by such depositor or any other person liable therefor.

12 U.S.C. § 1822(d) (emphasis added).

*In re Patterson*, 967 F.2d 505, 510 (11th Cir. 1992). Like every other debt owed to a debtor, a deposit is subject to setoff within the parameters set forth in the Bankruptcy Code.

67.     The Debtor understood that the Accounts would be subject to setoff when it established them. Indeed, Colonial Bank's rules and regulations for such accounts expressly included the following provision:

> **Set Off.** You acknowledge that we have the right to set off any indebtedness which you owe us . . . without any further notice to or demand to you, whether the indebtedness or other obligations are now existing or hereafter arise. We may set off against the account any claim that we have against any one or more of the account owners on a joint account . . . without regard to the joint or several ownership of the funds on deposit to the account and without requirement that the claim be owed to us by all of the account owners rather than only some of them.
>
> To the fullest extent permitted by the Uniform Commercial Code, and other applicable law, you grant to us a security interest in all of your accounts in order to secure any indebtedness that you owe us, regardless of the source of funds in the accounts . . . . The security interest granted herein is consensual and is in addition to our right of set off.

Statement of Facts, ¶ 25.

68.     The FDIC-Receiver is entitled to protect these nonbankruptcy setoff rights, which section 553 of the Bankruptcy Code expressly preserves. *See* 11 U.S.C. § 553(a). Under that section, a right to setoff otherwise existing under nonbankruptcy law is preserved in bankruptcy where: (1) a creditor holds a prepetition claim against the debtor; (2) the creditor owes a prepetition debt to the debtor; (3) the claim and the debt are mutual; and (4) the claim and the debt are valid and enforceable. 11 U.S.C. § 553; *see In re Akincibasi*, 372 B.R. 80, 84 (Bankr. M.D. Fla. 2007); *In re Nase*, 297 B.R. 12, 19 (Bankr. W.D. Pa. 2003). All of these criteria are satisfied.

69.     The alleged deposit liabilities that comprise the Accounts are a prepetition debt owed by Colonial Bank to the Debtor. Indeed, the FDIC-Receiver placed its administrative hold

on those accounts almost two weeks prior to the petition date, as the Debtor's Cash Collateral Motion recited. *See* Cash Collateral Motion, ¶ 11. Likewise, the FDIC-Receiver's many different claims against the Debtor arose prepetition.

70.　　The FDIC-Receiver's replacement claims are expressly deemed to be prepetition claims under the language of section 502(h) of the Bankruptcy Code. *See* 11 U.S.C. § 502(h) ("A claim arising from the recovery of property under section 522, 550, or 553 of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition"). Similarly, the decisions establish that the FDIC-Receiver's claims for income tax refunds and other tax-related assets are viewed as prepetition claims under the facts presented here. *See United States v. Carey (In re Wade Cook Fin. Corp.)*, 375 B.R. 580, 595-96 (9th Cir. B.A.P. 2007) (claims for tax refunds arising from application of NOL carrybacks were prepetition claims even though tax year ended post-petition). The FDIC-Receiver's claims to insurance proceeds are also based entirely on pre-petition wrongful acts that caused harm to Colonial Bank, giving rise to a right to payment under the applicable policies as of that time. The FDIC-Receiver's various other claims would be deemed prepetition under a similar analysis.

71.　　That certain of the FDIC-Receiver's claims were unliquidated, unmatured or even contingent as of the filing of the Debtor's chapter 11 petition does not prevent setoff. *See, e.g., Braniff Airways v. Exxon Co.*, 814 F.2d 1030, 1035 (5th Cir. 1987) ("setoff may be asserted in bankruptcy even though one of the debts involved is absolutely owing but not presently due when the petition is filed") (citing *In re Nickerson & Nickerson, Inc.*, 62 B.R. 83, 85 (Bankr. D. Neb. 1986)); *In re Morristown Lincoln-Mercury, Inc.*, 42 B.R. 413, 417-18 (Bankr. E.D. Tenn. 1984) ("§ 553 does not prohibit setoff of a creditor's claim arising pre-petition, unliquidated or

unmatured as of the petition date, against a debtor's pre-petition claim"")); *Wade Cook Fin. Corp.*, 375 B.R. at 595-96 (income tax refunds); *In re Glenn*, 207 B.R. 419 (Bankr. E.D. Pa. 1997); *In re Rozel Industries, Inc.*, 120 B.R. 944, 949 (Bankr. N.D. Ill. 1990).

72.     As the case law makes clear, setoff is available based on claims that are "absolutely owing," even if the amount of such claim is not determined or other steps to collection have not been completed until after the petition date.   All of the FDIC-Receiver's claims against the Debtor are "absolutely owing."   The decision in *Wade Cook* is illustrative. There, the Ninth Circuit bankruptcy appellate panel evaluated a debtor's claim for federal income tax refunds based on net operating losses that could not be calculated until its tax year ended after its petition date.   The appellate court held that the refund claim was a prepetition claim to the extent that it was based on prepetition events, even if the claim was unliquidated as of the debtor's petition date.   *See Wade Cook*, 375 B.R. at 595-96 (collecting citations).   In reaching this conclusion, the court noted, among other things, that "there is nothing in the definitions of 'debt' or 'claim' or in the provisions of § 553 requiring that an amount due must be computed before the bankruptcy petition date."   *Id.*

73.     Mutuality also is satisfied.   Contrary to arguments that have been advanced in earlier proceedings, under the P&A Agreement, BB&T did not assume liability for *all* deposits of Colonial Bank but only for "Assumed Deposits," P&A Agreement, § 2.1(a), a defined term that expressly excludes "all or any portion of [Colonial Bank] deposit balances which, in the discretion of the Receiver or the Corporation . . . may be needed to provide payment of any

liability of any depositor to the Failed Bank or the Receiver . . ." P&A Agreement, at 4 (emphasis added) (*see* Statement of Facts, ¶ 11).[11]

74.     The carve-out in the P&A Agreement definition essentially tracks the language of section 12(d) of the Federal Deposit Insurance Act, codified at 12 U.S.C. § 1822(d), which provides:

> **Offsets against insured deposits**
>
> The Corporation may withhold payment of such portion of the insured deposit of any depositor in a depository institution in default as <u>may be required to provide for the payment of any liability of such depositor to the depository institution in default or its receiver</u>, which is not offset against a claim due from such depository institution, pending the determination and payment of such liability by such depositor or any other person liable therefor.

12 U.S.C. § 1822(d) (emphasis added).

75.     Section 9.5 of the P&A Agreement provides the means by which the FDIC-Receiver protects its setoff rights with respect to any deposit balance (or portion thereof). That provision states that the FDIC-Receiver may, "<u>[a]t any time</u>," "determine that all or any portion of any deposit balance . . . <u>does not constitute a 'Deposit'</u> . . . and may direct the Assuming Bank

---

[11] The definition of "Assumed Deposits" under the P&A Agreement reads: "'Assumed Deposits' means 'Deposits.'" P&A Agreement at 2. "Deposits" are, in turn, defined as follows:

> **"<u>Deposit</u>"** means a deposit as defined in 12 U.S.C. Section 1813(l), including without limitation, outstanding cashier's checks and other official checks and all uncollected items included in the depositors' balances and credited on the books and records of the Failed Bank; <u>provided, that</u> the term "Deposit" shall not include all or any portion of those deposit balances which <u>in the discretion of the Receiver</u> or the Corporation, (i) may be required to satisfy it for any liquidated or contingent liability of any depositor arising from an unauthorized or unlawful transaction, or (ii) <u>may be needed to provide payment of any liability of any depositor to the Failed Bank or the Receiver</u>, including the liability of any depositor as director or officer of the Failed Bank, whether or not the amount of the liability is or can be determined as of Bank Closing.

P&A Agreement at 4 (emphasis added).

[BB&T] to withhold payment of all or any portion of any such deposit," and may direct the Assuming Bank to "return all or any portion of such deposit balance to the Receiver . . ." *See* P&A Agreement, § 9.5.[12]

76.     In this case, the FDIC-Receiver suspected as of the closing date that it might have claims against the Debtor that it would want to set off against its deposit balances.  There is no dispute that before the petition date, the FDIC-Receiver placed a hold on the Accounts to preserve those rights while it investigated its potential claims.  *See* Statement of Facts, ¶¶ 22-23.  Indeed, the Debtor itself acknowledged as much when it filed its Cash Collateral Motion seeking use of those account balances only weeks into this bankruptcy case.  *See* Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral [Doc. 87] , ¶ 12 ( "The FDIC-Receiver attempts to justify the hold that it has placed on the Bank Accounts by contending that, as successor to Colonial Bank, it may have a claim against the Debtor and that it is authorized to offset that claim against funds on deposit in the Bank Accounts.").

---

[12] Section 9.5 of the P&A Agreement provides, in pertinent part:

> At any time, the Receiver or the Corporation may, in its discretion, determine that all or any portion of any deposit balance assumed by the Assuming Bank pursuant to this Agreement does not constitute a "Deposit" (or otherwise, in its discretion, determine that it is the best interest of the Receiver or Corporation to withhold all or any portion of any deposit), and may direct the Assuming Bank to withhold payment of all or any portion of any such deposit balance.  Upon such direction, the Assuming Bank agrees to hold such deposit and not to make any payment of such deposit balance to or on behalf of the depositor, or to itself, whether by way of transfer, set-off, or otherwise.  The Assuming Bank agrees to maintain the "withheld payment" status of any such deposit balance until directed in writing by the Receiver or the Corporation as to its disposition.  At the direction of the Receiver or the Corporation, the Assuming Bank shall return all or any portion of such deposit balance to the Receiver or the Corporation, as appropriate, and thereupon the Assuming Bank shall be discharged from any further liability to such depositor with respect to such returned deposit balance. . . .

P&A Agreement, § 9.5.

77.     Before the Debtor's petition date, a hold was in place and the FDIC-Receiver was taking steps to investigate whether all or a portion of the balances held in the Accounts should be excluded from the "Deposits" that were assumed by BB&T.  This motion merely requests modification of the automatic stay (to the extent the Court concludes the stay even applies) to allow the FDIC-Receiver to complete that process and exercise its established setoff rights against those balances.

## B.     "Cause" Exists to Modify the Stay

78.     Courts generally recognize that once a creditor has established a right of setoff, as the FDIC-Receiver has done here, that creditor also has made a prima facie showing of "cause" for relief from the automatic stay under section 362(d)(1).  *In re Ealy*, 392 B.R. 408, 414 (Bankr. E.D. Ark. 2008), *appeal dismissed*, 396 B.R. 20 (8th Cir. B.A.P. 2008); *Internal Rev. Serv. v. Orlinski (In re Orlinski)*, 140 B.R. 600, 603 (Bankr. S.D. Ga. 1991); *see also United States v. Gould (In re Gould)*, 401 B.R. 415, 426 (9th Cir. B.A.P. 2009); *In re Nuclear Imaging Systems, Inc.*, 260 B.R. 724, 730 (Bankr. E.D. Pa. 2000).

79.     In the absence of a showing of adequate protection, a creditor such as the FDIC-Receiver here is entitled to relief from the automatic stay to exercise its setoff rights.  *See In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1019 (11th Cir. 1984); *In re Blanton*, 105 B.R. 321, 337 (Bankr. E.D. Va. 1989).  Adequate protection is a form of relief afforded to creditors whose interest in the debtor's property is such that the passage of time or continuation of the debtor's business could cause prejudice to the creditor.  *See, e.g.*, *In re Engle*, 93 B.R. 58, 61 (E.D. Pa. 1987).  Adequate protection is provided as an alternative to relief from the automatic stay and, conversely, relief from the automatic stay is justified where a lack of adequate protection exists.  In short, adequate protection compensates a creditor for forebearing

on its right to seek relief from the stay. *Id.* The purpose of adequate protection is to insure the creditor receives the value for which he bargained before the debtor's bankruptcy. *In re Swedeland Development Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 376, 386 (Bankr. E.D. Pa.), *aff'd*, 75 B.R. 819 (E.D. Pa. 1987).

80.     Here, the FDIC-Receiver has received nothing in the way of adequate protection, either in the form of cash payments, a replacement lien, or other "indubitable equivalent." Relief from the automatic stay therefore is necessary and appropriate. *See In re King*, No. 08-10892, 2008 Bankr. LEXIS 1983 (Bankr. N.D. Ga. May 29, 2008) (allowing modification of stay to permit setoff where turnover of funds could not be granted because it would destroy right to setoff and leaving stay in place would accomplish nothing).

81.     Moreover, allowing the Debtor to use the account balances and therefore destroy the FDIC-Receiver's right to setoff while the parties' rights have not yet been finally adjudicated would effectively result in the use of the automatic stay as a sword to defeat the legitimate interests of the FDIC-Receiver, a result that the Bankruptcy Code does not contemplate. *See Bernstein v. IDT Corp.*, 76 B.R. 275, 281 (S.D.N.Y. 1987) ("To deny GD the assertion of properly pleaded counterclaims would allow the Trustee to use the stay as a sword instead of a shield."); *Continental Air Lines, Inc. v. Hillblom (In re Continental Air Lines, Inc.)*, 61 B.R. 758, 761 (S.D. Tex. 1986) ("the debtor is not entitled to rely upon the automatic stay or the inherent power of the bankruptcy court as a sword against the minority shareholders of the target corporation"); *Turner Broad. Sys., Inc. v. Sanyo Electric, Inc.*, 33 B.R. 996, 1000 (N.D. Ga. 1983) ("the stay is not designed to be an offensive weapon – a sword – which would permit the debtor to benefit unilaterally from the breaching of a post-bankruptcy petition contract").

82.     To the extent that is deemed to apply, therefore, relief from the automatic stay is appropriate, subject to the final adjudication in the district court proceedings of the parties' claims against one another.

## NOTICE

83.     Notice of this motion has been provided to those parties who have filed in this chapter 11 case a request for notice.  The FDIC-Receiver respectfully submits that no other or further notice need be provided.

## PRIOR REQUEST

84.     As discussed above, the FDIC-Receiver made a prior motion for relief under section 362(d) of the Bankruptcy Code to exercise its setoff rights against the Accounts.  By stipulation, the relief sought in this motion was expressly excluded from consideration in connection with proceedings on that prior motion.

## CONCLUSION

For the foregoing reasons, the FDIC-Receiver respectfully requests that the Court grant it relief pursuant to 11 U.S.C. § 362(d) modifying the automatic stay, to the extent it may be deemed to apply, (1) to permit the FDIC-Receiver to take such actions as shall be necessary, whether under the P&A Agreement or otherwise, to exercise its setoff rights against the funds held in the Accounts in partial satisfaction of the FDIC-Receiver's various claims, subject to the final determination of the parties' respective claims against one another in pending district court proceedings, and (2) to preserve the status quo pending such determination.

Dated: Montgomery, Alabama
      September 27, 2010

Of Counsel:

Kathryn R. Norcross
Senior Counsel

Jeffrey E. Schmitt
Counsel

Federal Deposit Insurance Corporation
3501 Fairfax Drive
Arlington, Virginia  22226
(703) 562-2429

Respectfully submitted,

  /s/ Michael A. Fritz, Sr.           
Michael A. Fritz, Sr.
michael@fritzandhughes.com
Fritz & Hughes LLC
7020 Fain Park Drive Suite 1
Montgomery, AL 36117
(334) 215-4422

John J. Clarke, Jr.
Thomas R. Califano
Jeremy R. Johnson
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York  10020-1104
(212) 335-4500

Attorneys for the
  Federal Deposit Insurance Corporation,
  as Receiver for Colonial Bank