UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re                                                Case No. 09-32303-DHW
                                                     Chapter 11
THE COLONIAL BANCGROUP, INC.,

             Debtor.

MEMORANDUM OPINION

The Federal Deposit Insurance Corporation, in its capacity as receiver for Colonial Bank ("FDIC"), Montgomery, Alabama, filed a renewed motion for relief from the automatic stay, to the extent deemed applicable, to permit the FDIC to exercise alleged setoff rights against the balances held in certain demand deposit accounts of The Colonial BancGroup, Inc. ("Debtor") at Branch Banking and Trust Company ("BB&T"). The FDIC further seeks to preserve the status quo with respect to those rights until the claims of the debtor and FDIC against each other have been litigated to resolution.[1]

The parties submitted the motion to the court based on stipulated facts with a joint appendix of exhibits, documentary evidence supporting each party's position on unstipulated facts, briefs, and oral arguments of the parties.[2]

_____

[1] Almost all of the litigation regarding claims between the debtor and the FDIC is pending in the district court. *See In re The Colonial BancGroup, Inc.*, No. 2:10-cv-0409 (MHT) (M.D. Ala.); *Colonial BancGroup, Inc. v. FDIC*, No. 2:10-cv-0198 (MHT) (M.D. Ala.); *Colonial BancGroup, Inc. v. FDIC*, No. 2:10-cv-0410 (MHT) (M.D. Ala.); *Colonial BancGroup, Inc. v. FDIC*, No. 2:10-cv-411 (MHT) (M.D. Ala.). One adversary proceeding is pending in the bankruptcy court: *Colonial BancGroup, Inc. v. FDIC*, Adv. Proc. No. 10-3019 (DHW) (Bankr. M.D. Ala.) (dispute over certain real property located in Orlando, Florida).

[2] The parties stipulated to the admissibility of the documentary evidence.

## Jurisdiction

The court's jurisdiction over this disputed matter is derived from 28 U.S.C. § 1334 and from an order of the United States District Court for this district referring jurisdiction of title 11 matters to the Bankruptcy Court. See General Order of Reference of Bankruptcy Matters (M.D. Ala. Apr. 25, 1985). This is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(G), extending this court's jurisdiction to the entry of a final order or judgment.

## Procedural History

The FDIC-Receiver filed the motion for relief from the automatic stay initially on October 5, 2009. The motion requested permission to offset the balances in the debtor's accounts against the FDIC's claim under 11 U.S.C. § 365(o).[3] Section 365(o) requires a chapter 11 debtor to cure any deficit under a commitment to maintain the capital of Colonial Bank. The FDIC also asserted a security interest in the debtor's accounts and contended that the debtor's inability to reorganize constituted grounds for the lifting of the stay. The FDIC later amended the motion to clarify that its setoff rights were not limited to its claim under 365(o) but extended to all of the claims set forth in the FDIC's proof of claim filed with the court.

By stipulation of the parties, the court ruled first on the FDIC's claim under 11 U.S.C. § 365(o). The court denied the claim, rendering the setoff issue moot as to that claim.

The FDIC then filed a renewed motion for relief from the automatic stay on September 27, 2010 asserting rights of setoff with respect to its other claims. The renewed motion does not assert a security interest in the accounts, and the motion does not assert inability to reorganize as a basis

---

[3] Section 365(o) requires a chapter 11 debtor-in-possession to assume and "immediately cure any deficit under . . . any commitment by the debtor to a Federal depository institutions regulatory agency . . . to maintain the capital of an insured depository institution . . . " 11 U.S.C. § 365(o).

2

for relief from the stay.

Stipulated Facts

The parties filed a joint stipulation of undisputed facts, which are adopted and summarized below.

Prior to August 14, 2009, the debtor was a bank holding company that owned Colonial Bank, and the debtor had seven deposit accounts at the bank. One deposit account, the debtor's operating account ("xxxx1127"), was established prior to July 2009. A second account was dormant, with a zero balance. In July 2009, the debtor established five additional demand deposit accounts with the bank.

Each of the accounts was subject to the provisions of Colonial Bank's "Rules and Regulations for Depository Accounts." The full balance credited to each of the accounts constituted an "insured deposit" within the meaning of applicable federal law.

On August 14, 2009, the Alabama State Banking Department closed Colonial Bank and appointed the FDIC as its receiver. Effective as of its appointment as receiver, the FDIC-Receiver, the FDIC, and BB&T entered into a Purchase and Assumption Agreement, Whole Bank, All Deposits, dated as of August 14, 2009 ("P&A Agreement").

The debtor filed a voluntary petition for relief under chapter 11 on August 25, 2009. As of the petition date, the aggregate balance in the accounts was $38,408,337.34.[4] Each of the accounts has been the subject

---

[4] The balances were as follows:

| | |
|---|---|
| Account No. XXXX3234 | $0.00 |
| Account No. XXXX1127 | 14,381,038.24 |
| Account No. XXXX5437 | 4,000,000.00 |
| Account No. XXXX5460 | 5,091,170.82 |

3

of an administrative hold at all times since at least August 17, 2009.[5] The administrative hold that was placed on the accounts remains in effect to date.

The FDIC has objected to the debtor's use of money in the accounts but has consented to the use of $531,450, $893,550, and $500,000 from the operating account, and BB&T has disbursed these amounts to the debtor. The balance in the operating account is now $12,458,207.89.

The parties dispute whether the seven accounts were assumed by BB&T under the P&A Agreement. However, the parties do not dispute the following.

Records relating to the accounts were transferred to BB&T in connection with the closing under the P&A Agreement and are in the possession of BB&T subject to the provisions of the P&A Agreement. At all times after the petition date, BB&T prepared and sent out monthly account statements for the accounts. After the petition date, the accounts were designated as "debtor-in-possession" accounts by BB&T.

Since the closing of Colonial Bank, BB&T has included the balances for the accounts in statistics included within its quarterly reports to the Securities and Exchange Commission and its shareholders and in its

| | |
|---|---|
| Account No. XXXX5452 | 5,045,815.06 |
| Account No. XXXX5445 | 2,282,904.24 |
| Account No. XXXX3218 | 7,607,409.38 |
| Total | 38,408,337.74 |

[5] Lesylee Hodge, for the FDIC, sent an email on the subject of a "preliminary account hold report" to Margaret Fletcher of BB&T on Monday, August 17, 2009, which was the first business day following the bank closing. Ms. Hodge sent a second email to Ms. Fletcher dated October 6, 2009, on the subject of the account hold.

4

quarterly Call Reports filed with bank regulators. In addition, since the closing of Colonial Bank, BB&T has included the balances of the accounts in calculating its deposit insurance premiums paid to the FDIC, and the accounts have been on the BB&T deposit platform.

BB&T filed a proof of claim in this case on November 30, 2009, asserting a secured claim in the amount of $24,027,229.50, the balances at the time in the accounts, excluding the operating account. BB&T asserts a security interest in the five accounts established in July 2009. BB&T alleges that the five accounts secure outstanding loans made by Colonial Bank and sold by the FDIC-Receiver to BB&T.

Counsel for BB&T stated in open court on May 26, 2010, as follows:

I want to be clear on the record that it is our position that these are assumed liabilities of BB&T. We have treated them like that since day one. They are our deposit accounts. We have had control since August 14th of those accounts.

Now, we acknowledge that the deposit accounts are subject to whatever contractual rights the FDIC has, just like all of the assets and liabilities that we have assumed, but, to-date, those rights have not been exercised.

So it is our position, and I don't think there is any dispute that BB&T is in control of these deposit accounts.

BB&T later stated in written pleadings that it does not believe the FDIC's motion for relief from the stay impacts BB&T's interest in the accounts, but BB&T acknowledges that the accounts are subject to whatever rights the FDIC may have under the P&A Agreement.

Since the closing of Colonial Bank, the FDIC has not directed BB&T to return any of the deposit balances held in the accounts pursuant to section 9.5 of the P&A Agreement, and BB&T has not returned the balances

5

of the accounts to the FDIC. The FDIC's position is that it has not provided such an instruction since the petition date because it expected that the debtor would assert that such a direction was a violation of the automatic stay. The FDIC-Receiver filed its original motion for relief from the automatic stay on October 5, 2009 and renewed the motion on September 27, 2010 for confirmation that it may provide such an instruction.

The FDIC prepared a proforma jacket in connection with the Colonial Bank receivership, which provides that certain accounts raising issues with the Office of Foreign Assets Control would not be assumed by BB&T.

Before the closing of Colonial Bank, Taylor, Bean & Whitaker Mortgage Corporation ("Taylor, Bean") maintained numerous demand deposit accounts with Colonial Bank. Under a letter agreement dated August 19, 2009 between BB&T and the FDIC, the parties acknowledged that the Taylor, Bean accounts were not "Assumed Deposits" as that term is defined by the P&A Agreement. Five days later, Taylor, Bean filed a voluntary petition for relief under chapter 11 in the Middle District of Florida.

Since the closing of Colonial Bank, BB&T and the FDIC have not executed a similar letter agreement with respect to the accounts of the debtor. The FDIC's position is that it has not asked BB&T to enter into such a letter agreement with respect to the accounts since the Petition Date because it expected that the debtor would assert that doing so was a violation of the automatic stay. By the instant motion, the FDIC seeks the court's confirmation that it may take whatever actions may be necessary to confirm that the accounts are not "Deposits" under the P&A Agreement.

Stipulations Regarding the Contentions of the Parties

The debtor contends that (a) effective as of the closing of Colonial Bank on August 14, 2009, the seven accounts constituted part of the "Assumed Deposits" assumed by BB&T under the P&A Agreement and were transferred to BB&T and became BB&T's deposits; and (b) effective

6

as of the closing of Colonial Bank and continuing to date, BB&T has controlled the accounts and remained responsible to the debtor for the accounts as a liability of BB&T.

The FDIC contends that the accounts are not "Assumed Deposits" because the definitions of "Deposits" and "Assumed Deposits" under the P&A Agreement expressly exclude any deposit balance that, in the discretion of the FDIC, "may be needed to provide payment of any liability of any depositor to the Failed Bank or the Receiver." In the Motion, the FDIC seeks authorization to confirm that the balances in the accounts are not, and never have been, "Assumed Deposits" under the P&A Agreement.

As stated above, BB&T claims a security interest in all of the accounts except the operating account. BB&T alleges that the accounts secure loans made by Colonial Bank and sold by the FDIC to BB&T. The loans are also secured by real property. The FDIC does not seek to offset against the portion of the account balances that secure the debtor's obligations to BB&T. BB&T has filed a motion for relief from stay to enforce its security interest in the accounts.

## Additional Documentary Evidence

The debtor and the FDIC submitted additional documentary evidence in support of their respective positions on the motion. A summary of that evidence follows.

### Deposition of Brent Hicks

Brent Hicks is the Senior Vice-President, Senior Finance Executive, Acquired Assets, for BB&T. He is a certified public accountant and worked as an accountant for thirteen years prior to working at Colonial Bank. He worked at Colonial Bank for four years before it closed. He testified in deposition regarding the assumption of Colonial accounts by BB&T.

Deposits held by one or two entities were not assumed by BB&T.

The OFAC ("Office of Foreign Asset Control") accounts were not assumed. The OFAC is an agency of the U.S. Treasury. The accounts total about $185,000 and remained with the FDIC. Hicks was not sure whether the accounts of Taylor, Bean & Whitaker were assumed. However, he testified to a document that removed the Taylor, Bean accounts from being deemed deposits to simply being held in trust. Those accounts were transferred to BB&T's trust department and held in "custodial" accounts. They were removed from the deposit system and retained by the FDIC. The intent was to segregate the accounts and protect them from inadvertent action.[6] They were not considered "deposits" for purposes of the P&A Agreement.

However, the debtor's accounts were assumed. The accounts were included as deposits in the P&A Agreement between the FDIC and BB&T. The FDIC would have paid BB&T an amount of money for assuming the deposits, and BB&T would have paid a deposit premium to FDIC. Neither of these payments has been reversed, and the FDIC has not asked BB&T to return any part of the deposits. Nor has BB&T returned any part of the deposits to the FDIC. At the FDIC's request, BB&T placed a legal hold on the accounts, and payments from the accounts have been made only with FDIC's permission.

The P&A Agreement, page 43, states on Schedule 2.1(a) that excluded deposit liability accounts are "[t]o be provided." To Hicks's knowledge, nothing titled Schedule 2.1(a) was ever provided. However, there were communications about the OFAC accounts and there was an agreement relating to the Taylor, Bean accounts.

---

[6] The Taylor, Bean & Whitaker accounts were originally included in a calculation of the deposit premium to be paid from BB&T to the FDIC as part of the purchase price of the assets. The premium was a percentage of the total deposits assumed. However, the calculation was adjusted to remove the Taylor, Bean & Whitaker accounts, thereby reducing the premium that BB&T would have paid to the FDIC.

8

The accounts of the debtor remain on the deposit platform of BB&T. BB&T began sending the debtor statements of its accounts in August 2009. The statements have continued despite the legal hold on the accounts. FDIC did not request BB&T to stop sending out the statements. The accounts have never been moved to custodial accounts in the bank's trust department, as were the Taylor, Bean accounts.

Hicks stated in deposition, "[T]he best way I know to say it is BB&T has been responsible for these deposits as a liability and believes that they were transferred to BB&T and that they are BB&T's deposits." Hicks Deposition, 79:8-13.

A pro forma jacket prepared by the FDIC reflects that, of the accounts of the same type as the debtor's, only the accounts of the OFAC were retained by the FDIC. No other non-interest bearing accounts, including those of the debtor, remained with the FDIC.[7] The Taylor, Bean accounts were of the same type as the debtor's accounts. The pro forma jacket was prepared in September 2009, after the August 2009 letter agreement with Taylor, Bean.

### Deposition of Timothy Rich

Timothy Rich has worked for the FDIC for 23 years. He has worked in several capacities for the FDIC, having been promoted to higher levels of responsibility over time. Between 1987 and 2008, he served in such capacities as a bank examiner, a senior examiner, a review examiner, and case manager. In December 2008, he became a senior examiner for large financial institutions. The senior examiner for large financial institutions is generally dedicated to a single bank, and Rich was responsible for all aspects of the examination program for Colonial Bank until it closed in August 2009.

---

[7] The debtor's accounts are noninterest-bearing checking accounts because they were established to be insured deposits.

The week of the bank's failure, he participated in internal discussions about the FDIC's putting a hold or a freeze on the bank accounts of the debtor. He probably spoke with his regional director. The debtor established an account with Sterling Bank with about a million dollars withdrawn from its accounts at Colonial Bank. The FDIC thought that the holding company's withdrawal of fully insured funds from Colonial Bank could prompt a liquidity run on the bank, should it become public knowledge. Rich spoke to the debtor's acting chief executive officer, and the debtor voluntarily closed the Sterling Bank account and moved the funds back to Colonial Bank.

Rich stated that it is also possible that he had discussions with his staff regarding the likelihood or advisability of freezing the debtor's deposits. The FDIC froze only one deposit account, the operating account, because the remaining accounts already had holds. The operating account was frozen on the day of the bank's closing. Rich made that decision in consultation with his regional director.

Rich's role as examiner in charge ceased on the day of the bank's closing. Therefore, Rich was not involved in subsequent decisions whether to permit the debtor to make withdrawals from the accounts.

Purchase and Assumption Agreement

The P&A Agreement defines "Assumed Deposits" as simply "Deposits." P&A Agreement, Article I, Definitions, p. 2. In turn, a "Deposit" is defined as follows:

> "Deposit" means a deposit as defined in 12 U.S.C. Section 1813(l), including without limitation, outstanding cashier's checks and other official checks and all uncollected items included in the depositors' balances and credited on the books and records of the Failed Bank; provided, that the term "Deposit" shall not include all or any portion of those deposit balances which, in the discretion of the Receiver or the

10

Corporation, (i) may be required to satisfy it for any liquidated or contingent liability of any depositor arising from an unauthorized or unlawful transaction, or (ii) may be needed to provide payment of any liability of any depositor to the Failed Bank or the Receiver, including the liability of any depositor as a director or officer of the Failed Bank, whether or not the amount of the liability is or can be determined as of Bank Closing.

P&A Agreement, Article I, Definitions, p. 4.

Section 9.5 entitled <u>Withheld Payments</u>, states in pertinent part as follows:

At any time, the Receiver or the Corporation may, in its discretion, determine that all or any portion of any deposit balance assumed by the Assuming Bank pursuant to this Agreement does not constitute a "Deposit" (or otherwise, in its discretion, determine that it is the best interest of the Receiver or Corporation to withhold all or any portion of any deposit), and may direct the Assuming Bank to withhold payment of all or any portion of any such deposit balance. Upon such direction, the Assuming Bank agrees to hold such deposit and not to make any payment of such deposit balance to or on behalf of the depositor, or to itself, whether by way of transfer, set-off, or otherwise. The Assuming Bank agrees to maintain the "withheld payment" status of any such deposit balance until directed in writing by the Receiver or the Corporation as to its disposition. At the direction of the Receiver or the Corporation, the Assuming Bank shall return all or any portion of such deposit balance to the Receiver or the Corporation, as appropriate, and thereupon the Assuming Bank shall be discharged from any further liability to such depositor with respect to such returned deposit balance.

P&A Agreement, Article IX, Continuing Cooperation, pp. 29-30. The P&A Agreement further provides that the assuming bank is liable to the FDIC for any funds paid in contravention of a "withheld payment" status in the event the FDIC requests the return of that deposit:

> The Assuming Bank shall be obligated to reimburse the Corporation or the Receiver, as the case may be, for the amount of any deposit balance or portion thereof paid by the Assuming Bank in contravention of any previous direction to withhold payment of such deposit balance or return such deposit balance the payment of which was withheld pursuant to this Section.

*Id.* at 30.

The P&A Agreement included a group of schedules. Schedule 2.1(a) bears the title "Excluded Deposit Liability Accounts." The schedule states as follows: "To be provided." The schedule is otherwise blank. P&A Agreement, Schedules, p. 43.

## 11 U.S.C. § 553

Relief from the automatic stay is required "to exercise a valid right of setoff." *B. F. Goodrich Employees Federal Credit Union v. Patterson (In re Patterson)*, 967 F.2d 505, 509 (11th Cir. 1992). "The decision whether to lift the stay lies in the sound discretion of the bankruptcy court." *Id.*

The FDIC filed the instant motion for relief from the automatic stay to exercise alleged rights of setoff against the balances held in the demand deposit accounts of the debtor at BB&T. The debtor contends that the stay should not be lifted because the FDIC does not have rights of setoff against the accounts.

Setoff is a creditor's right to cancel "mutual debts against one another in full or in part." *Patterson,* 967 F.2d at 508. "The purpose of setoff is to avoid 'the absurdity of making A pay B when B owes A.'" *Id.*

12

A creditor's right to setoff is strictly construed in a bankruptcy proceeding because the

> right to setoff is contrary to the Bankruptcy Code's dominant theme of equal treatment of creditors, because a setoff has the effect of paying one creditor more than another.[8]

11 U.S.C. § 553 controls the right of setoff in a bankruptcy case. Section 553(a) states as follows:

> (a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case . . . .

11 U.S.C. § 553 does not create a creditor's right to setoff.[9] *See Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995). The Bankruptcy Code merely preserves the right, with certain exceptions, where (1) the debts are mutual and (2) both debts arose prepetition.

"Substantive law, usually state law, determines the validity of the

_____

[8] *Charter Crude Oil Co. v. Exxon Co. (In re The Charter Co.)*, 103 B.R. 302, 305 (M.D. Fla. 1989) (citing Lessig Construction, Inc. v. Schnabel Associates, Inc., 67 B.R. 436, 441 (Bankr. E.D. Pa. 1986)), *rev'd on other grounds,* 913 F.2d 1575 (11th Cir. 1990). *See Official Comm. of Unsecured Creditors v. Mfrs. and Traders Trust Co. (In re Bennett Funding Group, Inc.)*, 212 B.R. 206, 212 (B.A.P. 2nd Cir. 1997) ("mutuality is strictly construed against the party seeking setoff").

[9] With certain exceptions not applicable here, the Bankruptcy Code "*does not affect* any right of a creditor to offset a mutual debt." 11 U.S.C. § 553(a) (emphasis added).

13

right." *Patterson*, 967 F.2d at 509. Under Alabama law, the debts are mutual if the debts are "'due from one party to the other in the same right.'" *Patterson,* 967 F.2d at 509 (quoting *King v. Porter*, 230 Ala. 112, 116, 160 So. 101, 104 (1935) and citing *First Nat'l Bank of Abbeville v. Capps*, 208 Ala. 207, 94 So. 109 (1922)).

### Origin of FDIC's Alleged Right to Setoff

The FDIC claims a right of setoff under both federal and state law. First, the FDIC asserts a statutory right of setoff under 12 U.S.C. § 1822(d), which provides as follows:

> The [FDIC] may withhold payment of such portion of the insured deposit of any depositor in a depository institution in default as may be required to provide for the payment of any liability of such depositor to the depository institution in default or its receiver, which is not offset against a claim due from such depository institution, pending the determination and payment of such liability by such depositor or any other person liable therefor.

12 U.S.C. § 1822(d). Second, the FDIC asserts a right of setoff under state law as the statutory successor to Colonial Bank.[10] Under Alabama law:

> A bank customer's deposit in a banking account becomes a debt from the bank to the customer. When the bank also lends money to the depositor, mutual debts exist, and the bank may, when the loan matures, apply the money it owes the depositor towards the depositor's debt to the bank. *Rainsville Bank v. Willingham*, 485 So.2d 319 (Ala.1986).

---

[10] Upon its appointment as receiver for Colonial Bank, the FDIC-Receiver succeeded by operation of law to "all rights, titles, powers, and privileges of the insured depository institution. . ." FDIC Brief, Doc. #922, p. 5 (quoting 12 U.S.C. § 1821(d)(2)(A)).

14

*Patterson*, 967 F.2d at 510.

Mutuality of obligation is a requirement for setoff under both the federal and state law described above. Although the word "mutual" is not used in section § 1822(d), it describes a situation where mutual debts exist. Likewise, under 11 U.S.C. § 553(a), only a mutual debt may be offset in bankruptcy.

## Summary of Arguments

The FDIC has asserted claims against the debtor which, as stated above, are the subject of pending litigation, primarily in the district court.[11] The issue *sub judice* is whether the FDIC, if successful in that litigation, will have the right to satisfy those claims by setoff against the balances in the debtor's accounts.[12] The debtor asserts that the FDIC does not have the right of setoff because the FDIC is not liable to the debtor for the deposits; BB&T is liable on the accounts. In other words, the debts are not mutual.

The FDIC makes two primary arguments. First, the FDIC states that BB&T did not assume the debtor's accounts under the P&A Agreement. Therefore, the FDIC remains liable to the debtor for the deposit balances. In the alternative, the FDIC contends that, even if BB&T assumed the accounts, the FDIC may yet assume the accounts and offset the debt under 11 U.S.C. § 553.

---

[11] The FDIC estimates in brief that its claims against the debtor total several hundred million dollars. The debtor has also asserted a variety of claims against the FDIC.

[12] The setoff issue needs to be decided before resolution of the claims litigation because the debtor needs cash from the accounts to continue to fund this chapter 11 case. The FDIC has objected to the debtor's use of the money in the accounts based on its alleged right of setoff.

15

Conclusions of Law
Assumption of the Accounts by BB&T

First, the FDIC contends that BB&T did not assume liability for the accounts. In support, the FDIC points to the definition of "Assumed Deposits" under the P&A Agreement. The term expressly excludes any deposit balance that, in the discretion of the FDIC, "may be needed to provide payment of any liability of any depositor to the Failed Bank or the Receiver." P&A Agreement, Article I, Definitions, p. 4.

However, although the FDIC had discretion to exclude the debtor's deposits from the operation of the P&A Agreement, there is no evidence that it did so – either at the time of the P&A Agreement or at any time before the debtor filed the chapter 11 petition. Schedule 2.1(a) to the P&A Agreement states merely that excluded deposit liability accounts are "[t]o be provided." No accounts were listed on the schedule, and there is no evidence that Schedule 2.1(a) was ever provided.

The deposition testimony reflects that all of the deposit accounts were assumed except for the OFAC accounts and possibly the Taylor, Bean accounts. This testimony is supported by the pro forma jacket and the letter executed by the FDIC and Taylor, Bean. No such letter was executed with the debtor.

Moreover, a plethora of stipulated facts show that BB&T assumed liability for the debtor's deposits under the P&A Agreement. As recited above, the FDIC transferred records related to the accounts to BB&T where they remain to date. At all times after the petition date, BB&T prepared and sent out monthly account statements for the accounts. After the petition date, the accounts were designated as "debtor-in-possession" accounts by BB&T. Since the closing of Colonial Bank, BB&T has included the balances for the accounts in statistics included within its quarterly reports to the Securities and Exchange Commission and its shareholders and in its quarterly Call Reports filed with bank regulators. In addition, since the closing of Colonial Bank, BB&T has included the balances of the accounts

in calculating its deposit insurance premiums paid to the FDIC, and the accounts have been on the BB&T deposit platform. BB&T has treated the accounts as their own since August 14, 2009, subject to whatever rights the FDIC may have under the P&A Agreement.

Based on the overwhelming evidentiary support, the court concludes that BB&T assumed liability for the debtor's accounts under the P&A Agreement with the FDIC dated August 14, 2009. Because BB&T and not the FDIC is liable for the amount of the debtor's deposits, the deposits cannot serve as a basis for setoff by the FDIC under 11 U.S.C. § 553.

When the FDIC was appointed as the receiver for Colonial Bank, the FDIC had liability for the debtor's accounts as fully-insured deposits. At that time, the FDIC had a right under 12 U.S.C. § 1822(d) to offset the mutual debt. However, when BB&T assumed liability for the deposits under the P&A Agreement dated August 14, 2009, mutuality ceased to exist.

The court concludes that the FDIC has no right of setoff against the deposits because they are not a debt of the FDIC. In other words, with respect to the deposits, the debts between the FDIC and the debtor are not mutual and cannot serve as the basis of a setoff under 11 U.S.C. § 553.

Effect of Freeze

Section 9.5 allows the FDIC to determine, in its discretion, that a deposit assumed by the "assuming bank" does not constitute a "deposit" and to direct the assuming bank to withhold payment of the deposit balance. The assuming bank must maintain the "withheld payment" status until directed in writing by the FDIC as to its disposition. If the FDIC requests the assuming bank to return a deposit balance, it must do so, and it is not relieved of liability to the depositor until the deposit is returned. If the assuming bank has paid any portion of the deposit contrary to a directive to withhold payment, the assuming bank is liable to the FDIC. P&A Agreement, Article IX, Continuing Cooperation, pp. 29-30.

17

Section 9.5 essentially allows the FDIC to "unwind" the assumption of a deposit by the assuming bank. However, the section makes clear that the liability of the assuming bank to the depositor is not discharged until the deposit balance is actually returned to the FDIC.

In the instant case, although the FDIC directed BB&T to withhold payment of the debtor's deposit balances,[13] the FDIC has not directed BB&T to return the balances of the accounts to the FDIC. Therefore, under section 9.5 of the P&A Agreement, BB&T's liability on the accounts has not been discharged, and the BB&T remains liable on the accounts.

When the FDIC relinquished liability on the accounts prepetition, the FDIC retained, by contract, the right to assume liability on the accounts at an undefined future date. However, a contractual right to assume a liability does not equate to the liability itself. At all times since the execution of the P&A Agreement, liability for the accounts has resided with BB&T.[14]

Postpetition Assumption by the FDIC

The FDIC contends that even if BB&T assumed the accounts under the P&A Agreement, the FDIC may yet assume the accounts and offset the debt under 11 U.S.C. § 553. In support, the FDIC points to section 9.5 of the P&A Agreement.

The FDIC states that it has not requested a return of the debtor's

---

[13] The directive to withhold payment was made prepetition.

[14] The debtor points to an inconsistency in the FDIC's position. The FDIC does not seek to setoff against the portion of the account balances that secure the debtor's obligations to BB&T. However, if BB&T's security interest is perfected by possession of the accounts, how can the FDIC acknowledge BB&T's possession of the accounts on the one hand but deny BB&T's liability on the accounts on the other?

18

accounts for concern it would be accused of violating the automatic stay imposed by 11 U.S.C. § 362(a). The FDIC requests that the stay be lifted so that it may request a return of the deposit balances and offset the debt under 11 U.S.C. § 553.

As stated above, the Bankruptcy Code preserves the right of setoff only where (1) the debts are mutual and (2) both debts arose prepetition. Even if the FDIC could achieve mutuality at this point in time by requesting a return of the debtor's accounts, the FDIC could not, within this universe of time and space, transform its postpetition assumption of the accounts into a prepetion debt.

The FDIC argues that the postpetition "transfer" or "reassignment" of the debtor's deposits would not violate 11 U.S.C. § 553(a). In support, the FDIC notes that while section 553 prohibits a creditor from offsetting a debt against a <u>claim</u> transferred to the creditor postpetition, it does not similarly prohibit a creditor from offsetting a <u>debt</u> incurred by that creditor postpetition.[15] *Compare* 11 U.S.C. § 553(a)(2)(A) *with* § 553(a)(3).

However, such a provision would be superfluous. Section 553(a) preserves the right of setoff only where both debts were incurred prepetition. A creditor who assumes a liability postpetition necessarily incurs a postpetition debt.[16]

---

[15] The FDIC states in brief: "In contrast with section 553(a)(2) of the Bankruptcy Code, which prohibits setoff based on a *claim* acquired by a creditor after the petition date, section 553(a)(3) does not prohibit setoff following the post-petition reassignment of obligations on a debt." FDIC Brief, Doc. #1009, p. 12.

[16] The FDIC seems to argue that because Colonial Bank's liability on the deposits was established prepetition, the liability remains a prepetition obligation as to any subsequent obligor. However, that is not the case. The FDIC had no liability on the accounts when the petition was filed, and if the FDIC assumes liability at this time, the FDIC will necessarily incur that liability postpetition.

19

The court concludes that, even if the FDIC implemented Section 9.5 of the P&A Agreement by requesting a return of the debtor's deposit balances, the debt incurred thereby would constitute a postpetition debt ineligible for setoff under 11 U.S.C. § 553.

## Conclusion

The FDIC has not shown the requirements for the exercise of setoff against the debtor's deposit balances.  The debt is not a mutual debt because the FDIC has no liability to the debtor on the accounts.  Further, if the FDIC were to incur liability on the accounts at this time, it would constitute a postpetition debt ineligible for setoff under 11 U.S.C. § 553. Because the FDIC has no right of setoff against the accounts, the FDIC's motion for relief from the automatic stay imposed by 11 U.S.C. § 362(a) is due to be denied.

The court is not unaware of the exigent circumstances surrounding the closing of a bank and the execution of a purchase and assumption agreement with another entity.[17]  The FDIC has aptly communicated the speed with which these transactions must occur in order to ensure the seamless operation of the banking system and the confidence of the general public.  There simply is not enough time for the FDIC to make a fully informed and considered decision regarding the deposits it retains. Provisions like section 9.5 of the instant P&A Agreement supply that needed margin of time.  Unfortunately for the FDIC, in the instant case, bankruptcy intervened.

However, the FDIC could have anticipated the financial distress and potential need for bankruptcy relief the debtor would experience on the demise of Colonial Bank.  The bank was the debtor's principal operating subsidiary and accounted for approximately 99.3% of the debtor's

---

[17]  Indeed, Colonial Bank closed on Friday, August 14, 2009 and reopened on Monday, August 17, 2009 under the name of BB&T.  The purchase and assumption agreement was dated as of August 14, 2009.

20

consolidated assets.[18]  The FDIC could also have anticipated that the bank would have claims against the debtor and that the right of setoff should be preserved, especially given the size of the debtor's deposits.  Retaining the deposits of the debtor, a parent and insider of the bank, long enough to make an informed decision, would not have threatened the public policy goals of the FDIC.

An order consonant with this memorandum will enter separately.

Done this 24th day of January, 2011.

/s/ Dwight H. Williams, Jr.
United States Bankruptcy Judge

c: C. Edward Dobbs, Attorney for Debtor
   John J. Clarke, Jr., Attorney for FDIC
   Brian D. Pfeiffer, Attorney for Committee
   Robert B. Rubin, Attorney for Committee

---

[18] FDIC Motion for Relief from Stay, Doc. #922, p. 5 (citing to the Debtor's Form 10-K dated March 2, 2009).