UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re                                          Case No. 09-32303-DHW
                                               Chapter 11
THE COLONIAL BANCGROUP, INC.,

    Debtor.


MEMORANDUM OPINION

The debtor filed a proposed second amended chapter 11 plan of reorganization on February 21, 2011, as amended on March 3, 2011. An evidentiary hearing on confirmation of the plan was held on May 11, 2011. For the reasons stated herein, confirmation of the plan will be denied.

Objections to the plan were filed by (1) Federal Deposit Insurance Corporation, as receiver for Colonial Bank, Montgomery, Alabama ("FDIC") (Doc. #1221); (2) Branch Banking and Trust Company ("BB&T") (Doc. #1219); (3) the Lead Plaintiffs in the consolidated securities class action entitled *In re Colonial BancGroup, Inc. Securities Litigation,* Civil Action No. 2:09-cv-00104 (RDP), pending in the United States District Court for the Northern District of Alabama (Doc. #1071); and (4) multiple individual shareholders of the debtor.

The debtor offered documentary evidence and the testimony of Kevin O'Halloran, chief recovery officer for the debtor, in support of the requirements for confirmation under 11 U.S.C. § 1129. The FDIC cross-examined the debtor's witness and offered documentary evidence in support of its objection. BB&T also cross-examined the debtor's witness. The objections filed by BB&T and the FDIC share several common grounds.

Classification of Claims

First, BB&T and the FDIC contend that the debtor has classified the claims of creditors in an effort to gerrymander an affirmative vote on the

plan. Specifically, the debtor has placed claims of general unsecured creditors in three separate classes: Class D (Convenience Claims), Class E (Certain General Unsecured Claims), and Class F (Indenture Claims). The claims of each of these classes are impaired, and the claimants are entitled to vote.

Classes D and F voted to accept the plan. Class E, which includes the claims of BB&T and FDIC, voted to reject the plan due to the dominance of the FDIC's dissenting vote.[1] BB&T also voted to reject the plan.

BB&T and the FDIC contend that the Indenture Claims should not be classified separately from the claims of other unsecured creditors. 11 U.S.C. § 1129(a)(1) provides that a plan must comply with the "applicable provisions of this title." 11 U.S.C. § 1122 governs classification of claims or interests and states as follows:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.
>
> (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

Therefore, for a plan to be confirmable, a plan may place a claim in a class only if the claim is substantially similar to the other claims comprising that class. The Eleventh Circuit has discussed the discretion given to a plan proponent to classify claims:

> Although the proponent of a plan of reorganization has considerable discretion to classify claims and interests

---

[1] The claim of the FDIC was estimated by the court at $308 million.

2

according to the facts and circumstances of the case, this discretion is not unlimited. "[T]here must be some limit on a debtor's power to classify creditors. . . . The potential for abuse would be significant otherwise." If the plan unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification scheme violates basic priority rights, the plan cannot be confirmed.

*Olympia & York Florida Equity Corp. v. Bank of New York (In re Holywell Corp.)*, 913 F.2d 873, 880 (11th Cir. 1990) (citations omitted).

Although the Code is silent on the issue of whether similar claims may be separately classified, courts have held that it is not permissible to separately classify similar claims in order to gerrymander an affirmative vote on the plan. The Fifth Circuit has stated:

We conclude that if § 1122(a) permits classification of "substantially similar" claims in different classes, such classification may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims.

*Phoenix Mutual Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1279 (5th Cir. Tex. 1991), *cert. denied,* 506 U.S. 821 (1992), and *cert. denied,* 506 U.S. 822 (1992).

BB&T and the FDIC contend that the Indenture Claims are substantially similar to the claims of other general unsecured creditors, as evidenced by the terms of the indentures and the plan itself. The indenture documents state that the debtor's obligations rank *pari passu* with and equivalent to the debtor's obligations to creditors holding unsecured claims. The plan defines "General Unsecured Claims" to include the Indenture Claims. Additionally, the plan proposes identical treatment to Classes E and F. Both classes will share *pro rata* in the same pool of assets. BB&T and the FDIC argue that "[g]iven that both classes of claims are

3

unsecured claims which will receive identical treatment under the Plan, the Debtor cannot provide a rational basis or economic justification for their separate classification." BB&T Objection (Doc. #1219), p. 14.

The debtor responds that separate classification of the Indenture Claims is warranted for many reasons. The Claims in Class F represent the claims of beneficial owners of interests in the 2003 Debenture Offerings, the Preferred Securities Offering, and the 2008 Debenture Offerings. There are over 700 claimants in this class, and the aggregate amount of their claims exceed $350,000,000. The creditors in this class far outnumber the creditors in Classes D and E (15 voting in Class D, and 30 voting in Class E). The debtor does not know the identity of the beneficial claimants in this class and communicates with them through a few Indenture Trustees. The debt instruments continue to be publicly traded.

The debtor contends that the claims of creditors in Class F are unique in many ways. The interests of the numerous claimants in Class F are linked together and governed by the documents pursuant to which the debentures and notes were issued. Their interests are served by a trustee, and there is a public market for the trading of their claims. Their claims are accorded a specific rate of interest. No other creditors share these characteristics.[2]

The debts are structured to involve intermediary Indenture Trustees, requiring different solicitation and distribution procedures. The plan establishes a distribution protocol exclusively for claims in this class requiring the continued involvement of the Indenture Trustees, including the establishment of successive Indenture Claims Record Dates and delegation to the Indenture Trustees of the debtor's obligation to make such distributions. In addition, the plan creates a mechanism unique to Class F for the payment of Indenture Trustee Fees. The plan further provides indemnification for the services of the Indenture Trustees, which

---

[2] The lease claim of Toyota has a specific rate of interest, but does not share the other characteristics mentioned.

4

services benefit the estate.

The debtor states that the indenture documents are ambiguous in that the contractual provisions could, under certain circumstances, make each of the debtor's indentures senior or junior in right of payment to each other. The debtor disclosed this ambiguity and discussed it at length in the Third Amended Disclosure Statement (Doc. #1111). The debtor addressed this concern by eliminating, through the plan, the contractual subordination provisions and by enjoining the exercise of such provisions. Therefore, acceptance of the plan by this class effectively releases potential litigation claims held by class members. The debtor did not think it appropriate for other classes of creditors, by their vote, to determine whether these potential claims should be released.

In summary, the debtor argues that the Indenture claimants "represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed." Debtor Brief, Doc. #1241, p. 48, quoting *John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assocs.*, 987 F.2d 154, 159 (3d cir. 1993). The court agrees. The Eleventh Circuit has stated that "the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case." *Holywell*, 913 F.2d at 880. The court concludes there has been no abuse of that discretion. The debtor has articulated legitimate reasons for the separate classification of the claims in Class F. The plan does not "unfairly" create too many or too few classes, "manipulate class voting," or violate "basic priority rights." *Id.* The court holds that the plan does not violate the provisions of 11 U.S.C. § 1122.[3]

---

[3] The FDIC also contends that Class D, the convenience class, is artificially impaired. The court need not address this issue in light of the holding that Class F is properly classified. At least one impaired class has accepted the plan.

5

## Feasibility

BB&T and the FDIC also contend that the plan is not feasible for several reasons. First, the FDIC asserts the debtor has not demonstrated the requirement of 11 U.S.C. § 1129(a)(11) that confirmation of the plan is not likely to be followed by the liquidation of the debtor. Specifically, the FDIC argues that if the court's ruling on its 11 U.S.C. § 365(o) motion is reversed on appeal, this case must be converted to a case under chapter 7. However, the FDIC has taken no action to stay the effect of the order pending appeal.

Second, BB&T and the FDIC contend that the debtor's ability to fund the plan is solely dependent on litigation, the outcome of which is uncertain. However, the plan as proposed is a liquidating plan and does not assume any particular litigation result. The plan merely provides for the distribution of whatever funds are recovered.

Third, BB&T and the FDIC assert that the case is administratively insolvent.[4] However, this assertion is predicated on the reversal of the court's ruling on the FDIC's claim under 11 U.S.C. § 365(o). As stated above, the FDIC has taken no action to stay the effect of that order.

## Best Interest

BB&T and the FDIC also assert that the plan is not in the best interest of creditors. 11 U.S.C. § 1129(a)(7) requires the debtor to prove, as a requirement of confirmation, that dissenting creditors will receive as much through the plan as they would receive in a hypothetical chapter 7 case. Specifically, that section states:

---

[4] The FDIC states that "[t]he Debtor cannot demonstrate that the Plan is feasible unless it creates an appropriate reserve for payment of administrative and priority claims." FDIC Brief, Doc. #1221, p. 9.

6

Case 09-32303   Doc 1260   Filed 05/20/11   Entered 05/20/11 16:29:51   Desc Main
Document      Page 6 of 13

With respect to each impaired class of claims or interests –
  (A) each holder of a claim or interest of such class –
    (i) has accepted the plan; or
    (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date fo the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date . . .

11 U.S.C. § 1129(a)(7). This provision is commonly known as the "best interests of creditors" test. BB&T and the FDIC contend that the plan does not meet this test.

First, they contend that, although the plan's distribution scheme is no different from what would occur in chapter 7, "the Plan contemplates significant administrative expenses to be incurred both by a plan trustee and a plan committee that would be far more burdensome to the estate than the statutory commissions that would be payable to a chapter 7 trustee in a converted case." FDIC Brief, Doc. #1221, p. 12.

In a case under chapter 7, a chapter 7 trustee is entitled to reasonable compensation for his services. 11 U.S.C. § 326(a). However, the Bankruptcy Code places a cap on that fee by establishing a maximum declining contingent fee predicated on the amount distributed to creditors. *Id*.

In contrast, the debtor proposes to compensate the plan trustee at an hourly rate of $525 per hour, and, in addition to that, the trustee will be paid an increasing contingent fee predicated on the amount distributed to creditors relative to the amount of their claims.[5] The trustee will not earn

---

[5] The plan states that the terms of compensation of the Plan Trustee will be "set forth in a retention agreement as negotiated by the Debtor, in consultation with the Case Committee." Second Amended Plan, Doc. #1104, p.

7

the right to the contingent fee until unsecured creditors have received 25% of their claims. Therefore, the smaller the amount of allowed claims in this case, the sooner the contingent fee will apply to distributions.

---

24. The retention agreement contains the following provisions regarding compensation:

> *7. Compensation of Plan Trustee and Agents of the Plan Trustee.* The Plan Trustee will be compensated at an hourly rate of $525 and the Plan Trustee's fees and expenses reimbursement will be paid on a monthly basis from Available Cash. The Debtor shall pay the Plan Trustee a contingency fee equal to (i) 5% of Distributions of Cash to the Holders of Allowed General Unsecured Claims after the aggregate of all prior Distributions in Cash have returned to such Holders a minimum of 25% of their respective Allowed General Unsecured Claims and (ii) 10% of Distributions of Cash to the Holders of Allowed General Unsecured Claims after the aggregate of all prior Distributions in Cash have returned to such Holders a minimum of 40% of their respective Allowed General Unsecured Claims. The fees and expenses of the Plan Trustee shall constitute Post-Confirmation Administrative Expenses and shall be paid from available funds in the Expense Reserve. Any Post-Confirmation Professionals retained by the Debtor or Plan Trustee shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from available funds of the Estate.

Retention Agreement, Doc. #1248, pp. 3-4.

> In contrast, a chapter 7 trustee will only be entitled to compensation based on a percentage of disbursements made in the case – up to 25% of the first $5,000 or less, 10% of any amount in excess of $5,000 but less than $50,000, 5% of any amount in excess of $50,000 but less than $1 million, and up to 3% of amounts in excess of $1 million.

FDIC Brief, Doc. #1221, p. 12.

8

The proposed compensation to the plan trustee adds to the statutory chapter 7 compensation not only an additional component, an hourly rate, but an additional variable – the amount of allowed claims. The amount of allowed claims in this case is not certain at this point in time. Although the claims bar date has long passed, there are potential replacement claims that may yet arise if the debtor is successful in its avoidance actions. *See* Fed. R. Bankr. P. 3002(c)(3).

The debtor offered an exhibit outlining one scenario under which compensation to the plan trustee would not exceed the compensation to a chapter 7 trustee. The exhibit assumes that the FDIC will have a $300 million replacement claim in this case. However, if that claim does not materialize, the plan trustee's fee, under the same scenario, would exceed a chapter 7 trustee's maximum fee by almost double.[6]

BB&T and the FDIC also argue that "the plan trustee and the plan committee formed pursuant to the Plan will be entitled to hire professionals

---

[6] Assuming that the allowed claims total $400 million, and assuming that $300 million is distributed to creditors, a chapter 7 trustee would receive a maximum compensation of $9,023,250. In contrast, the plan trustee would receive $17 million, not counting his hourly rate.

Chapter 7 Trustee

| | |
|---|---:|
| 25% on the first $5,000 or less disbursed | 1,250 |
| 10% on amounts over $5,000 but not in excess of $50,000 | 4,500 |
| 5% on amounts over $50,000, but not in excess of $1 million | 47,500 |
| 3% of such moneys in excess of $1 million | 8,970,000 |
| Maximum Fee: | 9,023,250 |

Plan Trustee

| | |
|---|---:|
| $525 per hour | ? |
| 5% of distributions over 25% of allowed claims (over $100 million) | $3 million |
| 10% of distributions over 40% of allowed claims (over $160 million) | $14 million |
| Total contingent fee: | $17 million |

9

whose compensation and reimbursement of expenses will constitute post-confirmation administrative expenses." FDIC Brief, Doc. #1221, p. 12. However, for purposes of analysis, the court will not consider the compensation of professionals engaged by the respective trustees. There is no evidence that the plan trustee would expend more compensation on professionals than a chapter 7 trustee. In fact, it has been suggested that a chapter 7 trustee, who may not be as well versed with the legal issues arising in this case than the plan trustee, might, in fact, need more professional aid.

However, the argument with regard to the Plan Committee is well taken. The concern arises from the committee's prerogative under the plan to undertake litigation that the plan trustee has declined to pursue. For example, if the Plan Trustee declines to pursue "Designated Causes of Action," the Plan Committee has "standing to pursue such actions on behalf of the Debtor's Estate." Second Amended Plan, Doc. #1248, p. 25.

A trustee has a fiduciary duty to act in the best interest of the estate. The lion's share of the assets in the instant estate are choses in action. Whether the trustee be a plan trustee or a chapter 7 trustee, that trustee will be tasked with the responsibility of analyzing all potential causes of action, the costs of prosecuting the actions, the likelihood of prevailing in the actions, and the chances of collecting any judgment. The trustee will then make a determination whether, in his best judgment, pursuit of that action is warranted on behalf of the estate.

If a trustee, in the exercise of his fiduciary duty, determines that pursuit of a cause of action is not warranted on behalf of the estate, such litigation can only be deemed high-risk and speculative. Pursuit of the same cause of action by the Plan Committee using estate funds would constitute an additional layer of expense that would not exist in a chapter 7 case. For purposes of this analysis, the court assumes that a plan trustee and a chapter 7 trustee would reach the same decision. Therefore, in a chapter 7 case, such litigation would not be pursued.

10

BB&T and the FDIC also contend that the Plan does not meet the best interest test because, if the court's decision on 11 U.S.C. § 365(o) is reversed on appeal, the cure claim will have a higher priority in chapter 11 than it would in chapter 7. However, as stated above, the FDIC has taken no action to stay the court's order pending appeal.

For the above reasons, the court concludes that the proposed chapter 11 plan does not meet the "best interests of creditors" test.

### Good Faith

BB&T and the FDIC also contend that the plan is not proposed in good faith. 11 U.S.C. § 1129(a)(3). However, they assert no grounds in support separate from those already discussed *supra*. For instance, BB&T alleges grounds relating to feasibility, best interest, and classification of claims. The court cannot conclude that the plan's failure to meet the best interest test means that this plan was not filed in good faith.

### Other Allegations

BB&T also contends that the plan fails to account for BB&T's 11 U.S.C. § 502(h) replacement claims which BB&T anticipates will total $300,000,000. The debtor provided BB&T with a voting ballot on the plan limiting BB&T to a vote in the amount of only $1.00 based on the Voting Procedures Order. However, BB&T was not harmed by the dollar limit on its vote. The class in which BB&T is a member voted to reject the plan.

### Objection by Lead Plaintiffs

An objection to the plan was also filed by the lead plaintiffs in the consolidated securities class action entitled *In re Colonial BancGroup, Inc. Securities Litigation,* Civil Action No. 2:09-cv-00104 (RDP), pending in the United States District Court for the Northern District of Alabama.

The plaintiffs contend that the Plan impairs, in several respects, their

11

ability to prosecute that action. First, they object that the plan jeopardizes the preservation of books and records of the debtor that were transferred to third parties prepetition. However, this objection does not address a requirement for confirmation under 11 U.S.C. § 1129. The lead plaintiffs may obtain the relief they seek through a protective order in the district court litigation. The debtor proposed to amend the plan to state that the debtor will in good faith endeavor to obtain more books and records.

Second, the plaintiffs seek clarification that the injunction provision of the plan will not prevent them from proceeding against directors and officers of the debtor in the securities litigation. Counsel for the debtor stated at the hearing that it is not the debtor's intent to create such an injunction, and the debtor proposed to amend the plan to address this contention.

Third, the plaintiffs object to the plan's continuance of the automatic stay to the extent it would prevent the plaintiffs from proceeding against the debtor in the district court litigation. The plaintiffs seek to proceed against the debtor only to the extent of available insurance. However, the directors and officers are insured by the same policy as the debtor. Therefore, if the plaintiffs succeed against the directors and officers, the plaintiffs will have access to the debtor's insurance policy without proceeding against the debtor.

## Objection by Individual Shareholders

These objections were made by disappointed shareholders. None, however, state any legal ground to oppose confirmation. While this court is sympathetic to the plight of these investors, these objections must be overruled.

## Conclusion

For the reasons stated above, the court concludes that confirmation of the debtor's proposed chapter 11 plan should be denied because it fails

to meet the "best interests of creditors" test requirement of 11 U.S.C. § 1129(a)(7).

Done this 20th day of May, 2011.

/s/ Dwight H. Williams, Jr.
United States Bankruptcy Judge


c: C. Edward Dobbs, Attorney for Debtor
   John J. Clarke, Jr., Attorney for FDIC-Receiver
   Robert B. Rubin, Attorney for Committee
   N. Christian Glenos, Attorney for BB&T
   Ira M. Levee, Attorney for Lead Plaintiffs