# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| In re: | Chapter 11 |
| THE COLONIAL BANCGROUP, INC., | Case No. 09-32303 (DHW) |
| Debtor. | |

### DEBTOR'S MOTION PURSUANT TO BANKRUPTCY RULE 9019 TO APPROVE PROPOSED SETTLEMENT AGREEMENT AMONG THE FDIC-RECEIVER, DEBTOR AND BRANCH BANKING AND TRUST COMPANY

PURSUANT TO LBR 9007-1, THIS MOTION WILL BE TAKEN UNDER ADVISEMENT BY THE COURT AND MAY BE GRANTED UNLESS A PARTY IN INTEREST FILES A RESPONSE WITHIN 21 DAYS OF THE DATE OF SERVICE. RESPONSES MUST BE FILED WITH THE CLERK AND SERVED UPON THE MOVING PARTY. RESPONSES MUST BE FILED ELECTRONICALLY WITH THE CLERK OR BY U.S. MAIL ADDRESSED TO THE CLERK, U.S. BANKRUPTCY COURT, ONE CHURCH STREET, MONTGOMERY, ALABAMA 36104.

PLEASE TAKE FURTHER NOTICE THAT A HEARING TO CONSIDER THE MOTION AND ANY TIMELY OBJECTION, IF ANY, WILL BE HELD BEFORE THE HONORABLE DWIGHT H. WILLIAMS, JR. AT THE U. S. BANKRUPTCY COURT, ONE CHURCH STREET, COURTROOM 4C, MONTGOMERY, ALABAMA 36104, ON SEPTEMBER 30, 2015, AT 9:00 A.M.

The Colonial BancGroup, Inc. (the "Debtor"), by this motion (the "Motion"), seeks entry of an order pursuant to Sections 105 and 363 of Title 11 of the United States Code (the "Bankruptcy Code"), Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9007-1 of the Local Rules of this Court, approving the proposed Settlement Agreement attached hereto as Exhibit A (the "Settlement Agreement") among the Federal Deposit Insurance Corporation, as receiver for Colonial Bank (the "FDIC-Receiver"), the Debtor and Branch Banking and Trust Company ("BB&T"). The proposed settlement will result in the Debtor receiving a total of **$56,160,000** out of the Deposit Accounts and Tax Escrow Account

(as those terms are defined herein) and a release from the FDIC-Receiver and BB&T of an array of claims asserted against the estate, including secured, priority and unsecured claims, which claims threaten the prospect of a distribution to other pre-petition creditors of the estate if successfully pursued by the FDIC-Receiver and BB&T.

In support of this Motion, the Debtor shows the Court as follows:

## General Background

1.    The Debtor is a Delaware corporation that had its headquarters in Montgomery, Alabama and was the parent corporation of Colonial Bank. Prior to filing its bankruptcy petition, the Debtor operated as a financial holding company.  The Debtor was the holding company for Colonial Bank, an Alabama state-chartered bank, and the Debtor owns 100% of the outstanding stock of Colonial Bank.

2.    By order of the Alabama State Banking Department dated August 14, 2009, Colonial Bank was closed, and the FDIC-Receiver was appointed its receiver.  By operation of law, upon its appointment, the FDIC-Receiver succeeded to the rights, titles, powers and privileges of Colonial Bank.  12 U.S.C. § 1821(d)(2)(A).

3.    On August 14, 2009, the FDIC-Receiver entered into a purchase and assumption agreement (the "P&A Agreement") with BB&T and the Federal Deposit Insurance Corporation, in its corporate capacity ("FDIC-Corporate"), under which BB&T assumed Colonial Bank's deposits and certain other liabilities and purchased certain assets of Colonial Bank.

4.    On August 25, 2009 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code in this Court.  On June 2, 2011, the Court entered an Order (the "Confirmation Order") confirming the plan of liquidation (the "Plan") for the Debtor. In accordance with the Plan and the Confirmation Order, Kevin O'Halloran was appointed as the

Plan Trustee (as defined in the Plan). The Debtor's affairs and the disposition of its assets are now overseen by the Plan Trustee under the Plan.

### Jurisdiction and Venue

5.      Under Section 13.1 of the Plan, the Court retained jurisdiction over a number of matters relating to the Debtor's Chapter 11 case, including jurisdiction to resolve estate causes of action.  Accordingly, the Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

6.      The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).

7.      Venue of this Chapter 11 case and this Motion in this district is appropriate pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The predicates for the relief sought herein are Section 105 of the Bankruptcy Code and Bankruptcy Rule 9019.

### Overview of Disputes Being Settled

**A.      Disputes between Debtor and the FDIC-Receiver**

**1. Debtor's Proof of Claim in Colonial Bank Receivership**

9.      On November 19, 2009, the Debtor timely filed a claim with the FDIC-Receiver against the Colonial Bank receivership asserting claims on behalf of the Debtor's Chapter 11 estate (the "Debtor's Receivership Claim").  By letter dated January 6, 2010, the FDIC-Receiver disallowed the Debtor's Receivership Claim.  On March 5, 2010, the Debtor commenced a civil action in the United States District Court for the Middle District of Alabama (the "District Court"), styled *The Colonial BancGroup, Inc. v. F.D.I.C.*, 2:10-cv-00198-MHT-DHW (M.D. Ala.) (the "District Court Action"), seeking, inter alia, a de novo determination of the Debtor's Receivership Claim.  On May 28, 2010, the Debtor filed an amended complaint in the District

Court Action. The FDIC-Receiver filed an answer disputing the Debtor's claims, and the parties each filed motions for summary judgment with respect to all or portions of the claims. At a hearing on January 20, 2012, the District Court heard argument with respect to the parties' summary judgment motions, which remained *sub judice* at the time that the parties began working on the terms of a definitive settlement agreement.[1] Some of the claims and disputes that are the subject of the summary judgment motions, including disputes over the ownership of tax refunds, insurance proceeds and certain REIT preferred securities, are discussed in further detail below.

### 2. Dispute Over Bank Deposits

10. Disputes arose early in the Debtor's Chapter 11 bankruptcy case between the Debtor and the FDIC-Receiver with respect to the deposit balances in six deposit accounts that had been maintained by the Debtor with Colonial Bank and that were assumed by BB&T pursuant to the P&A Agreement (the "Deposit Accounts"). Pursuant to various orders of this Court, the Debtor was permitted to use a portion of one of those accounts, which it called its "Operating Account," subject to the provisions of those Court orders. As of May 29, 2015, the aggregate balance of the Deposit Accounts was $29,475,507.39.

11. In October of 2009 and September of 2010, the FDIC-Receiver filed motions in this Court for relief from stay in the Debtor's Chapter 11 bankruptcy case seeking authority to permit the FDIC-Receiver to enforce set-off rights with respect to the Deposit Accounts (the "Stay Relief Motion"). In a memorandum opinion and order entered on January 24, 2011, the Court denied the Stay Relief Motion. *See In re The Colonial BancGroup, Inc.*, No. 09-32303-

---

[1] On August 19, 2015, this Court and the District Court entered orders staying or administratively closing, without prejudice, the appeals, actions, adversary proceedings and contested matters that are the subject of the proposed Settlement Agreement pending this Court's consideration of this Motion.

DHW, 2011 WL 239201 (Bankr. M.D. Ala. Jan. 24, 2011). The FDIC-Receiver appealed to the District Court (the "Lift-Stay Appeal"), and in an opinion and order entered on January 4, 2012, the District Court reversed and vacated this Court's rulings. *See F.D.I.C. v. The Colonial BancGroup, Inc. (In re The Colonial BancGroup, Inc.),* 2:11-cv-0133(MHT), 2012 WL 12878 (M.D. Ala. Jan. 4, 2012). On January 16, 2012, the Debtor filed a motion for rehearing by the District Court, which remained pending at the time that the parties began working on the terms of a definitive settlement agreement.

### 3. FDIC-Receiver's Claim under Section 365(o)

12.     On November 5, 2009, the FDIC-Receiver filed a motion with the Court to enforce the Debtor's alleged commitments to maintain the capital of Colonial Bank pursuant to 11 U.S.C. § 365(o). The FDIC-Receiver contends that the deficit under the Debtor's alleged capital maintenance commitment exceeds $900 million and that it is entitled to a priority claim in that amount under 11 U.S.C. § 507(a)(9). The Court conducted a hearing on the Debtor's motion for summary judgment with respect to the Section 365(o) motion on May 26, 2010, and in orders entered on August 31, 2010 and September 1, 2010 granted the Debtor's summary judgment motion, denied the FDIC-Receiver's Section 365(o) motion, and disallowed the capital maintenance claim. *See In re The Colonial BancGroup, Inc.*, 436 B.R. 713 (Bankr. M.D. Ala. 2010). The FDIC-Receiver timely appealed to the District Court, *see F.D.I.C. v. The Colonial BancGroup, Inc.*, 2:10-cv-0877(MHT) (M.D. Ala.), that appeal was fully briefed by the parties, and the District Court heard argument at a hearing on November 7, 2011. The appeal remained *sub judice* at the time that the parties began working on the terms of a definitive settlement agreement.

#### 4. **FDIC-Receiver's Proof of Claim in Debtor's Case**

13.     On November 30, 2009, the FDIC-Receiver timely filed a proof of claim in the Debtor's bankruptcy case; on February 19, 2010, the FDIC-Receiver filed an amendment to that proof of claim; and on November 18, 2011, the FDIC-Receiver filed a second amendment to its proof of claim (together, the "FDIC-Receiver Proof of Claim").     On March 4, 2010, in connection with several other filings by the Debtor on the same date in both this Court and the District Court, the Debtor filed an objection in the Court to the FDIC-Receiver Proof of Claim. The FDIC-Receiver moved to withdraw the reference of that contested matter, which the Debtor did not contest.  *See In re The Colonial BancGroup, Inc.*, Case No. 2:10-cv-00409-MHT-DHW (M.D. Ala.) (the "Claim Objection Action").     The District Court entered scheduling orders that coordinated proceedings in the Claim Objection Action with the District Court Action.     The Debtor and the FDIC-Receiver filed cross motions for summary judgment with respect to all or some of the issues raised in the Claim Objection Action, and argument was presented to the District Court at a hearing on January 20, 2012.     The motions for summary judgment remained *sub judice* at the time that the parties began working on the terms of a definitive settlement agreement.

#### 5. **Dispute Over Tax Refunds**

14.     Until the Debtor's request for disaffiliation (discussed below), the Debtor, Colonial Bank, and their respective subsidiaries were members of an affiliated group of taxpayers ("Affiliated Group") as defined in Internal Revenue Code § 1504(a).     The Affiliated Group filed consolidated tax returns for tax years prior to 2009.

15.     Disputes became apparent between the Debtor and the FDIC-Receiver early in the Debtor's bankruptcy case concerning the ownership of federal and state tax refunds that might be

recovered by or on behalf of the Affiliated Group.  On February 24, 2010, the FDIC-Receiver and the Debtor executed a stipulation under which an escrow account was established at Regions Bank for the purpose of holding tax refunds that might be received pending the resolution of the parties' disputes concerning ownership of those refunds (the "Tax Escrow Account"), and both parties also agreed that any tax refunds received by either of them would be deposited into the Tax Escrow Account.  In an order entered on March 10, 2010, this Court approved the stipulation.

16.     In May 2011, the Debtor requested permission from the Internal Revenue Service ("IRS") under Treas. Reg. §§ 301.9100-1 and 301.9100-3 to make an election to disaffiliate Colonial Bank and its subsidiaries from the Affiliated Group pursuant to Treas. Reg. § 1.597-4(g).  In a ruling dated September 29, 2011, the IRS allowed the Debtor 90 days from the date of that ruling to make such an election.  By letter dated November 28, 2011, the FDIC-Receiver requested that the IRS reconsider its ruling, which request remains outstanding.    On December 22, 2011, the Debtor notified the FDIC-Receiver of its election to exclude Colonial Bank and its subsidiaries from the Affiliated Group effective as of August 14, 2009.  The Debtor and the FDIC-Receiver thereafter filed amended federal returns for the 2009 tax year.  The Debtor and the FDIC-Receiver filed separate federal and state returns for tax years after December 31, 2009.

17.     Tax refunds have been deposited in the Tax Escrow Account and, together with interest accrued thereon, the balance in the Tax Escrow Account, as of the last statement dated July 31, 2015, was $262,234,960.63.

18.     In May 2015, the FDIC-Receiver received three checks in the approximate aggregate amount of $150,000 for refunds of back-up withholding taxes and federal payroll taxes

paid by Colonial Bank (the "Bank Tax Refunds"). The FDIC-Receiver notified the Debtor and BB&T that it had received the Bank Tax Refunds, but the Bank Tax Refunds have not been deposited in the Tax Escrow Account because the FDIC-Receiver believes they are separate Bank-only refunds.

### 6. Dispute Over Insurance Proceeds

19.    The Debtor and the FDIC-Receiver disputed ownership of policy claims, insurance proceeds and premium refunds with respect to certain insurance policies. At the same time, both the Debtor and the FDIC-Receiver had disputes with the insurer under certain fidelity insurance policies. On November 4, 2010, the Court entered an agreed order pursuant to which the Debtor established a separate, segregated bank account to hold insurance proceeds that might be recovered by either party as a result of their disputes with the fidelity bond insurer pending the resolution of their ownership disputes. The Debtor thereafter established that account with Regions Bank (the "Insurance Proceeds Holding Account"). As the result of a Court-approved settlement and release agreement among the Debtor, the FDIC-Receiver and Federal Insurance Company dated September 12, 2014, a settlement payment from Federal Insurance Company of $30,000,000 was deposited in the account subject to the terms of the Court's order. As of the last statement dated July 31, 2015, the balance in the Insurance Proceeds Holding Account was $30,054,049.39 (the "Insurance Proceeds").

### B.    Disputes Between the Debtor and BB&T

#### 1. BB&T's Proof of Claim and Set Off Assertion

20.    On November 30, 2009, BB&T timely filed a proof of claim in the Debtor's bankruptcy case; on July 27, 2010, BB&T filed an amendment to that proof of claim; and on April 22, 2011, BB&T filed two additional proofs of claim (collectively, the "BB&T Proofs of

Claim"). BB&T asserts that it has a right to set off amounts it alleges the Debtor owes to BB&T against the balances in the Deposit Accounts and claims a security interest in the Deposit Accounts pursuant to a security agreement between the Debtor and Colonial Bank.

21.     On April 5, 2011, the Debtor filed an adversary proceeding in this Court contesting, among other things, BB&T's setoff rights and security interest in the Deposit Accounts, captioned *The Colonial BancGroup, Inc. v. BB&T*, Adv. Proc. No. 11-03022 (DHW) (the "BB&T Avoidance Action").   BB&T filed a motion to withdraw the reference of that adversary proceeding with the District Court, which the Debtor opposed.  That motion remained pending at the time that the parties began working on the terms of a definitive settlement agreement.

### 2. REIT Preferred Related Claims

22.     On April 8, 2011, the Debtor filed a second adversary proceeding against BB&T in this Court, captioned *The Colonial BancGroup, Inc. v. BB&T*, Adv. Proc. No. 11-03026 (DHW), asserting claims against BB&T for (a) turnover of a series of approximately $300 million of REIT preferred securities issued by a wholly owned, indirect subsidiary of Colonial Bank (the "REIT Preferred Securities") and (b) avoidance of the transfer, and recovery, of the REIT Preferred Securities (the "BB&T RPS Action") (which was similar to a claim the Debtor had asserted against the FDIC-Receiver in the District Court Action).  BB&T filed a motion with the District Court to withdraw the reference to this Court.  The Debtor consented to this motion and the BB&T RPS Action is pending before the District Court under Case No. 2:11-cv-00824 (MHT).  On November 16, 2011, both parties filed cross motions for summary judgment, and oral argument was presented to the District Court with respect those motions on

January 20, 2012. The motions remained *sub judice* at the time that the parties began working on the terms of a definitive settlement agreement.

23.     In the BB&T RPS Action, BB&T filed a third-party complaint against the FDIC-Receiver and FDIC-Corporate for indemnification under the P&A Agreement and similar relief related to the underlying claims, with respect to which those third-party defendants filed answers.

### Relief Requested

24.     Pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019, the Debtor respectfully requests that the Court approve the terms of the Settlement Agreement and authorize the Debtor and the Plan Trustee to enter into the Settlement Agreement and to take such action as shall be necessary or appropriate to implement its terms.

### Summary of Proposed Settlement Agreement

25.     Subject to Court approval, the Debtor, the FDIC-Receiver, and BB&T have determined that it is in their mutual best interests to settle various claims each has asserted against the other pursuant to the Settlement Agreement. Without conceding the merits of any claim or argument asserted by any other party, each of the Debtor, the FDIC-Receiver, and BB&T has agreed to the settlement set forth in the proposed Settlement Agreement in order to avoid the risks, uncertainty, delay and expense that would attend continued litigation of their various disputes.

26.     The proposed settlement will result in the Debtor receiving a total of $56,160,000 out of the Deposit Accounts and Tax Escrow Account and a release from the FDIC-Receiver and BB&T of an array of asserted claims against the Debtor's estate, including secured, priority and

unsecured claims, which claims threaten the prospect of a distribution to other pre-petition creditors of the estate if successfully pursued by the FDIC-Receiver and BB&T.

27.     All interested parties should review carefully the precise terms of the Settlement Agreement for a full and accurate understanding of the proposed settlement. In the event of any inconsistency between the Settlement Agreement and the summary contained below, the terms of the Settlement Agreement govern and control. However, for the convenience of the Court and parties in interest, the main components of the proposed settlement are summarized below. On the Effective Date (the date on which all conditions precedent to the effectiveness of the Settlement Agreement are satisfied), the following will occur:

(a)     BB&T will transfer to the Debtor **$27,360,000** from the deposit balances held in the Deposit Accounts. BB&T will retain for itself all of the remaining balances in the Deposit Accounts after deducting that payment to the Debtor (approximately $2,115,507). Upon its receipt of this payment, the Debtor will be deemed to have waived and released any further claims or rights with respect to the Deposit Accounts.

(b)     The Debtor (x) will cause the transfer to itself from the Tax Escrow Account of **$28,800,000** and (y) will cause the transfer to the FDIC-Receiver of the entire remaining balance in the Tax Escrow Account after deducting the foregoing payment to the Debtor. Based on the July 31, 2015 account statement, the payment to the FDIC-Receiver shall be at least $233,434,960.63, plus interest accruing after July 31, 2015 and additional deposits, if any, after that date.

(c)     The FDIC-Receiver will be deemed the owner of all Tax Refunds (as this term is defined in the Settlement Agreement) received by the FDIC-Receiver or the Debtor after the Effective Date and of the Bank Tax Refunds in the amount of approximately $150,000.

(d)     The Debtor will reasonably cooperate with the FDIC-Receiver with respect to matters, if any arise, relating to Tax Refunds or arising from or concerning filings with any taxing authority by or on behalf of the Affiliated Group.

(e)     The Debtor will cause the transfer of the entire balance on deposit in the Insurance Proceeds Holding Account to the FDIC-Receiver. As of the statement dated July 31, 2015, the balance in the Insurance Proceeds Holding Account was $30,054,049.39.

(f)     Each of the Debtor, the FDIC-Receiver and their respective counsel will be deemed to have released any claim for attorneys' fees and expenses against the Insurance Proceeds Holding Account, notwithstanding any principle of law or order of the Court to the contrary.

(g)     BB&T, or its designee, will be deemed to be the sole legal, equitable, and beneficial owner of the REIT Preferred Securities for all purposes.

(h)     The Debtor will consent to, and the FDIC-Receiver will not object to, Peachtree Hills Place LLC's proposed sale of real property securing a loan from Colonial Bank to Peachtree Hills Place LLC and the related settlement of guarantees and indebtedness, all of which pertains to BB&T's asserted claim against the Debtor as guarantor for any deficiency. If the sale is not consummated, the Debtor has agreed, upon proper notice, to transfer and assign to BB&T or its designee, all of the Debtor's membership interests in Peachtree Hills Place LLC.

(i)     The FDIC-Receiver Proof of Claim, the BB&T Proofs of Claim, and the Debtor Receivership Claim will be deemed withdrawn with prejudice, and the Debtor, the FDIC-Receiver and BB&T will not be entitled to any distribution on account of those proofs of claim other than the amounts set forth in the Settlement Agreement.

(j)     The Debtor, the FDIC-Receiver and BB&T will release claims against each other, but, for the avoidance of doubt, certain claims are excluded from these mutual releases, including (1) certain claims the Debtor and the FDIC-Receiver may have against PricewaterhouseCoopers LLP ("PwC") or Crowe Horwath LLP (and its predecessors), (2) claims against another party for failing to comply with the Settlement Agreement or the Approval Order, (3) certain claims against past or current directors, officers, employees, representatives, professionals employed by, or third party advisors of the Debtor, Colonial Bank or their respective subsidiaries (other than the Plan Trustee), and (4) certain claims the FDIC-Receiver and BB&T have or may have under the P&A Agreement, the CSLA, the Single Family Shared-Loss Agreement or any related agreement(s).

(k)     Solely to the extent any claim, right, or cause of action arises from or is based on any act, or omission to act, by PwC after the Petition Date, based on tax advice and related tax services provided by PwC to the Debtor or its bankruptcy estate after the Petition Date, the FDIC-Receiver will agree not to sue PwC.

(l)     The Debtor will dismiss with prejudice its claims against the FDIC-Receiver seeking to avoid and recover capital contributions and other alleged pre-petition transfers from the Debtor to its subsidiary Colonial Bank.

(m)     The following disputes among the Debtor, the FDIC-Receiver and BB&T will be resolved by virtue of the Settlement Agreement

- -     the FDIC-Receiver Proof of Claim

- -     the BB&T Proofs of Claim

- -     the Debtor Receivership Claim

- -     the disputes among the Debtor, the FDIC-Receiver and BB&T over the Deposits Accounts, including the issues raised in the Lift-Stay Appeal

- -     the dispute between the Debtor and the FDIC-Receiver over the Tax Refunds

- -     the dispute between the Debtor and the FDIC-Receiver over the Section 365(o) priority claim asserted by the FDIC-Receiver

- -     the claims asserted by the Debtor against the FDIC-Receiver in the District Court Action

- -     the dispute between the Debtor and the FDIC-Receiver over the proceeds of the Insurance Proceeds Holding Account

- -     the disputes among the Debtor, the FDIC-Receiver and BB&T with respect to the Peachtree Hills Loan

- -     the disputes among the Debtor, the FDIC-Receiver and BB&T regarding the REIT Preferred Securities

(n)     The effectiveness of the Settlement Agreement is subject to certain conditions precedent, including the entry of an order of approval by this Court and such order becoming a "Final Order" as defined in the Settlement Agreement, subject to the rights of the Settling Parties to waive any part of the definition of "Final Order" through an express written waiver that is duly executed by the Settling Parties.

28.     Information regarding the claims the Debtor is proposing to settle, and the host of issues raised and defenses asserted with respect to those claims, can be obtained from the dockets of the litigation matters set forth on Exhibit C to this Motion.

## Standards for Settlement Approval

29.     Section 363(b)(1) of the Bankruptcy Code provides that a "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Section 105(a) of the Bankruptcy Code provides in relevant part that "[t[he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

30.     Under Bankruptcy Rule 9019, the Court has the authority to approve a compromise of a controversy or dispute. *See Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Continental Airlines, Inc. v. Air Line Pilots' Ass'n Int'l. (In re Continental Airlines, Inc.)*, 907 F.2d 1500, 1508 (5th Cir. 1990). Moreover, compromises are favored in bankruptcy. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3rd Cir. 1996). Whether to approve a proposed settlement is a matter within the sound discretion of the bankruptcy court. *In re Munford, Inc.*, 97 F.3d 449, 455 (11th Cir. 1996).

31.     The Courts of Appeal generally agree that, in deciding whether to approve a proposed settlement, a bankruptcy court should evaluate the following:

> (a)     the probability of success in litigation, with due consideration for the uncertainty of the facts and the law;
>
> (b)     the difficulties, if any, to be encountered in collecting on a judgment;
>
> (c)     the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay; and
>
> (d)     the paramount interest of the creditors and a proper deference to their reasonable views.

*See In re Justice Oaks II, Ltd.,* 898 F.2d 1544, 1549 (11th Cir. 1990); *Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp.(In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). These criteria essentially require the Court to "assess and balance the value of the claim that is

being compromised against the value to the estate of the compromise proposal." *Myers*, 91 F.3d at 393. In other words, bankruptcy courts are charged with determining whether the proposed settlement is fair and equitable and in the best interests of the bankruptcy estate. *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994).

32.     Whether a proposed settlement is a product of an arms-length negotiation is a factor bearing on the wisdom of the compromise. *Matter of Cajun Elec. Power Co-op. Inc.*, 119 F.3d 349, 356 (5th Cir. 1997); *Matter of Foster Mortgage Corp.*, 68 F.3d 914, 918 (5th Cir. 1995). Additionally, whether the settlement is in the best interest of the estate is an important consideration. *See, e.g., Cajun Elec.*, 119 F.3d at 356.

33.     Generally, the role of a bankruptcy court, when evaluating a proposed settlement, is not to decide the issues in dispute by conducting a mini-trial. Instead, a bankruptcy court should determine whether the settlement is fair and equitable as a whole. *See, e.g., Cajun Elec.*, 119 F.3d at 355-56; *In re Joiner*, 319 B.R. 903, 907 (Bankr. M.D. Ga. 2004); *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994) ("the judge is not required to assess the minutia of each and every claim"). In addition, "[i]t must be remembered that the evaluation of any lawsuit is quite problematic and calls for a significant degree of speculation." *Texas Extrusion Corp. v. Lockheed Corp. (Matter of Texas Extrusion Corp.)*, 844 F.2d 1142, 1159 (5th Cir. 1988).

34.     To be approved, the settlement does not need to constitute the "best result obtainable." *Tri-State Fin., LLC v. Lovald*, 525 F.3d 649, 654 (8th Cir. 2008) (internal citations omitted). Rather, in taking into account the aforementioned factors, bankruptcy courts "need only determine that the settlement does not fall below the lowest point in the range of reasonableness." *Id.* (internal punctuation omitted). Indeed, "[i]f courts required settlements to be perfect, they would seldom be approved." *Official Committee of Unsecured Creditors v. CIT*

*Group/Business Credit Inc. (In re Jevic Holding Corp.)*, 787 F.3d 173, 180 (3d Cir. 2015) (affirming bankruptcy court's approval of a settlement even though resolution of one of the claims was "far from compelling").

### Basis for Relief Requested

35.     The proposed settlement set forth in the Settlement Agreement is reasonable, fair and equitable and in the best interests of the Debtor, its estate and its creditors.

36.     The Settlement Agreement is the product of protracted arms-length, good faith negotiations among the Debtor, the FDIC-Receiver and BB&T and is not the result of any collusion, unfair dealing, wrongful conduct or fraud.  Settlement discussions between the Debtor and the FDIC-Receiver began as early as October 2010, and have continued intermittently since then.

37.     As is apparent from the broad scope of the litigation matters listed on schedule 1 of the Settlement Agreement (the "Litigation Matters"), the Debtor's Chapter 11 case has been marked by contentious disputes between the Debtor, on one hand, and the FDIC-Receiver and BB&T, on the other.

38.     In particular, from the beginning of this bankruptcy case filed over five years ago, the FDIC-Receiver has contested virtually every significant step taken or request made by the Debtor. Unable in the past to resolve their disputes by agreement, the parties resorted to litigation. While the Debtor believes that its various claims against the FDIC-Receiver and BB&T, and its defenses to the claims asserted by the FDIC-Receiver and BB&T, have merit, the outcome of any of the Litigation Matters is far from certain.

39.     The disputes over ownership of the Tax Refunds, REIT Preferred Securities and Insurance Proceeds are the subject of motions for summary judgment which were orally argued

to the District Court on January 20, 2012 and have remained pending for more than three and a half years.[2]

40.     Since the oral argument on these issues in 2012, numerous Circuit Court of Appeals, including the Eleventh Circuit, have rendered decisions interpreting various tax sharing agreements ("TSA") under applicable state law, and determining the effect of the TSA's upon the competing claims of the holding company and bank to ownership of the tax refunds. These cases include the following:

    (a)    In *Federal Deposit Insurance Corp. v. Zucker (In re NetBank, Inc.)*, 729 F.3d 1344 (11th Cir. 2013), *cert. denied*, 135 S. Ct. 476 (2014), the Eleventh Circuit held that the specific language of the TSA in that case established under Georgia law that the parties intended to establish an agency relationship with respect to refunds from the IRS attributable solely to the bank and that the tax refund was owned by the bank,.

    (b)    In *Zucker v. Federal Deposit Insurance Corp. (In re BankUnited Financial Corp.)*, 727 F.3d 1100 (11th Cir. 2013), *cert. denied*, 134 S. Ct. 1505 (2014), the Eleventh Circuit interpreted the language in the TSA in that case to mean under Delaware law that the tax refunds were the property of the bank, and not the parent company.

    (c)    In *Federal Deposit Insurance Corp. v. Siegel (In re IndyMac Bancorp, Inc.)*, 554 Fed. Appx. 668 (9th Cir. Apr. 21, 2014), the Ninth Circuit interpreted a TSA under California law and held that the "TSA does not establish a principal-agent relationship under California law, because the Bank does not exercise control over Bancorp's activities under the TSA," resulting in the award of the tax refund to the holding company.

    (d)    In *Federal Deposit Insurance Corp. v. AmFin Financial Corp.*, 757 F.3d 530 (6th Cir. 2014), *cert. denied*, 135 S. Ct. 1402 (2015), the Sixth Circuit reversed and remanded the district court's judgment on the pleadings that the parent-tax filer owned the tax refunds, finding the TSA ambiguous under Ohio law and instructing the district court to consider extrinsic evidence.

    (e)    In *Cantor v. Federal Deposit Insurance Corp. (In re Downey Financial Corp.)*, 593 Fed. Appx. 123 (3d Cir. Jan. 26, 2015), the Third Circuit affirmed the bankruptcy court's holding under California state law that the TSA created a debtor-creditor relationship, not an agency relationship,

---

[2] *See* Exhibit C for citations to the docket where briefs on the pending motions for summary judgment may be found on Pacer.

between the holding company and the bank and that the tax refund constituted property of the holding company.

41. The FDIC-Receiver asserts that the two Eleventh Circuit decisions (when applied to the Debtor's unsigned Intercorporate Tax Allocation Policy under Alabama law) control the issue of ownership in favor of the FDIC-Receiver and that the other decisions are either distinguishable or consistent with its position. The Debtor has submitted opposing arguments that the same case law is supportive of the Debtor's ownership position when applied to the Debtor's Intercorporate Tax Allocation Policy.[3]

42. The Debtor's motion for reconsideration in the Lift-Stay Appeal of the District Court's opinion reversing and remanding this Court's decision denying the FDIC-Receiver's alleged right to set off against the Deposit Accounts and the FDIC-Receiver's appeal of this Court's denial of the FDIC-Receiver's roughly $900 million priority claim under Section 365(o) of the Bankruptcy Code were argued to the District Court in 2011 and have remained pending for more than three and a half years.

43. The Litigation Matters are complex and fact-intensive, and in some instances the applicable law is uncertain. Because the disputes underlying the Litigation Matters are complex and uncertain, the probability of the Debtor's success on these various claims and issues cannot be predicted with certainty. One possible outcome of the Litigation Matters is that the Debtor would not recover any amount on its claims against the FDIC-Receiver and BB&T. Further, even if the Debtor was successful on at least some of these claims, the FDIC-Receiver could prevail on its asserted priority claim under Sections 365(o) and 507(a)(9) of the Bankruptcy Code in an amount exceeding any recovery by the Debtor. Approval of the proposed Settlement

---

[3] See Exhibit C for citations to the docket where supplemental briefs submitted by the Debtor and the FDIC-Receiver on these tax refund cases may be found.

Agreement, then, will enable the Debtor to avoid the risks and uncertainty associated with litigating the Litigation Matters.

44.     Continued prosecution and defense of litigation of the Litigation Matters will necessarily result in significant delay. Any decision by the District Court would inevitably be the subject of further appeal to the Eleventh Circuit by the losing party and/or the subject of remand for further trial. Indeed, the District Court's initial order on the Lift-Stay Appeal (which is the subject of the Debtor's pending motion for reconsideration) directed as a part of its reversal that the case be remanded for further proceedings. This remand has not occurred only because of the pending motion for rehearing.

45.     The potential additional discovery, trial and appeals on the multitude of issues implicated in the Litigation Matters would be time-consuming and expensive, hamper the pursuit and resolution of other claims of the estate, and indefinitely postpone the wind down of this Chapter 11 case and any potential distribution to creditors.

46.     The Debtor's estate can ill afford such cost, expense and delay given the Debtor's limited resources and the imminent maturity date of its secured litigation funding arrangements that were approved pursuant to the Court's Order entered September 13, 2012 [Docket No. 1933]. The term loan component of that secured funding will mature on October 24, 2015, unless extended by the parties, although preliminary discussions regarding a potential extension of the term have occurred.

47.     Approval of this settlement will provide the Debtor's estate with adequate funds to repay the outstanding term loan and the obligation under the investor funding of the disputed asset litigation, leaving for the Debtor's estate funds estimated to be in excess of $30,000,000.

48.     In sum, the proposed Settlement Agreement avoids lengthy, burdensome and expensive litigation, is an exercise of the Debtor's sound and prudent business judgment, and is a reasonable compromise of the myriad of complex claims and defenses asserted by the Debtor, the FDIC-Receiver and BB&T against each other in the Litigation Matters. The Settlement Agreement ensures that a priority claim asserted by the FDIC-Receiver will not be allowed against the Debtor's estate (which, if allowed, could deprive general unsecured creditors of any distribution in this case) and paves the way for the estate to receive a meaningful recovery on its claims without further delay or litigation expense.

49.     When weighed against the risks and uncertainty associated with continuing litigation of the Litigation Matters, the likely expense of such litigation, the financial needs of the Debtor and its estate, the impact of litigation costs upon the Debtor's estate, and the substantial recovery realized by the Debtor's estate under the Settlement Agreement, the Settlement Agreement clearly benefits the Debtor, its estate and its creditors.

50.     For the foregoing reasons, the Debtor believes that the proposed settlement is fair, equitable and reasonable and satisfies the standards for approval of a settlement.

## Notice

51.     The Debtor proposes to give notice of the Motion by CM/ECF notification to those parties registered as of the filing of this Motion and submits that no other or further notice is necessary.

**WHEREFORE**, the Debtor respectfully requests that this Court enter an order substantially in the form annexed hereto as Exhibit B, and grant the Debtor such other and further relief as this Court deems just and proper.

Dated:   August 28, 2015

**PARKER, HUDSON, RAINER & DOBBS, LLP**

By:   */s/ Rufus T. Dorsey, IV*
      C. Edward Dobbs, Esq.
      Rufus T. Dorsey IV, Esq.

      1500 Marquis Two Tower
      285 Peachtree Center Avenue, N.E.
      Atlanta, Georgia  30303
      (404) 420-5550
      ced@phrd.com
      rtd@phrd.com


**QUINN EMANUEL URQUHART & SULLIVAN,
LLP**

By:   */s/ Benjamin Finestone*
      Benjamin Finestone, Esq.

      51 Madison Avenue
      22nd Floor
      New York, New York  10010
      (212) 849-7000
      benjaminfinestone@quinnemanuel.com


Attorneys for Debtor The Colonial BancGroup, Inc.

## Exhibit A

### Settlement Agreement

(Copy attached)

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (the "Settlement Agreement") is entered into as of August 25, 2015, by and among The Colonial BancGroup, Inc. (the "Debtor"), the Federal Deposit Insurance Corporation, as receiver for Colonial Bank (the "FDIC-Receiver"), and Branch Banking & Trust Company ("BB&T"). The signatories hereto are referred to collectively as the "Parties" or each individually as a "Party."

## RECITALS

WHEREAS,

A.      The Debtor is a corporation formed under the laws of the State of Delaware. Prior to its bankruptcy petition the Debtor operated as a financial holding company. The Debtor was the holding company for Colonial Bank, an Alabama state-chartered bank, and owns 100% of Colonial Bank's outstanding common stock.

B.      By order dated August 14, 2009, the Alabama State Banking Department closed Colonial Bank and appointed the FDIC-Receiver as its receiver. By operation of law, the FDIC-Receiver succeeded, *inter alia*, to "all rights, titles, powers and privileges" of Colonial Bank. 12 U.S.C. § 1821(d)(2)(A).

C.      On August 14, 2009, the FDIC-Receiver, entered into a purchase and assumption agreement (the "P&A Agreement") with BB&T and the Federal Deposit Insurance Corporation, in its corporate capacity ("FDIC-Corporate") under which BB&T assumed Colonial Bank's deposits and certain other liabilities and purchased certain of Colonial Bank's assets.

D.      On August 25, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Alabama (the "Bankruptcy Court"), styled *In re The Colonial BancGroup, Inc.*, Case No. 09-32303 (the "Bankruptcy Case"). On June 2, 2011, the Bankruptcy Court entered an order confirming the Debtor's plan of liquidation, under which Kevin O'Halloran was appointed Plan Trustee (in that role and in his prior role as chief recovery officer for the Debtor, the "Plan Trustee").

E.      Until the Debtor's request for disaffiliation, the Debtor, Colonial Bank, and their respective subsidiaries were members of an affiliated group ("Affiliated Group") as defined in IRC § 1504(a). The Affiliated Group filed consolidated tax returns for tax years from prior to 2004 through and including 2009.

F.      In May 2011, the Debtor requested permission from the Internal Revenue Service ("IRS") under Treas. Reg. §§ 301.9100-1 and 301.9100-3 to make an election to disaffiliate Colonial Bank and its subsidiaries from the Affiliated Group pursuant to Treas. Reg. § 1.597-4(g). In a ruling dated September 29, 2011, the IRS allowed the Debtor 90 days from the date of that ruling to make such an election. By letter dated November 28, 2011, the FDIC-Receiver requested that the IRS reconsider its ruling, which request remains outstanding. On December 22, 2011, the Debtor notified the FDIC-Receiver of its election to exclude Colonial Bank and its subsidiaries from the Affiliated Group effective as of August 14, 2009. The Debtor

and the FDIC-Receiver thereafter filed amended federal returns for the 2009 tax year. The Debtor and the FDIC-Receiver filed separate federal and state returns for tax years after December 31, 2009.

Disputes Between the Debtor and the FDIC-Receiver

G.      On November 19, 2009, the Debtor timely filed a claim with the FDIC-Receiver against the Colonial Bank receivership asserting claims on behalf of the Debtor's chapter 11 estate (the "Debtor's Receivership Claim"). By letter dated January 6, 2010, the FDIC-Receiver disallowed the Debtor's Receivership Claim. On March 5, 2010, the Debtor commenced a civil action in the United States District Court for the Middle District of Alabama (the "District Court"), styled *Colonial BancGroup, Inc. v. F.D.I.C.*, 2:10-cv-00198-MHT-DHW (M.D. Ala.) (the "District Court Action"), seeking, *inter alia*, a *de novo* determination of the Debtor's Receivership Claim. On May 28, 2010, the Debtor filed an amended complaint in the District Court Action. The FDIC-Receiver filed an answer disputing the Debtor's claims, and the parties each filed motions for summary judgment with respect to all or portions of the claims. At a hearing on January 20, 2012, the District Court heard argument with respect to the parties' summary judgment motions, which remain *sub judice*.

H.      Disputes arose early in the Debtor's chapter 11 bankruptcy case between the Debtor and the FDIC-Receiver with respect to the deposit balances in six deposit accounts that had been maintained by the Debtor with Colonial Bank and that were assumed by BB&T pursuant to the P&A Agreement (the "Deposit Accounts"). Pursuant to various orders of the Bankruptcy Court, the Debtor was permitted to use a portion of one of those accounts, which it called its "Operating Account," subject to the provisions of those Bankruptcy Court orders. As of May 29, 2015, the aggregate balance of the Deposit Accounts was $29,475,507.39.

I.      In October of 2009 and September of 2010, the FDIC-Receiver filed motions in the Bankruptcy Court for relief from stay in the Debtor's chapter 11 bankruptcy case seeking authority to permit the FDIC-Receiver to enforce rights with respect to the Deposit Accounts (the "Stay Relief Motion"). In a memorandum opinion and order entered on January 24, 2011, the Bankruptcy Court denied the Stay Relief Motion. The FDIC-Receiver appealed to the District Court (the "Lift-Stay Appeal"), and in an opinion and order entered on January 4, 2012, the District Court reversed and vacated the Bankruptcy Court's rulings. *See F.D.I.C. v. Colonial BancGroup, Inc. (In re Colonial BancGroup, Inc.)*, 2:11-cv-0133(MHT), 2012 WL 12878 (M.D. Ala. Jan. 4, 2012). On January 16, 2012, the Debtor filed a motion for rehearing by the District Court, which remains pending.

J.      On November 5, 2009, the FDIC-Receiver filed a motion with the Bankruptcy Court to enforce the Debtor's alleged commitments to maintain the capital of Colonial Bank pursuant to 11 U.S.C. § 365(o). The FDIC-Receiver contends that the deficit under the Debtor's alleged capital maintenance commitment exceeds $900 million and that it is entitled to a priority claim in that amount under 11 U.S.C. § 507(a)(9). The Bankruptcy Court conducted a hearing on the Debtor's motion for summary judgment with respect to the 365(o) motion on May 26, 2010, and in orders entered on August 31, 2010 and September 1, 2010 granted the Debtor's summary judgment motion, denied the FDIC-Receiver's 365(o) motion and disallowed the capital maintenance claim. The FDIC-Receiver timely appealed to the District Court, *see*

2

*F.D.I.C. v. Colonial BancGroup, Inc.*, 2:10-cv-0877(MHT) (M.D. Ala.), that appeal was fully briefed by the parties and the District Court heard argument at a hearing on November 7, 2011. The appeal remains *sub judice*.

K.     On November 30, 2009, the FDIC-Receiver timely filed a proof of claim in the Bankruptcy Case; on February 19, 2010, the FDIC-Receiver filed an amendment to that proof of claim; and on November 18, 2011, the FDIC-Receiver filed a second amendment to its proof of claim (together, the "FDIC-Receiver Proof of Claim").  On March 4, 2010, in connection with several other filings by the Debtor on the same date in both the Bankruptcy Court and the District Court, the Debtor filed an objection in the Bankruptcy Court to the FDIC-Receiver Proof of Claim.  The FDIC-Receiver moved to withdraw the reference of that contested matter, which the Debtor did not contest.  *See In re Colonial BancGroup, Inc.*, Case No. 2:10-cv-00409-MHT-DHW (M.D. Ala.) (the "Claim Objection Action").  The District Court entered scheduling orders that coordinated proceedings in the Claim Objection Action with the District Court Action.  The Debtor and the FDIC-Receiver filed cross motions for summary judgment with respect to all or some of the issues raised in the Claim Objection Action, and argument was presented to the District Court at a hearing on January 20, 2012.  The motions for summary judgment remain *sub judice*.

L.     On February 24, 2010, the FDIC-Receiver and BancGroup executed a stipulation under which an escrow account was established at Regions Bank for the purpose of holding tax refunds pending the resolution of the parties' disputes concerning ownership of those refunds (the "Tax Escrow Account"), and both parties also agreed that any tax refunds received by either of them would be deposited into the Tax Escrow Account.  In an order entered on March 10, 2010, the Bankruptcy Court approved the stipulation.  Tax refunds have been deposited in the Tax Escrow Account and, together with interest accrued thereon, the balance in the Tax Escrow Account as of the last statement dated July 31, 2015 was $262,234,960.63.

M.     In May 2015, the FDIC-Receiver received three checks in the approximate aggregate amount of $150,000 for refunds of back-up withholding taxes and federal payroll taxes paid by Colonial Bank (the "Bank Tax Refunds").  The FDIC-Receiver notified the Debtor and BB&T that it had received the Bank Tax Refunds but the Bank Tax Refunds have not been deposited in the Tax Escrow Account because the FDIC-Receiver believes they are separate Bank-only refunds.

N.     The Debtor and the FDIC-Receiver disputed ownership of policy claims and insurance proceeds with respect to certain insurance policies.  On November 4, 2010, the Bankruptcy Court entered an agreed order pursuant to which the Debtor established a separate, segregated bank account to hold insurance proceeds that might be recovered by either Party pending the resolution of their ownership disputes.  The Debtor thereafter established that account with Regions Bank (the "Insurance Proceeds Holding Account").  As the result of a settlement and release agreement among the Debtor, the FDIC-Receiver and Federal Insurance Company dated September 12, 2014, a settlement payment from Federal Insurance Company of $30,000,000 was deposited in the account subject to the terms of the Bankruptcy Court order.  As of the last statement dated July 31, 2015, the balance in the Insurance Proceeds Holding Account was $30,054,049.39.

3

## Disputes Between the Debtor and BB&T

O.    On November 30, 2009, BB&T timely filed a proof of claim in the Debtor's chapter 11 bankruptcy case; on July 27, 2010, BB&T filed an amendment to that proof of claim; and on April 22, 2011, BB&T filed two additional proofs of claim (collectively, "BB&T Proofs of Claim").  BB&T asserts that it has a right to set off amounts it alleges the Debtor owes to BB&T against the balances in the Deposit Accounts and claims a security interest in the Deposit Accounts pursuant to a security agreement between the Debtor and Colonial Bank.

P.    On April 5, 2011, the Debtor filed an adversary proceeding in the Bankruptcy Court contesting, among other things, BB&T's setoff rights and security interest in the Deposit Accounts, captioned *Colonial BancGroup, Inc. v. BB&T*, Adv. Proc. No. 11-03022 (DHW) (the "BB&T Avoidance Action").  BB&T filed a motion to withdraw the reference of that adversary proceeding with the District Court, which the Debtor opposed.  That motion remains pending.

Q.    On April 8, 2011, the Debtor filed a second adversary proceeding against BB&T in the Bankruptcy Court, captioned *Colonial BancGroup, Inc. v. BB&T*, Adv. Proc. No. 11-03026 (DHW), asserting claims against BB&T for (a) turnover of a series of approximately $300 million of REIT preferred securities issued by a wholly owned, indirect subsidiary of Colonial Bank (the "REIT Preferred Securities") and (b) avoidance of the transfer, and recovery, of the REIT Preferred Securities (the "BB&T RPS Action").  BB&T filed a motion with the District Court to withdraw the reference to the Bankruptcy Court.  The Debtor consented to this motion and the BB&T RPS Action is pending before the District Court under Case No. 2:11-cv-00824 (MHT).  On November 16, 2011, both parties filed cross motions for summary judgment, and oral argument was presented to the District Court with respect those motions on January 20, 2012.  The motions remain *sub judice*.

R.    In the BB&T RPS Action, BB&T filed a third-party complaint against the FDIC-Receiver and FDIC-Corporate for indemnification under the P&A Agreement and similar relief related to the underlying claims, with respect to which the FDIC-Receiver has filed an answer.

\*                          \*                          \*

S.    The Parties have engaged in extensive, good faith, arms' length negotiations in an effort to resolve all disputes between them, resulting in the settlement (the "Settlement") that is set forth in this Settlement Agreement.  Without conceding the merits of any claim or argument asserted by any other Party, the Parties have entered into the Settlement Agreement in order to avoid the inherent risk, delay, and substantial expense that would arise from litigating the Parties' disputes to resolution.

Case 09-32303    Doc 2169    Filed 08/28/15    Entered 08/28/15 15:12:29    Desc Main
                    Document        Page 26 of 57

NOW, THEREFORE, the Parties, in consideration of the agreements herein and for other good and valuable consideration acknowledged by each of them to be satisfactory and adequate, and intending to be legally bound, do hereby mutually agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01.  Recitals.  The recitals set forth above are incorporated by reference and are explicitly made a part of this Settlement Agreement.

Section 1.02.  Definitions.  The following terms shall have the following meanings ascribed to them:

"Affiliated Group" has the meaning provided in the Recitals.

"Approval Order" has the meaning provided in Section 5.01.

"Auditor Litigation" means:  (a) the actions commenced by the Debtor and the Plan Trustee styled (i) *The Colonial BancGroup, Inc. v. PricewaterhouseCoopers LLP*, Case No. 2:11-cv-00746 (M.D. Ala.) and (ii) *The Colonial BancGroup, Inc., v. PricewaterhouseCoopers LLP,* Adv. Proc. No. 11-03063*SEALED* (Bankr. M.D. Ala.) and (b) the action commenced by the FDIC-Receiver styled *F.D.I.C. v. PricewaterhouseCoopers LLP*, Case No. 2:12-cv-00957 (M.D. Ala.).

"Bankruptcy Case" has the meaning provided in the Recitals.

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Court" has the meaning provided in the Recitals.

"Bank Tax Refunds" has the meaning provided in the Recitals.

"BB&T" has the meaning provided in the first paragraph of this Settlement Agreement.

"BB&T Avoidance Action" has the meaning provided in the Recitals.

"BB&T Professionals" means Bradley Arant Boult Cummings LLP and any partners, members, shareholders, or employees thereof.

"BB&T Proofs of Claim" has the meaning provided in the Recitals.

"BB&T RPS Action" has the meaning provided in the Recitals.

"CSLA" means the Commercial Shared-Loss Agreement between the FDIC-Receiver and BB&T that is attached as Exhibit 4.15B to the P&A Agreement.

"Debtor" has the meaning provided in the first paragraph of this Settlement Agreement.

5

"Debtor Professionals" means Balch & Bingham LLP; Campbell, Guin, Williams, Guy, and Gidiere, LLC. (and its predecessor firm Leitman, Siegal, Payne & Campbell, P.C.); Cohen, Pollock, Merlin & Small, P.C.; DiCarlo Caserta & McKeighan PLC (and its predecessor firm DiCarlo Caserta McKeighan & Phelps PLLC); Holmes Costin & Marcus; Moore Stephens Tiller, LLC; New Bridge Management, LLC; Parker, Hudson, Rainer & Dobbs, LLP; Quinn Emanuel Urquhart & Sullivan, LLP; Schulte Roth & Zabel LLP; and any partners, members, shareholders or employees of any of the foregoing.

"Debtor's Receivership Claim" has the meaning provided in the Recitals.

"Deposit Accounts" has the meaning provided in the Recitals.

"District Court" has the meaning provided in the Recitals.

"District Court Action" has the meaning provided in the Recitals.

"Effective Date" means the first business day on which all of the conditions in Section 6.01 have been satisfied.

"Excluded Tax Refunds" means (x) Bank Tax Refunds; (y) refunds of tax paid by the Debtor, Colonial Bank or their respective subsidiaries on their own behalf to any state or local taxing authority that does not allow for consolidated or combined tax filings by the members of an affiliated group; and (z) any refunds of tax received by BB&T after the Effective Date with respect to taxes paid by BB&T for or on behalf of any subsidiary of Colonial Bank for any period after August 14, 2009.

"FDIC-Corporate" has the meaning provided in the Recitals.

"FDIC-Receiver" has the meaning provided in the first paragraph of this Settlement Agreement.

"FDIC-Receiver Professionals" means DLA Piper LLP (US); Fritz & Hill LLC (and its predecessor firms Fritz & Hughes LLC and Fritz Hughes & Hill LLC); Miller & Martin PLLC; Mullin Hoard Brown LLP; and any partners, members, shareholders or employees of any of the foregoing.

"Final Order" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the applicable subject matter that has not been reversed, stayed, modified or amended and as to which (a) any right to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending, or (b) an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been filed and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or rehearing was sought or (ii) the time to appeal further or seek certiorari, review, reargument, stay or rehearing has expired and no such further appeal or petition for certiorari, review, reargument, stay or rehearing is pending, provided that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to 11 U.S.C. § 502(j), Rule 59 or Rule 60 of the Federal

6

Rules of Civil Procedure, or Bankruptcy Rules 9023 or 9024, may be filed with respect to such order, and provided, further, that the Parties can waive any part of this definition through an express written waiver that is duly executed on behalf of each of the Parties.

"IRS" has the meaning provided in the Recitals.

"Insurance Proceeds Holding Account" has the meaning provided in the Recitals.

"Lift-Stay Appeal" has the meaning provided in the Recitals.

"Party" or "Parties" have the meanings provided in the first paragraph of this Settlement Agreement.

"P&A Agreement" has the meaning provided in the Recitals.

"Peachtree Hills Loan" has the meaning provided in Section 2.05.

"Petition Date" has the meaning provided in the Recitals.

"Plan" means the Second Amended Chapter 11 Plan of Liquidation of The Colonial BancGroup, Inc., as amended.

"Plan Trustee" has the meaning provided in the Recitals.

"Purchase and Sale Agreement" has the meaning provided in Section 2.05.

"PwC" means PricewaterhouseCoopers LLP.

"REIT Preferred Securities" has the meaning provided in the Recitals.

"Stay Relief Motion" has the meaning provided in the Recitals.

"Tax Escrow Account" has the meaning provided in the Recitals.

"Tax Refunds" means all federal and state tax refunds recovered or recoverable (i) on behalf of the Affiliated Group based upon consolidated or combined tax returns for any tax year through and including December 31, 2008, regardless of the method by which such refunds are recovered, (ii) all federal and state tax refunds recovered or recoverable by the Affiliated Group or its members for the tax year ended December 31, 2009, regardless of whether such refunds are or may be recovered as the result of a consolidated or combined return or claim for refund, and (iii) all interest or earnings accrued with respect to the foregoing, either prior to payment of such refund by the relevant taxing authority or prior to disbursement from the Tax Escrow Account, provided that Tax Refunds shall not include Excluded Tax Refunds.

7

# ARTICLE II

## SETTLEMENT TRANSFERS

Section 2.01.  Deposit Accounts Settlement.

(a)  On the Effective Date, BB&T shall transfer to the Debtor $27,360,000.00 from the deposit balances held in the Deposit Accounts and BB&T shall retain for itself all of the remaining balances in the Deposit Accounts after deducting that payment.  Upon its receipt of the payment provided for in this subsection, the Debtor shall be deemed to have waived and released any further claims or rights with respect to the Deposit Accounts.  No later than five (5) days after the Effective Date, the parties shall file a stipulation of dismissal with prejudice of the Lift Stay Appeal.

(b)  As of the Effective Date, (i) the FDIC-Receiver shall be deemed to have waived any and all claims and rights with respect to the Deposit Accounts and the FDIC-Receiver's Stay Relief Motion shall be deemed to have been resolved, and (ii) BB&T shall be deemed to have waived any and all claims and rights with respect to the $27,360,000.00 deposit balance transferred pursuant to Section 2.01(a) to the Debtor.

(c)  The portion of the balance in the Deposit Accounts that BB&T shall retain pursuant to this section shall not constitute "Recoveries" as defined in the CSLA, and BB&T shall have no other obligation to pay or share such amounts with the FDIC-Receiver (or, to the extent applicable under the CSLA, FDIC-Corporate).

Section 2.02.  Disbursements from Tax Escrow Account.  On the Effective Date, the Debtor (x) shall cause the transfer to itself from the Tax Escrow Account of $28,800,000.00 and (y) shall cause the transfer to the FDIC-Receiver of the entire remaining balance in the Tax Escrow Account after deducting the foregoing payment to the Debtor.  (Based on the account statement for the period ended July 31, 2015, the payment to the FDIC-Receiver shall be at least $233,434,960.63, plus interest accruing after July 31, 2015 and additional deposits, if any, made after July 31, 2015.)  In accordance with the applicable order of the Bankruptcy Court, no disbursement shall be permitted from the Tax Escrow Account prior to the payments provided for in this section.  As soon as practicable after the payments provided for in this section have been made, the Debtor shall close the Tax Escrow Account.

Section 2.03.  Disbursement from Insurance Proceeds Holding Account.  On the Effective Date, Debtor shall cause the transfer of the entire balance on deposit in the Insurance Proceeds Holding Account to the FDIC-Receiver.  In accordance with the applicable order of the Bankruptcy Court, no disbursement shall be permitted from the Insurance Proceeds Holding Account prior to the payment provided for in this section.  As soon as practicable after the payment provided for in this section has been made, the Debtor shall close the Insurance Proceeds Holding Account.  On the Effective Date, the Debtor and the FDIC-Receiver and their respective counsel shall be deemed to have released any claim for attorneys' fees and expenses against the Insurance Proceeds Holding Account notwithstanding any principle of law or order of the Bankruptcy Court to the contrary.

Section 2.04.   <u>REIT Preferred Securities.</u>  Effective as of the Effective Date, (a) BB&T or its designee shall be deemed to be the sole legal, equitable, and beneficial owner of the REIT Preferred Securities for all purposes, (b) the Debtor shall be deemed to have transferred and assigned to Colonial Bank, effective as of August 11, 2009, any and all right, title and interest the Debtor may have or may ever have had in the REIT Preferred Securities; (c) the FDIC-Receiver shall be deemed to have sold, transferred and assigned to BB&T any and all right, title and interest Colonial Bank may have or may ever have had in the REIT Preferred Securities pursuant to the P&A Agreement; (d) any obligation of the Debtor to transfer the REIT Preferred Securities to Colonial Bank, including in accordance with the Exchange Agreement dated as of May 21, 2007 among the Debtor, Colonial Bank, and CBG Florida REIT Corp., shall be deemed to have been fully satisfied; (e) with respect to matters related to the REIT Preferred Securities, all third parties shall be authorized and directed to take instructions solely from BB&T, or its designee, with respect to those items as to which the owner of the REIT Preferred Securities is entitled to give instructions, and (f) any and all third parties shall be authorized and directed to take necessary, proper or advisable actions and all other actions reasonably requested or instructed by BB&T to record, reflect, transfer, vest, assign, convey, and maintain, as necessary, that BB&T is the sole legal, equitable, and beneficial owner of the REIT Preferred Securities, including, without limitation, by (i) causing the applicable trustees, registrars, paying agents, depositary, and transfer agents to amend their records to reflect a transfer of the REIT Preferred Securities to the Debtor and then to Colonial Bank, and to reflect BB&T as the sole legal, equitable, and beneficial owner of the REIT Preferred Securities; (ii) causing the trustees and boards of directors, as applicable, of CBG Florida REIT Corp. to take all necessary, proper and advisable action to reflect BB&T as the sole legal, equitable, and beneficial owner of the REIT Preferred Securities; and (iii) amending any agreements, articles, or declarations to reflect BB&T as the sole legal, equitable, and beneficial owner of the REIT Preferred Securities.

Section 2.05.   <u>Peachtree Hills Loan.</u>

(a)      Upon the Effective Date, the Debtor shall be deemed to have consented to, and the FDIC-Receiver shall be deemed not to have objected to, (i) the sale by Peachtree Hills Place LLC to TPA Acquisition I, LLC of the collateral securing a loan from Colonial Bank to Peachtree Hills Place LLC ("<u>Peachtree Hills Loan</u>") substantially in accordance with those parties' Purchase and Sale Agreement (Amended & Restated) dated as of July 17, 2015 (the "<u>Purchase and Sale Agreement</u>"), and (ii) the related settlement and dismissal of litigation with the borrowers and guarantors with respect to the Peachtree Hills Loan (including the participation interest of PNC Bank) substantially in accordance with the settlement agreement entered into as of July 16, 2015 among Peachtree Hills Place LLC, David L. Barnhart, Edwin Andrew Isakson, Kevin Warner Isakson, IBPHP Development LLC, and BB&T.

(b)      If the sale of collateral to TPA Acquisition I, LLC referred to in the preceding subsection is not consummated, the Debtor shall upon receipt of written notice to that effect from BB&T transfer and assign to BB&T or its designee, for no additional consideration, all of the Debtor's membership interest in Peachtree Hills Place LLC, <u>provided</u> that such written notice must be received by the Debtor no later than sixty (60) days after the date on which the sale to TPA Acquisition I, LLC failed to close as contemplated in the Purchase and Sale Agreement.

(c)     To the extent the proceeds obtained by BB&T as the result of the transactions contemplated in this Section 2.05 exceed the remaining book value of the Peachtree Hills Loan, then the excess over that book value shall constitute "Recoveries" within the meaning of the CSLA, provided that the FDIC-Receiver waives any further right under the CSLA to audit BB&T's books and records or to seek adjustment or recovery of any Shared-Loss Amount (as defined in the CSLA) solely with respect to the Peachtree Hills Loan.

## ARTICLE III

## TAX MATTERS

Section 3.01.  Ownership of Tax Refunds.  As of the Effective Date:  (a) the Debtor shall be deemed the owner of the amount to be disbursed to the Debtor from the Tax Escrow Account pursuant to Section 2.02; and (b) the FDIC-Receiver shall be deemed the owner of (i) the amount to be disbursed to the FDIC-Receiver from the Tax Escrow Account pursuant to Section 2.02, (ii) any Tax Refunds recovered after the Effective Date, and (iii) all federal, state or local tax refunds recovered or recoverable with respect to taxes paid by or on behalf of Colonial Bank or Colonial Bank's subsidiaries other than as members of the Affiliated Group, including without limitation the Bank Tax Refunds.  The Debtor and BB&T disclaim any ownership interest in the Bank Tax Refunds.

Section 3.02.  Tax Cooperation and Future Tax Refunds.

(a)     On and after the Effective Date, the Debtor and the FDIC-Receiver shall reasonably cooperate with respect to matters relating to Tax Refunds or arising from or concerning filings with any taxing authority by or on behalf of the Affiliated Group, if any such matters arise.  The Debtor and the FDIC-Receiver shall provide each other a reasonable opportunity to review and provide comments on any written submissions to any taxing authority concerning the tax matters addressed in this subsection (a) and shall promptly provide each other with copies of all such filings and of any other correspondence to or from any taxing authority concerning the matters addressed in this subsection (a).

(b)     On or as soon as reasonably practicable following the Effective Date, the Debtor shall execute such documents as may be reasonably requested by the FDIC-Receiver and are in accordance with this Settlement Agreement to notify the IRS and any relevant state taxing authority that any Tax Refunds recovered after the Effective Date shall be paid by the relevant taxing authority directly to the FDIC-Receiver.  The FDIC-Receiver shall be responsible for preparing the forms of such documents and shall bear the costs of preparing and filing such documents, to the extent such documents are reasonably requested.

(c)     If after the Effective Date the Debtor or its representative receives any Tax Refunds from a taxing authority then:  (i) the Debtor shall hold the Tax Refunds in trust for the FDIC-Receiver pending disbursement to the FDIC-Receiver; (ii) the Debtor shall promptly notify the FDIC-Receiver of the amount of such Tax Refunds that it has received and provide the FDIC-Receiver with copies of documentation received with respect to such Tax Refunds from any taxing authority; (iii) the Debtor shall endorse any check for payment to the benefit of the FDIC-Receiver by no later than ten (10) business days after the Debtor receives such a check;

10

(iv) for any Tax Refunds by wire transfer, the Debtor shall pay the full amount of such Tax Refunds to the FDIC-Receiver by wire transfer by no later than five (5) business days after receipt; and (v) the FDIC-Receiver shall be deemed the owner of such Tax Refunds pending delivery in accordance with this subsection and the Debtor shall have no right or authority to use such Tax Refunds.

Section 3.03.  <u>Post-Effective Date Assessments.</u>  If after the Effective Date the Affiliated Group receives any assessment of a deficiency from a taxing authority with respect to an Affiliated Group tax year prior to January 1, 2010, the Debtor and the FDIC-Receiver shall meet and confer in a good faith effort to determine how the deficiency should be addressed.  Each of those Parties expressly reserves, and does not release, any claim of recourse, contribution, reimbursement or indemnification it may have against the other Party with respect to any such assessment.

Section 3.04.  <u>Withdrawal of Tax Challenges To Debtor Disaffiliation Election.</u>  As soon as reasonably practicable after the Effective Date, the FDIC-Receiver shall notify the IRS that it withdraws its request to reconsider the Debtor's disaffiliation election dated on or around November 28, 2011 and to the IRS private letter ruling extending the common parent's time to make such an election pursuant to Treas. Reg. §§ 301.9100-1 and 301.9100-3.  After the Effective Date, the FDIC-Receiver shall refrain from initiating or pursuing any opposition, protest or other form of challenge to:  (a) the IRS private letter ruling extending the Debtor's time to make the disaffiliation election; (b) the Debtor's disaffiliation election dated on or around December 22, 2011; (c) the Debtor's amended federal returns for the 2009 tax year following its disaffiliation election; or (d) the Debtor's separate federal and state returns for tax years after December 31, 2009.

Section 3.05.  <u>Post-Effective Date Filings.</u>  As of the Effective Date, for any tax year on or after January 1, 2010 (a) the Debtor shall be solely responsible for filing tax returns and other filings required by any taxing authority with respect to the Debtor and its direct subsidiaries other than Colonial Bank and (b) the FDIC-Receiver shall be solely responsible for filing tax returns on behalf of Colonial Bank and its subsidiaries.

## ARTICLE IV

## RELEASES, DISMISSAL OF LITIGATION AND WITHDRAWAL OF CLAIMS

Section 4.01.  <u>Full and Final Satisfaction of Claims.</u>  Upon the Effective Date, the consideration to be received under this Settlement Agreement shall be deemed upon its receipt to constitute full and final satisfaction, settlement, and release of the claims, litigation, and disputes that are the subject hereof, including any matter that is the subject of the releases provided in <u>Section 4.04</u>.

Section 4.02.  <u>Stay and Dismissal of Litigation.</u>

(a)  No later than five (5) business days after this Settlement Agreement has been executed by each of the Parties, the Debtor, the FDIC-Receiver and BB&T shall take such actions as shall be necessary to obtain an immediate stay in contemplation of dismissal of all of the actions, proceedings or contested matters set forth in <u>Schedule 1</u>, <u>provided</u> that any

such stay shall be subject to immediate termination in the event that this Settlement Agreement is terminated as provided for in Section 6.02, with each Party to be restored to its litigation position immediately prior to entry of the order staying proceedings in those circumstances.

(b)    No later than five (5) business days after the Effective Date, each Party shall file in the relevant court a stipulation of dismissal with prejudice, pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure (or that Rule as incorporated in Rule 7041 of the Federal Rules of Bankruptcy Procedure), of any action, appeal or adversary proceeding listed in Schedule 1 in which that Party is the plaintiff, appellant, a counterclaim plaintiff, a cross-claim plaintiff or a third-party plaintiff. To the extent dismissal with prejudice of an action, appeal or proceeding cannot be obtained by stipulation, then the Party that initiated the action or proceeding shall be responsible for preparing and prosecuting a motion for its voluntary dismissal with prejudice. The moving party in any contested matter listed in Schedule 1 shall be responsible for preparing and filing such court papers as shall be required to obtain its withdrawal with prejudice. Each other Party that is named in any action, proceeding or contested matter listed in Schedule 1 shall reasonably cooperate in the preparation, execution and filing of the court papers necessary to obtain the dismissal or withdrawal with prejudice of that action, proceeding or contested matter; the FDIC-Receiver shall use its good faith efforts to obtain the consent of FDIC-Corporate to any such filings to the extent required.

Section 4.03.    Withdrawal of Claims.

(a)    FDIC-Receiver Proof of Claim.    Upon the Effective Date, the FDIC-Receiver Proof of Claim shall be deemed withdrawn with prejudice pursuant to Bankruptcy Rule 3006, and neither the FDIC-Receiver nor Colonial Bank will be entitled to any distribution, reserve, or other consideration on account of the FDIC-Receiver Proof of Claim or otherwise except as expressly provided by this Settlement Agreement.

(b)    BB&T Proofs of Claim.    Upon the Effective Date, the BB&T Proofs of Claim shall be deemed withdrawn with prejudice pursuant to Bankruptcy Rule 3006, and BB&T will not be entitled to any distribution, reserve, or other consideration on account of the FDIC-Receiver Proof of Claim or otherwise except as expressly provided by this Settlement Agreement.

(c)    Debtor's Receivership Claim.    Upon the Effective Date, the Debtor's Receivership Claim shall be deemed to have been withdrawn with prejudice. The Debtor will not be entitled to any distribution, reserve, or other consideration in the Colonial Bank receivership on account of the Debtor's Receivership Claim or otherwise except as expressly provided by this Settlement Agreement.

Section 4.04.    Releases.

(a)    Release by the Debtor.    Except as provided in Section 4.05, upon the Effective Date, the Debtor, for itself, its bankruptcy estate, its Plan Trustee, its successors and assigns, and any individual or entity claiming by, through or on behalf of any of them, hereby releases, waives and discharges any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, whether for tort, contract, violations of federal or

12

state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that any one of them has, had, or may have had (i) against Colonial Bank, Colonial Bank's direct or indirect subsidiaries, the FDIC-Receiver and BB&T, or their respective successors and assigns, that were or could have been asserted by the Debtor, its bankruptcy estate, or its Plan Trustee in the Debtor's Receivership Claim, in any of the litigation matters set forth in <u>Schedule 1</u>, or in any other claim, action or proceeding, based on, arising from or concerning any act taken, or fact in existence, on or before the Effective Date (even if damages arose after the Effective Date from such acts or facts in existence on or before the Effective Date), and (ii) against the BB&T Professionals and the FDIC-Receiver Professionals solely to the extent arising from or concerning any act taken, or omission to act, by such professionals in connection with the Bankruptcy Case or in connection with any of the litigation matters set forth in <u>Schedule 1</u>.

(b)     <u>Releases by the FDIC-Receiver</u>.  Except as provided in <u>Section 4.05</u>, upon the Effective Date, the FDIC-Receiver, for itself and Colonial Bank, and any individual or entity claiming by, through or on behalf of either of them, hereby releases, waives and discharges any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that any one of them has, had, or may have had (i) against the Debtor (as it existed prior to or after the Petition Date), its bankruptcy estate, the Plan Trustee, or their respective successors and assigns, that were or could have been asserted by the FDIC-Receiver in the FDIC-Receiver Proof of Claim, in any of the litigation matters set forth in <u>Schedule 1</u>, or in any other claim, action or proceeding based on, arising from or concerning any act taken, or fact in existence, on or before the Effective Date (even if damages arose after the Effective Date from such acts or facts in existence on or before the Effective Date); (ii) against BB&T arising from the filing against the FDIC-Receiver of any claim in the litigation matters set forth in <u>Schedule 1</u>; and (iii) against the BB&T Professionals and the Debtor Professionals solely to the extent arising from or concerning any act taken, or omission to act, by such professionals in connection with the Bankruptcy Case or in connection with any of the litigation matters set forth in <u>Schedule 1</u>.

(c)     <u>Release by BB&T</u>.  Except as provided in <u>Section 4.05</u>, upon the Effective Date, BB&T, for itself, its successors and assigns, and any individual or entity claiming by, through or on behalf of any of them, hereby releases, waives and discharges any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that any one of them has, had, or may have had (i) against the Debtor (as it existed prior to or after the Petition Date), its bankruptcy estate, the Plan Trustee, or their respective successors and assigns, that were or could have been asserted by BB&T in the BB&T Proofs of Claim, in any of the litigation matters set forth in <u>Schedule 1</u>, or in any other claim, action or proceeding, based on, arising from or concerning any act taken, or fact in existence, on or before the Effective Date (even if damages arose after the Effective Date from such acts or facts in existence on or before the Effective Date); (ii) against the FDIC-Receiver or FDIC-Corporate that were asserted by BB&T in any of

13

the litigation matters set forth in Schedule 1; and (iii) against the Debtor Professionals and the FDIC-Receiver Professionals solely to the extent arising from or concerning any act taken, or omission to act, by such professionals in connection with the Bankruptcy Case or in connection with any of the litigation matters set forth in Schedule 1.

Section 4.05. Preservation of Certain Claims. The Debtor, for itself and its bankruptcy estate, the FDIC-Receiver and BB&T each shall retain, to the extent held under applicable law, the following respective claims, rights or causes of action, which shall not be released, waived, satisfied, resolved or impaired by any provision in this Settlement Agreement:

(a)     Any claims, rights or causes of action against another Party for failure to comply with this Settlement Agreement or the Approval Order;

(b)     Any claim, rights or causes of action by the Debtor, its bankruptcy estate or the FDIC-Receiver against past or current directors, officers, employees, representatives, professionals employed by, or third party advisors of the Debtor, Colonial Bank or their respective subsidiaries (other than the Plan Trustee) based on, arising from or concerning any act taken, omission to act, or fact in existence, on or before the Petition Date (even if damages arose from such acts or facts in existence after the Petition Date), provided that this exclusion shall not affect the releases provided to the BB&T Professionals, the Debtor Professionals or the FDIC-Receiver Professionals to the extent such releases are set forth in Section 4.04.

(c)     Any claim, rights or causes of action against past or current directors, officers, employees, professionals or third party advisors of the Debtor, Colonial Bank or their respective subsidiaries for such directors', officers', employees', professionals' or third party advisors' obligations arising from any promissory note or other instrument of indebtedness, mortgage, deed-of-trust, security agreement or guaranty.

(d)     Any claim, right, cause of action or defense asserted, or that may be asserted, by the Debtor, its bankruptcy estate, the Plan Trustee or the FDIC-Receiver in connection with any claim, rights or causes of action against PwC, Crowe Horwath LLP or Crowe Chizek and Company LLC, including, without limitation, any claims, rights or causes of action asserted in the Auditor Litigation and any dispute between the Debtor and the FDIC-Receiver concerning ownership of such claim, right or cause of action asserted therein. For the avoidance of doubt, this Settlement Agreement is not intended to effect a resolution of, or limitation upon, the rights, claims, causes of action or defenses of the Debtor, its bankruptcy estate, the Plan Trustee or the FDIC-Receiver with respect to the Auditor Litigation, and such matters shall continue as if this Settlement Agreement did not exist. Nothing in this Settlement Agreement is intended or shall be construed to bar, discharge, settle, release, waive or otherwise prejudice or constitute an accord and satisfaction, in whole or in part, of any claim, right, cause of action or defense the Debtor, its bankruptcy estate, the Plan Trustee or the FDIC-Receiver has or may have in the Auditor Litigation.

(e)     Except for claims asserted by BB&T against the FDIC-Receiver in any action or proceeding listed in Schedule 1 (which are being resolved and released by this Settlement Agreement) or as otherwise expressly provided in this Settlement Agreement, the FDIC-Receiver and BB&T each shall retain all claims, rights and causes of action each has or

14

may have under the P&A Agreement, the CSLA, the Single Family Shared-Loss Agreement or any related agreement(s).

Section 4.06. <u>Limited Covenant Not to Sue PwC.</u> Solely to the extent any claim, right, or cause of action arises from or is based on any act, or omission to act, by PwC after the Petition Date, based on tax advice and related tax services provided by PwC to the Debtor or its bankruptcy estate after the Petition Date, the FDIC-Receiver, for itself and Colonial Bank, covenants not to sue PwC; <u>provided</u> that for the avoidance of doubt this limited covenant not to sue does not apply to any claim, right, or cause of action that has been asserted by the FDIC-Receiver in the Auditor Litigation.

## ARTICLE V

## APPROVAL OF SETTLEMENT

Section 5.01. <u>Bankruptcy Court Approval</u>. The Debtor shall have sole responsibility for preparing and prosecuting a motion seeking an order from the Bankruptcy Court, which shall be in form satisfactory to all Parties (the "<u>Approval Order</u>"), approving the Settlement, the Settlement Agreement and all of the actions and transactions contemplated in this Settlement Agreement pursuant to Bankruptcy Rule 9019 and any other applicable provision of the Bankruptcy Code (the "<u>Rule 9019 Motion</u>"). The Rule 9019 Motion shall be filed reasonably promptly after the execution of this Settlement Agreement. An Approval Order substantially in the form attached to this Settlement Agreement as **Exhibit A** will be satisfactory to all Parties. The Debtor shall provide the FDIC-Receiver and BB&T with a reasonable opportunity to review and provide comment upon drafts of the Rule 9019 Motion and of any filings to be made by the Debtor in support of such a motion, and the Debtor shall reasonably consider comments provided thereon by the FDIC-Receiver, BB&T or their respective counsel. The FDIC-Receiver and BB&T shall cooperate in, and support, the Rule 9019 Motion and the Parties shall take all steps reasonably necessary to obtain the Approval Order. To the extent there is any inconsistency between this Settlement Agreement and any submission made in connection with the Rule 9019 Motion, the terms of this Settlement Agreement shall govern.

## ARTICLE VI

## CONDITIONS TO EFFECTIVENESS; TERMINATION

Section 6.01. <u>Conditions to Effectiveness.</u> The provisions of this Settlement Agreement are subject to prior satisfaction of the following conditions:

(a) The board of directors of the Federal Deposit Insurance Corporation shall have approved the Settlement (as of the date of execution of this Settlement Agreement, this condition has been satisfied);

(b) Each Party shall have duly executed this Settlement Agreement and delivered its counterpart in accordance with <u>Section 7.09</u>.

(c) The Approval Order shall have become a Final Order.

15

Section 6.02. <u>Termination.</u> This Settlement Agreement may be terminated by any Party, in its sole discretion, by delivering written notice to each of the Parties if the Conditions to Effectiveness have not been satisfied on or before January 31, 2016, or if the Approval Order is reversed or materially modified by a Final Order to the detriment of the Party delivering a termination notice as the result of an appeal, request for reconsideration or other motion or action.

Section 6.03. <u>Effect of Termination.</u> Except as expressly provided in this Settlement Agreement, if this Settlement Agreement is terminated pursuant to <u>Section 6.02</u>: (i) the Settlement Agreement shall become null and void and shall be deemed of no force and effect, with no liability on the part of any Party (or of any director, officer, employee, attorney, agent, or other representative of any Party) for breach of this Settlement Agreement, (ii) no Party shall have any obligations to any other Party arising out of this Settlement Agreement, (iii) no claims, rights or causes of action described in <u>Section 4.04</u> shall be deemed released, resolved, waived, satisfied or discharged, in whole or in part, and (iv) the Parties shall be restored to their respective litigation positions as of the date of execution of the Settlement Agreement.

**ARTICLE VII**

**<u>MISCELLANEOUS</u>**

Section 7.01. <u>Representation and Warranties.</u> Each Party represents and warrants to the others that, as of the date of this Settlement Agreement, (i) such Party has received independent legal advice with respect to the advisability of executing and delivering this Settlement Agreement or has determined not to seek such counsel; (ii) such Party has been authorized to execute this Settlement Agreement; (iii) this Settlement Agreement has been duly and validly executed by such Party and, subject to the conditions set forth in this Settlement Agreement, constitutes a legal, valid and binding contract, enforceable against such Party in accordance with its terms; (iv) such Party is acting freely and voluntarily in executing and delivering this Settlement Agreement, has not acted under coercion or duress, and understands the effects of this Settlement Agreement; and (v) such Party has not transferred, assigned or granted, has not purported to assign, transfer or grant, and will not assign, transfer or grant any of the claims, rights, demands or causes of action, released by this Settlement Agreement.

Section 7.02. <u>Notices.</u> All notices and other communications required or permitted under this Settlement Agreement shall be in writing and if mailed by prepaid first class mail, certified mail, return receipt requested, shall be deemed to have been received on the earlier of the dates shown in the receipt or three (3) business days after the postmark date thereof. In addition, notices hereunder may be delivered by overnight mail, hand, or email in which event the notice shall be deemed effective when delivered. All notices and other communication of this Settlement Agreement shall be given to the parties hereto at the following addresses:

16

|     |                 |                                       |
| --- | --------------- | ------------------------------------- |
| (a) | Debtor:         | The Colonial BancGroup, Inc.          |
|     |                 | Attn: Kevin O'Halloran, as Plan Trustee |
|     |                 | 1720 Peachtree Street, Suite 425      |
|     |                 | Atlanta, GA 30309                     |
|     |                 | kevinnm@bellsouth.net                 |
|     | with a copy to: | C. Edward Dobbs, Esq.                 |
|     |                 | Parker Hudson Rainer & Dobbs LLP      |
|     |                 | 1500 Marquis Two Tower                |
|     |                 | 285 Peachtree Center Ave. NE          |
|     |                 | Atlanta, GA 30303                     |
|     |                 | ced@phrd.com                          |
| (b) | FDIC-Receiver:  | Jeffrey E. Schmitt, Esq.              |
|     |                 | Federal Deposit Insurance Corporation |
|     |                 | 3501 Fairfax Drive, Room D-7064       |
|     |                 | Arlington, VA 22226                   |
|     |                 | jschmitt@fdic.gov                     |
|     | with a copy to: | John J. Clarke, Jr., Esq.             |
|     |                 | DLA Piper LLP (US)                    |
|     |                 | 1250 Avenue of the Americas           |
|     |                 | New York, NY 10020                    |
|     |                 | john.clarke@dlapiper.com              |
| (c) | BB&T:           | Russell S. Bogue III, Esq.            |
|     |                 | 271 17th Street, Suite 900            |
|     |                 | Suite 900                             |
|     |                 | Atlanta, GA 30363                     |
|     |                 | RBogue@BBandT.com                     |
|     | with a copy to: | N. Christian Glenos, Esq.             |
|     |                 | Bradley Arant Boult Cummings, LLP     |
|     |                 | One Federal Place                     |
|     |                 | 1819 Fifth Avenue North               |
|     |                 | Birmingham, AL 35203                  |
|     |                 | cglenos@babc.com                      |

Section 7.03.  <u>Entire Agreement.</u>  This Settlement Agreement constitutes the entire agreement among the Parties and supersedes all prior negotiations, representations, promises or warranties (oral or otherwise) made by any Party with respect to the subject matter hereof.  No Party has entered into this Settlement Agreement in reliance on any other Party's prior representation, promise or warranty (oral or otherwise) except for those that may be expressly set forth herein.

Section 7.04.  <u>No Admission.</u>  This Settlement Agreement constitutes a compromise of the Parties' disputes.  Nothing contained herein shall constitute or be deemed to be an admission

17

or concession by any Party as to any matter, including with respect to the truth of any fact alleged by any Party against the other or the validity of any claim or cause of action that has been or could be asserted in any litigation involving the Debtor, the FDIC-Receiver, or BB&T. Except in a dispute seeking enforcement of this Settlement Agreement, nothing in this Settlement Agreement or any of its terms, or any negotiations or proceedings connected with this Settlement Agreement, or any documents or statements referred to therein, shall be admissible in evidence against any Party in any litigation, matter or proceeding between any of the Parties or which either the Debtor or the FDIC-Receiver may bring against present or former directors, officers, employees, professionals, or third party advisors of the Debtor, Colonial Bank or their respective subsidiaries, subject in all respects to the releases provided hereunder.

Section 7.05.  No Limitation on Jurisdiction.  No provision of this Settlement Agreement shall be construed or interpreted as limiting, waiving, releasing or compromising the jurisdiction and authority of the FDIC-Receiver, FDIC-Corporate or any other state or federal regulatory agency, in the exercise of its supervisory or regulatory authority, or to diminish its ability to institute administrative or judicial enforcement proceedings seeking removal, prohibition or any other administrative or judicial enforcement action.  The FDIC-Receiver expressly reserves all other jurisdictional arguments, including arguments concerning the proper forum for resolution of the Parties' underlying disputes in the event that this Settlement Agreement is terminated or fails to become effective.  The Parties agree to meet and confer in good faith in an effort to resolve any dispute arising under this Settlement Agreement before commencing any legal action or proceeding with respect to such dispute.

Section 7.06.  No Third Party Beneficiary.  Except as expressly provided in the releases set forth in Section 4.04, nothing in this Settlement Agreement, express or implied, is intended to, or shall be construed to, confer upon any person other than the Parties and their respective successors and assigns, any right, remedy or claim under or by reason of this Settlement Agreement, which is and shall be for the sole and exclusive benefit of the Parties.

Section 7.07.  Governing Law.  This Settlement Agreement shall be governed by and construed in accordance with the internal laws of the State of Alabama and applicable federal law.

Section 7.08.  Headings.  The headings of the sections, paragraphs and subsections of this Settlement Agreement are inserted for convenience only and do not in any way limit or modify its terms.

Section 7.09.  Counterparts.  This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original copy of this Settlement Agreement and all of which, when taken together, shall constitute one and the same Settlement Agreement. Copies of executed counterparts transmitted by telecopy, PDF images, or other method of electronic transmission shall be considered original executed counterparts, provided receipt of copies of such counterparts is confirmed.

Section 7.10.  Amendments.  This Settlement Agreement may not be modified or amended without the written agreement of all of the Parties and, to the extent necessary,

18

additional approval by the Bankruptcy Court and the board of directors of the Federal Deposit Insurance Corporation.

Section 7.11.  <u>Costs.</u>  Each Party shall bear its own fees and expenses, including attorney and accounting fees, incurred in connection with the matters that are the subject of this Settlement Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Section 7.12. <u>No Presumption.</u>  This Settlement Agreement is the product of negotiations between the Parties and their respective counsel.  There shall be no presumption that any ambiguity in this Settlement Agreement is to be construed against any one of the Parties.

THE COLONIAL BANCGROUP, INC.

By: _____
        Name:  Kevin O'Halloran
        Title:  Plan Trustee


FEDERAL DEPOSIT INSURANCE CORPORATION,
  as Receiver for Colonial Bank


By: _____
        Name:
        Title:


BRANCH BANKING & TRUST COMPANY


By: _____
        Name:
        Title:

Section 7.12. <u>No Presumption.</u>   This Settlement Agreement is the product of negotiations between the Parties and their respective counsel.  There shall be no presumption that any ambiguity in this Settlement Agreement is to be construed against any one of the Parties.

THE COLONIAL BANCGROUP, INC.

By: _____
      Name:  Kevin O'Halloran
      Title:  Plan Trustee


FEDERAL DEPOSIT INSURANCE CORPORATION,
  as Receiver for Colonial Bank


By: _____
      Name:  DAVID COOLEY
      Title:  ASSOCIATE DIRECTOR


BRANCH BANKING & TRUST COMPANY


By: _____
      Name:
      Title:

20

Section 7.12. <u>No Presumption.</u>  This Settlement Agreement is the product of negotiations between the Parties and their respective counsel. There shall be no presumption that any ambiguity in this Settlement Agreement is to be construed against any one of the Parties.

THE COLONIAL BANCGROUP, INC.

By: _____
      Name:  Kevin O'Halloran
      Title:  Plan Trustee

FEDERAL DEPOSIT INSURANCE CORPORATION,
  as Receiver for Colonial Bank

By: _____
      Name:
      Title:

BRANCH BANKING & TRUST COMPANY

By: _____
      Name:  T. Brent Hicks
      Title:  Risk Executive - Finance & Capital Markets

20

## Schedule 1
## (Litigation Matters)

*The Colonial BancGroup, Inc. v. F.D.I.C.*,
    2:10-cv-00198-MHT-DHW (M.D. Ala.)

*In re: The Colonial BancGroup, Inc.*,
    2:10-cv-00409-MHT-DHW (M.D. Ala.)

*The Colonial BancGroup, Inc. v. F.D.I.C.*,
    2:10-cv-00410-MHT-WC (M.D. Ala.)
    (originally Adv. Proc. No. 10-03018 (Bankr. M.D. Ala.))

*The Colonial BancGroup, Inc. v. F.D.I.C.*,
    2:10-cv-00411-MHT-WC (M.D. Ala.)
    (originally Adv. Proc. No. 09-03087 (Bankr. M.D. Ala.))

*F.D.I.C. v. The Colonial BancGroup, Inc.*,
    2:10-cv-00877-MHT-WC (M.D. Ala.) (appeal)

*F.D.I.C. v. The Colonial BancGroup, Inc.*,
    2:11-cv-00133-MHT-WC (M.D. Ala.) (appeal)

*F.D.I.C. v. The Colonial BancGroup, Inc.*,
    2:12-cv-00081-MHT (M.D. Ala.) (appeal)

*The Colonial BancGroup, Inc. v. Branch Banking & Trust Co. v. F.D.I.C.*,
    2:11-cv-00824-MHT-DHW (M.D. Ala.)
    (originally Adv. Proc. No. 11-03026 (Bankr. M.D. Ala.))

*The Colonial BancGroup, Inc. v. Branch Banking and Trust Co.*,
    Adv. Proc. No. 11-03022 (Bankr. M.D. Ala.)

*The Colonial BancGroup, Inc. v. Branch Banking and Trust Co.*,
    2:11-mc-03579-MHT (M.D. Ala.)
    (motion to withdraw the reference of Adv. Proc. No. 11-03022 (Bankr. M.D. Ala.))

**Exhibit A**
**(Form of Approval Order)**

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **THE COLONIAL BANCGROUP, INC.,** | **Case No. 09-32303 (DHW)** |
| **Debtor.** | |

### ORDER GRANTING DEBTOR'S MOTION PURSUANT TO BANKRUPTCY RULE 9019 TO APPROVE SETTLEMENT AGREEMENT AMONG FDIC-RECEIVER, DEBTOR AND BRANCH BANKING AND TRUST COMPANY

This matter is before the Court upon the motion (the "Motion") of The Colonial BancGroup, Inc. (the "Debtor") for entry of an order pursuant to Section 105 of Title 11 of the United States Code (the "Bankruptcy Code"), Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9007-1 of the Local Rules of this Court, approving the Settlement Agreement among the Debtor, the Federal Deposit Insurance Corporation, as receiver for Colonial Bank (the "FDIC-Receiver"), and Branch Banking and Trust Company ("BB&T" and together with the Debtor and the FDIC-Receiver, the "Settling

Parties").[1] The Court having jurisdiction to consider the Motion and the relief requested in the Motion; due notice of the Motion having been provided, and it appearing that no other or further notice need be provided, and all interested persons having had a full and fair opportunity to object to the proposed Settlement Agreement with respect to any and all of the Settling Parties; and based upon the Motion and all of the proceedings before this Court; and no objection to the Motion having been raised; and the Court having determined (i) that the Settlement Agreement is an exercise of the Debtor's sound business judgment, (ii) that the terms and conditions of the Settlement Agreement are fair, equitable and in the best interests of the Debtor, its creditors, its bankruptcy estate, and all parties in interest and within the range of reasonableness for the matters addressed in the Settlement Agreement, (iii) that the settlement reflected in the Settlement Agreement is the result of good faith, arms' length negotiations among the Settling Parties; and (iv) that the settlement reflected in the Settlement Agreement is not the result of any collusion, unfair dealing, wrongful conduct or fraud by any Settling Party; and after due deliberation and sufficient cause appearing therefor, it is hereby:

**ORDERED** that the Motion is granted; and it is further

**ORDERED** that the Settlement Agreement, and each and every term thereof, including, without limitation, the releases contained therein and the withdrawal or dismissal with prejudice of the Settled Matters, are approved, and authority is granted for the performance of all of the obligations thereunder; and it is further

**ORDERED** that the Debtor is authorized and directed to enter into the Settlement Agreement, to execute and deliver any other agreements, instruments or documents reasonably necessary or appropriate to implement and fully perform under the Settlement Agreement, and to

---

[1] Capitalized terms used, but not otherwise defined, herein shall have the meaning ascribed to them in the Motion.

Case 09-32303   Doc 2169   Filed 08/28/15   Entered 08/28/15 15:12:29   Desc Main
Document      Page 48 of 57

take all actions reasonably necessary or appropriate to effectuate the Settlement Agreement and to perform its obligations under the Settlement Agreement in all respects, including, without limitation, to make or cause to be made the transfers from the Deposit Account, the Tax Escrow Account and the Insurance Proceeds Holding Account and, after such transfers have been made, to close the Tax Escrow Account and the Insurance Proceeds Holding Account, as set forth in the Settlement Agreement; and it is further

**ORDERED** that (a) the Debtor shall be deemed to have transferred and assigned to Colonial Bank, effective as of August 11, 2009, any and all right, title and interest the Debtor may have or may ever have had in the REIT Preferred Securities and such property is not deemed to have been, or be, a part of the Debtor's bankruptcy estate; and (b) the FDIC-Receiver shall be deemed to have sold, transferred and assigned to BB&T, effective as of August 14, 2009, any and all right, title and interest of Colonial Bank in the REIT Preferred Securities pursuant to the Purchase and Assumption Agreement dated as of August 14, 2009 between and among the FDIC-Receiver, the FDIC-Corporate and BB&T; and it is further

**ORDERED** that the failure to specifically include or reference any particular provision of the Settlement Agreement in this Order shall not affect, diminish or impair the effectiveness of such provision, it being the intent of the Court that the Settlement Agreement be authorized and approved in its entirety; and it is further

**ORDERED** that the Settled Matters are finally resolved in accordance with the Settlement Agreement and that the FDIC-Receiver and BB&T shall have no Claims in this case against the Debtor, except for the Claims expressly preserved and set forth in the Settlement Agreement; and it is further

**ORDERED** that the automatic stay imposed by Section 362 of the Bankruptcy Code shall be modified to the extent necessary to effectuate the terms of the Settlement Agreement; and it is further

**ORDERED** that this Order shall be immediately effective, and the stay otherwise provided for in Rule 6004(h) of the Federal Rules of Bankruptcy Procedure, to the extent applicable, is hereby waived; and it is further

**ORDERED** that the Court shall retain jurisdiction to hear and determine all matters arising from the entry of this Order and the implementation of the Settlement Agreement.

###END OF ORDER###

EAST\101415919.12

4

**Exhibit B**

**Proposed Order**

(Copy attached)

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| In re: | Chapter 11 |
| THE COLONIAL BANCGROUP, INC., | Case No. 09-32303 (DHW) |
| Debtor. | |

## ORDER GRANTING DEBTOR'S MOTION PURSUANT TO BANKRUPTCY RULE 9019 TO APPROVE SETTLEMENT AGREEMENT AMONG FDIC-RECEIVER, DEBTOR AND BRANCH BANKING AND TRUST COMPANY

This matter is before the Court upon the motion (the "Motion") of The Colonial BancGroup, Inc. (the "Debtor") for entry of an order pursuant to Section 105 of Title 11 of the United States Code (the "Bankruptcy Code"), Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9007-1 of the Local Rules of this Court, approving the Settlement Agreement among the Debtor, the Federal Deposit Insurance Corporation, as receiver for Colonial Bank (the "FDIC-Receiver"), and Branch Banking and Trust Company ("BB&T" and together with the Debtor and the FDIC-Receiver, the "Settling

Parties").[4] The Court having jurisdiction to consider the Motion and the relief requested in the Motion; due notice of the Motion having been provided, and it appearing that no other or further notice need be provided, and all interested persons having had a full and fair opportunity to object to the proposed Settlement Agreement with respect to any and all of the Settling Parties; and based upon the Motion and all of the proceedings before this Court; and no objection to the Motion having been raised; and the Court having determined (i) that the Settlement Agreement is an exercise of the Debtor's sound business judgment, (ii) that the terms and conditions of the Settlement Agreement are fair, equitable and in the best interests of the Debtor, its creditors, its bankruptcy estate, and all parties in interest and within the range of reasonableness for the matters addressed in the Settlement Agreement, (iii) that the settlement reflected in the Settlement Agreement is the result of good faith, arms' length negotiations among the Settling Parties; and (iv) that the settlement reflected in the Settlement Agreement is not the result of any collusion, unfair dealing, wrongful conduct or fraud by any Settling Party; and after due deliberation and sufficient cause appearing therefor, it is hereby:

**ORDERED** that the Motion is granted; and it is further

**ORDERED** that the Settlement Agreement, and each and every term thereof, including, without limitation, the releases contained therein and the withdrawal or dismissal with prejudice of the Litigation Matters, are approved, and authority is granted for the performance of all of the obligations thereunder; and it is further

**ORDERED** that the Debtor is authorized and directed to enter into the Settlement Agreement, to execute and deliver any other agreements, instruments or documents reasonably necessary or appropriate to implement and fully perform under the Settlement Agreement, and to

---

[4] Capitalized terms used, but not otherwise defined, herein shall have the meaning ascribed to them in the Motion.

take all actions reasonably necessary or appropriate to effectuate the Settlement Agreement and to perform its obligations under the Settlement Agreement in all respects, including, without limitation, to make or cause to be made the transfers from the Deposit Account, the Tax Escrow Account and the Insurance Proceeds Holding Account and, after such transfers have been made, to close the Tax Escrow Account and the Insurance Proceeds Holding Account, as set forth in the Settlement Agreement; and it is further

**ORDERED** that (a) the Debtor shall be deemed to have transferred and assigned to Colonial Bank, effective as of August 11, 2009, any and all right, title and interest the Debtor may have or may ever have had in the REIT Preferred Securities and such property is not deemed to have been, or be, a part of the Debtor's bankruptcy estate; and (b) the FDIC-Receiver shall be deemed to have sold, transferred and assigned to BB&T, effective as of August 14, 2009, any and all right, title and interest of Colonial Bank in the REIT Preferred Securities pursuant to the Purchase and Assumption Agreement dated as of August 14, 2009 between and among the FDIC-Receiver, the FDIC-Corporate and BB&T; and it is further

**ORDERED** that the failure to specifically include or reference any particular provision of the Settlement Agreement in this Order shall not affect, diminish or impair the effectiveness of such provision, it being the intent of the Court that the Settlement Agreement be authorized and approved in its entirety; and it is further

**ORDERED** that the Litigation Matters are finally resolved in accordance with the Settlement Agreement and that the FDIC-Receiver and BB&T shall have no Claims in this case against the Debtor, except for the Claims expressly preserved and set forth in the Settlement Agreement; and it is further

**ORDERED** that the automatic stay imposed by Section 362 of the Bankruptcy Code shall be modified to the extent necessary to effectuate the terms of the Settlement Agreement; and it is further

**ORDERED** that this Order shall be immediately effective, and the stay otherwise provided for in Rule 6004(h) of the Federal Rules of Bankruptcy Procedure, to the extent applicable, is hereby waived; and it is further

**ORDERED** that the Court shall retain jurisdiction to hear and determine all matters arising from the entry of this Order and the implementation of the Settlement Agreement.

###END OF ORDER###

## Exhibit C

## Docket Citations Related to Claims Being Settled

(1) *The Colonial BancGroup, Inc. v. F.D.I.C.*, 2:10-cv-00198-MHT-DHW (M.D. Ala.)
----The Debtor's Amended Complaint [Docket No. 20]
----The FDIC-Receiver's First Amended Answer [Docket No. 37]
----The FDIC-Receiver's Motion for Partial Summary Judgment, the Debtor's response and the related briefing by the parties [Docket Nos. 44-46, 59, & 61]
----The FDIC-Receiver's Motion for Summary Judgment, the Debtor's response and related briefing [Docket Nos. 109-115, 129, 130, 131 & 138]
----The Debtor's Motion for Summary Judgment regarding Ownership of REIT Preferred Securities, the FDIC-Receiver's response and related briefing [Docket Nos. 116, 117, 120, 127, 128, 139, 194 & 197]
----The Debtor's Motion for Summary Judgment regarding Ownership of Tax Refunds, the FDIC-Receiver's response and related briefing [Docket Nos. 118, 119, 121, 122, 127, 128, 139, 151, 155, 157, 161, 163, 171-74, 180-93, 195, 196, 198-201 & 204]

(2) *In re The Colonial BancGroup, Inc.*, 2:10-cv-00409-MHT-DHW (M.D. Ala.)
----The Debtor's amended and restated objection to the FDIC-Receiver's proof of claim [Docket No. 12]
----The Debtor's Motion for Summary Judgment regarding Ownership of REIT Preferred Securities, the FDIC-Receiver's response and related briefing [Docket Nos. 70, 71, 74, 81, 82 & 88]
----The Debtor's Motion for Summary Judgment regarding Ownership of Tax Refunds, the FDIC-Receiver's response and related briefing [Docket Nos. 72, 73, 75, 76, 81, 82, 88, 97-100, 104, 106, 109-113 & 118-40]

(3) *The Colonial BancGroup, Inc. v. F.D.I.C.*, 2:10-cv-00410-MHT-WC (M.D. Ala.) (originally Adv. Proc. No. 10-03018 (Bankr. M.D. Ala.))
----The Debtor's Amended Complaint [Docket No. 14]
----The FDIC-Receiver's Motion to Dismiss, the Debtor's response and related briefing [Docket Nos. 21, 22, 28 & 34]

(4) *The Colonial BancGroup, Inc. v. F.D.I.C.*, 2:10-cv-00411-MHT-WC (M.D. Ala.) (originally Adv. Proc. No. 09-03087 (Bankr. M.D. Ala.))
----The Debtor's Complaint [Docket No. 2]
----The FDIC-Receiver's Motion to Dismiss [Docket No. 2]

(5) *F.D.I.C. v. The Colonial BancGroup, Inc.*, 2:10-cv-00877-MHT-WC (M.D. Ala.) (appeal)
----The FDIC-Receiver's brief, the Debtor's response, BB&T's response, and response of the Official Committee of Unsecured Creditors [Docket Nos. 21, 22, 32-34, 39, 45, 47, 49, 61, 64 & 65]

(6) *F.D.I.C. v. The Colonial BancGroup, Inc.*, 2:11-cv-00133-MHT-WC (M.D. Ala.) (appeal)
----The FDIC-Receiver's brief, the Debtor's and the Committee's response, BB&T's response, and related briefing [Docket Nos. 15, 20, 21, 25, 30, 36 & 37]
----The Court's ruling in favor of the FDIC-Receiver [Docket No. 58]
----The Debtor's request for a rehearing, the FDIC-Receiver's response and related briefing [Docket Nos. 60, 61, 72, 73, 75 & 76]

(7) *F.D.I.C. v. The Colonial BancGroup, Inc.*, 2:12-cv-00081-MHT (M.D. Ala.) (appeal)
----The FDIC-Receiver's statement of the issue on appeal and related documents [Docket No. 2]

(8) *The Colonial BancGroup, Inc. v. Branch Banking & Trust Co. v. F.D.I.C.*, 2:11-cv-00824-MHT-DHW (M.D. Ala.) (originally Adv. Proc. No. 11-03026 (Bankr. M.D. Ala.))
----The Debtor's Complaint [Docket No. 1]
----BB&T's Amended Answer [Docket No. 1]
----BB&T's Third-Party Complaint against the FDIC-Receiver and The Federal Deposit Insurance Corporation in its corporate capacity [Docket No. 1]
----The Debtor's Motion for Summary Judgment as to Count I Regarding Ownership of REIT Preferred Securities, BB&T's Motion for Summary Judgment and related briefing [Docket Nos. 26-29, 32-34, 40, 52, 53 & 61]

(9) *The Colonial BancGroup, Inc. v. Branch Banking & Trust Co.*, Adv. Proc. No. 11-03022 (Bankr. M.D. Ala.)
----The Debtor's Complaint [Docket No. 1]
----BB&T's Answer and First Amendment to Answer [Docket Nos. 9 & 26]
----BB&T's Third Party Complaint against the FDIC-Receiver and The Federal Deposit Insurance Corporation in its corporate capacity [Docket No. 16]

*See also The Colonial BancGroup, Inc. v. Branch Banking & Trust Co.*, 2:11-mc-03579-MHT (M.D. Ala.) (motion to withdraw the reference of Adv. Proc. No. 11-03022 (Bankr. M.D. Ala.))